Geoffrey S. Sheldon, Bar No. 185560
gsheldon@lcwlegal.com
Joung H. Yim, Bar No. 216136
jyim@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045
Telephone: 310.981.2000
Facsimile: 310.337.0837

Attorneys for Defendant ALEX DIAZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

STEVE HOBB,

Plaintiff,

v.

CITY OF BANNING, a public and/or municipal corporation; BANNING POLICE DEPARTMENT, a public agency and/or municipal corporation; ALEX DIAZ, individually and as Police Chief; DON PETERSON, individually; and DOES 1 THROUGH 10,

Defendants.

Case No.: 5:16-cv-01352 AB (JCx)

Complaint Filed: June 23, 2016
FAC Filed: August 8, 2016

**DEFENDANT ALEX DIAZ'S APPENDIX OF EVIDENCE IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES (VOLUME 2 OF 4 – EXHIBIT 8)**

Trial Date: January 16, 2018
Final Pretrial Conf.: December 18, 2017
Discovery Cut-Off: August 18, 2017

Date: September 22, 2017
Time: 10:00 a.m.
Courtroom: 7B

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

# EXHIBIT 8

# ADMINISTRATIVE INVESTIGATION

# PREPARED FOR THE BANNING POLICE DEPARTMENT

**IA # 15-04**

**November 27, 2015**

DAVID FLUTTS
RCS INVESTIGATIONS AND CONSULTING LLC
P.O. BOX 29798
ANAHEIM HILLS, CALIFORNIA 92809-9798
WWW.RCSINVESTIGATIONS.COM
714-779-2300

# TABLE OF CONTENTS

SECTION 1..........SUMMARY

SECTION 2..........CONCLUSIONS AND FINDINGS

SECTION 3..........EXHIBITS

Exhibit A......................Banning Police Department Policy Manual sections

Exhibit B......................Nicole Yadon e-mail complaint

Exhibit C......................Debora Monroe-Heaps e-mail complaint

Exhibit D......................Corporal Hobb Internal Affairs Investigation notice

Exhibit E......................Call log and shift bulletin for July 30, 2015

Exhibit F......................Debora Monroe-Heaps interview transcript

Exhibit G......................Vivian Amezquita interview transcript

Exhibit H......................Gloria Davis interview transcript

Exhibit I...................... Sharleen Lampkin interview transcript

Exhibit J......................Nicole Yadon interview transcript

Exhibit K......................Corporal Hobb interview transcript

# SECTION 1

# INTRODUCTION AND SUMMARY

# SECTION 1

## INTRODUCTION

RCS Investigations and Consulting was retained by the City of Banning to conduct an administrative investigation regarding allegations of potential misconduct against Banning Police Corporal Steve Hobb. In August 2015, the Banning Police Department received two complaints via e-mail regarding conduct by Hobb which occurred on July 30, 2015. Briefing training was scheduled for that day and representatives from the Riverside County Sexual Assault Response Team [SART] arrived and provided sexual assault response training to officers from the Banning Police Department.

The complaints alleged that Corporal Hobb was rude, discourteous and unprofessional to the SART Team members who provided the briefing training.

Based on the complaints received, RCS Investigators deemed Corporal Hobb a subject employee and identified the following possible allegations of misconduct:

**Allegation "1"**– It was alleged that Corporal Hobb was discourteous to SART Team members, who provided training at the Banning Police Department on July 30, 2015.

**Allegation "2"** - It was alleged that Corporal Hobb demonstrated unbecoming conduct and poorly represented the Banning Police Department during his interaction with SART Team members, who provided training on July 30, 2015.

RCS Investigations and Consulting was retained to conduct a neutral and fair investigation on behalf of the City of Banning regarding allegations of misconduct against Corporal Hobb. Various documents were reviewed including policy sections, personnel complaints, call logs and patrol shift bulletins. Each of the documents and other relevant material was reviewed and interviews were conducted as part of the work product of the investigation.

## SUMMARY

The Banning Police Department has policies in place which were established in-part, as an equitable and uniform procedure for dealing with personnel matters. RCS Investigators reviewed and considered the following ***Banning Police Department Policy Manual*** sections as part of the work product of this investigation:

### 338.3.2 CONDUCT

(k) Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department.

**338.3.5 PERFORMANCE**

(aa) Any other on-duty or off-duty conduct which any employee knows or reasonably should know is unbecoming a member of the Department or which is contrary to good order, efficiency or morale, or which tends to reflect unfavorably upon the Department or its members.

The Banning Police Department Policy Manual sections are included as **Exhibit "A"** in this report.

RCS Investigators reviewed a complaint sent via e-mail to Chief Alex Diaz by Nicole Yadon, S.A.R.T. Program Coordinator for Rancho Springs Medical Center. The e-mail was sent on August 3, 2015 and contained the following verbatim information:

*Good morning, I am the SART Coordinator out of Rancho Springs Medical Center in Murrieta. Myself along with other members of our team from Riverside County Regional Medical Center and Riverside Area Rape Crisis were scheduled to provide annual SART training on Thursday July 30 at 1600. Upon arrival we were not so pleasantly greeted by an officer named "Hobb". He was extremely rude and seemed somewhat annoyed attempting to argue with us stating that we had just provided this training a few months ago. Our team provides this training once a year, during the summer months. After we informed him that this training was set up by you, he proceeded to roll his eyes, huff and very rudely direct us down the stairs. All of our team felt extremely uncomfortable during this presentation due to his demeanor and body posture while we were presenting. Once finished, we were told to let ourselves out, and had to roam through halls until we found the exit. I am sure that this is not the way your department should be represented. I felt that it was important you were aware of this, as our goal is to build relationships with Law Enforcement for the benefit of our victims. If you have any questions, please feel free to contact me via cell. Thank you for your time. Nicole D. Yadon*

A copy of the complaint is included as **Exhibit "B"** in this report.

RCS Investigators reviewed a complaint sent via e-mail to Chief Diaz by Debora Monroe Heaps, Director of Programs for the Riverside Area Rape Crisis Center. The e-mail was sent on August12, 2015 and contained the following verbatim information:

*Chief Diaz,*

*The Western Riverside County Sexual Assault Team annually schedules our briefing trainings. We provide training to all Law Enforcement agencies in our service area-south to Temecula, west to Corona, east to Cabazon and surrounding areas. It is coordinated by the Riverside Area Rape Crisis Center and the advocacy program, the forensic nurse from Riverside County Regional Medical Center, and a district attorney take time to provide training in assisting first responders in sexual assault response. We were grateful that you scheduled us and know you felt it is important to your Team to have this training. The professionals that provide the training are taking professional time to meet the needs of this critical collaboration.*

*On July 30, 2015 at 4PM our advocate Vivian A, forensic nurses from both County and Rancho Springs hospitals and a District Attorney were prepared for training. They were greeted in an unprofessional manner by an Officer Hobb. He complained that they had just received the training and didn't have time for "this". Our team was very intimidated by his dismissive and rude manners even through the presentation that he postured as without value and inconvenient.*

*I received a call from the Manager of the Forensic Nurses Gloria Davis at Riverside County Medical Center after her nurse complained about his treatment of the team. Our advocate also came to my office and let me know about the poor way the SART Team was received by him.*

*It is our desire to form strong professional collaborations with all of the Law Enforcement agencies. The sexual assault field is changing very rapidly at this time and our desire is for victims, our communities and professionals to have the most updated and accurate information possible to investigate and gather evidence for these horrible crimes. Thank you for your attention in this matter. Sincerely Debora Heaps.*

A copy of the complaint is included as **Exhibit "C"** in this report.

RCS Investigators reviewed an Internal Affairs Investigation notice provided to Corporal Hobb on August 21, 2015, as well as notices on September 30, 2015 and October 9, 2015.

Copies of the notices are included as **Exhibit "D"** in this report.

RCS Investigators reviewed a partial call log for July 30, 2015 and noted 10 incidents between 4:00 and 5:00 P.M. RCS Investigators reviewed a partial shift bulletin for July 30, 2015. The bulletin described significant incidents which occurred during the patrol shift. The bulletin listed only two significant incidents between 4:00 and 5:00 p.m.; a mental disorder call at 4:03 p.m. [Incident # 1507300080] and a residential alarm call at 4:36 p.m. [Incident # 1507300088]. From the listed documents, RCS Investigators were unable to determine the number, if any; calls that were pending during the time SART Team members interacted with Corporal Hobb and conducted briefing training.

Copies of the documents are included as **Exhibit "E"** in this report.

**Interview of Debora Monroe-Heaps**

On September 17, 2015, RCS Investigator Flutts conducted a telephone interview with Debora Monroe Heaps. The interview was recorded and a transcript is included as **Exhibit "F"** in this report. The following is a synopsis of the interview.

Debora Heaps is the Director of Programs for the Riverside Area Rape Crisis Center and when asked to describe her job duties she replied, "We provide services to sexual assault victims and their family members. So we provide hot lining, advocacy, in-person counseling for court groups, accompaniment for victims of crimes specifically sexual assault to all age groups and also we provide primary prevention education to all ages as well, young people all the way to the elderly or seniors, and I oversee both of those departments."

Debora Heaps continued, "I also oversee our volunteer program and I have a responsibility to also network with the community at the administrative level. I also write grants for funding reasons. We're a non-profit 501(c) (3) and I also monitor those grants." Heaps was asked if a training session was scheduled at the Banning Police Department on July 30, 2015, and she said there was. Heaps was asked how her organization was involved with that training program and she replied, "The Riverside Area Rape Crisis Center has been providing briefing training to first responders at all law enforcement

agencies in our service area which includes west to Corona, south to Temecula, and east to Cabazon, Banning Police Department being one of the agencies that we provide advocacy for sexual assault victims to."

Debora Heaps was asked if that training was provided to a number of law enforcement agencies and she replied, "Yes, we provide annual training unless there is a station that needs additional training, usually if they've had a big influx in staffing that they want more training, and we spearhead that for as long as I can remember when I got here, we provide these services and that's been, I've been working here over 20 years. So it was our responsibility to contact the law enforcement agencies and to schedule these trainings."

Debora Heaps continued, "Then after a while, after I'd been doing that for quite some while, I know the procedures of the forensic examiners, the nurses, I understand the district attorney, we network very well with him, and also law enforcement, we understand what their role is in providing services to sexual assault victims. I thought it would be wonderful if we could get the forensic nurses and the district attorney also to come to the briefing trainings so we had all four disciplines under the same roof... That particular day, a district attorney could not make it."

Debora Heaps was asked if her organization coordinated with all the presenters for the July 30, 2015, session scheduled at the Banning Police Department and she replied, "Yes, we first contact all the agencies and schedule with them so, Chief Diaz coordinated with us and we scheduled through him and then we in turn let the other team members know cause we call ourselves a SART team, a Sexual Assault Response Team, and so we coordinated with the rest of the team to let them know the day of the training."

Debora Heaps was asked if she personally set up the training session at the Banning Police Department with Chief Diaz or if someone under her direction. She replied, "It was someone under my direction. It was either Vivian Amezquita or it was Rachel McDonald, one of our Community Education Presenters. It is their responsibility to get these scheduled. They are Community Education Presenters." Heaps was asked who was present at the Banning Police Department session and she said, "Representing our agency, it was Vivian Amezquita."

Debora Heaps was asked if Nicole Yadon was present and she replied, "Yes, Nicole Yadon is the SART Manager for Rancho Springs Medical Center." Heaps indicated Sharleen Lampkin, a SART forensic nurse at the Riverside County Regional Medical Center in Moreno Valley was also present. Heaps was asked if she became aware there were problems with the training session at some point and she stated she did.

Debora Heaps stated she became aware of the problems when she received a call from the SART Manager of Riverside County Regional Medical Center, Gloria Davis. Heaps acknowledged Davis was one of the forensic nurses at Riverside County Regional Medical Center in Moreno Valley. Heaps was asked what Davis told her and she replied, "She said that the night before at Banning that, Sharleen had called her and told her that the team had been treated very disrespectfully and was not received well by the Banning Police Department."

Debora Heaps continued, "She also said that perhaps we have to rethink this and maybe make a video so that maybe they can just push it in for training reasons. She said that this was a big sacrifice to her team to do these trainings in person every day for many months, for two months we'd been doing them, it takes a lot of time and if the law enforcement agencies are not getting anything out of them or don't want us there or not appreciative, that we may have to rethink it."

Debora Heaps was asked in her experience, if the training sessions had been presented in person for a number of years and she said they had been conducted in that manner for the past 20 years. Heaps was asked if Gloria Davis provided names of any employees at the Banning Police Department and she said it was Officer Hobbs. Heaps was asked if Davis provided any details as to what type of behavior Hobbs was engaged in and she replied, "Sharleen said to her, who, Gloria is Sharleen's manager, that he was dismissive, that he was rude, that he rolled his eyes at them, that he said they didn't have time for this stuff, that they had already had a training recently in this and they didn't need it and it was an inconvenience to them."

Debora Heaps was asked if the training session was completed and she replied, "Yes, he did in a very, like I have to do it type way, disrespectful way. He took them back to the briefing room and they conducted the training and it was reported to me through Gloria Davis that he just rolled his eyes, he postured disrespectfully and was hostile.". Heaps was asked if there was a certain time of year when the training took place and she said it was during the summer. Heaps was asked to estimate how many agencies her organization served and she said 12 agencies in the western Riverside County area.

Debora Heaps was asked if she indicated earlier the person from the District Attorney's office was not present during the training session on July 30, 2015, and she replied, "Yes, they don't always make a hundred percent of them. It is on a voluntary basis that their DA's come up and it depends on their day of, in trials and on that particular day, we don't get a hundred percent participation with them but they do the best they can. I had already been to Banning Police Department personally for one of the briefing trainings and a DA was there that day but not this particular day."

Debora Heaps was asked when that training occurred and she replied, "I'm trying to see when that one was on my calendar. We did not end up conducting it or completing it because there had been a report of a bomb in a mailbox and they had to go out and respond to that. It is a very small agency so we totally understood that it took their officers out there to protect the community. It was earlier in the month I believe... the date that I went there was July the 27th, the Monday before this happened."

Debora Heaps continued, "To answer your question, yes, Nicole is normally at all the briefing trainings representing the agency. Once in a while she may have one of her forensic nurses do it. Sharleen is one of the SART nurses and all of the SART nurses and the manager take turns from Riverside County Regional Medical Center." Heaps acknowledged there was a group that conducted the training on a regular basis and added, "All the nurses know about it at both hospitals. Our agency of course is well aware of it, the district attorney is well aware of it, and then of course Rancho Springs is well aware of it. We've been doing this many years."

Debora Heaps was asked if the training session scheduled for Banning on July 27, 2015, was cancelled due to an incident they had in the City and she said it was. Heaps was asked if she became aware at some point that Nicole Yadon sent an e-mail complaint to the police department after the training

session on July 30, 2015 and she replied, "Yes, the very following week, she cc'd me an e-mail that she sent to Chief Diaz." Heaps was asked if the e-mail was dated Monday, August 3, 2015, and she said, "That sounds right, she reacted a lot faster than I did."

Debora Heaps was asked if she spoke to anyone other than Gloria Davis from the time she found out about the issues and the e-mail she was copied on from Nicole Yadon. She replied, "Yes, on Monday morning Vivian, my staff person who was there came into my office on Monday morning." Heaps was asked if Vivian Amezquita described in essence what she said earlier in the interview and she indicated it was the same information Davis conveyed to her. Heaps was asked if similar problems occurred at other police departments in the past and she said they had not.

Deborah Heaps added, "I mean once in a while they'll say we weren't expecting you or we forgot or we have had an unusual, we were talking about it, an unusual amount of cancellations this time that when we get there and there's an emergency. We had someone that was jumping off the bridge over the 215, we had a police officer that was attacked, we had an officer related shooting this year, and then we also had the bomb scare up at Banning. So they, they get rescheduled."

Deborah Heaps was asked the typical length of the training session and she replied, "They can last anywhere from, they average about a half an hour. They could end a little bit earlier than that or some of them, there's so many questions and participation that it can go almost to an hour. But that's excessive. I think an hour, not excessive but that's on the longer end." Heaps was asked aside from receiving Nicole Yadon's e-mail, if she ever spoke to her regarding the incident and she said she did.

Debora Heaps was asked when her conversation with Nicole Yadon occurred and she replied, "I think we ended up speaking shortly after I got her e-mail. I also talked to her when I sent my e-mail and received an immediate response from Chief Diaz. I felt that would be helpful for her too cause she had not heard, I don't think she had heard from them or she had just heard from them and, so this is Chief Diaz, I wanted to let her know that I had received a response from him. I sent that on the 13th I believe. So I must've talked to her on the 14th."

Debora Heaps was asked if her e-mail was dated Wednesday, August 12, 2015, and she said it was. Heaps was asked if Nicole Yadon provided details about the actual event during that conversation and if they were consistent with what she already heard. She replied, "Well I had already read her e-mail and when I read her e-mail, she sent it at 8:22, my staff person had already been in my office. So at 8:00 in the morning, so, and I did not, I stayed quiet because I wanted my staff person to be able to say it in her words and not to be influenced by anything that I had heard or that, from Gloria on Friday. Then I opened up my, she'd come immediately into my office after 8:00 a.m. so then when I opened up my e-mails, there had been an e-mail from Nicole at 8:22 a.m."

Debora Heaps continued, "When I opened up my e-mail, then I saw that she in fact had sent an e-mail to Banning Police Department." Heaps confirmed she personally spoke to Vivian Amezquita, Nicole Yadon and Gloria Davis regarding the actual incident. Heaps was asked if she spoke with anyone else and she said she heard about Sharleen Lampkin's experience through her supervisor. Heaps was asked if she indicated earlier that she sent an e-mail to Chief Diaz on August 12, 2015, and she confirmed she did.

Debora Heaps was asked if she spoke to Chief Diaz at some point after sending the e-mail and she said she did. Heaps was asked to describe that conversation and she replied, "It was quite some time after the e-mail. It wasn't, it was a little while after it… I sent my e-mail directly to him; I didn't know who Nicole sent her e-mail to. I acted on my own and on August the 12th, because I had wanted to think about it for a while and know what I wanted to say."

Debora Heaps continued, "We cherish our partnerships and our collaborations with law enforcement and we don't, I personally did not want to look like, to sound like we were complaining. I try and do this in a very professional way. We respect the responsibility of law enforcement and what they do to protect our community and how they help survivors of sexual assault and I wanted to make sure and word this correctly. So it took me some time to put my thoughts together on this but I did send it on August the 12th at 5:08 p.m. He responded immediately, he responded in two minutes."

Debora Heaps acknowledged there was a delay with respect to Nicole Yadon receiving a response from Chief Diaz, because her e-mail was sent to his assistant and she was out of town. Heaps indicated Diaz called her shortly after she sent the e-mail and they had a good conversation. Heaps added, "He had already received my e-mail but he wanted to again personally speak with me and apologize about what happened and he wanted me to know that he was not okay with this type of behavior and that it would not be tolerated."

Debora Heaps continued, "He felt really bad because he said he had just left before they got there and that he felt bad that he had not greeted them. I said well, I'm a supervisor too and when I leave my office the staff has a responsibility to be professional when I'm not here. I also said that I remember having a conversation about I'm, it was unfortunate he, that the professionals were treated this way but I'm glad that it was the professionals and not the community because this could've been very problematic in the community as well, if he treats people like this."

Debora Heaps further stated, "I basically said that this could be a liability for someone to treat professionals and the community like this, and that's why I shared it with him to protect his agency." Heaps was asked if she had anything further to add and she replied, "Well, I just told him also, I did not know his rank, I did not know Officer Hobb's rank and I did share with him that I didn't know that but that if he was a man of seniority or rank, that his behavior and posturing on these types of trainings might influence the less experienced officers and that it could discredit the training."

Debora Heaps added, "He was very, very grateful that we come. He said they were a small agency and cannot afford a lot of outside training, so they are always grateful that we come. There is a ton of new information in regards to sexual assault right now. It is changing very quickly and it's imperative that those who are responding to this crime or these types of crimes, know what to do and how to give the community good information… he was very grateful that we come out and we update them on a regular basis."

**Interview of Vivian Amezquita**

On September 23, 2015, RCS Investigator Flutts conducted an interview with Vivian Amezquita. The interview was recorded and a transcript is included as **Exhibit "G"** in this report. The following is a synopsis of the interview.

Vivian Amezquita is the Community Educator for the Riverside Area Rape Crisis Center. Amezquita was asked if she responded to various agencies and other locations to provide presentations and she said she did. Amezquita was asked if she participated in a training session at the Banning Police Department on July 30, 2015, and she stated she did. Amezquita said she and two others conducted the training.

Vivian Amezquita was asked who assisted her with the training and she replied, "Nicole and Sharleen. Nicole is from the Rancho Springs Medical Center; she's a nurse there and a SART nurse. And Sharleen is from RUMC here in Moreno Valley, she's also a SART nurse from there." Amezquita confirmed she was referring to Riverside University Medical Center. Amezquita was asked if she provided that type of training to other law enforcement agencies in the past and she said she did. Amezquita was asked if she ever presented the training for the Banning Police Department and she said she did last year. Amezquita confirmed she typically provided training to agencies on a yearly basis.

Vivian Amezquita was asked to describe what occurred when she arrived to conduct the training at the Banning Police Department that day and she replied, "We arrived, we let the person at the front desk know that we were there and they said they were gonna let someone know to come out and get us. The officer came out and he asked us what we were doing there and we explained that we were there for our SART training, our yearly SART training. He said well, we just had some nurses here like a couple months ago doing this training."

Vivian Amezquita continued, "We said well, that's not possible. Nicole was responding this time, she said that's not possible because we are the only nurses that provide this training and we were here last year, it's a yearly thing. And he said no, there were nurses here not too long ago and we already had this training. He asked us for our other contact, which was my position to respond, that it was Alex Diaz. He said oh, that's sergeant, rolled his eyes and said, come inside." Amezquita confirmed the officer questioned her as to who set up the training and who the contact person at the police department was. Vivian Amezquita was asked if her organization was responsible for setting up the training and she replied, "Yes, yes, we do. We do all the calling, and I looked in my phone and that's Alex Diaz and he said, oh, that's sergeant, rolled his eyes, said alright, come inside." Amezquita was asked if she recalled the name of the officer she spoke to that day and she said she did not. Amezquita was asked if she knew what the officer was referring to when he made the comment "that's a sergeant" when she mentioned the name Alex Diaz and she said she did not. Amezquita was asked if she knew Diaz' position at the police department and she said he was the Chief of Police.

Vivian Amezquita was asked to describe the officer's demeanor at that point and she replied, "I think the thing that mostly made us realize that there was something wrong was he was mad that we were there, and I think we always get those questions; what are you doing here; what can I help you with. But he was upset at the fact that we were there and that's what caused the awkwardness, the tension, and when we walked into the room, you could feel the tension. So we thought maybe the problem was with everybody and that we were there and so it was really hard to present."

Vivian Amezquita confirmed the officer who initially greeted them in the lobby was obviously angry. When asked to describe what she based that opinion on Amezquita replied, "By the way that he was saying things. He said well, what are you guys doing here, it wasn't just like a normal, well how can I help you, you know. It was more of like, well the attitude. It was the attitude that he was giving and

that's when we all kind of looked at each other and we, we noticed that he was mad. I was nervous trying to find the name of the contact because I thought maybe we did make a mistake and we weren't supposed to be there. But I had it on my calendar, it said Alex Diaz, that's my contact, and that's when he let us in."

Vivian Amezquita was asked if she knew how far in advance the training session had been scheduled and she replied, "We schedule it from one to two months ahead of time. So it should've been at least a month." Amezquita was asked if the officer escorted them inside the building and she said they were escorted to the briefing room. Amezquita was asked where the briefing room was located in relation to the lobby and she explained, "You walk through the door and there's a couple turns that you have to make and then it's the briefing room. When you get out, it's a lot more complicated. We were lost when we got out but when going in, he led us in, so it's a lot easier to follow him in."

Vivian Amezquita was asked how many officers and or employees were present at the time and she said, "I believe there were about four or five in there." Amezquita acknowledged everyone was wearing a police uniform. Amezquita was asked what time the training was scheduled to begin and she said 4:00 p.m. Amezquita said she felt obvious tension when she walked into the room and when asked what she meant by that she replied, "When we walked in they looked at us but would not make eye contact and it looked like, it felt like they were kind of already maybe had known that we were coming and it was just this very awkward thing that we were walking into and no one wanted to give us eye contact."

Vivian Amezquita continued, "We weren't greeted by anybody, we usually are, maybe we're just used to that. We weren't greeted by anybody. And the reason is because later on more officers walked in, there was one woman who did not have a uniform, she was just dressed professionally, and their attitude was a lot different to the people who were already in there. They were the only ones who asked us questions, who actually acknowledged us or whatever it was, but the people who were already in there did not at any point." Amezquita stated the training began approximately five minutes prior to the other people walking into the briefing room.

Vivian Amezquita confirmed the female who entered the room was not in uniform and the males were all in uniform. Amezquita acknowledged eventually there were seven or eight people attending the training. When asked if it would be accurate to say she did not receive the same feeling from the last group of employees that entered the room as she did from the initial group, Amezqita said that was true. Amezquita was asked the length of the training and she said, "I'm gonna say about 15 minutes."

Vivian Amezquita was asked if 15 minutes was the typical length for the training and she replied, "Yes, sometimes when it's all three of us going, it might go max 20 to 30 minutes if there's questions. But this one, 15, about 15 minutes, yes." Amezquita was asked if the people who joined the group had questions and she said, "Yes, the woman was the one that mostly, without the uniform, she was the one that mostly acknowledged us and asked us questions and clarified and that was it." Amezquita was asked if she had the impression the female was a police officer and she replied, "I wasn't sure what she was. I wanted to ask but I didn't, I don't know what she was."

Vivian Amezquita was asked if she, Nicole Yadon and Sharleen Lampkin all presented segments of the training and she replied, "Yes, I go first and then the nurses go after me and they pick who goes first. I believe it was Sharleen who might've gone first before Nicole." Amezquita confirmed Yadon and

Lampkin presented their portion of the training as well and the session was over in about 15 minutes. Amezquita was asked what occurred at that point and she replied, "Well during our presentation, it was the normal thing other than the same officer who had let us in, he was sitting at the front, very serious, kind of just leaning back in his chair."

Vivian Amezquita continued, "The only thing that I did notice different from our usual is Sharleen stuttering not really able to do any, much of her presentation. I don't think she said everything that she was supposed to say and she did clarify on the way out that she didn't say everything she was supposed to say because of her tension or her feeling that she just was not comfortable. She was... intimidated was the word that she used." Amezquita confirmed Sharleen Lampkin told her afterward that she felt intimidated.

Vivian Amezquita was asked if it was obvious that Sharleen Lampkin was having trouble with her presentation and she replied, "She was stuttering and wasn't really saying much. She wasn't, she was kind of looking down at her paper, didn't want to make eye contact, yes." Amezquita was asked if she attended the training sessions with Lampkin in the past and she said she did. Amezquita was asked if she had ever seen Lampkin act like that in the past and she said she never did and that it was out of character for her.

Vivian Amezquita was asked if the initial officer they spoke to made any comments during the 15 minutes of the actual training session and she said he did not. Amezquita was asked if she indicated earlier they became lost leaving the building and she replied, "We got lost because apparently there are two different ways that you can get out, but one way you actually are at a dead end. So we had to find our way and go right back around and try to find our way out. Usually we're led out so we're very used to being, just escorted out of the room and everything, but we weren't this time so we kind of found our way out eventually." Amezquita was asked if they were typically escorted out of the building after the training was completed at other police agencies and she said they were always escorted out.

Vivian Amezquita was asked what occurred when the training session was completed and she replied, "Some of them said thank you. The woman said thank you and we just said all right, thank you, and since nobody stood up to lead us out, we just led ourselves out. We didn't even ask." Amezquita was asked if the initial officer was seated at the front of the room and facing them during the training session and she confirmed he was. Amezquita was asked if she faced the group when she gave her presentation and she said she did.

Vivian Amezquita was asked if the initial officer said anything when the training was completed and she replied, "I don't remember him saying anything, no." Amezquita was asked if anyone made any effort to escort her anywhere and she said no one did. Amezquita was asked if anyone made any statements as if they were going to escort her out, and she no one did.

Vivian Amezquita was asked her opinion regarding the manner in which she was treated that day and she said, "I just thought it was very disrespectful because we had already agreed with someone above this officer that we would be coming into their agency to present. I just thought that if he did have an issue, which is fine, if you have an issue, that's great, but that he should've gone to his superior and not directly to us because we were already in agreement. I just think that the way that he treated us was not fair because we were there as guests and we voluntarily, and giving this training to them for free. I just

think that he could've done it differently if he had an issue and could've gone to his superior instead of us."

Vivian Amezquita acknowledged the initial officer appeared angry that day. When asked how else she would describe him she replied, "He just seemed very frustrated and I didn't think that maybe we were the only issue, just seemed like he was just frustrated. But he seemed angry at our presence." Amezquita was asked if she, Nicole Yadon and Sharleen Lampkin discussed what occurred after the training session ended that day and she said, "Yes, all the way until we got outside to the parking area."

Vivian Amezquita continued, "Nicole was the first one that brought it up, like, what was that. And that's how we all started discussing and Sharleen said that she didn't finish or say everything. That she kind of forgot all the stuff that she was supposed to say. I said yeah, I was very, just quick to the point because I just wanted to get out of there. And Nicole said the same thing, but Nicole made the point and said I'm going to file a complaint because that was not okay." Amezquita was asked if they all drove separately to the location and she said they did.

Vivian Amezquita was asked where she drove from that day and she said, "I think I might've come from here, the office.". Amezquita confirmed Nicole Yadon's office was in Murrieta and Sharleen Lampkin's office was in Moreno Valley. Amezquita was asked if she reported the incident to anyone and she replied, "Yes, first my Executive Director, Larry McAdara, as soon as I came into the office." Amezquita was asked if she reported the incident to McAdara that same day and she said, "No, that was actually the next day because I went home after that since our shift is over. So it was the next day."

Vivian Amezquita confirmed the training was on a Thursday and she reported it to Larry McAdara the following morning. Amezquita was asked how McAdara responded and she replied, "I told him everything. He of course was disappointed and he approved of the fact that Nicole was going to file a complaint because Nicole had gotten the badge name and everything, or his name and he said that he supported that and that we were gonna have to talk to our Director of Programs, which is Debora Heaps, when she got back."

Vivian Amezquita continued, "Butt he was upset because again, we all go through the effort of making this training and of course he's gonna be upset when we're disrespected." Amezquita was asked if she eventually spoke to the Director of Programs, Debora Heaps and she said, "Yes, I believe that must've been Monday because she was gone that weekend." Amezquita was asked to describe that conversation and she replied, "She had already gotten a call from, I believe she is a director over at the Moreno Valley Hospital, so it's Sharleen's supervisor."

Vivian Amezquita continued, "So she had already gotten a call from Gloria Davis, is her name, and so she already knew some of the details, but I let her know my side and what I had seen and she said yeah, we're gonna be filing a complaint and she agreed to send an e-mail to Alex Diaz." Amezquita was asked if it was her understanding that Debora Heaps eventually sent a complaint and she replied, "Yes, she read me the e-mail before sending it because we were collaborating on that, so I could give her the details of what I had experienced."

Vivian Amezquita was asked if Debora Heaps collaborated with her to ensure she had the correct information and she acknowledged she did. Amezquita was asked if she ever actually saw the e-mail

and she said Heaps shared it with her. Amezquita was asked if she had any further involvement after the conversations with Heaps and she said she did not. Amezquita was asked if she ever spoke to Nicole Yadon or Sharleen Lampkin about that and she said she did not. Amezquita acknowledged Heaps informed her that Yadon also sent a complaint. Amezquita was asked if Sharleen Lampkin's supervisor, Gloria Davis, contacted Heaps that weekend and she said she did. Amezquita was asked if she had anything further to add and she said she did not.

**Interview of Gloria Davis**

On September 24, 2015, RCS Investigator Flutts conducted an interview with Gloria Davis. The interview was recorded and a transcript is included as **Exhibit "H"** in this report. The following is a synopsis of the interview.

Gloria Davis is employed with the Riverside Regional Medical Center in Moreno Valley as the Program Manager of the Sexual Assault Response Team. Davis was asked to describe her job duties and she replied, "I manage the program that is responsible for the care of sexual assault victims and child sexual assault." Davis was asked if she supervised a number of SART nurses as part of her duties and she said she did.

Gloria Davis was asked if she became aware of a training session scheduled at the Banning Police Department on July 30, 2015 and she replied, "I did. I had requested that my day nurse, Sharleen Lampkin, do the briefing. She called me immediately after she left Banning and was very upset at how they were received at the briefing." Davis was asked if Lampkin was the only staff member of hers that was involved in the training and she said she was.

Gloria Davis was asked if she knew the other individuals involved in the presentation and she replied, "I believe that Nicole Yadon was present and there was also Vivian Amezquita from Riverside Area Rape Crisis." Davis was asked if she became aware there was a problem at some point after the training and she said, "It was immediately after the training, she called me on her way home and said she was upset at how they were received."

Gloria Davis confirmed she was referring to Sharleen Lampkin. When asked what she specifically said to her Davis replied, "She said when they arrived at the training the officer that came out asked what they, when they arrived at the training, they called them, usually they'll call and somebody will come out and escort them into the police briefing. Well, an officer came out and he said what are you guys here for? One of them said what they were there for the briefing, and he said we don't have any briefing scheduled today; I don't know what you guys are doing here. I'm kind of paraphrasing what she said."

Gloria Davis continued, "As I understand it, Vivian pulled out her phone and she says, well, let me check and see who scheduled the appointment. And she looked on her phone and she said this was scheduled by the Chief. And the officer rolled his eyes and he said this is a big waste of our time and I don't know why, you guys were just here. You were here just like a few weeks or months ago. I don't know why we have to go through this again. Vivian, I think it was Vivian, said oh, no, we only come out once a year, we haven't been out here recently."

Gloria Davis further stated, "Apparently he argued that point and then he said okay, I'll take you in and just get it over with as quickly as you can. He kept looking at his watch and rolling his eyes and muttering under his voice, this is just the biggest waste of time." Davis was asked if she received all of that information from Sharleen Lampkin right after the training and she replied, "Yes. Right after the training because she was upset."

Gloria Davis added, "So then she said when they went into the training that he sat down, he folded his arms, he kept rolling his eyes and looking at his watch and he made her very uncomfortable. So she said the other police officers that were there were very respectful, very nice, but it was that one particular officer, she told me his name, I wanna say Hobbs or something like that, I can't remember offhand. But she said he kept, just looking at his watch, rolling his eyes and just made the whole atmosphere very uncomfortable and she said I felt very unwelcome there."

Gloria Davis was asked what she did after receiving the information from Sharleen Lampkin and she replied, "I'm trying to remember what day of the week it was, I think it was like a Thursday or Friday, it was towards the end of the week, and I really didn't address it until the following week. I was originally gonna call the Chief myself and then I thought, I'm not the person that puts these trainings on; I should go to the person that arranges them. So I called Debora Heaps, the director of the Riverside Area Rape Crisis, and I relayed my nurse's comments and sentiment and I basically told Debora, for me to send my nurse out there, I said it's very hard for scheduling because we have a very, very small department."

Gloria Davis continued, "This is not easy to send people to briefings. So to send my nurse to a briefing where she's not welcome and the information is not welcome and they don't want her there, I said if that's the case, then I'm not going to send another employee to Banning. I said you can schedule the briefings, you can do them yourself, but I'm not wasting my resources at a facility that's not welcome to hear what we're there to show to them."

Gloria Davis was asked if she sent Sharleen Lampkin as well as other employees to those training sessions in the past and she replied, "Well, yes, we do it once a year and we send, I send, I go most of the time but since Sharleen lives out in Banning, I said why don't you do the briefing and then from there you can go home. So most of the time we do send a nurse, either myself or one of my staff to a briefing and we go to all of the law enforcement agencies that do this briefing once a year." Davis was asked if she personally experienced any problems similar to what Lampkin described and she said she did not.

Gloria Davis was asked if she ever heard any of her staff members describe problems similar to that in the past and she replied, "No, this is the first time we've ever had an issue at a briefing. Most of the time they're very welcomed to hear the information because there's new officers that are constantly coming in and out of the department and the whole purpose of the briefing is to help them know what to do and what the process is to follow with sexual assault victims." Davis was asked if she discussed the incident with anyone other than Debora Heaps and she said she did not. Davis was asked if she had anything further to add and she said she did not.

**Interview of Sharleen Lampkin**

On September 24, 2015, RCS Investigator Flutts conducted an interview with Sharleen Lampkin. The interview was recorded and a transcript is included as **Exhibit "I"** in this report. The following is a synopsis of the interview.

Sharleen Lampkin is employed with the Riverside Regional Medical Center in Moreno Valley as a registered nurse. Lampkin was asked if she had a specific area of assignment and she said, "SART, the Sexual Assault Response Team." Lampkin was asked to describe her duties and she replied, "I do sexual assault exams for people that are brought in with that complaint. I testify for cases, I do some outreach in the community, we do briefings in police departments and schools and anything else."
Sharleen Lampkin was asked if she participated in a training session at the Banning Police Department on July 30, 2015, and she said she did. Lampkin was asked her specific involvement in the training and she replied, "I was supposed to talk about the different things that the officers are to do when they bring patients here for an exam, what they do prior to coming, calling us and such." Lampkin was asked if officers brought sexual assault victims to the Riverside Medical Center in Moreno Valley and she said they did.

Sharleen Lampkin was asked to name the other presenters participating in the training that day and she replied, "I think that day there was Nicole from another facility down in Rancho Springs. She's the coordinator down there, and someone from the Riverside Area Rape Crisis Center. I believe her name was Vivian, I can't remember for sure." Lampkin was asked if there were three presenters and she said there were.

Sharleen Lampkin was asked to describe what occurred after she arrived to conduct training that day and she replied, "Well we arrived there, we were waiting, we checked in with whoever met us at the window and we waited for a while. An officer, I can't remember his name, he came to the door, he wanted to know what we were there for because, he was like, you guys just came, we just had one of these trainings a week ago or a couple of weeks ago."

Sharleen Lampkin continued, "I was like, no, that couldn't have been true because we were here earlier and we, earlier that week was our first training at Banning and we had gotten turned away because of some bomb threat. So we understood and we left. So this was our second training for the year, we do this annually. And so we told him that and he was like, no, you guys were just here a couple of weeks ago. We're like, we're pretty sure that we weren't. So he's like well, who sent you, who okayed this, and who set this up."

Sharleen Lampkin further stated, "The Rape Crisis Center Coordinator, she looked up in her phone to see who set it up and she told him the name of the guy. He was like, huh, that's our boss. He was like how long is this gonna take, come on in. And we didn't, it was very awkward because we didn't feel welcome at all from him. The rest of the officers were very cordial when we went down there, they were responsive, they asked questions and were appropriate but he was very unhappy for us to be there and glared at us the whole time. We just kind of avoided eye contact with him."

Sharleen Lampkin was asked how long they waited in the lobby after they arrived and she said, "Probably another 10 or 15 minutes after the time we were supposed to start." Lampkin indicated the

training was scheduled to begin at either 3:00 or 4:00 p.m.; however, she could not recall which. Lampkin was asked to describe the officer's demeanor during the initial contact at the lobby and she said, "Irritated." Lampkin was asked if the officer appeared irritated at the fact they were there and she replied, "Yeah, and not really, he did not really seem to want to listen to us."

Sharleen Lampkin confirmed she felt generally unwelcome by the officer and added, "The other officers, they did not even seem to be aware of any of what was going on." Lampkin was asked if she felt any type of tension or unwelcome type of demeanor from anyone else and she said, "No, just him." Lampkin was asked if the officer eventually walked her into the building and she said he took them into the briefing room.

Sharleen Lampkin was asked how many other officers or employees were present and she estimated 15 to 20 officers. Lampkin was asked if she proceeded to provide the training and she said they did. Lampkin was asked if she, Nicole Yadon and Vivian Amezquita each had a segment of the training and she confirmed they did. Lampkin was asked if the training was completed that day and she replied, "We were able to complete it, we also gave the part for the District Attorney because we had some stuff from them. The DA wasn't able to come."

Sharleen Lampkin confirmed usually a representative from the District Attorney's office would provide training as well. Lampkin was asked the length of that training session and she said, "Probably no longer than ten minutes. We were real, we were fast." Lampkin was asked if the training was shorter than normal and she replied, "It's probably about average. Sometimes it goes a little bit longer or, I mean, that's about average. But we were deliberately, we did not want to linger." Lampkin was asked why and she explained, "Because he specifically asked, how long is this gonna take, so we felt like we were a bother."

Sharleen Lampkin was asked other than the initial officer, if she had issues with any other employees present that day and she said she did not. Lampkin was asked if there were any other interactions between her, Nicole Yadon or Vivian Amezquita and the other employees and she said there were not. Lampkin was asked if the officer she spoke to initially was present in the briefing room and she said, "He was, he was seated, if I'm in the front looking towards him, he was over in the right corner, right in front." Lampkin acknowledged the officer was seated to her right, facing her, towards the front of the room.

Sharleen Lampkin was asked if all three presenters were at the front of the room together and she said they were only at the front of the room for their particular segment of the training. Lampkin confirmed when she gave her portion of the training, she was facing the group. Lampkin was asked if she observed the initial officer's mannerisms during her presentation and she said she did not look at him. Lampkin added, "I purposely did not look at him, I felt uncomfortable."

Sharleen Lampkin was asked if she presented training to other agencies prior to July 30, 2015 and she said she did. Lampkin was asked if she ever had similar problems similar and she replied, "No. I've had people look bored but nothing, everybody's been very polite." Lampkin was asked if she had any further interaction with the initial officer after the training was completed and she said she did not. Lampkin was asked if there were any issues while leaving the building that day and she said, "No, someone else, I think, escorted us out. He didn't escort us out, someone else did."

Sharleen Lampkin was asked if it was typical to be escorted out of the building when she was at different agencies and she said it was. Lampkin was asked if the initial officer said anything else to her or the other presenters and she said he did not. Lampkin was asked to summarize her general concerns regarding what occurred that day and she replied, "I guess when I got back, probably as soon as, all of us were like, what the heck, because all of the three of us were kind of, we didn't understand where this animosity was coming from. As soon as I got to my car I called my boss and I'm like, I felt very unwelcome and very uncomfortable. That was like the worst briefing I've ever been to."

Sharleen Lampkin was asked if she, Nicole Yadon and Vivian Amezquita talked after the training was over and she replied, "Yeah, just briefly on the way to the car. We were just like, what the heck. Yeah, all of us were confused and, yeah, the same." Lampkin was asked if Gloria Davis was her boss and she said she was. Lampkin confirmed she spoke to Davis right after the training ended. Lampkin was asked if she described what occurred to Davis and she said, "Yeah, at that day, I can't remember the guy's name. I knew his name then and I called her up. I'm like, his name is… whatever his name was, and I was like, I said I think Nicole's gonna call and say something. But I was like, I think you should too."

Sharleen Lampkin was asked if she was with Nicole Yadon when she said she was going to complain and she said she was. Lampkin confirmed Yadon did not specifically indicate how she was going to complain. Lampkin was asked if she spoke to Yadon about the incident after their conversation and she replied, "No, no, I let Gloria, once I relayed it to Gloria; I let that out of my hands. I tried to stay out of that." Lampkin acknowledged she had no further involvement with the matter.

Sharleen Lampkin was asked if she became aware of anyone sending complaints to the Banning Police Department and she said she did not. Lampkin was asked if anything else occurred that day other than what she described and she said nothing did. Lampkin was asked if she had anything further to add and she said she did not.

**<u>Interview of Nicole Yadon</u>**

On September 28, 2015, RCS Investigator Flutts conducted an interview with Nicole Yadon. The interview was recorded and a transcript is included as **Exhibit "J"** in this report. The following is a synopsis of the interview.

Nicole Yadon is employed with the Rancho Springs Medical Center in Murrieta as a Sexual Assault Coordinator. Yadon was asked to describe her job duties and she replied, "Yes, I manage a team of forensic nurses who provide exams on sexual assault survivors as well as I perform the exams myself." Yadon was asked if she was scheduled to participate in a training session at the Banning Police Department on July 30, 2015 and she replied, "Yes, each summer we go out to all of the various departments throughout Riverside County and provide just an annual in-service on our services along with the Rape Crisis Center."

Nicole Yadon indicated she personally participated in providing training to multiple different police departments for the past six years. Yadon was asked the names of the other presenters participating in that training and she replied, "I'm trying to recall, I'm sorry, it's been a while. There was a nurse from

Riverside County Regional Medical Center. I can't remember exactly which one; I think it was Sharleen Lampkin. And then there was an advocate there from the Rape Crisis Center and I can't recall off the top of my head who it was." Yadon confirmed she was one of the three presenters.

Nicole Yadon acknowledged that typically a representative from the District Attorney's office was present as well; however, they did not attend that day. Yadon was asked if the three presenters each had a certain segment of the training to present and she confirmed they did. Yadon was asked to describe what occurred when she arrived to conduct the training on July 30, 2015 and she replied, "We were waiting in the lobby; the other people from the advocacy and Riverside County were already there when I got there and they had already approached the front counter and had told them why we were there." Nicole Yadon continued, "Technically, once we tell them that we're there, we do have to wait a little while. The officer and I don't even remember his name, I apologize, it's in my e-mail, wherever, I saw that you have that. The officer came out and just told us that we had already been there to provide that training just a few months ago. We told him that we had not, that this is an annual training that we had actually been there on Monday of that week but had been canceled because there was another event that was taking the officers out of the briefing."

Nicole Yadon further stated, "Briefing had been cancelled for that day. So he again said no, you guys were just here a few months ago. And again, no we're the only SART team within the county and no one has been here, we only do these in the summer. Anyway, he kind of bantered with us back and forth for a few minutes in regards to the fact that we had already been there and we had in fact not. So he left and went back into the Department and he came back out a few minutes later and wanted to know who had scheduled the briefing training. And the advocate, I can't remember her name... Vivian was kind of scrolling through her phone trying to look at her e-mails to see who had set up the briefing and whatever, she mentioned, I believe it's Diaz."

Nicole Yadon added, "The officer then kind of rolled his eyes and huffed and said that was the chief that did that and then said, hang on a second and then went back behind the, into the Department again and then came back out a few minutes later and said follow me. Just very, he was very rude, very abrupt; we were all kind of speechless. Nobody really wanted to talk at that point. So we followed him into the back and once we got to the stairway he just pointed at the stairs and he said, it's downstairs. And so at that point we went downstairs and kind of went into the first room that we saw that we assumed was the briefing room."

Nicole Yadon continued, "There were a couple other officers sitting in the room when we got in there. We all went into the back and kind of waited until we were invited to speak. It was very uncomfortable. The entire time he was slouched in his chair, kinda kicked back just very annoyed." Yadon was asked what time the briefing was scheduled to begin and she believed it was 3:00 p.m. Yadon was asked how long she waited in the lobby and she estimated ten minutes. Yadon confirmed the officer who spoke to them said they already had the training and they indicated they were there earlier in the week; however, the briefing was cancelled due to an incident in the field.

Nicole Yadon acknowledged Vivian Amezquita scrolled through her phone and confirmed Chief Diaz set up the training for July 30, 2015, and at that point the officer "huffed" and rolled his eyes and walked away from them and returned a few minutes later. Yadon added, "At that point once he realized that the Chief had scheduled it, he must've went back to confirm I guess, came back out and got us and had us

follow him and then like I said, pointed at the stairway and said it's down there, down the stairs. So we went down the stairs, went into the briefing room and like I said, waited until we were invited to speak."

Nicole Yadon was asked if the officer took them downstairs after he contacted them a second time and she replied, "No, he came out, he bantered with us about the fact that we had already been there, went into the back, came back out, said who scheduled it. We said the Chief. That's when he kinda huffed and rolled his eyes, went into the back and then came back out and got us again." Yadon confirmed they went downstairs to the briefing room at that point.

Nicole Yadon was asked if she was in the briefing room on prior occasions and she said she was not. Yadon added, "I believe Erica Schwartz was there on Monday and she's the DA, but like I said the training was cancelled because there were other things going on." Yadon was asked if she provided training sessions to various other agencies in the county and she said she did and they were conducted annually during the summer and were set up by the Rape Crisis Center.

Nicole Yadon was asked if the officer told them what room to enter when he advised them to walk downstairs and she said he did not. Yadon was asked if the officer left at that point and she replied, "He told us to go downstairs and we went down there, I don't know where he went at that point but then he showed up a few moments later." Yadon confirmed no one actually escorted them to the briefing room or told them where to go. Yadon added, "Which is extremely uncommon because every time we're, unless, if it's somewhere that we were just there a few days ago they'll say okay, you know where you're going, right, yeah, we've got it and then we'll go on our own but I had never been to this Department."

Nicole Yadon confirmed in her experience when conducting training at the various agencies, someone typically escorted them to where the class would occur. Yadon acknowledged there were a couple officers in uniform in the briefing room when they arrived, as well as a dispatcher and an investigator.

Nicole Yadon indicated the male investigator was wearing dress attire and added, "I did have some communication with him and I'd have to go back through my e-mails to tell you what his name was because he had some questions and asked for some follow-up in regards to some information about exams. And so I had e-mailed him the next day." Yadon was asked her opinion respective to their contact with the initial officer and she replied, "I was really thrown back. He was, appeared very annoyed that we were there."

Nicole Yadon continued, "It was very uncomfortable. We kinda argued in the back quietly over who was gonna talk first because nobody wanted to and we do these every single summer probably 20 or 30 a year, I mean they're back to back to back, and so sometimes we'll do them up to three times a day. I have no problem speaking, and at this point, I didn't wanna talk, I didn't even want to go up there. It was very, very, very uncomfortable." Yadon was asked how long they were in the briefing room prior to beginning the training session and she said it was just a few minutes.

Nicole Yadon was asked to describe what the initial officer they spoke to was doing at that point and she replied, "Just kinda leaned back in his chair and had his leg kind of kicked up on the other leg, seemed very disinterested. His whole presentation just seemed in my opinion, very, very annoyed." Yadon was asked if she eventually walked to the front of the room to conduct her segment of the training and she

stated she did. Yadon confirmed each of the presenters went to the front of the room individually and faced the group. Yadon said by the time they completed the presentation, there were upwards of ten people in the room.

Nicole Yadon was asked where the initial officer was sitting as she faced the group and she replied, "The room has like round, I believe like round, like rows of round tables, very long tables. When you're standing up facing them he was gonna be on the right, kind of the end of maybe the second row." Yadon was asked if she formed an opinion as to whether or not he was a supervisor or in charge of the briefing and she replied, "At that point I didn't know, it wasn't until the next day when I had communication with the investigator that I believe he said he was maybe a sergeant."

Nicole Yadon was asked the length of the training and she said, "Maybe 10 or 15 minutes tops, which is about average." Yadon was asked what occurred after the training concluded and she replied, "Once it was finished the investigator had asked me a couple questions, in regards to some information that he needed and then the officer in question, I don't remember what the exact statement was but basically we let ourselves out. So we went back upstairs and we kind of roamed through the Department because we didn't know how to get out, there wasn't really a clearly marked exit. None of us had been to that agency in the past."

Nicole Yadon was asked if any of the presenters conducted training at the Banning Police Department in the past and she said, "No, I don't think the girls had. I don't want to speak for them but I don't think so because nobody knew how to get out so we kinda roamed our way out of the Department." Yadon was asked if the initial officer said anything when the training was concluded and she replied, "I don't recall." Yadon confirmed the officer did not walk them out of the building. Yadon was asked if anyone offered to walk them out of the building and she said no one did. Yadon confirmed they walked around the building before they found their way out.

Nicole Yadon was asked if she left the building with the other two presenters and she said she did. Yadon was asked if she and the other presenters discussed what occurred and she replied, "Yeah, we couldn't get out of there quick enough and afterwards we were all just very thrown back at the experience in and of itself and there's kind of some brief discussion about, like, wow, like I don't even know what just happened, but when I had e-mailed the investigator the following day, um I had asked him, and I don't remember exactly what the words was but like kinda what was that guy's problem, he was extremely rude."

Nicole Yadon continued, "He basically just said that oh, he just got back from a trip to Vegas or something and had gotten there late that day and so he was just kind of annoyed in general and for us, for me to not take it personal." Yadon was asked if she indicated earlier that she conducted those types of training over the past six years and she said she did, all over the county. Yadon was asked if she experienced anything similar to what occurred with respect to that officer in the past and she said she never did.

Nicole Yadon was asked to provide an overview of her concerns regarding the initial officer that day and she replied, "I was shocked that we were so unwelcomed by him. Now the other people in the room, several of them had very valid questions, engaged in the dialog. A lot of times we'll do these trainings and you can tell that there's specific officers that aren't really interested and that's fine and if they want

to be quiet and sit to themselves, that's not a big deal. But typically the person who greets us is very friendly, shows us where to go, shows us the way out and makes it clear to the group that they need to pay attention to us; that this is very important training for them."

Nicole Yadon continued, "I just felt extremely unwelcomed, very uncomfortable. And I can talk to anybody about anything and I didn't even want to speak because it was like, it was like you could hear a pin drop in the room. There was so much tension from him, it was very uncomfortable." Yadon confirmed she did not have any negative interactions with anyone else at the Banning Police Department that day. Yadon was asked if the officer's attitude was the reason she did not want to provide training there and she said it was.

Nicole Yadon was asked if she reported the incident to anyone at her place of employment and she said, "I don't believe so." Yadon was asked if she spoke to anyone other than the two presenters about the situation and she said she spoke to Debora Heaps, the program director at the Rape Crisis Center in Riverside. Yadon added, "And I spoke to Gloria Davis and she's the Program Manager at Riverside County Regional at their SART program." Yadon acknowledged one of the presenters worked for Heaps and the other presenter worked for Davis.

Nicole Yadon was asked if she sent an e-mail to the Banning Police Department on August 3, 2015, in which she expressed her complaints about what occurred that day and she said, "I did sent an e-mail, I don't recall the date but I assume that's accurate." Yadon was shown a copy of the e-mail and she verified it was a copy of the one she sent. Yadon was asked if she copied Debora Heaps in the e-mail and she believed she did. Yadon was asked if she had further conversations with anyone regarding the incident after sending the e-mail and she did not recall.

Nicole Yadon was asked if she spoke to Chief Diaz' assistant and she said she did. Yadon was asked to describe the conversation and she replied, "I believe that she had indicated that she was gonna forward the e-mail or forward the complaint to him and then he ended up calling me directly." Yadon stated Chief Diaz wanted her to know that her concerns were going to be addressed by the Department and the situation involving the officer was unacceptable.

**Interview of Corporal Steve Hobb**

On October 30, 2015, RCS Investigator Flutts conducted an interview with Corporal Steve Hobb. Hobb was represented by his attorney, Robert Baumann. Hobb was admonished to answer all questions completely and truthfully and was admonished of his rights pursuant to the California Government Code. The interview was recorded and a transcript is included as **Exhibit "K"** in this report. The following is a synopsis of the interview.

Corporal Hobb has been employed by the Banning Police Department for 10 years and is currently assigned to Patrol. Hobb was asked his assignment on July 30, 2015, and he said he was the Watch Commander for Patrol Team 3, working the 4:00 p.m. to 4:00 a.m. shift. Hobb was asked if he became aware at some point that members of the SART team were at the Department to provide briefing training and he said, "Yes, I did. I was in briefing and one of the records personnel, a female, came down and advised me that there was some people upstairs."

Corporal Hobb was asked if he had previous knowledge the training was to take place that day and he replied, "I did from an e-mail but I forgot about it." Hobb believed the e-mail was from Sergeant Fisher. When asked the content of the e-mail he said, "I don't know when it was dated or when he sent it out but it was something, it was saying that the SART team was coming for briefing training." Hobb was asked if the e-mail indicated the date and time SART was scheduled to provide training and he acknowledged it did.

Corporal Hobb was asked if he eventually responded to the lobby to meet with the SART personnel and he said he did. Hobb was asked how much time elapsed from when he was told they were there, until he met with the SART personnel and he replied, "Maybe five minutes." Hobb confirmed briefing already started and when asked if he was conducting briefing as part of his Watch Commander duties, he said he was. Hobb was asked if any additional training was taking place that day and he said there was not.

Corporal Hobb was asked how many SART personnel were in the lobby and he said there were three females. Hobb was asked if he made a statement similar to: "What are you guys doing here" when he met them in the lobby and he said he did not. Hobb was asked how he greeted the SART personnel and he replied, "From my recollection it was, I already knew they were SART because the records personnel told me that; I knew they were already there for training because she told me they were here for training. I went up there, I'm like; I might've said that, like what are you doing here. That doesn't sound like the appropriate question to ask right off the bat, so I can't see myself asking that, because that sounds rude to ask that question, what are you doing here? Honestly I couldn't tell you what I said; it wasn't something along those lines."

Corporal Hobb was asked if he told the SART members the Banning Police Department just had the same training a few months prior and he said he did. Hobb was asked what he based that information on and he replied, "My personal knowledge, remembering the training, and my officers before I walked upstairs they, they commented, we just had this training." Hobb was asked if the Records Bureau employee notified him by phone that the SART personnel were in the lobby or if she physically responded to the briefing room and he said she walked downstairs to tell him. Hobb was asked if he was told about the training in the presence of the other officers in the room and he said he was.

Corporal Hobb was asked in his experience, if the training was presented annually and he believed it was usually once a year. Hobb confirmed both he and the other officers in the room recalled having the training recently. Hobbs was asked how the SART personnel responded and he replied, "One of the females said well that's impossible, we're the only ones that do the training and we haven't been here in over a year." Hobb was asked how he responded and he said, "I was, replied that well, I remember having it and so do my officers. And then she responded, one of them responded, well, your chief scheduled us to be here."

Corporal Hobb was asked if all three females were involved in the discussion and he replied, "I believe it was one. It might've been, might've been a second chimed in and said something." Hobb was asked if he specifically questioned them as to who set up the training and he said, "I did not ask them, one of the females responded with, well your chief set up this training." Hobb was asked if he observed any of the

females check their phone regarding the details of the meeting and he said he did not. Hobb was asked if he ever referred to Chief Diaz as a sergeant during that conversation and he did not recall.

Corporal Hobb was asked if that sounded like something he may have said and he replied, "If I did, if I said that it was a total slip and that would be disrespectful and I wouldn't say that." Hobb was asked when one of the females indicated Chief Diaz arranged the training, if he visibly rolled his eyes at any point and he said, "Huh, I don't recall, rolling my eyes. Could I have, I'm not saying I didn't but I don't recall rolling my eyes. I don't recall doing that." Hobb was asked if he had any reaction when he was advised Diaz set up the training and he said, "Once she said that that the chief set it up, I said well let's go down and do it. Let's go down and do it, can you speed up the process though because we got calls pending and she said not a problem."

Corporal Hobb was asked based on his past experience, how long the training typically lasted and he said, "Depends on questioning, it could go, there's three of them, there's usually a SART nurse, there's a rape crisis advocate, there's usually two or, and then there's a supervisor and they all take turns speaking so it could take, it could take a half hour." Hobb was asked if he specifically recalled there were calls for service pending that day and he said he did.

Corporal Hobb was asked the length of a typical briefing when there was no outside or extra training and he replied, "Well it depends if I'm doing training, I'll do my own training. If there's calls pending, we just, we clear and we go. There's times where we don't even go through the, the shift before us, calls for service and go over that, so it varies. It could be, let's go, we've got calls pending because I already get a pass-down from the sergeant prior to briefing so I already know the major incidents and if I have to pass those I will. But for the most, I mean, sometimes it's, there's no briefing and we'll come back to it later or sometimes it could be a half hour, sometimes it can be an hour depending on what I wanna train the guys on and bring up."

Corporal Hobb was asked if that was a typical practice to pass matters off from another shift and he said it was. Hobb was asked the typical deployment on that shift and he said three officers plus a supervisor. Hobb was asked if he audibly sighed at any point during his conversation with the SART personnel after learning Chief Diaz arranged the training and he said he could have. Hobb was asked if he told any of the SART members he did not have time for the training and he said he did not. Hobb was asked after his initial contact with the SART members in the lobby, if he went back inside and then returned a few minutes later and he replied, "I don't recall. I recall once I walked out and greeted them, we talked, they followed us downstairs. Well, followed me."

Corporal Hobb was asked after being told Chief Diaz set up the training, if he left the lobby to confirm that fact and he said he did not. Hobb was asked how far he was into briefing when he was informed by Records the SART members were in the lobby and he replied, "It was like right at the beginning, there was still dayshift guys mingling around and then when she told me I recall seeing the detectives start walking in so they were down there for the same training." Hobb was asked if detectives knew about the training ahead of time and he said, "I'm a hundred percent sure more than likely they knew about it because Sergeant Arretche probably had it on his calendar cause he was there."

Corporal Hobb was asked if Sergeant Arretche was the Detective Sergeant at the time and he confirmed he was. Hobb was asked if Arretche was currently in that position and he believed he was. Hobb was

asked if he finished the patrol briefing after the SART members completed their presentation and he replied, "I think as soon as the training was done we went 10-8." Hobb was asked the length of the SART training that day and he replied, "She did it really fast, like it was five maybe 10 minutes." Hobb was asked if all three females participated in the training and he stated they did.

Corporal Hobb was asked if conducting briefing was a normal part of his duties as a Watch Commander and he said it was. Hobb confirmed when he met the SART members in the lobby; he had them follow him to the briefing room. Hobb was asked if he physically led them to the briefing room and he said he did. Hobb was asked where the briefing room was located in relation to the lobby and he replied, "You go through the lobby door past records, hang a right, go down the stairs, down the main hallway, go left and then right, right into briefing." Hobb confirmed the briefing room was downstairs from the lobby.

Corporal Hobb was asked if he was annoyed or angry about the SART members being present that day and he said he was irritated. Hobb added, "I wasn't irritated that they were there, I was irritated that we had calls and we already had this training and we had to do it again. And I don't know if it's a set schedule, I don't think it is. It's the same training, they pass the same information." Hobb believed two patrol officers and possibly a trainee were working that day. When asked how many detectives were present he replied, "I remember Sergeant Arretche, maybe, maybe Detective Segura and maybe Detective Nolan. I don't know if Detective Bennett was there or not." Hobb was asked if any other employees were present and he said, "I think dayshift stuck around. Dayshift patrol."

Corporal Hobb was asked if he was seated during the training presentation and he replied, "I was right in the front row, far left corner right in the front when you walk in, first seat on the right side." Hobb was asked if that was his normal position when conducting briefing and he said, "Unless I'm doing something on the computer and I got the Power Point." Hobb confirmed he sometimes presented from the podium. Hobb was asked if he recalled repeatedly looking at his watch during the SART training and he said he did not wear a watch. Hobb indicated he typically did not wear a watch.

Corporal Hobb was asked how the SART team exited the briefing room when they finished training and he said, "I don't know, I didn't walk with them." Hobb was asked if he had someone else advise them where to go and he replied, "I think Sergeant Arretche might've walked with them out." Hobb acknowledged he was not sure; however, he knew he did not walk them out. Hobb was asked if he directed anyone to escort the SART members out of the building and he replied, "No, because I, they, I think they were answering questions when me and the patrol guys cleared. I think they were still answering questions to people that were still lingering around."

Corporal Hobb was asked if he and the other patrol officers eventually went in-service and he said, "I think so, yes." Hobb was asked if he had any further interaction with the SART members after initially contacting them in the lobby and he said not that he recalled. Hobb was asked if he was discourteous or rude to any of the SART members during their interactions and he replied, "I don't believe so." Hobb was asked in his opinion, if he was professional in his interactions with the SART members that day and he said he was. Hobb was asked if he had anything further to add and he said he did not.

Attorney Baumann asked Corporal Hobb if he recalled receiving notification the SART members were going to be there that day and he replied, "I found an e-mail afterwards and I had already read it so I knew, I read it before the meeting. Before the, I had read it when the e-mail came out but I forgot about

it. I forget how far in advance it was." Baumann asked Hobb how many pending calls there were when the SART members arrived and he did not recall.

# SECTION 2

# CONCLUSIONS AND FINDINGS

# SECTION 2

## CONCLUSIONS AND FINDINGS

This administrative investigation was initiated after the Banning Police Department received two complaints via e-mail regarding Corporal Hobb's behavior on July 30, 2015. Briefing training was scheduled on July 30, 2015, and representatives from the Riverside County Sexual Assault Response Team [SART] arrived and provided sexual assault response training to members of the Banning Police Department. The complaints alleged Hobb was rude, discourteous and unprofessional to the SART Team members present.

## Allegation "1"

**It was alleged that Corporal Hobb was discourteous to SART Team members, who provided training at the Banning Police Department on July 30, 2015.**

## Allegation "2"

**It was alleged that Corporal Hobb demonstrated unbecoming conduct and poorly represented the Banning Police Department during his interaction with SART Team members, who provided training on July 30, 2015.**

## CONCLUSIONS

Vivian Amezquita, Sharleen Lampkin and Nicole Yadon are all members of the Riverside County Sexual Assault Response Team [SART] and they arrived at the Banning Police Department on July 30, 2015, to provide briefing training. The SART Team provides annual training to a number of police agencies throughout Riverside County.

When they arrived at the Banning Police Department, the SART Team members were eventually met by Corporal Steve Hobb, who was the Acting Watch Commander that day. Vivian Amezquita, Sharleen Lampkin and Nicole Yadon were generally consistent in their descriptions of Hobb's demeanor and attitude and all stated he was unprofessional, abrupt, rude and discourteous to them. The SART Team members complained that Hobb was irritated they were there to provide training and made the comment, "What are you doing here?"

The SART Team members stated Corporal Hobb claimed he and the other patrol officers just received the same training recently; however, the SART Team members were consistent in their statements training was conducted annually during the summer months and no training had been provided at the Banning Police Department since the summer of 2014.

The SART Team members stated Corporal Hobb audibly sighed and "rolled his eyes" when he was told the training was set up by Chief Alex Diaz. One of the members also said Hobb referred to Chief Diaz as a sergeant. The SART members generally stated Hobb's attitude was unprofessional and they did not feel welcomed by him and they were uncomfortable throughout the time they were at the Department. The SART members also stated after the training was completed, they were not escorted out of the police station and wandered around until they found their way out to the front lobby.

## FINDINGS

During his administrative interview, Corporal Hobb said he received an e-mail notification about the training; however, forgot about it. When asked if he made the statement, "What are you doing here" when he greeted the SART Team members, Hobb initially stated he did not and that would have been a rude question. Hobb later stated he may have said that, and finally stated he could not recall what he said; however, it was not anything like that.

Corporal Hobb acknowledged SART training was held annually and he told the SART Team members that officers had recently had the training. Regarding his initial contact with the SART Team members, Hobb said he was speaking primarily to one person; however, he said a second team member then "chimed in" to the conversation.

Corporal Hobb said he did not recall referring to Chief Diaz as a sergeant; however, if he did it was a slip and not intentional. Hobb stated at the time of the pending training, there were patrol calls holding and he acknowledged that he asked the SART Team members to, "Speed up the process."

Corporal Hobb acknowledged he was irritated the SART Team members were at the Department to provide training that day. When asked if he audibly sighed at any point, Hobb stated he could have. When asked if he "rolled his eyes," Hobb said he did not recall doing that; however, it was possible. When the training was completed, Hobb said he and the patrol officers left the briefing room. Hobb said Detective Bureau personnel attended the training and were still present when he left. Hobb acknowledged he did not escort the SART Team members back to the lobby and did not ask any other employees to do so.

RCS Investigators found the SART Team members' statements to be generally consistent with each other and there was no information to suggest their observations were inaccurate. During his administrative interview, Corporal Hobb acknowledged at least in-part, some of the statements and actions described by the SART Team members. RCS Investigators believe Hobb's initial contact with the SART Team members, during which time he questioned why they were there; who set up the training and insisting that he and officers recently had the same training was unprofessional and discourteous.

RCS Investigators believe Corporal Hobb was clearly irritated at the presence of the SART Team members, as acknowledged during his administrative interview. Hobb acknowledged he could have audibly sighed and he did not recall; however, it was possible he rolled his eyes during his interaction with the SART Team members.

Based on the statements made by the SART Team members, RCS Investigators believe it was likely Corporal Hobb demonstrated those actions and in doing so, poorly represented the Banning Police Department and demonstrated unbecoming conduct. RCS Investigators are of the opinion Hobb was rude and discourteous to the SART Team members and his actions made them feel uncomfortable, during the time they were at the Department. In addition, Hobb, in his capacity as the Acting Watch Commander, had an obligation to professionally treat the SART Team members, including making arrangements for them to be escorted from the briefing room at the conclusion of the training.

During his administrative interview, Corporal Hobb stated at the time the briefing training occurred, there were several calls for service pending. RCS Investigators reviewed a partial call log for July 30, 2015 and noted only ten incidents that day between 4:00 and 5:00 p.m. Of those, five incidents were graffiti incidents with disposition codes of AB, which indicated the graffiti was abated by Code Enforcement. One incident was listed as "Medical" with a disposition code of OA, which indicated the incident was referred to another agency. Finally, one incident during that period of time was a residential alarm with a disposition code of AC, which indicated the alarm was cancelled by the alarm company.

RCS Investigators reviewed the patrol shift bulletin for July 30, 2015. The bulletin listed significant incidents for that shift. Aside from the above mentioned residential alarm, the only other incident listed between 4:00 and 5:00 p.m. was a mental disorder call. That incident was closed with a disposition of RT, which indicated a report was taken.

The above reviewed documents did not appear to show a great deal of activity occurred between the listed times on July 30, 2015; however, RCS Investigators were unable to determine the exact number of calls, if any, that were pending at the time of Corporal Hobb's interaction with the SART Team members. Even if a number of calls were pending at the time of the training, Corporal Hobb was still expected to treat the SART Team members courteously and professionally.

Based on the above information, RCS Investigators are of the opinion Corporal Hobb was discourteous and unprofessional during his interactions with the SART Team members and that his actions demonstrated unbecoming conduct and poorly represented the Department. **As such, both Allegations are SUSTAINED.**

RCS Investigators submitted a compact disk containing audio recordings of witness statements and Corporal Hobb's administrative interview. The CD is included as Exhibit **"L"** in this report.

# SECTION 3

# EXHIBITS

# EXHIBIT A

338.3.2 CONDUCT

(k) Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department.

338.3.5 PERFORMANCE

(aa) Any other on-duty or off-duty conduct which any employee knows or reasonably should know is unbecoming a member of the Department or which is contrary to good order, efficiency or morale, or which tends to reflect unfavorably upon the Department or its members.

# EXHIBIT B

**From:** Yadon, Nicole
[mailto:Nicole.Yadon@uhsinc.com]
**Sent:** Monday, August 03, 2015 8:22 AM
**To:** Daniele Savard
**Subject:** Follow up from Briefing

*Good morning, I am the SART Coordinator out of Rancho Springs Medical Center in Murrieta. Myself along with other members of our team from Riverside County Regional Medical Center and Riverside Area Rape Crisis were scheduled to provide annual SART training on Thursday July so" at 1600. Upon arrival we were not so pleasantly greeted by an officer named "Hobb". He was extremely rude and seemed somewhat annoyed attempting to argue with us stating that we had just provided this training a few months ago. Our team provides this training once a year, during the summer months. After we informed him that this training was set up by you, he proceeded to roll his eyes, huff and very rudely direct us down the stairs. All of our team felt extremely uncomfortable during this presentation due to his demeanor and body posture while we were presenting. Once finished, we were told to let ourselves out, and had to roam through halls until we found the exit. I am sure that this is not the way your department should be represented. I felt that it was important you were aware of this, as our goal is to build relationships with Law Enforcement for the benefit of our victims. If you have any questions, please feel free to contact me via cell.*

*Thank you for your time.*

*Nicole D. Yadon*

# EXHIBIT C

**From:** Debora Heaps [mailto:dheaps@rarcc.org]
**Sent:** Wednesday, August 12, 2015 5:08 PM
**To:** Alex Diaz
**Subject:** Briefing Training July, 30, 2015--4PM Sexual Assault Response Team

Chief Diaz,

The Western Riverside County Sexual Assault Team annually schedules our briefing trainings. We provide training to all Law Enforcement agencies in our service area-south to Temecula, west to Corona, east to Cabazon and surrounding areas. It is coordinated by the Riverside Area Rape Crisis Center and the advocacy program, the forensic nurse from Riverside County Regional Medical Center, and a district attorney take time to provide training in assisting first responders in sexual assault response. We were grateful that you scheduled us and know you felt it is important to your Team to have this training. The professionals that provide the training are taking professional time to meet the needs of this critical collaboration.

On July 30, 2015 at 4PM our advocate Vivian A, forensic nurses from both County and Rancho Springs hospitals and a District Attorney were prepared for training. They were greeted in an unprofessional manner by an Officer Hobb. He complained that they had just received the training and didn't have time for "this". Our team was very intimidated by his dismissive and rude manners even through the presentation that he postured as without value and inconvenient.

I received a call from the Manager of the Forensic Nurses Gloria Davis at Riverside County Medical Center after her nurse complained about his treatment of the team. Our advocate also came to my office and let me know about the poor way the SART Team was received by him.

It is our desire to form strong professional collaborations with all of the Law Enforcement agencies. The sexual assault field is changing very rapidly at this time and our desire is for victims, our communities and professionals to have the most updated and accurate information possible to investigate and gather evidence for these horrible crimes.

Thank you for your attention in this matter.

Sincerely,
Debora Monroe Heaps
Director of Programs
Riverside Area Rape Crisis
Center
951-686-7273

# EXHIBIT D



**Banning Police Department**
125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

**To:** Cpl. Steve Hobb

**Date:** August 21, 2015

**From:** Lieutenant Phil Holder

**Reference:** Internal Affairs Investigation #15-04

---

A complaint has been filed against you alleging your conduct on July 30, 2015 was contrary to the department's policy and procedures. In the complaint, it is alleged you were discourteous and argumentative towards members of the Western County Sexual Assault Team when they arrived at the Banning Police Department to conduct briefing training. Subsequently, the City has an obligation by law to conduct an investigation into this allegation.

Based on the allegation, I must advise you it is unacceptable for you to take any adverse actions against any person(s) for their involvement in the filing of the complaint.

David Flutts, a private investigator, will be the fact-finder in this matter. However, at this time, a time and date for your interview has not been scheduled. When the interview takes place you will be directed to cooperate in the interview and to respond in a complete, accurate, and truthful manner. The interview will be recorded.

During the interview you will have the right to be accompanied by a representative of your choice who may be present at all times during the interview. However, this representative shall not be a person subject to the same investigation. In order to maintain the integrity of the investigation process, you are ordered to refrain from discussing this notice, the interview, or the investigation itself, with anyone other than your representative. Before you discuss the matter with your representative you must first notify me of who you've selected so that I can ensure they are not subject to the same investigation or are a possible witness.

If you have any questions prior to the interview please do not hesitate to call me at 951-849-1097.

SH
8/21/15




**Banning Police Department**
125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

**To:** Cpl. Steve Hobb

**Date:** September 30, 2015

**From:** Lieutenant Phil Holder

**Reference:** Internal Affairs Investigation #15-04 Interview

---

Your interview regarding Internal Affairs Investigation 2015-04 is scheduled for Wednesday, October 7, 2015 at 1100 hours in the small conference room at Banning City Hall. The complaint pertains to allegations that you were discourteous and argumentative towards members of the Western County Sexual Assault Team when they arrived at the Banning Police Department to conduct briefing training on July 30, 2015.

David Flutts, a private investigator, will be the fact-finder in this matter. When the interview takes place you will be directed to cooperate in the interview and to respond in a complete, accurate, and truthful manner. The interview will be recorded.

During the interview you will have the right to be accompanied by a representative of your choice who may be present at all times during the interview. However, this representative shall not be a person subject to the same investigation. In order to maintain the integrity of the investigation process, you are ordered to refrain from discussing this notice, the interview, or the investigation itself, with anyone other than your representative. Before you discuss the matter with your representative you must first notify me of who you've selected so that I can ensure they are not subject to the same investigation or are a possible witness.

If you have any questions prior to the interview please do not hesitate to call me at 951-849-1097.



**Banning Police Department**
125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

**To:** Steve Hobb
Corporal

**Date:** October 9, 2015

**From:** Alex Diaz
Chief of Police

**Reference:** Internal Affairs Investigation #15-04

---

At the request of your attorney, I have agreed to re-schedule your interview concerning this matter in which it is alleged you were discourteous and argumentative towards members of the Western County Sexual Assault Team when they arrived at the Banning Police Department on July 30, 2015 to conduct briefing training. The nature of the allegations are such that if sustained, discipline could result for violations of City and/or Department ordinances, resolutions, rules, regulations, policies, orders and/or directives.

Your interview is **rescheduled for Friday, October 30, 2015, at 10 a.m. in the small conference room of the Banning City Hall.** David Flutts will be the sole interrogator for the administrative interview. You are directed to answer questions in a complete, accurate and truthful manner, in accordance with your obligations under the Banning Police Department Policy Manual. You are further ordered to obey any lawful order given by the investigator as though such order was coming from a superior in your chain of command with the City of Banning Police Department.

You are advised in advance that the interview will be recorded. You will have access to the recording if any further proceedings are contemplated or prior to any further interrogation relating to this investigation at a subsequent time. You have the right to bring your own recording device and to record any and all aspects of your interview.

During the interview you will have the right to be accompanied by a representative of your choice who may be present at all times during the interview. However, this representative shall not be a person subject to the same investigation. Before you discuss the matter with your representative you must first notify me of who you've selected so that I can ensure they are not subject to the same investigation or are a possible witness. You are advised that under current case law, an officer's right to be represented by the person of his or her choice is not unlimited. The officer must choose a representative who is reasonably available to represent the officer, and who is physically able to represent the officer at the reasonably scheduled interrogation. It remains the officer's responsibility to secure the attendance of his or her chosen representative at the interrogation. If he or she is unable to do so, the officer should select another representative

so that the interrogation may proceed at a reasonable hour. The chosen representative during administrative hearings need not be an attorney.

You are directed to sign and return this memo to confirm only your receipt of same and of the directives herein.

**RECEIVED AND ACKNOWLEDGED**

______________________________

Steve Hobb Date

# EXHIBIT E



BANNING POLICE DEPARTMENT

INCIDENT SUMMARY

07/30/2015

Page 2

11/06/2015

| Date | Time | Inc # | Type | Dispo | Unit | Address |
|---|---|---|---|---|---|---|
| 07/30/2015 | 08:33 | 201507300037 | 911 | LN | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 08:38 | 201507300038 | 911 | LN | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 08:38 | 201507300039 | 911 | LN | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 09:01 | 201507300040 | 911 | LN | | 776 19TH, Banning |
| 07/30/2015 | 09:15 | 201507300041 | 911 | LN | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 09:49 | 201507300042 | SUSP SUB | OK | P34 | 475 N 5TH, Banning |
| 07/30/2015 | 09:55 | 201507300043 | PEDCK | AR | S8 | Repplier Park, 399 W George, Banning |
| 07/30/2015 | 09:58 | 201507300044 | 911 | OA | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 10:11 | 201507300045 | REPO | LN | | Family Tow, 1284 E Lincoln, Banning |
| 07/30/2015 | 10:31 | 201507300046 | 911 | OA | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 10:36 | 201507300047 | WELCHK | AR | P30 | 1499 W Cottonwood Rd, Banning |
| 07/30/2015 | 10:45 | 201507300048 | 911 | OA | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 11:24 | 201507300049 | CODE ENF | LN | E66 | Bradley Wright Residence, 475 E Theodore, Bannin |
| 07/30/2015 | 11:42 | 201507300050 | RUNAWAY | LN | | Ferree's Group Home, 2269 W Nicolet, Banning |
| 07/30/2015 | 11:42 | 201507300051 | TSTOP | WA | P34 | Banning Donuts, 584 W Ramsey, Banning |
| 07/30/2015 | 11:46 | 201507300052 | ALARM/R | FA | P34 | 2998 Mohawk Rd, Banning |
| 07/30/2015 | 11:49 | 201507300053 | CODE ENF | LN | E66 | 1339 Almond Wy, Banning |
| 07/30/2015 | 11:55 | 201507300054 | 911 | LN | | Beaver Primary Care Center, 5957 W Ramsey, Banni |
| 07/30/2015 | 12:00 | 201507300055 | 911 | OA | | 1999 N 8TH, Banning |
| 07/30/2015 | 12:12 | 201507300056 | CODE ENF | LN | E66 | 1453 E Hoffer, Banning |
| 07/30/2015 | 12:20 | 201507300057 | ALARM/R | FA | P34 | 414 E Theodore, Banning |
| 07/30/2015 | 12:31 | 201507300058 | 415 PC | CV | P34 | PD Lobby, 125 E Ramsey, Banning |
| 07/30/2015 | 12:39 | 201507300059 | CODE ENF | LN | E66 | 1067 Durward, Banning |
| 07/30/2015 | 12:44 | 201507300060 | STREET | OA | | S Highland Springs/Sun Lakes Blvd, Banning |
| 07/30/2015 | 13:01 | 201507300061 | SUSP SUB | OK | P30 | Coyne Power Sports, 2301 W Ramsey, Banning |
| 07/30/2015 | 13:06 | 201507300062 | ALARM/C | AC | | Shaw, Louis, 1046 Juniper Pl, Banning |
| 07/30/2015 | 13:30 | 201507300063 | CODE ENF | LN | E66 | Caretaker Info Attached, 3880 W Jacinto View Rd |
| 07/30/2015 | 13:37 | 201507300064 | 242 IP | LN | P30 | Eagle Bar, W Ramsey/Grandview Ave, Banning |
| 07/30/2015 | 13:39 | 201507300065 | TRAFHAZ | AS | P34 | W RAMSEY/8TH St, Banning |
| 07/30/2015 | 13:47 | 201507300066 | WELCHK | LN | P30 | 2951 Summerset Ci, Banning |
| 07/30/2015 | 13:51 | 201507300067 | 911 | LN | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 14:07 | 201507300068 | TSTOP | CI | P34 | W Ramsey/Sunset Ave, Banning |
| 07/30/2015 | 14:14 | 201507300069 | ALARM/C | FA | P30 | Grace Lutheran Church, 1000 W Wilson, Banning |
| 07/30/2015 | 14:22 | 201507300070 | CODE ENF | LN | E66 | 4097 W Ramsey, Banning |
| 07/30/2015 | 14:22 | 201507300071 | SUSP VEH | UT | P30 | 1401 Wesley, Banning |
| 07/30/2015 | 14:43 | 201507300072 | 911 | LN | | 1999 N 8TH, Banning |
| 07/30/2015 | 14:46 | 201507300073 | FU | RT | P30 | 10-21, 1513 W Cottonwood Rd, Banning |
| 07/30/2015 | 14:50 | 201507300074 | FU | SU | | PD, 125 E Ramsey, Banning |
| 07/30/2015 | 15:03 | 201507300075 | DPSS REF | PD | P26 | 555 N Hathaway, 555 N Hathaway #1004, Banning |
| 07/30/2015 | 15:15 | 201507300076 | MEDICAL | OA | | 1436 Riviera Av, Banning |
| 30/2015 | 15:23 | 201507300077 | SUSP VEH | UT | S8 | N 4TH/INDIAN School Lane, Banning |




# BANNING POLICE DEPARTMENT

## INCIDENT SUMMARY

07/30/2015



11/06/2015

| Date | Time | Inc # | Type | Dispo | Unit | Address |
|---|---|---|---|---|---|---|
| [illegible]/2015 | 15:30 | 201507300078 | 911 | OA | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 15:33 | 201507300079 | 503 PC | AR | P26 | Pj's Golf Carts, 2415 W Ramsey, Banning |
| 07/30/2015 | 16:03 | 201507300080 | 5150 | RT | P32 | Four Paws Inn, 3500 W Ramsey, Banning |
| 07/30/2015 | 16:09 | 201507300081 | GRAFFITI | AB | | E Victory Av/S Florida, Banning |
| 07/30/2015 | 16:09 | 201507300082 | GRAFFITI | AB | | 640 W Nicolet, Banning |
| 07/30/2015 | 16:10 | 201507300083 | GRAFFITI | AB | | W Lincoln/Navajo, Banning |
| 07/30/2015 | 16:10 | 201507300084 | GRAFFITI | AB | | N 8TH/INDIAN School Ln, Banning |
| 07/30/2015 | 16:10 | 201507300085 | GRAFFITI | AB | | S Sunset/Jefferson, Banning |
| 07/30/2015 | 16:16 | 201507300086 | MEDICAL | OA | | 1245 W Hoffer, Banning |
| 07/30/2015 | 16:25 | 201507300087 | REQ INFO | IN | P26 | PD, 125 E Ramsey, Banning |
| 07/30/2015 | 16:36 | 201507300088 | ALARM/R | AC | | 1108 Foothill Dr, Banning |
| 07/30/2015 | 16:42 | 201507300089 | 911 | LN | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 17:07 | 201507300090 | TSTOP | WA | P27 | N 8TH/RAMSEY, Banning |
| 07/30/2015 | 17:13 | 201507300091 | 911 | LN | | 1999 N 8TH, Banning |
| 07/30/2015 | 17:19 | 201507300092 | TSTOP | WA | P27 | E Ramsey/Livingston, Banning |
| 07/30/2015 | 17:36 | 201507300093 | AOD/ACO | UN | P32 | 925 W Hays, Banning |
| 07/30/2015 | 17:42 | 201507300094 | 911 | LN | | 3724 W Ramsey, Banning |
| 07/30/2015 | 17:50 | 201507300095 | 911 | LN | | Cell, 60 Alola, Banning |
| 07/30/2015 | 17:55 | 201507300096 | 415 FAM | LN | P27 | 1260 W Williams #9, Banning |
| 07/30/2015 | 17:55 | 201507300097 | AOD/ACO | UT | P32 | 1490 W Barbour, Banning |
| 07/30/2015 | 18:17 | 201507300098 | 911 | IN | | 1999 N 8TH, Banning |
| 07/30/2015 | 18:31 | 201507300099 | MEDICAL | OA | | 4872 Fairway Oaks Av, Banning |
| [illegible]/2015 | 18:42 | 201507300100 | SUSP SUB | AR | P32 | 1513 W Cottonwood Rd, Banning |
| 07/30/2015 | 18:50 | 201507300101 | SUSP SUB | UT | P27 | Lyons Park, 955 S Hargrave, Banning |
| 07/30/2015 | 18:56 | 201507300102 | MEDICAL | OA | | 281 Brooklawn Dr, Banning |
| 07/30/2015 | 19:17 | 201507300103 | 273.5 IP | AR | P27 | 495 E Theodore, Banning |
| 07/30/2015 | 19:20 | 201507300104 | AOD/CPS | AS | P26 | Lobby, 270 W Wilson, Banning |
| 07/30/2015 | 19:45 | 201507300105 | 911 | LN | | 60 Alola, Banning |
| 07/30/2015 | 19:45 | 201507300106 | 415 PC | LN | | 493 E Theodore, Banning |
| 07/30/2015 | 19:50 | 201507300107 | MISSPERS | RT | P26 | Lobby, 2140 W Ramsey, Banning |
| 07/30/2015 | 19:53 | 201507300108 | 415 NEIG | CV | P32 | Banning Suites Motel, 3911 W Ramsey #304, Bannin |
| 07/30/2015 | 20:17 | 201507300109 | MEDICAL | OA | | 1031 Southern Hills Dr, Banning |
| 07/30/2015 | 20:19 | 201507300110 | TRESPASS | UT | P26 | N Hargrave/E Nicolet, Banning |
| 07/30/2015 | 20:32 | 201507300111 | 242 PAST | CV | P32 | Stagecoach Auto Plaza, 4097 W Ramsey, Banning |
| 07/30/2015 | 20:34 | 201507300112 | 911 | LN | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 20:34 | 201507300113 | 911 | LN | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 20:37 | 201507300114 | 415 NEIG | LN | P26 | 2120 W Monroe, Banning |
| 07/30/2015 | 20:37 | 201507300115 | 415 JUV | RP | | W Indian School/N 8TH St, Banning |
| 07/30/2015 | 20:41 | 201507300116 | 911 | LN | | 1999 N 8TH, Banning |
| 07/30/2015 | 20:48 | 201507300117 | 911 | LN | | Cell, 1999 N 8TH, Banning |
| 07/30/2015 | 20:58 | 201507300118 | 415 PC | LN | P26 | E Williams/Allen St, Banning |
| 07/30/2015 | 20:59 | 201507300119 | 415 FAM | LN | C10 | Georgebertos, 755 W Ramsey, Banning |
| 07/30/2015 | 21:01 | 201507300120 | 911 | LN | | Cell, 1999 N 8TH, Banning |





**13:01 Suspicious Subject(s)** 1507300061

Brenton Bulrice

Erik Vanheck, 951-768-4926, reported RP ADV A MALE SUBJ BEHIND THE DUMPSTERS AT LOC// ADV HE IS HITTING HIMSELF IN THE HEAD AND YELLING// BMA 50 YOA LSW: WEARING A HAT BLU SHIRT BLK PANTS//. Incident location was 2301 W Ramsey, Coyne Power Sports, Banning. . Disposition: Checks Ok by U444 - Brenton Bulrice. Subj Was Moved Along

**13:06 Commercial Alarm** 1507300062

RP Locations was 866-689-0599. Safety Security, reported GARAGE DOOR RESET UNK ACT: 1304 HRS RP PENDING PH: NONE LISTED OPER: 650. Incident location was 1046 Juniper Pl, Shaw, Louis, Banning. . Disposition: Alarm Cancelled by Alarm Company by Pam Stone.

**13:37 Battery - In Progress** 1507300064

Brenton Bulrice, Vincent Avila

Sonya Rodriguez, Banning, 951-259-3733, reported RP IS A PASSERBY ADV A MALE IS 242'ING A FEMALE IN A WHITE FORD TAURS// ADV THE MALE IS THE DRIVER// HMA 50 YOA LSW: BRO SHIRT// UNK DESC OF FEMALE IN THE PASSENGER SEAT//RP REQ TO REMAIN ANON
Cellular E911 Call:
Lat:33.926092 Lon:-116.93422
Service Class: W911. Incident location was W Ramsey/Grandview Ave, Eagle Bar, Banning. Vehicle description: 1993 White Ford Taurus, 3CDE197/CA.10-8. NEG ON 242 415 V BETWEEN BF AND GF// PARTIES CALMED DOWN AND WERE TRANSPORTED. Disposition: Log Note Only by U444 - Brenton Bulrice.

**13:47 Welfare Check** 1507300066

Brenton Bulrice

Desert Clinic Pain Institue, 36101 Bob Hope Dr #STE B1-B, 321-1315, reported ATC: JAMES DROST 61 YRS RP STATED HE HAD NO ONE TO TURN TO AND HE HAS OVERDOSED BEFORE RP STATES SUBJ HUNG UP, ON CALL BACK MALE TOLD RP IT WAS NOT GOOD AND NO ONE COULD HELP
Service Class: BUSN. Incident location was 2951 Summerset Ci, Banning. . Disposition: Log Note Only by U444 - Brenton Bulrice. Subj Checks Ok// Neg On 5150 Subj Is Hbd

**14:07 Traffic Stop** 1507300068

William Auer, Brian Callahan

Officer initiated activity at W Ramsey/Sunset Ave, Banning. Vehicle description: 2009 Ducat, 20E7972/CA. Disposition: Cite Issued by U452 - William Auer.

**14:14 Commercial Alarm** 1507300069

William Auer, Brian Callahan, Brenton Bulrice

Pacific Alarm, 800-432-1429, reported COVERS WEST FELLOWSHIP HALL RESET UNK ACT: 1411 HRS RP PENDING PH: 951-849-3232 OPER: 212. Incident location was 1000 W Wilson, Grace Lutheran Church, Banning. . Disposition: False Alarm by U444 - Brenton Bulrice. Exterior Structures Secure

**14:22 Suspicious Vehicle** 1507300071

Brenton Bulrice

Christina Valencia, 1401 Wesley, Banning, 951-845-7327, reported RP STATES A TRUCK PULLED UP AND TOOK PICTURES OF RP'S HOUSE AND OTHER HOUSES IN THE NEIGHBORHOOD WHEN RP ASKED WHY HE WAS TAKING PICTURES, HE SAID IT WASN'T ILLEGAL. Vehicle description: 2013 Gray Ford F150, 09707K1/CA. Disposition: Unable to Locate/Gone on Arrival by U444 - Brenton Bulrice. Veh Goa/Utl Adv Rp To Call Back If Veh Returns

**15:23 Suspicious Vehicle** 1507300077
Vincent Avila

Kathryn Hood, 1880 N Alesandro, Banning, 719-310-7890, reported SUSP VEH CIRCLING AREA SLOWLY LATE 90'S BLK HONDA ACCORD UNK LIC 3-4 SUBJS INSIDE 1 SUBJ WAS LAYING DOWN FOR A SHORT AMOUNT OF TIME IN THE BACK SEAT LAST SEEN S/B 4TH 3 AGO. Incident location was N 4TH/INDIAN School Lane, Banning. . Disposition: Unable to Locate/Gone on Arrival by U404 - Vincent Avila.

**15:33 Embezzelment** 15-2293/1507300079
Patrick Kelly

Paul Steelman, 760-272-1003, reported RP ADV THAT AN EMPLOYEE WAS EMBEZZLING FUNDS FROM A COMPANY CREDIT CARD// RP ADV SUBJ IS DETAINED AT THE LOC// CARLISLES, TONY DOB: 02041999//. Incident location was 2415 W Ramsey, Pj's Golf Carts, Banning. . Disposition: Arrest by U422 - Patrick Kelly. Juv Was Released To The Mother

**16:03 Mental Disorder** 15-2292/1507300080
Brandon Smith, Robert Castro

//kelly, 3500 W Ramsey, Banning, 951-203-6822, reported IN THE PKG LOT WM BALD LSW: BLK TSHIRT, SUBJ SAYING HE WANTS TO KILL HIMSELF NO WPNS SEEN
Cellular E911 Call:
Lat:33.925653 Lon:-116.9151
Service Class: WPH2. . Disposition: Report Taken by U451 - Robert Castro.

**16:36 Residential Alarm** 1507300088

Safe Security, 877-716-6507, reported BRANT RESID COVERS GRAGE DOOR RESET UNK ACT: 1631 HRS RP PENDING PH: 951-572-5420. Incident location was 1108 Foothill Dr, Banning. . Disposition: Alarm Cancelled by Alarm Company by Pam Stone.

**17:07 Traffic Stop** 1507300090
Brandon Smith

Officer initiated activity at N 8TH/RAMSEY, Banning. Vehicle description: 1997 Chevrolet, 6ZMH530/CA. Disposition: Warning (Cite/Verbal) by U427 - Brandon Smith.

**17:19 Traffic Stop** 1507300092
Brandon Smith

Officer initiated activity at E Ramsey/Livingston, Banning. Vehicle description: 2007 Black Chrysler 300, 5XIN986/CA. Disposition: Warning (Cite/Verbal) by U427 - Brandon Smith.

**17:36 Animal Call** 1507300093
Robert Castro

Teresa Houle, 714-798-1435, reported RP ADV THAT THERE IS A GERMAN SHEPARD IN THEIR YARD// ADV THAT IT WON'T LEAVE THE YARD AND IT IS TRYING TO ATTACK HER ANIMALS// ADV SHE ALREADY ADV ACO. Incident location was 925 W Hays, Banning. . Disposition: Unfounded by U451 - Robert Castro. Dog Was Goa And No Longer In The Area

**17:55 415 Family** 1507300096
Robert Castro, Brandon Smith, Steve Hobb

Vivian Anges, 1260 W Williams #9, Banning, 951-842-8484, reported RP ADVD DAUGHTER IS REFUSING TO LEAVE HER HOME // 415 VERBAL WITH MELISSA STARNES 090380 // RP ADVD SHE PULLED HER DAUGHTERS HAIR
Cellular E911 Call:
Lat:33.943376 Lon:-116.89326
Service Class: W911. 10-8. 10-8. daughter agreed to leave. she removed her belongings and is outside waiting for a ride. daughter was advised not to cause a disturbance while waiting or she will be subject to arrest. Disposition: Log Note Only by U427 - Brandon Smith.





**17:55 Animal Call**

1507300097
Robert Castro

Anna Chacon, 909-379-3965, reported RP ADV OF 2 DOGS THAT LOOK LIKE WOLVES ARE WANDERING AROUND HER NEIGHBORHOOD// NOT VICIOUS OR AGGRESSIVE. Incident location was 1490 W Barbour, Banning. RP ADVISED DOGS NO LONGER IN THE AREA. Disposition: Unable to Locate/Gone on Arrival by U451 - Robert Castro.

**18:42 Suspicious Subject(s)**

1507300100
Steve Hobb, Brandon Smith, Robert Castro

Ronald Mccomisky, Banning, 951-990-3067, reported RP ADV THE FEMALE SUSP IS AT THE LOC// ADV SHE PULLED UP IN THE DRIVE WAY// BLK TAURUS// REF CASE 15-2291//
Cellular E911 Call:
Lat:33.94372 Lon:-116.89352
Service Class: W911. Incident location was 1513 W Cottonwood Rd, Banning. Vehicle description: 2004 Black Ford Taurus, 5FZP736/CA. Disposition: Arrest by U451 - Robert Castro.

**18:50 Suspicious Subject(s)**

1507300101
Brandon Smith, Steve Hobb

Anon, 951-570-2503, reported RP ADV OF A GRAY CAR AND RED CAR WITH A AN OPEN CONTAINER ON TOP OF THE VEH// ADV THE OCCUPANTS LOOK YOUNG// 6 SUBJS. Incident location was 955 S Hargrave, Lyons Park, Banning. . Disposition: Unable to Locate/Gone on Arrival by U427 - Brandon Smith.

**19:17 Domestic Violence - In Progress**

15-2294/1507300103
Patrick Kelly, Brandon Smith, Steve Hobb

Yadira Orta, 475 E Theodore, Banning, 951-443-6559, reported RP CALLING FOR NEIGH WHO WIT THE BF HITTING GF OUTSIDE // HMA LSW: WHI SHIRT
Cellular E911 Call:
Lat:33.938195 Lon:-116.8717
Service Class: WPH2. Incident location was 495 E Theodore, Banning. 10-8. Disposition: Arrest by U427 - Brandon Smith.

**19:20 Assist CPS**

1507300104
Patrick Kelly

Dakota Meza, 951-217-6818, reported RP REQ OFFICER ASSISTANCE WHILE SHE CHECKS ON THE WELFARE OF THE CHILDREN AT THE LOC//. Incident location was 270 W Wilson, Lobby, Banning. Vehicle description: 1996 Suzuki, 14P3738/CA. Disposition: Assisted by U422 - Patrick Kelly. Neg On Children Being In The Resd

**19:45 Disturbing the Peace**

15-2295/1507300106
Steve Hobb

Sunny Lantry, Banning, 951-400-9934, reported RP ADV THAT THE FEMALE FROM THE EARLIER DV IS NOW THREATENING THE NEIGHBORS AND THE FAMILY FOR CALLING THE POLICE// ADV THAT THEY ARE ALL SAFE INSIDE AND THE FEMALE IS ON THE PORCH// ADV THE FEMALE IS 415 V
Cellular E911 Call:
Lat:33.94093 Lon:-116.86455
Service Class: W911. Incident location was 493 E Theodore, Banning. REF CASE 15-2294. Disposition: Log Note Only by Alexandra Avery.

**19:50 Missing Person**

15-2296/1507300107
Patrick Kelly

George Blancas, 951-448-2899, reported RP ADV THAT OVER A WEEK AGO HIS GF AND HIM GOT INTO A FIGHT AND SHE LEFT MCDONALDS AND HAS NOT RETURNED HOME// ADV SHE DOES NOT HAVE A CELL PHONE// SALIE, MARY DOB: 02271992//. Incident location was 2140 W Ramsey, Lobby, Banning. . Disposition: Report Taken by U422 - Patrick Kelly.

# EXHIBIT F

BANNING POLICE DEPARTMENT

INTERVIEW WITH
DEBORA MONROE-HEAPS

INTERVIEWED BY
DAVID FLUTTS

ADMINISTRATIVE INVESTIGATION
RCS #2015-044

SEPTEMBER 17, 2015 @ 3:00 PM

Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

Investigator David Flutts (DF)
RCS Investigations and Consulting

Debora Monroe-Heaps (DH)
Director of Programs
Riverside Area Rape Crisis Center

DF: Okay, can you still hear me okay?

DH: I can.

DF: Okay, I'm gonna go ahead and read my information that I need to. Um, today's date is September 17, 2015, the time is approximately 3:00 p.m. My name is David Flutts, I'm a private investigator from RCS Investigations and Consulting. Our firm was retained by the City of Banning to conduct an administrative investigation related to a complaint received concerning possible misconduct by Corporal Steve Hobb.

This is a telephone interview with Debora Heaps and, uh, Miss Heaps, as I said before I started the recording, uh, do I have your consent to record this?

DH: Yes

DF: Okay, thank you. And if you could just state and spell your name for the record.

DH: Yes, my name is Debora Monroe-Heaps, D-e-b-o-r-a, last name Monroe, M-o-n-r-o-e, hyphen, H-e-a-p-s.

DF: Okay

DH: And I am the Director of Programs for the Riverside Area Rape Crisis Center.

DF: Okay, and if you could can you briefly describe your overall job duties in your position?

DH: Yes, um, my overall job, uh, we provide services to sexual assault victims and their family members. So we provide hot lining, um, advocacy, in-person counseling for court groups, accompaniment, um, for victims of crimes specifically sexual assault to all age groups and also we provide primary prevention education to, um, all ages as well, um, young people all the way to the elderly or seniors, and I oversee both of those departments and I also oversee our volunteer, um, program and I have a responsibility to also network with the community at the administrative level. I also write grants for funding reasons. We're a non-profit 501(c)(3) and I also, um, monitor those grants.

DF: Okay. Um, if you could just confirm with me, uh, to your knowledge was there a training session scheduled at the Banning Police Department on July 30th of 2015?

DH: Yes, there was, at 4:00 p.m.

DF: And how was your organization involved in that training program?

DH: Uh, the Riverside Area Rape Crisis Center has been providing briefing training to first responders at all law enforcement agencies in our service area which includes west to Corona, south to Temecula, and east to Cabazon, Banning Police Department being one of the agencies that we provide advocacy for sexual assault victims to.

DF: Okay, and that partially answered my next question – So this training is provided to a number of law enforcement agencies, is that correct?

DH: Yes, we provide annual training unless there is a station that needs additional training, usually if they've had a big influx in staffing that they want more training, and we spearhead that for as long as I can remember when I got here, we provide these services and that's been, I've been working here over 20 years.

DF: Okay

DH: So it was our responsibility to contact the law enforcement agencies and to schedule these trainings. And then, um, after a while, after I'd been doing that for quite some while, um, yes, I know the procedures of the forensic, um, examiners – the nurses, I understand the district attorney, we network very well with him, and also law enforcement, we understand what their role is in providing services to sexual assault victims. I thought it would be wonderful if we could get the forensic nurses and the district attorney also to come to the briefing trainings so we had all four disciplines under the same roof and we could dialog and exchange information, update them on current laws, also update them on information about, um, evidence gathering, evidence storing, how to interact effectively with sexual assault victims for a best result, best practice, um, in regards to, um, interviewing and providing, um, services and getting reports for sexual assault victims.

DF: Okay, so –

DH: So that started happening quite some time ago that Riverside County Regional Medical Center bought in and started providing nursing – nurses at each one or our trainings. We also have a second, um, evidentiary exam center and that's found at Rancho Springs Medical Center and, uh, Nicole Yadon who is the manager there, bought in and she also presents as well because sometimes they, if one hospital is busy than the other, they might, um, defer to the other hospital. So they sort of need to know about both hospitals. Um, unfortunately and, um, we

also are fortunate that the District Attorney's Office bought into it too and has been providing district attorneys to also, um, help and assist the first responders and the law enforcement agencies on these briefing trainings. That particular day, a district attorney could not make it.

DF: Okay, so on this particular day, the July 30th session scheduled at Banning PD, was it then your organization was the one who coordinated with all the presenters for that day?

DH: Yes, we first contact all the agencies and schedule with them so, um, uh, Chief Diaz coordinated with us and we scheduled through him and then we in turn let the other team members know cause we call ourselves a SART team – a Sexual Assault Response Team – and so we coordinated with the rest of the team to let them know the day of the training.

DF: Okay, so –

DH: And we had, um, in this last quarter, we had, um, over 30 of these trainings.

DF: Okay, and on this particular, for this particular session at Banning PD, did you personally set it up with Chief Diaz or was that someone under your direction?

DH: It was someone under my direction. It was either Vivian Amezquita or it was Rachel McDonald, one of our Community Education Presenters. It is their responsibility to get these scheduled.

DF: Okay, and if you could, those two people, Vivian, uh, could you spell her last name for me if you would?

DH: A-m-e – let me see, I am sorry. I wanna get it right. A-m-e-z-q-u-i-t-a.

DF: Okay

DH: A-m-e-z-q-u-i-t-a, Amezquita.

DF: And her first name is Vivian, V-i-v-i-a-n?

DH: Vivian, V-i-v-i-a-n.

DF: Okay, and the other person's name was what? Rachel?

DH: Rachel, R-a-c-h-e-l, last name McDonald, M-c-D-o-n-a-l-d.

DF: Okay, and what are their titles?

DH: They are Community Education Presenters.

DF: Okay, and I believe you may have emailed this information to me but just so I have it for the record, um, who specifically was present at the Banning PD session, if you know?

DH: Representing out agency, it was Vivian Amezquita.

DF: Okay, and you mentioned earlier Nicole Yadon, is that how you say her name?

DH: Yes, Nicole Yadon is the SART Manager for Rancho Springs Medical Center.

DF: Okay, and she was present as well?

DH: Yes, she was.

DF: And do you know who else specifically was present?

DH: Yes, Sharleen Lampkin.

DF: Okay, can you spell her name?

DH: Um, Sharleen is S-h-a-r-l-e-e-n, last name's Lampkin, L-a-m-p-k-i-n, and she's a SART nurse. She's a forensic nurse.

DF: Okay, and what is she – is she associated with a specific facility?

DH: Oh, I'm sorry, Riverside County Regional Medical Center.

DF: And where is that located?

DH: In Moreno Valley.

DF: Okay,

DH: On Nason and Cactus.

DF: And you said that Nicole is at Rancho Springs?

DH: Yes, at Rancho Springs Medical Center.

DF: And where is that located?

DH: That's in Murrieta.

DF: Okay, alright. And, uh, so it was just the three of them, is that correct?

DH: Yes, it is.

DF: Okay. So at some point after that training did you become aware that there had been some problems with the session?

DH: Yes, I did.

DF: And how did you become aware of that?

DH: Um, I became aware of it the next day in the morning on July the 31st. The SART Manager of Riverside County Regional Medical Center, Gloria Davis, made a cellphone to cellphone personal call to me.

DF: Okay

DH: Because I was off that day and she, we all have each other's numbers because of the level of response that we have.

DF: And Gloria is the manager of the forensic nurses, is that right?

DH: Yes, she is.

DF: Okay

DH: At Riverside County Regional Medical Center.

DF: And again, as you said, that's in Moreno Valley?

DH: It's in Moreno Valley on Nason and Cactus.

DF: Okay, and what did Miss Davis tell you?

DH: She said that the night of the last, um, night before at Banning that, uh, Sharleen had called her and told her that the team had been treated, um, very disrespectfully and was not received well by the Banning Police Department. She also said that perhaps we have to rethink this and maybe, uh, make a video and, uh, so that maybe they can just push it in for training reasons. She said that this was a big sacrifice to her team to do these trainings person, you know, uh, in person every day for many months, you know, for two months we'd been doing them, it takes a lot of time and if the law enforcement agencies are not getting anything out of them or don't want us there or not appreciative, that we may have to rethink it.

DF: And, um, in your experience in your position have these various trainings been done in person for a number of years?

DH: Yes, ever since I've been here.

DF: Okay, and you said that's over 20 years?

DH: Yes

DF: And did Miss Davis specifically name to you any employees of Banning PD?

DH: Uh, yes, it was an Officer Hobbs. I asked for the name and his name was Officer Hobbs.

DF: Okay, and did Miss Davis give you any details as to what kind of behavior Officer Hobb was presenting to them?

DH: Uh, Sharleen said to her, who, uh, Gloria is Sharleen's manager, that he was dismissive, that he was rude, that he rolled his eyes at them, that he said they didn't have time for this stuff, that they had already had a training recently in this and they didn't need it, they didn't need it.

DF: Okay

DH: And it was an inconvenience to them.

DF: Okay, and, uh, to your knowledge did they in fact complete the training session?

DH: Yes, um, he did, um, in a very, huh, like I have to do it type way. Um, disrespectful way. He took them back to the briefing room and they conducted the training and, um, it was reported to me through Gloria Davis that he just rolled his eyes, he postured disrespectfully, um, and was hostile.

DF: Okay, and in regards to, in general terms to these trainings, you mentioned that they'd been doing these every day for two months. Is there a certain time of year where they get all these done?

DH: We get them done in the summer.

DF: Okay, and, um, do you have an estimate as to how many actual agencies or an approximate number of agencies that your organization presents to?

DH: Yeah, I could, let me see – that's a good question. If you wait a minute I can find that.

DF: Sure

DH: One, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve. Twelve agencies.

DF: Okay

DH: I'm sorry. Yeah.

DF: And you say these are all throughout the county, correct?

DH: Uh, yes, they're in our service area, yes, in what we call western Riverside County.

DF: And earlier you said that runs from Corona on the west to – what were the other areas?

DH: South boundary is Temecula and, uh, all the way up to the San Bernardino – north is San Bernardino boundary line and east to Cabazon.

DF: Okay, and you said on this particular training session of July 30th, um, uh, there typically is a DA person there but for this one that person was not present?

DH: Yes, they don't always make a hundred percent of them. It is on a voluntary basis that their DA's come up, um, and it depends on their day of, in trials and, um, yes, on that particular day – we don't get a hundred percent participation with them but they do the best they can. I had already been to Banning Police Department personally, um, for one of the briefing trainings and a DA was there that day but, um, not this particular day.

DF: And how long ago was that, do you recall?

DH: Um, I'm trying to see when that one was on my calendar. We did not end up conducting it or completing it because there had been a report of a bomb in a mailbox and they had to go out and respond to that. It is a very small agency so we totally understood that it took their officers out there to protect the, to protect the community. It was earlier in the month I believe.

DF: Okay

DH: I'm trying to find it on my schedule.

DF: Earlier in the month of July?

DH: I believe so.

DF: Okay

DH: I'm trying to find it right now.

DF: That's fine. No, that's fine.

DH: Because one of our presenter – if my presenters are not available, if their day is too full, then I will go ahead and fill in for them.

DF: Okay, so that was gonna be part of my next question – uh, Vivian, Nicole, and Sharleen, are they typically the ones who present this or do others present as well?

DH: Okay, and I just, I'm going back – the date that I went there was July the 27th, the Monday before this happened.

DF: Okay

DH: Uh, huh, and to answer your question, yes, Nicole is normally at all the briefing trainings representing the agency. Once in a while she may have one of her forensic nurses do it. Sharleen is, um, one of the SART nurses and all of the SART nurses and the manager take turns from Riverside County Regional Medical Center.

DF: Okay, so they've got a group that do this on a regular basis?

DH: Oh, yeah, yeah. All the nurses know about it at both hospitals. Our agency of course is well aware of it, the district attorney is well aware of it, and then of course Rancho Springs is well aware of it. We've been doing this many years.

DF: Now at the session that you said you were present at Banning on July 27th, is that the one that had to be cancelled because of the incident they had?

DH: Yes

DF: Okay. Now, um, after you became aware of this at some point did you become aware that Nicole Yadon had sent an email complaint to the police department?

DH: Yes, the very following week, um, she cc'd me an email that she sent to Chief Diaz.

DF: Okay, and the email I have from her was dated August 3rd, does that sound like the right -?

DH: That sounds right.

DF: Okay

DH: Yes

DF: And that was a Monday?

DH: Yes

DF: Okay. Now, um –

DH: She reacted a lot faster than I did.

DF: Okay. Now, uh, from the time you found out that there had been some issues along with the fact that Nicole cc'd you on her email, did you speak to anyone other than Gloria?

DH: Yes, on Monday morning Vivian, um, my staff person who was there came into my office on Monday morning.

DF: Okay, and did she relate in essence what you told me before?

DH: Yes

DF: Okay

DH: It was, it matched up and I had not talked, I just let her talk and it matched up perfectly.

DF: To what Gloria had said?

DH: Yes

DF: Okay. Now, uh, have there been other occasions previously where there've been these types of problems at other police departments?

DH: No

DF: Okay, is this the first in your experience that you've seen?

DH: Yes

DF: Okay

DH: I mean once in a while they'll say we weren't expecting you or we forgot or, you know, we have had, um, an unusual, we were talking about it, an unusual amount of cancellations this time that when we get there, um, and there's an emergency. We had someone that was jumping off the bridge over the 215, we had a police officer that was attacked, we had an officer related shooting this year, and then we also had the bomb scare up at Banning. So they, they get rescheduled.

DF: Right

DH: But there's just been a lot of, huh, it was, we were having a discussion about that – there was an unusual amount of, um, of cancellations.

DF: Right. Okay, now these training sessions, how long do they typically last?

DH: Um, they can last anywhere from, they average about a half an hour. They could end a little bit earlier than that or some of them, um, there's so many questions and participation, um, that it can go, um, almost to an hour.

DF: Okay

DH: But that's excessive. I think an hour – not excessive but that's on the longer end.

DF: Now aside from Nicole cc'ing you on her email did you ever actually speak to her about this?

DH: Yes

DF: Okay, when was that, do you recall?

DH: Um, I think we ended up speaking shortly after I got her email.

DF: Okay

DH: And then I also talked to her when I sent my email and received an immediate response from Chief Diaz. And I felt that would be helpful for her too cause she had not heard – I don't think she had heard from them or she had just heard from them and, um, so – this is Chief Diaz – so, um, I wanted to let her know that I had received a response from him.

DF: Okay

DH: And I sent that on the 13th I believe.

DF: Okay

DH: So I must've talked to her on the 14th.

DF: Alright, I actually have a copy of your email here. It's actually dated August 12th, on a Wednesday. Does that sound right?

DH: Yes, that's – yes.

DF: Okay. Now during your conversation with Nicole, did she provide any details about the actual event and if so were they consistent with what you had already heard?

DH: Well I had already read her email and when I read her email, um, she sent it at 8:22, my staff person had already been in my office-

DF: Oh, okay.

DH: So at 8:00 in the morning, so, and I did not, I stayed quiet because I wanted my staff person to be able to say it in her words and not to be influenced by anything that I had heard or I, you know, that, uh, from Gloria on Friday.

DF: Right

DH: And then I opened up my, she'd come immediately into my office after 8:00 a.m. so then when I opened up my emails, um, there had been an email from Nicole at 8:22 a.m.

DF: Okay

DH: When I opened up my email, then I saw that, um, that she in fact had sent an email to, um, Banning Police Department.

DF: Okay. So, um, so other than – so in regards specifically to this actual incident, uh, you spoke personally to Vivian, to Nicole, and to Gloria, is that right?

DH: That's correct.

DF: Okay, was there anyone else that you spoke to?

DH: Um, well I ended up speaking to the Chief.

DF: Okay, I'll get to that in a minute.

DH: Yeah

DF: Okay. So, uh, did you speak to – well I guess, so Vivian and Nicole were both obviously present. The only other person that was present was Sharleen and she related the experience to Gloria. Is that correct?

DH: Correct, yes, and I heard her experience through her supervisor.

DF: Okay, now, uh-

DH: Because we spearhead this, all of the team comes to us about any issues or any questions in regards to briefing trainings.

DF: Okay. Now the, uh, you already said this but you – I just wanna confirm – you did in fact send an email to Chief Diaz on August 12th?

DH: Yes

DF: And you, uh, some point after that, is that when you spoke to him?

DH: Yes

DF: Can you describe -?

DH: But you know what? For the life of me I can't remember the date that he called.

DF: Okay, but it was after your email?

DH: Oh, yes, it was, um, quite some time after the email. It wasn't, it was a little while after it.

DF: Okay. Now in some of the correspondence that I was given, um, it looks like the chief's assistant was out of town for some period of time. Maybe that may have been the delay. I'm not –

DH: Well I sent, I sent my email directly to him from off – I didn't know who Nicole sent her email to.

DF: Okay

DH: I, I acted on my own and on August the 12th, because I had wanted to think about it for a while and, uh, know what I wanted to say and, uh, we cherish our partnerships and our collaborations with law enforcement and we don't, I didn't, we didn't – I personally did not want to look like, um, to sound like we were complaining. I try and do this in a very professional way. We respect the responsibility of law enforcement and what they do to protect our community and how they help survivors of sexual assault and I wanted to make sure and word this correctly. So it took me some time to put my thoughts together on this but I did send it on August the 12th at 5:08 p.m.

DF: Okay

DH: And then he, he responded immediately. He responded in two minutes.

DF: Yeah, you know what? – I just, after I asked you that I looked at my documents here and it looks like the delay occurred with regard to Nicole's email.

DH: Uh, huh

DF: Her email was to the chief's assistant and there was a little bit of delay because she was out of town. So I see, I see what it was now. So it wasn't –

DH: Yes

DF: It wasn't yours.

DH: It might've been, you know, shortly thereafter that the Chief personally called me and we had a very good, um, conversation.

DF: Now in your conversation with Chief Diaz did you basically relate what you've related to me in terms of what, you know, what you, what happened?

DH: Um, he had already received my email but he wanted to again personally speak with me and apologize about what happened and he wanted me to know that he was not okay with this type of behavior and that it would not be tolerated. And that he, um, um, he, he, he felt really bad cause he said he had just left before they got there and that he felt bad that he had not greeted them.

DF: Uh, huh

DH: And I, I said, well, you know, I'm a supervisor too and when I leave my office the staff has a responsibility to be professional when I'm not here.

DF: Right

DH: So, you know, and I also said that, uh, I remember having a conversation about I'm, it was unfortunate he, that they, the professionals were treated this way but I'm glad that it was the professionals and not the community because this could've been, um, you know, very problematic in the community as well, if he treats people like this. And I basically said that this, this could be a liability, you know, for someone to treat professionals and the community like this, you know, and that's why I shared it with him to protect his agency.

DF: Okay. Now, um, is there anything else that we haven't discussed that you think might be relevant to this?

DH: Well, I just told him also, I did not know his rank, I did not know Officer Hobb's rank and I did share with him that I didn't know that but that if he was a man of, um, seniority or rank, that his behavior and posturing on these types of trainings, um, might influence the less experienced officers-

DF: Right

DH: And that it could, um, discredit the training. And he was very, very grateful that we come. He said they were a small agency and cannot afford a lot of outside training so they are always grateful that we come. There is a ton of new information in regards to sexual assault right now. It is changing very quickly and it's imperative that those who are responding to this crime, um, or these types of crimes, know what to do and how to give the community good information and referrals, how to get other help, uh, where to take them for forensic exams, um, how far out is the, um, are the forensic exams being conducted, um, what to expect at the hospital, um, also, you know, the follow up and where the evidence, you know, what, what to do with the evidence. There's, there's a lot that goes into this. So he, um, was very grateful that we come out and we update them on a regular basis.

DF: Okay. Uh, those are all the questions that I have for you at this point. Is there anything else you'd like to add?

DH: I don't think so.

DF: Okay. I'm gonna conclude the interview here in just a moment but if I could get you to stay on the line just for a second, I wanna speak to you about arranging some other interviews if you wouldn't mind.

DH: Yes, that would be fine.

DF: Okay, we're gonna go ahead and conclude the interview. It is September 17, 2015, the time is about 3:30 p.m.

To the best of my knowledge and ability, the above transcript is a true and accurate transcription of the recorded interview of Debora Monroe-Heaps by RCS Investigations and Consulting LLC, transcribed by Karyn Flutts for the Banning Police Department.

# EXHIBIT G

BANNING POLICE DEPARTMENT

INTERVIEW WITH
VIVIAN AMEZQUITA

INTERVIEWED BY
DAVID FLUTTS

ADMINISTRATIVE INVESTIGATION
RCS #2015-044

SEPTEMBER 23, 2015 @ 3:55 PM

Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

Investigator David Flutts (DF)
RCS Investigations and Consulting

Vivian Amezquita (VA)
Community Educator
Riverside Rape Crisis Center

DF: Today's date is September 23rd, the time is about 3:55 p.m. My name is David Flutts, I'm a private investigator from RCS Investigations and Consulting. Our firm was retained by the City of Banning to conduct this administrative investigation. The investigation concerns allegations of potential misconduct against a Banning Police Officer and resulted from complaints received by members of the public. The incident under investigation occurred on July 30, 2015. The RCS case number is 2015-044 and the Banning PD, IA number is 15-04.

This is an interview with Vivian Amezquita and the interview is being conducted at 1845 Chicago Avenue in Riverside. And, uh, Vivian, do I have your consent to record this interview?

VA: Yes, sir.

DF: Please state and spell your name for the record.

VA: Vivian Amezquita, V-i-v-i-a-n, last name A-m-e-z-q-u-i-t-a.

DF: And what is your position here?

VA: Community Educator.

DF: And this is the Riverside Rape Crises Center?

VA: Yes, sir.

DF: And as part of your position do you go to various agencies and other locations and give presentations?

VA: Yes

DF: Did you participate in a training session at the Banning Police Department on July 30th, 2015?

VA: Yes

DF: And what was your particular involvement in that session?

VA: We were doing a training on what our advocates do here at the Rape Crisis Center because we encounter police officers when that is going on.

DF: Okay, and how many presenters were there that day?

VA: There was three of us.

DF: Okay, and do you know who the other two were?

VA: Nicole and Sharleen.

DF: Okay, and do you know where Nicole's from?

VA: Nicole is from the, um, Rancho Springs Medical Center, she's a nurse there and a SART nurse. And Sharleen is from RUMC here in Moreno Valley, she's also a SART nurse from there.

DF: Okay, and that's Riverside County Medical Center?

VA: They changed it to Riverside University Medical Center.

DF: Okay

VA: That's their new official name.

DF: Okay

VA: But, yes.

DF: And she's a SART nurse?

VA: SART nurse as well.

DF: Okay

VA: Uh, huh

DF: And have you provided this sort of training to other law enforcement agencies?

VA: Yes

DF: Have you ever presented at the Banning Police Department?

VA: Yes, last year.

DF: Okay, and do you typically provide this training to agencies on a yearly basis?
VA: Yes

DF: Okay. Please describe what occurred when you arrived to conduct the training that day.

VA: We arrived, we let the person at the front desk know that we were there and they said they were gonna let someone know to come out and get us. Um, the officer came out and he asked us what we were doing there and we explained that we were there for our SART training, our yearly SART training. Uh, he said, well, we just had some nurses here like a couple months ago doing this training. Um, and we said, well, that's not possible – Nicole was responding this time – she said, that's not possible because we are the only nurses that provide this training and we were here last year, it's a yearly thing. And he said, no, there were nurses here not too long ago, um, and we already had this training. And he asked us for our other contact which was my position to respond, that it was Alex Diaz. Um, and he said, oh, that's sergeant, rolled his eyes and said, come inside.

DF: I'm sorry, say that part again about Diaz.

VA: Yes, he said, who is your contact? And I said –

DF: So he asked you that?

VA: Yes, he asked me that because I have contact information. We are the ones that set it up.

DF: Okay, your organization's the one who sets the training up?

VA: Yes, yes, we do. We do all the calling. Um, and I looked in my phone and that's Alex Diaz and he said, oh, that's sergeant, rolled his eyes, said, alright, come inside.

DF: And do you know the officer's name?

VA: I don't remember his name.

DF: Okay, and when he said, Alex Diaz, oh, that's a sergeant and then he rolled his eyes? Okay, did you understand what he meant by that?

VA: No

DF: Do you know what position Alex Diaz has there?

VA: No

DF: Okay, he's the Chief of Police.

VA: Okay

DF: Okay

VA: Okay

DF: So how would you, uh, if you could just in general terms, describe the officer's demeanor at that point?

VA: I think the thing that mostly made us realize that there was something wrong was he was mad that we were there. Um, and I think, you know, we always get those questions, what are you doing here? What can I help you with? But he was upset at the fact that we were there, um, and that's what caused the awkwardness, the tension, and, um, when we walked into the room, you could feel the tension. So we thought maybe the problem was with everybody and that we were there, um, and so it was really hard to present and –

DF: Okay, so you initially had contact with the officer when the officer came out and greeted you at the lobby?

VA: Uh, huh

DF: Okay. Um, you said that it was obvious that the officer was angry? How, how do you -? Is that right?

VA: Yeah. Yes.

DF: Okay, um, describe how you had that opinion based on what he was doing.

VA: By the way that he was saying things. He said, well, what are you guys doing here? It wasn't just like a normal, well, how can I help you? You know? It was more of like, well the attitude. It was the attitude that he was giving, um, and that's when we all kind of looked at each other and it's, we, we noticed that he was mad. Um, I was nervous trying to find the name of the contact because I thought maybe we did make a mistake and we weren't supposed to be there. But I had it on my calendar, it said Alex Diaz, that's my contact, and that's when he let us in.

DF: And that's when the officer said, oh, sergeant?

VA: Yeah, oh, that sergeant, rolled his eyes and, come on in.

DF: Okay, and then, um, so how far ahead of time had that session been scheduled, do you know?

VA: We schedule it from one to two months ahead of time. So it should've been at least a month.

DF: Okay

VA: Yeah

DF: And so then, um, did the officer then escort you somewhere?

VA: Yes, we were escorted to their briefing room.

DF: Okay, and where's that located in relation to the lobby, do you remember?

VA: Uh, you walk into the room, I'm sorry, through the door, uh, and there's a couple turns that you have to make and then it's the briefing room.

DF: Okay

VA: Um, when you get out, it's a lot more complicated. We were lost when we got out but when going in, he led us in, so.

DF: Okay

VA: It's a lot easier to follow him in.

DF: Okay. Now, uh, when he led you into the briefing room you said, I think you said, right?

VA: Uh, huh, yes. Yes.

DF: Um, how many other officers and or employees were present in there at that time?

VA: I believe there were about four or five in there.

DF: Four or five total?

VA: Yes

DF: Were they all officers?

VA: Yes

DF: Were they wearing uniforms?

VA: Yes, all of them were.

DF: Like standard police uniforms?

VA: Yes

DF: Okay, and correct me if I'm wrong but I, this training was scheduled for 4:00 p.m.?

VA: Yes, it was 4:00 p.m.

DF: Okay

VA: Uh, huh

DF: Now you said earlier that when you walked into the briefing room there was obvious tension?

VA: Yes

DF: You said you could feel it?

VA: Yes

DF: Describe what you mean by that.

VA: When we walked in, um, they looked at us but would not make eye contact and it looked like, it felt like they were kind of already maybe had known that we were coming and it was just this very awkward thing that we were walking into and no one wanted to give us eye contact. We weren't greeted by anybody, we usually are, um, maybe we're just used to that. Uh, we weren't greeted by anybody. And the reason is because later on more officers walked in, there was one woman who did not have a uniform, she was just dressed professionally, and their attitude was a lot different to the people who were already in there. They were the only ones who asked us questions, who actually acknowledged us or whatever it was, but the people who were already in there did not at any point.

DF: So how long had the training been going on before these other people came in?

VA: They actually walked in before we started so about five minutes after we walked in.

DF: Okay

VA: Yes

DF: And you said one was a female?

VA: Yes, only female.

DF: And not in a uniform?

VA: Not in uniform, professional clothing.

DF: Okay, and who was the other one? Male? Female?

VA: They were males.

DF: Okay

VA: Yes

DF: Were they in uniform?

VA: They were all in uniform.

DF: Okay

VA: Other than her.

DF: So eventually there ended up being seven or eight people?

VA: Uh, huh.

DF: Is that right?

VA: Uh, huh, yes, yes.

DF: And so would it be accurate to say that you didn't get the same feeling from those as you did from the initial group?

VA: Yes

DF: Okay. How long did the training session last?

VA: I'm gonna say about 15 minutes.

DF: And is that a typical length for that kind of training?

VA: Yes, um, sometimes when it's all three of us going, it might go max 20 to 30 minutes if there's questions. But this one, 15, about 15 minutes, yes.

DF: Okay, and you said that the people who came in a little later than the original group actually asked some questions?

VA: Yes, the woman was the one that mostly – without the uniform –

DF: Okay

VA: She was the one that mostly acknowledged us and asked us questions and clarified and that was it.

DF: Did you get the impression that she was a police officer?

VA: I wasn't sure what she was.

DF: Okay

VA: Um, I never, I wanted to ask but I didn't. I don't know what she was.

DF: Okay, and, um, did all three of you actually present segments of the training or how did you do that?

VA: Yes, I go first, um, and then the nurses go after me and they pick who goes first.

DF: Okay

VA: Um, I believe it was Sharleen who might've gone first before Nicole.

DF: Okay, and so both Nicole and Sharleen had portions that they presented?

VA: Yes

DF: Okay, and at the end of the session, um, again, you said it was about 15 minutes total?

VA: Uh, huh

DF: Okay, and, um, what happened at that point, if anything?

VA: Well, um, well during our presentation, it was the normal thing other than – the same officer who had let us in, uh, he was sitting at the front, um, very serious, kind of just leaning back in his chair. Um, and I know, the only thing that I did notice different from our usual is Sharleen, Sharleen stuttering not really able to do any, much of her presentation. I don't think she said everything that she was supposed to say and she did clarify on the way out that she didn't say everything she was supposed to say.

DF: Uh, huh

VA: Because of her tension or her feeling that she just was not comfortable. She was...intimidated was the word that she used.

DF: So she told you that afterward?

VA: Yes

DF: Okay, but it was obvious that she was having trouble?

VA: She was stuttering and wasn't really saying much. She wasn't, she was kind of looking down at her paper, didn't want to make eye contact, um, yes.

DF: And you've attended these training sessions with her before?

VA: Yes

DF: Have you seen her like that before?

VA: No, never. No.

DF: Okay, so that was out of character?

VA: Yes, yeah.

DF: Okay. Now during the actual training portion of the 15 minutes, did the original officer, did he say anything to any of you?

VA: No

DF: Okay, and, um, when, was there an issue as you were leaving, um, you got lost or something?

VA: We got lost.

DF: Okay

VA: Because apparently there are two different ways that you can get out, but one way you actually are at a dead end. So we had to find our way and go right back around and try to find our way out. Um, usually we're led out so we're very used to being, just escorted out of the room and everything, um, but we weren't this time so we kind of found our way out eventually.

DF: Okay

VA: Yeah

DF: So in your experience providing training at other police agencies, typically is it your experience that you're usually escorted out?

VA: Yes, we're always escorted out.

DF: Okay

VA: Yes

DF: And does that always happen?

VA: Yes

DF: And what happened when your session was over? Did anyone say anything to you?

VA: Um, some of them said thank you. The woman said thank you, um, and we just said, alright, thank you, and we just – since nobody stood up to lead us out, we just led ourselves out.

DF: Okay

VA: We didn't even ask.

DF: Okay, so the original officer, you said that during the actual training he was seated at the front?

VA: Yeah, he was right at the front.

DF: Okay, was he facing you?

VA: Yeah, he was, um, he was looking at us, yeah.

DF: Okay

VA: He was.

DF: And when you were giving the training, were you facing the group?

VA: Yes

DF: Okay, and so when you completed, um, did that original officer say anything to you at all?

VA: I don't remember him saying anything, no.

DF: Okay. Did anyone make any effort to escort you anywhere?

VA: No

DF: Did anyone say anything to you as if they were going to escort you out?

VA: No

DF: Now, um, I'm just gonna ask you your opinion now – What, in your opinion that day, what were the concerns or what was your opinion about the way you were treated there?

VA: I just thought it was very disrespectful because we had already agreed with someone above this officer, that we would be coming into their agency to present. And I just thought that if he did have an issue, which is fine, if you have an issue, that's great, but that he should've gone to his superior and not directly to us because we have a – we were already in agreement. Um, so I just think that the way that he treated us was not fair, um, because we were there as guests and we voluntarily, and giving this training to them for free. Um, so if, I just think that he could've done it differently if he had an issue and could've gone to his superior instead of us.

DF: And earlier you described him as being angry, is that right?

VA: Yeah, uh, huh.

DF: How else would you describe him that day?

VA: He just seemed very frustrated and, hum, I didn't think that maybe we were the only issue, just seemed like he was just frustrated. But he seemed angry at our presence.

DF: Now, um, after the training session that day did you and Nicole and Sharleen – Sharleen, right?

VA: Yes

DF: Did you discuss what happened?

VA: Yes

DF: Where did you do that? Outside?

VA: Yes, we, all the way until we got outside to our, um, to the parking area.

DF: And what did you talk about?

VA: We, well, Nicole was the one, the first one that brought it up – Like, what was that? And that's how we all started discussing and Sharleen said that she didn't finish or say everything. That she kind of forgot all the stuff that she was supposed to say. Um, I said, yeah, I was very, just quick to the point because I just wanted to get out of there. And Nicole said the same thing but Nicole made the point and said, I'm going to file a complaint because that was not okay.

DF: Did the three of you drive there separately?

VA: Yes

DF: Okay, and, um, do you recall where you came from that particular day?

VA: I think I might've come from here, the office.

DF: Okay

VA: Yes

DF: And my understanding is Nicole's office is in Murrieta, is that right?

VA: Yes, yes it is.

DF: And, uh, Sharleen is in Moreno Valley?

VA: In Moreno Valley, yes.

DF: Okay. Now when you, after this event, did you report this to anyone here?

VA: Yes, first, um, my Executive Director, Larry McAdara.

DF: How do you spell his name?

VA: L-a-r-r-y, and McAdara is M-c-A-d-r, uh, a-r-a, sorry.

DF: M, small "c"?

VA: Yes

DF: Okay, McAdara?

VA: Yes

DF: Okay, and he's the Executive Director?

VA: Executive Director.

DF: When did you say something to him about this?

VA: As soon as I came into the office.

DF: And was that, was that the same day?

VA: No, that was actually the next day because I went home after that since our shift is over.

DF: Okay

VA: So it was the next day.

DF: So this, from my recollection, this event was on a Thursday?

VA: Thursday, uh, huh.

DF: Okay, so you spoke to him on that Friday?

VA: Friday.

DF: Was it in the morning?

VA: Yes

DF: And did you basically tell him what you just told me?

VA: Yes

DF: As far as what had gone on?

VA: Uh, huh

DF: What if anything did he say?

VA: Uh, I told him, um, everything. He of course was disappointed and he approved of the fact that Nicole was going to file a complaint because Nicole had gotten the badge name and everything – or his name, um, and he said that he supported that and that we were gonna have to talk to our Director of Programs, which is Debora Heaps, when she got back. Um, but he was upset, um, because again, we all go through the effort of making this training and of course he's gonna be upset when we're disrespected.

DF: And did you at some point eventually speak to Debora Heaps?

VA: Yes

DF: And you said she's the Director of Programs?

VA: Yes

DF: And when did you speak to her, do you remember?

VA: I believe that must've been Monday because she was gone that weekend.

DF: Okay, so the following Monday?

VA: Yes

DF: Okay, and describe that conversation.

VA: Uh, she had already gotten a call from, um, I believe she is, uh, a director over at the Moreno Valley Hospital, uh, so it's Sharleen's supervisor. So she had already gotten a call from Gloria Davis, is her name, and so she already knew some of the details, um, but I let her know my side and what I had seen and she said, yeah, we're gonna be filing a complaint and she agreed to send an email to Alex Diaz.

DF: Okay, and was it your understanding that Miss Heaps eventually did send a complaint?

VA: Yes, she, uh, read me the email before sending it because we were, um, collaborating on that, so I could give her the details of what I had experienced.

DF: And did she collaborate with you on that to make sure she had the correct information?

VA: Yes

DF: And, um, so did you ever actually see the actual email?

VA: Yes

DF: Okay, and Debora shared that with you?

VA: Yes

DF: Okay. Um, now after dealing with Debora on this, did you have any other involvement with the situation?

VA: No

DF: Okay. Did you ever speak to Sharleen or Nicole again about this?

VA: No

DF: Okay, and, uh, you said earlier that, was it your understanding that Nicole also sent a complaint?

VA: Yes, Debora told me.

DF: Okay

VA: Uh, huh

DF: And just so I'm clear, you stated that Gloria Davis, um, who is Sharleen's manager,

VA: Uh, huh

DF: -apparently had contacted Debora over that weekend?

VA: Yes

DF: Okay. Okay, is there anything else you'd like to add?

VA: No, I think that's it.

DF: Okay, is there anything else that occurred that we did not cover?

VA: No, that's it.

DF: Okay. Uh, we're gonna go ahead and conclude the interview. It is approximately 4:12 p.m.

To the best of my knowledge and ability, the above transcript is a true and accurate transcription of the recorded interview of Vivian Amezquita by RCS Investigations and Consulting LLC, transcribed by Karyn Flutts for the Banning Police Department.

# EXHIBIT H

CITY OF BANNING POLICE DEPARTMENT

INTERVIEW WITH
GLORIA DAVIS

INTERVIEWED BY
DAVID FLUTTS

ADMINISTRATIVE INVESTIGATION
RCS #2015-044

SEPTEMBER 24, 2015 @ 10:10 AM

Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

Investigator David Flutts (DF)
RCS Investigations and Consulting

Gloria Davis (GD)
Program Manager
Sexual Assault Response Team

DF: Today's date is September 24, 2015, the time is about 10:10 a.m. My name is David Flutts, I'm a private investigator from RCS Investigations and Consulting. Our firm was retained by the City of Banning to conduct this administrative investigation. The investigation concerns allegations of potential misconduct against a Banning Police Officer and resulted from complaints received by members of the public. The incident under investigation occurred on July 30, 2015. The RCS case number is 2015-044 and the Banning PD Internal Affairs case number is 15-04.

This is an interview with Gloria Davis and the interview is being conducted at the Riverside Regional Medical Center, is that correct?

GD: Correct

DF: Okay. –in the City of Moreno Valley. And Miss Davis, do I have your consent to tape record this interview?

GD: Uh, you do.

DF: And can you please state and spell your name?

GD: Uh, Davis, D-a-v-i-s, Gloria, G-l-o-r-i-a.

DF: And what is your position here?

GD: I am the Program Manager of the Sexual Assault Response Team.

DF: And can you briefly describe your job duties?

GD: Uh, I manage the program that – I manage the program that is responsible for the care of sexual assault victims and child sexual assault.

DF: Okay, and as part of your position do you supervise a number of SART nurses?

GD: I do.

DF: Okay. Did you become aware of a training session scheduled at the Banning Police Department on July 30th, 2015?

GD: I did.

DF: And how did you become aware of that?

GD: Uh, I had requested that my day nurse, Sharleen Lampkin, do the briefing. Uh, she called me immediately after she left Banning and was very upset at how they were received at the briefing.

DF: Okay, and, um, so Sharleen Lampkin, and I'm gonna spell that for the transcriber – it's S-h-a-r-l-e-e-n, L-a-m-p-k-i-n, is that correct?

GD: Correct

DF: Okay, and, uh, was she the only staff member of yours that was involved in this training?

GD: Uh, she was my only staff member there.

DF: Okay, and do you know who the other people involved in the presentation were?

GD: Uh, I believe that Nicole Yadon was present and, uh, there was also, uh, Vivian Amezquita from Riverside Area Rape Crisis.

DF: Okay, and I'm gonna spell that as well – it's Nicole, Yadon is Y-a-d-o-n, and Vivian, V-i-v-i-a-n, and her last name is Amezquita, A-m-e-z-q-u-i-t-a.

GD: Correct

DF: Now, um, so at some point after this training you became aware there had been some problems?

GD: It was immediately after the training, she called me on her way home and said she was upset at how they were received.

DF: And this is Sharleen who called you?

GD: Sharleen

DF: Okay, and can you tell me what specifically she said to you?

GD: Well, she said when they arrived at the training, uh, the officer that came out asked what they – when they arrived at the training, they called them, usually they'll call and somebody will come out and escort them into the police briefing. Well, an officer came out and he, uh, said, what, what are you guys here for? And, um, one of them said what they were there for, for the briefing, and he said, um,

we, we don't have any briefing scheduled today, I don't know what you guys are doing here. And I'm kind of paraphrasing what she said.

DF: Yeah, okay.

GD: And, uh, as I understand it, Vivian pulled out her phone and she says, well, let me check and see who scheduled the appointment. And she looked on her phone and she said, oh, this was scheduled by the Chief. And the officer rolled his eyes and he said, this is, this is a big waste of our time and I don't know why, uh, why – you guys were just here, uh, you were here just like a few weeks or months ago. I don't know why we have to go through this again. And, uh, Vivian, I think it was Vivian, said, oh, no, we only come out once a year, we haven't been out here, you know, recently.

DF: Okay

GD: And he, uh, apparently he argued that point and then he said, oh, okay, okay, I'll take, I'll take you in and, uh, you know, just get it over with as quickly as you can. He kept looking at his watch and rolling his eyes and muttering under his voice, this is just the biggest waste of time.

DF: Okay, and all this information was reported to you by Sharleen?

GD: Yes

DF: And she called you right after the training?

GD: Right after the training because she was upset.

DF: Okay

GD: So then she said when they went into the training that he sat down, he, uh, folded his arms, he kept rolling his eyes and looking at his watch and he made her very uncomfortable. So she said the other police officers that were there were very respectful, very nice, but it was, it was that one particular officer – uh, she told me his name – I wanna say Hobbs or something like that, I can't remember offhand.

DF: Okay, alright.

GD: But she said he kept, uh, just looking at his watch, rolling his eyes, and just made the whole atmosphere very uncomfortable and she said, I, I felt really – her personally, she said, I felt very unwelcome there.

DF: Okay

GD: So, um –

DF: So once you had this information from Sharleen, what if anything did you do?

GD: Well, I'm trying to remember what day of the week it was, I think it was like a Thursday or Friday, it was towards the end of the week, and I really didn't address it until the following week. And I was originally gonna call the Chief myself and then I thought, you know, I'm not, I'm not the person that puts these trainings on, I should go to the person that arranges them. So I called Debora Heaps, the director of the Riverside Area Rape Crisis, and I relayed my nurse's comments and sentiment and I basically told Debora, you know, I said, for me to send my nurse out there, I said, it's a very, it's very, very hard for scheduling because we have a very, very small department. This is not easy to send people to briefings. So to send, send my nurse to a briefing where she's not welcome and the information is not welcome and they don't want her there, I said, if that's the case, then I'm not going to send another employee to Banning. I said, you can schedule the briefings, you can do them yourself, but I'm not wasting my resources at a facility that's not welcome to hear what we're there to show to them.

DF: And in your position, uh, have you sent Sharleen as well as others to these types of trainings before?

GD: Well, yes, we do it once a year and we send, I send, I, I go most of the time but since Sharleen lives out in Banning, I said, you know, why don't you do the briefing and then from there you can go home.

DF: Okay.

GD: So, uh, most of the time, um, we, we do send a nurse, either myself or one of my staff to a briefing and we go to all of the law enforcement agencies that do this briefing once a year.

DF: Okay, and had you ever personally experienced any problems such as this?

GD: No

DF: Okay, and had you ever heard any of your staff members describe any problems such as this?

GD: No, no, I, this is the first time we've ever had an issue at a briefing. Most of the time they're very welcomed to hear the information because there's new officers that are constantly, you know, coming in and out of the department and the whole purpose of the briefing is to help them know what to do and what the process is to follow with sexual assault victims.

DF: Okay, and aside from your phone call to Debora Heaps did you discuss the situation with anyone else?

GD: No

DF: Okay. Alright, is there anything else you'd like to add?

GD: No

DF: Okay. I don't have any more questions. We're gonna go ahead and conclude the interview. It is approximately 10:20 a.m.

To the best of my knowledge and ability, the above transcript is a true and accurate transcription of the recorded interview of Gloria Davis by RCS Investigations and Consulting LLC, transcribed by Karyn Flutts for the City of Banning Police Department.

# EXHIBIT I

CITY OF BANNING POLICE DEPARTMENT

INTERVIEW WITH
SHARLEEN LAMPKIN

INTERVIEWED BY
DAVID FLUTTS

ADMINISTRATIVE INVESTIGATION
RCS #2015-044

SEPTEMBER 24, 2015 @ 10:20 AM

Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

Investigator David Flutts (DF)
RCS Investigations and Consulting

Sharleen Lampkin (SL)
Registered Nurse
Sexual Assault Response Team

DF: Today's date is September 24, 2015, the time approximately 10:20 a.m. My name is David Flutts, I'm a private investigator from RCS Investigations and Consulting. Our firm was retained by the City of Banning to conduct this administrative investigation. The investigation concerns allegations of potential misconduct against a Banning Police Officer and resulted from complaints received by members of the public. The incident under investigation occurred on July 30, 2015. The RCS case number is 2015-044 and the Banning Police Department Internal Affairs case number is 15-04.

This is an interview with Sharleen Lampkin and the interview is being conducted at the Riverside Regional Medical Center in Moreno Valley. And, uh, do I have your consent to tape record this interview?

SL: Yes

DF: Please state and spell your name.

SL: Sharleen Lampkin, S-h-a-r-l-e-e-n, Lampkin, L-a-m-p-k-i-n.

DF: And what is your positon here?

SL: I'm an RN.

DF: And do you have a specific area of assignment?

SL: SART, the Sexual Assault Response Team.

DF: And what are your job duties, briefly, if you would describe them?

SL: Um, I do sexual assault exams for people that are brought in, um, with that complaint. Um, I testify for cases, I do some outreach in the community, we do briefings in police departments and schools and, uh, anything else.

DF: And did you participate in a training session at the Banning Police Department on July 30, 2015?

SL: Yes

DF: What was your specific involvement in that training?

SL: Um, I was supposed to talk about, um, the different things that the officers are to do when they bring patients here for an exam. Um, what they do prior to coming, calling us and such.

DF: Is the facility here, is this the facility where officers would bring sexual assault victims?

SL: Yes

DF: Okay, and what other presenters were present that day?

SL: Um, we had, I think that day, um, there was, uh, Nicole from another facility down in Rancho Springs. She's the coordinator down there, and someone from the Riverside Area Rape Crisis Center. I believe her name was Vivian, I'm not, I can't remember for sure.

DF: Okay, so it was the three of you?

SL: Yes

DF: Okay. Please describe what occurred when you arrived to conduct the training that day.

SL: Um, well we arrived there, we were waiting, we, you know, checked in with whoever met us at the window and, um, we waited for a while. Um, an officer, I can't remember his name, he came to the door, he wanted to know, you know, what we were there for because, he was like, you guys just came, we just had one of these trainings, you know, a week ago or a couple of weeks ago. I was like, no, that couldn't've been true because we were here earlier and we, uh, earlier that week was our first training at Banning and we had gotten turned away because of some bomb threat. So we were, you know, we understood and we left. So this was our second training for the year, we do this annually. And so we told him that and he was like, no, you guys were just here a couple of weeks ago. We're like, we're pretty sure that we weren't. So he's like, huh, well, who sent you? Who okayed this? And so, who set this up? So the, um, the Rape Crisis Center Coordinator, she looked up in her phone to see who set it up and she told him the name of the guy. He was like, huh, that's our boss. He was like, huh, how long is this gonna take? Come on in. And we didn't, it was very awkward because we didn't feel welcome at all from him. The rest of the officers were very, you know, cordial when we went down there, they were responsive, they, you know, asked questions and were appropriate but he was very unhappy for us to be there and, you know, glared at us the whole time.

DF: Glared at you?

SL: Yeah

DF: Okay

SL: We just kind of avoided eye contact with him.

DF: You said when you arrived that day you had to wait some time in the lobby area?

SL: Yeah

DF: How long do you think you had to wait?

SL: Probably another 10 or 15 minutes after the time we were supposed to start.

DF: And what was the start time supposed to be?

SL: Uh, I can't remember if it was 3:00 or 4:00, I can't, I really can't remember.

DF: Okay, and so how would, in general terms, how would you describe the officer's demeanor at the initial contact at the front lobby?

SL: Irritated

DF: Okay, irritated at the fact that you were there?

SL: Yeah, and not really, he did not really seem to want to listen to us.

DF: And you mentioned earlier something about you, in general you felt not welcome there?

SL: By him.

DF: Okay

SL: The other officers, you know, they did not even seem to be aware of any of what was going on.

DF: Okay, so you didn't feel any of that kind of tension or that kind of demeanor from anyone else?

SL: No, just him.

DF: Okay, and did the initial officer, you said you didn't remember his name, right?

SL: No

DF: Okay

SL: I can't remember his name.

DF: Did he eventually walk you in somewhere into the building?

SL: Yeah, he walked us in to the, where they meet.

DF: Was it a briefing room?

SL: Briefing room.

DF: Okay, and how many other officers or employees were present if you recall?

SL: I can't remember, probably 15, 20 officers.

DF: And did you proceed to provide the training?

SL: We did.

DF: And did each of the three of you, you, Nicole, and Vivian, did you each have a segment of the training?

SL: We did.

DF: Okay, and was that all completed?

SL: Uh, huh, we were able to complete it – and we also…

DF: You were able -?

SL: We were able to complete it, we also gave the part for the district attorney because we had some stuff from them. The DA wasn't able to come.

DF: Okay, so these types of trainings, usually there's a representative from the DA's office?

SL: Correct

DF: Okay. So how long did the training session last?

SL: Hum, probably no longer than 10 minutes. We were real, we were fast.

DF: And is that shorter than typical?

SL: Um, it's probably about average. Sometimes it goes a little bit longer, um, or, I mean, that's about average. But we were, we were deliberately, we did not want to linger.

DF: Okay, and why was that?

SL: Because he was, he specifically asked, how long is this gonna take? So we felt like we were –

DF: Okay

SL: -a bother.

DF: So other than that initial officer did you have any other issues with any of the other employees there?

SL: No

DF: And was there any other interaction between any of the three of you and any of the other employees?

SL: No

DF: And the original officer, was he present in the briefing room?

SL: He was.

DF: Okay, and where was he sitting, if he was?

SL: He was seated, if I'm in the front looking towards him, he was over in the right corner, right in front.

DF: Your left, the right of the room? Your left?

SL: Some, I'm facing the room, my right.

DF: Your right, okay.

SL: Yeah, at the left of the room towards the front.

DF: Okay, and was he facing you?

SL: He was facing us.

DF: Okay, and were all three of you up at the front?

SL: No, we would, in the back and then we'd come up front to –

DF: For your segments?

SL: Yeah

DF: Okay, and when you were up there giving your portion of the training were you facing the group?

SL: Yes

DF: Okay, did you, did the initial officer, did he have any, any other, did you see him doing anything else? Any visual things? Was he, any mannerisms? Did you see him doing anything else?

SL: I didn't look at him.

DF: Okay

SL: Yeah, I –

DF: Did you purposely not look at him?

SL: I purposely did not look at him.

DF: Okay, and why was that?

SL: Uh, well, I felt uncomfortable.

DF: Okay

SL: Yeah

DF: Now, um, prior to this day, July 30th, had you given these types of trainings before?

SL: Yeah

DF: And, at other agencies?

SL: Yeah

DF: And have you ever had any problems similar to this?

SL: No. I've had people look bored but, you know, but nothing – they were, everybody's been very polite.

DF: Okay. Now after the training was completed, uh, did you have any further interaction with the initial officer?

SL: No

DF: And, um, did you, uh, was there an issue with getting out of the building that day?

SL: No, someone else, I think, escorted us out. He didn't escort us out, someone else did.

DF: Okay, so you were escorted out by someone?

SL: Yeah

DF: Now is that typical when you're at these agencies?

SL: Yes

DF: That someone escorts you in and out?

SL: Yes

DF: Okay, and I think I may have asked this but, um, did that initial officer say anything else to you or any of the other, the three of you?

SL: No, nothing.

DF: So if you could summarize your general concerns about what happened that day?

SL: Um, I guess when I got back, probably as soon as, all of us were like, what the heck? Cause we were, all of the three of us were kind of, we didn't understand where this animosity was coming from. And when I, as soon as I got to my car I called my boss and I'm like, I, I felt very unwelcome and very uncomfortable. That was like the worst briefing I've ever been to.

DF: And did the three of you, you, Nicole, and Vivian, did you talk right afterward?

SL: Yeah, just briefly on the way to the car. We were just like, what the heck? Yeah, all of us were confused and, yeah, the same.

DF: And your boss is Gloria?

SL: Gloria

DF: Okay, and you talked to her right afterward?

SL: Right afterwards.

DF: And did you relay, you know, in essence what happened that day?

SL: Yeah, at that day, I, I can't remember the guy's name. I knew his name then and I called her up. I'm like, his name is…you know, whatever his name was, and I was like, I think, um, I said, I think Nicole's gonna, you know, call and say something. But I was like, I think you should too.

DF: Okay, so when you were still there that day with Nicole, Nicole indicated that she was going to call someone or complain somehow?

SL: Yeah, complain, yeah.

DF: Okay, did she say specifically how she was going to do that?

SL: She didn't.

DF: Okay, did you ever talk to her again after that about this?

SL: No. No, I let Gloria – once I relayed it to Gloria, I let that out of my hands.

DF: Okay

SL: I tried to stay out of that.

DF: So you had no more involvement with it?

SL: Nah, uh.

DF: Okay. Did you ever become aware of anyone actually sending any sort of complaints to the Banning Police Department?

SL: No

DF: Okay. Did anything else occur that day when you were present there other than what we've already talked about?

SL: No

DF: Okay. Is there anything else you'd like to add?

SL: No

DF: Okay, we're gonna go ahead and conclude the interview. It is about 10:30 a.m., September 24, 2015.

To the best of my knowledge and ability, the above transcript is a true and accurate transcription of the recorded interview of Sharleen Lampkin by RCS Investigations and Consulting LLC, transcribed by Karyn Flutts for the City of Banning Police Department.

# EXHIBIT J

CITY OF BANNING POLICE DEPARTMENT

INTERVIEW WITH
NICOLE YADON

INTERVIEWED BY
DAVID FLUTTS

ADMINISTRATIVE INVESTIGATION
RCS #2015-044

SEPTEMBER 28, 2015 @ 10:00 AM

Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

Investigator David Flutts (DF)
RCS Investigations and Consulting

Nicole Yadon (NY)
Sexual Assault Coordinator
Rancho Springs Medical Center

DF: Today's date is September 28, 2015, the time is 10:00 a.m. My name is David Flutts, I'm a private investigator from RCS Investigations and Consulting. Our firm was retained by the City of Banning to conduct this administrative investigation. The investigation concerns allegations of potential misconduct against a Banning Police Officer and resulted from complaints received by members of the public. The incident under investigation occurred on July 30, 2015. The RCS case number is 2015-044 and the Banning Police Department Internal Affairs case number is 15-04.

This is an interview with Nicole, is it Yadon?

NY: Uh, huh.

DF: Nicole Yadon and the interview is being conducted at the Rancho Springs Medical Center in Murrieta. And, uh, do I have consent to tape record this interview?

NY: You do.

DF: Okay. Please state and spell your name for the record.

NY: Nicole Yadon, N-i-c-o-l-e, Y-a-d-o-n.

DF: And what is your position?

NY: I am the Sexual Assault Coordinator.

DF: And for this hospital?

NY: Correct

DF: And, um, can you briefly describe your job duties?

NY: Yes, I manage a team of forensic nurses who provide exams on sexual assault survivors as well as I perform the exams myself.

DF: Were you scheduled to perform, or I'm sorry, to participate in a training session at the Banning Police Department on July 30, 2015?

NY: Yes, each summer we go out to all of the various departments throughout Riverside County and provide just an annual, uh, in-service on our services along with the Rape Crisis Center.

DF: And how long have you personally been doing this type of training?

NY: Six years.

DF: Okay, and you go to multiple different police departments?

NY: Correct

DF: And who were the other people that were there to present training?

NY: I'm trying to recall, I'm sorry, it's been a while. Uh, there was a nurse from county, uh, from Riverside County Regional Medical Center. I can't remember exactly which one, I think it was Sharleen Lampkin. And then there was an advocate there from the Rape Crisis Center and I can't recall off the top of my head who it was.

DF: And so it was just the three of you?

NY: Correct

DF: And when you provide these types of trainings is there typically a representative from the DA's office?

NY: Most of the time.

DF: This day there wasn't?

NY: Correct

DF: Okay

NY: We've had some trouble getting them scheduled and to come out.

DF: Okay, and did each of the three of you have a certain segment you were going to present?

NY: Correct

DF: And, um, please describe what occurred when you arrived to conduct the training.

NY: We were waiting in the lobby, um, the other people from the advocacy and Riverside County were already there when I got there and they had already approached the front counter and had told them why we were there. And technically, once we tell them that we're there, we do have to wait a little while. Um, the officer, and I don't even remember his name, I apologize, um, it's in my email, wherever, I saw that you have that. Um, the, uh, the officer came out and just told us that we had already been there to provide that training just a few months ago. Uh, we told him that we had not, that this is an annual training, that we had actually been there on Monday of that week but had been canceled because there was another event that was taking the officers out of the briefing. Briefing had been cancelled for that day. And so he again said no, you guys, you guys were just here a few months ago. And again, no, we, we're the only SART team within the county and no one has been here, we only do these in the summer. Um, anyway, he kind of bantered with us back and forth for a few minutes in regards to the fact that we had already been there and we had in fact not. Um, and so he, um, he left and went back into the department and he came back out a few minutes later and wanted to know who had scheduled the, the, um, the briefing training. And the advocate, I can't remember her name –

DF: Is the advocate's name Vivian?

NY: Vivian, thank you. I wanted to say Veronica – thank you, Vivian. Um, Vivian was kind of scrolling through her phone trying to look at her emails to see who had set up the briefing and whatever, she mentioned, um, I believe it's Diaz, um, the officer then kind of rolled his eyes and huffed and said, um, that, uh, that that was the chief that did that and then, um, you know, said, hang on a second and then went back behind the, um, into the department again and then came back out a few minutes later and said, you know, follow me. Just very, he was very rude, very abrupt, uh, we were all kind of speechless. Um, nobody really wanted to, um, talk at that point. So we followed him into the back and once we got to the stairway he just pointed at the stairs and he said, it's downstairs. And so at that point we, went to, went downstairs and kind of went into the first room that we saw that we assumed was the briefing room. There were a couple other officers sitting in the room when we got in there. Uh, we all went into the back and kind of waited until we were invited to speak. Um, and it was very uncomfortable. Uh, the entire time he was slouched in his chair, kinda kicked back, um, just very annoyed. Um-

DF: Okay, I'm gonna stop you for just a second.

NY: Sure

DF: Let me just verify a couple things. So, uh, do you recall what time the training was scheduled for?

NY: Oh, my, gosh, we've done so many. Um, I wanna say three, two, three o'clock.

DF: Okay

NY: Maybe later, I'm sorry, I don't recall, we've done so many.

DF: That's fine. When you got there how long did you have to wait in the lobby the first time?

NY: Uh, probably 10 minutes I believe.

DF: Okay, and then he came, the officer in question came out the first time and then that's when he was questioning you about, he was making statements that they had just had this training, etcetera?

NY: Correct

DF: And you indicated that that same week on Monday, uh, training had been scheduled, however, it didn't occur because of an incident that they had?

NY: Yeah, there was a bomb, a grenade in a mailbox I believe.

DF: And on that particular day, on that Monday, were you there?

NY: Correct

DF: Okay, and, um, so you said that Vivian scrolled through her phone and found that in fact, um, Diaz was the one who set up the training?

NY: Correct

DF: Do you know Diaz' position?

NY: He's the Chief.

DF: Okay, and then, uh, at that point the officer, you said he huffed and rolled his eyes?

NY: Correct

DF: Okay, did he make any comments about Diaz?

NY: He just said, that's the Chief.

DF: Okay, and you said he then left and came back again?

NY: Right, just a few minutes maybe.

DF: And then he said, the second time he continued to question the training?

NY: No, at that point once he realized that the Chief had scheduled it, um, and he must've went back to confirm I guess, came back out and got us and had us follow him and then, like I said, pointed at the stairway and said, you know, it's down there, down the stairs. So we went down the stairs, went into the briefing room and, you know, like I said, waited until we were invited to speak.

DF: Now, um, so you went to the, got to the lobby, waited a few minutes, he came out the first time, then he left and came back a second time.

NY: Correct

DF: And the second time was when he let you in and you went down the stairs?

NY: No, he came out, he bantered with us about the fact that we had already been there, um, went into the back, came back out, said, who scheduled it? We said, the Chief. That's, you know, when he kinda huffed and rolled his eyes, went into the back and then came back out and got us again.

DF: Okay, so the third time that he came out is in essence when he took you in?

NY: Correct

DF: And you went downstairs?

NY: Correct

DF: And, um, you went into what was the briefing room?

NY: Correct

DF: Did you know where to go?

NY: No

DF: Had you been there before?

NY: No

DF: Uh, you said earlier that you had been there Monday, did you never even get that far?

NY: No

DF: Okay, and, um-

NY: And I believe Erica Swartz was there on Monday. Uh, but like I said, uh, and she's the DA, but like I said, she, um, the training was cancelled because there were other things going on.

DF: And these trainings that you provide, you provide these to various agencies in the county?

NY: Correct

DF: And generally those are done annually?

NY: Correct, in the summertime.

DF: Okay, and –

NY: They're actually set up by Rape Crisis-

DF: Right

NY: -and then we just tag along with them as part of the team.

DF: Now when the officer led you or showed you, pointed downstairs, uh, did he say what room to go into?

NY: No

DF: Did he leave you at that point or where was he?

NY: Um, you know what? He told us to go downstairs and we went down there, I don't know where he went at that point but then he showed up a few moments later.

DF: In the room?

NY: Correct

DF: Okay, so in essence no one actually walked you into the room to tell you where to go?

NY: Correct

DF: Okay

NY: Which is extremely, um, uncommon because every time we're, unless, you know, sometimes if it's, if it's somewhere that we were just there a few days ago they'll say, okay, you know where you're going, right? Yeah, we've got it. Um, and then, you know, then we'll go on our own but I had never been to this department.

DF: So in your experience doing these trainings at various agencies does someone typically lead you right into where you need to be?

NY: Exactly.

DF: And, uh, in your experience doing these trainings when the training is concluded does someone normally walk you out?

NY: Correct

DF: Okay, and so the room you were in you said it was the briefing room, is that correct?

NY: Correct

DF: And you said there were a couple of officers in there?

NY: Correct

DF: Were they in uniform?

NY: Yes

DF: And, um-

NY: I believe there was a dispatcher there as well as a, uh, investigator.

DF: Okay, and the dispatcher was dressed how?

NY: Um, I'm gonna say she had on like a polo shirt maybe and –

DF: Some kind of marked shirt of some sort?

NY: Yes, yes.

DF: Okay

NY: Not a uniform.

DF: And that was a female you said?

NY: Correct

DF: And then you said there was an investigator?

NY: Correct

DF: Was that a male or female?

NY: A male.

DF: And dressed how?

NY: Uh, suit and, or, I'm sorry, dress pants and dress shirt.

DF: Okay

NY: And I did have some communication with him, um, and I'd have to go back through my emails to tell you what his name was, um, because he had some questions and asked for some follow-up in regards to some, uh, information about exams. And so I had emailed him the next day.

DF: Okay, and so how would you describe your initial, I guess opinion of the officer in terms of how the interaction went?

NY: Um, I was really thrown back. He was, um, appeared very annoyed that we were there. Um, um, it was very uncomfortable. We kinda argued in the back quietly over who was gonna talk first because nobody wanted to and we do these every single summer probably 20 or 30 a year, um, you know, I mean they're back to back to back, and so sometimes we'll do them up to three times a day. So, and I have no problem speaking, and at this point, I didn't wanna talk, I didn't even want to go up there. It was very, very, very uncomfortable.

DF: And once you came into the room how long did you wait before your training started?

NY: Uh, just a few minutes.

DF: Okay, and, uh, earlier you mentioned that the officer in question was sitting there slouching or something?

NY: Correct

DF: Can you describe specifically what he was doing?

NY: Uh, just kinda leaned back in his chair and had his leg kind of kicked up on the other leg, um, seemed very disinterested. Very, his, his whole presentation just seemed in my opinion, very, very annoyed.

DF: And the room you were in, did you eventually go to the front to do the training?

NY: Correct

DF: Did the three of you go up individually?

NY: Correct

DF: And were you facing the group?

NY: Yes

DF: And so there were, uh, the officer in question and then two additional uniformed officers?

NY: Um, I think by then they were kind of trickling in-

DF: Okay

NY: And I wanna say by the time we were done there were probably upwards of 10 people in the room.

DF: Total?

NY: Yeah

DF: Okay, and were you facing them?

NY: Correct

DF: And where was the officer in question sitting?

NY: Um, so the room has, um, like round, um, I believe like round, like rows of round tables, very long tables. Um, and, uh, when you're standing up facing them he was gonna be on the right, kind of the end of maybe the second row.

DF: Okay, and did you form any opinions as to whether or not he was a supervisor or he was in charge of the, of what was going on?

NY: At that point I didn't know, uh, it wasn't until the next day when I had communication with the investigator, um, that I believe he said he was maybe a sergeant.

DF: Okay

NY: I think.

DF: And so how long did the training last?

NY: Um, maybe 10 or 15 minutes tops.

DF: And, um –

NY: Which is about average.

DF: Okay, that was my next question. So that's about average?

NY: Correct

DF: And once the training was concluded, what happened?

NY: Uh, once it was finished the investigator had asked me a couple questions, um, in regards to some information that he needed and then, um, the, uh, the officer in question, um, um, I'm trying to recall – I don't remember what the exact statement was but basically we, we let ourselves out. So we went back upstairs and we kind of roamed through the department because we didn't know how to get out, there wasn't really a clearly marked exit. Um, none of us had been to that agency in the past –

DF: None of the three of you had ever been there?

NY: Nah, uh, no.

DF: Okay

NY: I, I don't think the girls had. I don't want to speak for them but I don't think so because nobody knew how to get out so we kinda roamed our way out of the department.

DF: So did the officer in question say anything to you when the training was concluded?

NY: I don't recall.

DF: Okay

NY: I don't wanna make something up.

DF: But the officer in question clearly did not walk you out?

NY: Not at all.

DF: And no one else walked you out?

NY: No

DF: Did anyone offer to walk you out?

NY: No

DF: Okay, so you had to walk around a bit before you figured out how to get out?

NY: Correct

DF: Okay, and, um, so when you were finished did you go outside with the other two?

NY: Correct

DF: Was there any conversation about what had occurred?

NY: Um, yeah, we couldn't get out of there quick enough and afterwards we were all just very thrown back at the experience in and of itself, um, and there's kind of some brief discussion about, like, wow, like I don't even know what just happened. Um, but when I had emailed the investigator the following day, um, you know, I had asked him, and I don't remember exactly what the words was but like kinda what was that guy's problem, you know, he was extremely rude. And he basically just said that, oh, he just got back from a trip to Vegas or something and had gotten there late that day and so he was just kind of annoyed in general and for us, you know, for me to not take it personal.

DF: And you said that you've been doing these types of trainings for about six years?

NY: Correct

DF: And you do them all over the county?

NY: Correct

DF: And you do –

NY: I've only done them in California for three years but previously I was in Illinois. I did them there as well.

DF: Okay, so it's safe to say you've been doing similar type training sessions for six years?

NY: Correct

DF: And in terms of Southern California and Riverside County in particular, have you ever had an experience like this with an officer?

NY: Never

DF: So if you could just give me an overview of what your concerns were with regard to that officer that day.

NY: I was just, I was, I was shocked that we were so unwelcomed by him. Now, the other people in the room, several of them had very valid questions, engaged in the dialog, um, you know? A lot of times we'll do these trainings and you can tell that there's specific officers that aren't really interested and that's fine and if they want to be quiet and sit to themselves, that's not a big deal. But typically the person who greets us is, um, is, is very friendly, um, shows us where to go, shows us the way out, um, and makes it clear to the group that, you know, we, um, that, you know, that they need to pay attention to us, that this is very important training for them. Um, I just felt extremely unwelcomed, um, uh, very uncomfortable. And I can talk to anybody about anything and I didn't even want to speak because it was like, it was like you could hear a pin drop in the room. There was so much tension from him, you know, it, it was, it was very uncomfortable.

DF: And as you said you didn't have any negative interactions with anyone else there that day?

NY: No

DF: Okay. Would it be accurate to say than that based on the officer's attitude you didn't really feel like giving the training there?

NY: Absolutely.

DF: Did you report the situation to anyone here at your employment?

NY: Um, I don't believe so.

DF: Okay. After the training you said you spoke to the other two. Uh, after that time, did you speak to anyone else about the situation?

NY: I spoke to Debora Heaps-

DF: Okay

NY: She's the Program Director at Riverside or at uh, um, Rape Crisis in Riverside.

DF: Right

NY: Um, and I spoke to Gloria Davis and she's the Program Manager at Riverside County Regional at their SART program.

DF: And so one of the presenters that day was someone that works for her?

NY: For Debora.

DF: Yeah

NY: Correct

DF: And Gloria, correct?

NY: Yes

DF: Okay. Did you send an email to Banning Police Department on August 3, 2015, in which you expressed your complaints about what occurred that day?

NY: I did sent an email, I don't recall the date but I assume that's accurate.

DF: Yeah, I'm gonna show you a copy, and obviously, it's just from, from this point down. If you could just look at that and I'd just like you to verify that that appears to be a copy of the email you sent.

NY: Correct

DF: Does that appear to be a true copy?

NY: Yes

DF: Okay, and, uh, with regard to that email, did you cc Debora Heaps in that email to your recollection?

NY: I believe I did.

DF: Okay, and as you said she's the Program Director for the Riverside Area Rape Crisis Center?

NY: Correct

DF: After you sent that email did you have any further conversations with anyone regarding this situation?

NY: I don't recall.

DF: Did you ever speak to Chief Diaz' assistant?

NY: Oh, yes, I'm sorry, yes.

DF: Okay, and her name is Danielle, is that right? You don't recall?

NY: I don't recall.

DF: Okay. What was that conversation about?

NY: I believe that she had indicated that she was gonna forward the email or forward the complaint to him, um, and then he ended up calling me directly.

DF: Okay, was it, what was that conversation about?

NY: Um, he just wanted to let me know that my concerns were gonna be addressed and that, um, that this officer has been a perpetual problem and that he wanted me to understand that, um, that this was not going to just be pushed under the table, that he was going to take care of the situation and that this was completely unacceptable.

DF: And it looks like from the correspondence that I have that your conversation with Danielle, the Chief's assistant, occurred on August 12th. Does that sound about right?

NY: Yeah, there was a bit of a delay.

DF: Okay

NY: I think he was out or she was out or, I don't know.

DF: And did you speak to the Chief that same day?

NY: I don't recall.

DF: Okay. Other than those conversations did you have any further involvement with the situation?

NY: No

DF: Okay, is there anything else you'd like to add?

# EXHIBIT K

BANNING POLICE DEPARTMENT

INTERVIEW WITH
STEVE HOBB

INTERVIEWED BY
DAVID FLUTTS

ADMINISTRATIVE INVESTIGATION
RCS #2015-044

OCTOBER 30, 2015 @ 9:55 AM

Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

Steve Hobb (SH)
Police Corporal
Banning Police Department

Robert Baumann (RB)
Attorney
Representative for Steve Hobb

DF: Today's date is October 30, 2015, the time is 9:55 a.m. This interview is being conducted at the Banning City Hall. My name is David Flutts, I'm a private investigator from RCS Investigations retained on behalf of the City of Banning to conduct this investigation. I am the authorized designee assigned to investigate this matter. Corporal Steve Hobb, his representative an attorney, Robert Baumann, and I are the only persons present during this interview. Mr. Baumann, would you please identify yourself for the record?

RB: Yes, representative for Corporal Hobb, Robert, last name Baumann, B-a-u-m-a-n-n.

DF: Thank you. The City of Banning is conducting an administrative investigation into allegations of misconduct against Corporal Hobb. It was alleged Corporal Hobb was discourteous and unprofessional to members of the Riverside County Sexual Abuse Response Team when they were at the department to present training on July 30, 2015. The RCS case number for this investigation is 2015-044 and the Banning Police Department IA number is 15-04.

The nature of the allegations is such that you are deemed the subject employee of this investigation. I have been authorized to communicate an order from Chief Diaz that you are admonished to answer all questions asked of you completely and that all of your answers are to be truthful. Knowingly making false or misleading statements during this interview will be considered a separate violation that could result in discipline up to and including dismissal. Do you understand this admonishment?

SH: Yes, I do.

DF: I will now advise you of your rights under the Public Safety Officers' Procedural Bill of Rights as outlined in the California Government Code: You have the right to have a representative of your choice with you during this interview and you have chosen to exercise that right, correct?

SH: Yes

DF: This interview is being recorded. You have the right to make your own recording of any and all aspects of this interview and you are choosing to record this interview, is that correct?

SH: Yes

DF: You will have access to the department's recording of your interview if any further proceedings are contemplated or prior to any further interrogation at a subsequent time. There will be no more than two persons questioning you and for this interview I will be the only person asking you questions. If this interview is taking place during your off-duty time you will compensated in accordance with regular department procedures and you will not be released from employment for any time missed. This interview session will be for a reasonable period of time based on all the circumstances. Please advise me if you need to take a break during this interview. At no time will you be threatened with punitive action or promised any type of reward or inducement. No offensive language will be used during the course of this interview. You will not be subject to a visit by the press or news media without your expressed consent. Do you wish to give your expressed consent for such release?

SH: No

DF: Neither your home address nor photograph will be given to the press or news media without your expressed consent. Do you wish to give such expressed consent?

SH: No

DF: Do you fully understand what I have said so far?

SH: Yes

DF: Are you under the influence of any medication, drugs, or alcohol which may impair your ability to participate in this interview?

SH: No

DF: Do you have any physical, mental, or emotional disability which may impair your ability to participate in this interview?

SH: No

DF: Do you have any questions before we begin?

SH: I do not.

DF: As the authorized designee of Chief Diaz I am now ordering you to answer all questions completely and truthfully, do you understand?

SH: Yes

DF: Please state and spell your name for the record.

SH: Steve Hobb, S-t-e-v-e, Hobb, H-o-b-b.

DF: What is your current assignment and how long have you been at the department?

SH: I'm a Police Corporal assigned to Patrol, been working for the Banning Police Department for 10 and a half months. I'm sorry, 10 and a half years.

DF: Years

RB: I was gonna say, I was like, I'm pretty sure it's longer than that.

DF: On July 30, 2015, what was your assignment?

SH: I was the Watch Commander for Patrol Team-3.

DF: And what were your work hours that day?

SH: 1600 till 04 the following day.

DF: Okay. At some point did you become aware members of the SART team were present to provide briefing training?

SH: Yes, I did.

DF: How did you become aware of that?

SH: I was in briefing and one of the records personnel, a female, came down and advised me that there was some people upstairs.

DF: And, um, did you have previous knowledge that training was going to occur that day?

SH: I did from an email but I forgot about it.

DF: Okay, who was that email from?

SH: I think it was from Sergeant Fisher.

DF: Okay, and what was the extent of that email if you recall?

SH: Uh, I don't know when it was dated or when he sent it out but it was something, it was saying that the SART team was coming for briefing training.

DF: Okay, and did the, to your recollection did that email include a day and time that they were scheduled?

SH: Yes, it did.

DF: And did you eventually go up to the lobby and meet with the SART personnel?

SH: Yes, I did.

DF: And, um, how much time passed from the time you were told by the records person that, until you went up to the lobby and met with them?

SH: Maybe five minutes.

DF: Okay, and you said earlier that briefing had already started?

SH: Yes

DF: And in your position as the Watch Commander for that team, were you the person that was conducting briefing?

SH: Yes

DF: To your recollection was there any other additional or special training that was going on that day?

SH: No

DF: When you went up to the lobby and met with or I'm sorry, - Uh, when you went up to the lobby, uh, how many of the SART personnel were there?

SH: Three

DF: And were they females?

SH: Yes

DF: And, uh, when you met them in the lobby, uh, did you ask them, "What are you guys doing here?" – Or anything similar to that?

SH: No

DF: What was your, how did you greet them if you recall?

SH: From my recollection it was – I already knew they were SART because the records personnel told me that; I knew they were already there for training because she told me they were here for training. Um, I went up there, I'm like, uh, you know, I might've said that, like, what are you, what are you, what are you doing here? That doesn't sound like the appropriate question to ask right off the bat so I can't see myself asking that. Um, cause that sounds rude to ask that question, what are you doing here?

DF: Okay

SH: Um, honestly I couldn't tell you what I said. It wasn't, it wasn't something along those lines.

DF: Alright. Um, at any point during that initial interaction with them did you tell them that the department had just had that same training a few months prior to that?

SH: Yes

DF: Okay, and what did you base that on?

SH: My personal knowledge, remembering the training, and my officers before I walked upstairs they, they commented, we just had this training.

DF: Okay, and, um, so when you had started briefing that day and the records person, did they call to briefing or did they physically come in and tell you?

SH: They walked down and physically told me.

DF: Okay, and did they tell you in the presence of the officers that were present?

SH: Yes

DF: Okay, and, um, in your experience at Banning PD, this specific training, is that something that occurs on an annual basis, on a regular basis, or do you know?

SH: We usually, I don't know if there's a set schedule, it's usually once a year.

DF: Okay, and so not only did the officers mention that they had, we had just had that but your own recollection was that you had just had that some recent time?

SH: Yes

DF: Okay, and what if any response did any of them have when you said that you had just had this training?

SH: Um, one of the females said, uh, well that's impossible, we're the only ones that do the training and we haven't been here in over a year.

DF: Okay, and what if any response did you have to that?

SH: I was, replied that well, I remember having it and so do my officers. And then she responded, one of them responded, well, your chief scheduled us to be here.

DF: Okay. Now let me ask you this – Was there, of the three ladies that were there, was there one that was, that you were interacting with or were they all answering questions? Do you know?

SH: I believe it was one. It might've been, might've been a second chimed in and said something.

DF: Okay, and you already partially answered this but did you ask them specifically who had set up the training?

SH: I did not ask them, uh, she, one of the females responded with, well, your chief set up this training.

DF: Okay. At any point did you see any of the three looking at a phone, like looking for reference or checking some device to check on who had set up the training or anything like that?

SH: No

DF: Did you see any of the three grabbing a phone and doing anything like looking at anything?

SH: No

DF: At any point during your conversation with the three women did you ever refer to, um, Chief Diaz as a sergeant?

SH: I don't recall.

DF: Is that something that sounds like something you might have said?

SH: If I did, if, if I said that it was a total slip and that would be disrespectful and I wouldn't say that.

DF: Okay. When one of the women indicated that Chief Diaz had arranged the training did you, at any point did you visibly role your eyes to them?

SH: Huh, I don't recall, um, rolling my eyes. Could I have? I'm not saying I didn't but I don't recall rolling my eyes. Um, I don't recall doing that.

DF: Okay. Um, describe if you would what your, I mean, what, when you were told Chief Diaz had set up the training did you have any, what was your thought process? Did you have any reaction to that?

SH: Once, once she said that, once she said that the chief set it up I said, well, let's go down and do it. Let's go down and do it, um, can you speed up the process though because we got calls pending. And she said, not a problem.

DF: Okay, and, um, you said earlier that you had had that particular training in the past, is that right?

SH: Yes

DF: And how long does that training typically last?

SH: Depends on questioning, it could go, there's three of them, there's usually a SART nurse, there's a rape crisis advocate – there's usually two or – and then there's a supervisor and they all take turns speaking so it could take, it could take a half hour.

DF: And, um, that particular day, um, you mentioned there were calls pending, is that correct?

SH: Yes

DF: Do you specifically recall that?

SH: Yes

DF: Okay, and how long does your briefing typically last on a typical day when you don't have any outside training or anything extra?

SH: Well it depends if I'm doing training, I'll do my own training. Um, sometimes it, if there's calls pending, we just, we clear and we go. There's times where we don't even go through the, the shift before us, calls for service and go over that. Um, so it varies. It could be, let's go, we've got calls pending cause I already get a hand-me-down, a hand-down, a pass-down from the sergeant prior to briefing so I already know the major incidents and if I have to pass those I will. But for the most, I mean, sometimes it's, there's no briefing and we'll come back to it later or

sometimes it could be a half hour, sometimes it can be an hour depending on what I wanna train the guys on and bring up.

DF: Okay, and you said that typically, is it your typical practice to having the previous incidents from the previous shift in your hands or whatever, do you typically pass those on if you have time?

SH: Yes

DF: Okay, and how many, on that particular shift how many officers are on-duty?

SH: On that day? I think it was two and they had a trainee maybe.

DF: Okay, is that a typical deployment on that shift?

SH: I think now it's up to three.

DF: Three plus a supervisor?

SH: Yes

DF: Okay. At any point after you were told that Chief Diaz had arranged the training did you audibly sigh at any point to any of these people, any of these three women?

SH: I'm, I could've sighed, I could've sighed.

DF: Did you at any point, uh, did you tell any of the SART members you didn't have time for this training?

SH: No

DF: After your initial contact with them in the lobby area did you go back inside, uh, and then come back out again a few minutes later?

SH: I don't recall. I recall once I walked out and greeted 'em, we talked, they followed us downstairs.

DF: When you say us, who do you, who's us?

SH: Well, followed me.

DF: Okay, so, um, at any point after you were told that Diaz set up, Chief Diaz set up the training did you ever, did you do anything to try and confirm that? Did you go call someone or anything like that? Did you make, did you do anything to verify that Chief Diaz had set up that training?

SH: No.

DF: So at the time you were told by the records person that the SART team members were in the lobby how far into briefing were you if you recall?

SH: It was like right at the beginning, there was still dayshift guys mingling around and then, uh, when she told me I recall seeing the detectives start walking in so they were down there for the same training.

DF: Okay. So along with the patrol officers there were detectives that were there for the training?

SH: Yes

DF: Did you tell them about the training or did they know about it ahead of time, if you know?

SH: I'm pretty sure, I'm a hundred percent sure more than likely they knew about it cause Sergeant Arretche probably had it on his calendar cause he was there.

DF: Okay, and what's his name again? Sergeant -?

SH: Sergeant Arretche.

DF: How do you spell that?

SH: A-r-r-e-t-c-h-e

DF: Is he a, was he at that time the Detective Sergeant?

SH: Yes

DF: Is he still in that position?

SH: As far as I know.

DF: After the training was completed by the SART members did you finish patrol briefing or was that the end of briefing?

SH: Uh, I think as soon as the training was done we went 10-8.

DF: Okay, and, um, on this specific day do you recall how long the training took? How long it lasted?

SH: She did it really fast, like it was five maybe 10 minutes.

DF: Did all three of the people that were present have some participation in the training?

SH: I believe so.

DF: And you said earlier you were the Watch Commander so you were the one conducting the briefing?

SH: Yes

DF: And is that normally part of your duties as a Watch Commander?

SH: Yes

DF: And, um, you said that you had them follow you in eventually, is that correct? Once you took them into the briefing area?

SH: Yes

DF: Did you physically lead them to where the briefing room is?

SH: Yes

DF: Where is the briefing room in relation to the lobby?

SH: Uh, you go through the lobby door past records, hang a right, go down the stairs, down the main hallway, go left and then right, right into briefing.

DF: So the briefing room is downstairs from the lobby?

SH: Yes

DF: Were you annoyed or angry that the SART members were there that day?

SH: Uh, annoyed, angry, maybe irritated.

DF: But not annoyed or angry?

SH: No

DF: Okay

SH: I wasn't irritated that they were there, I was irritated that we had calls and we already had this training and we had to do it again.

DF: And you said earlier that you thought that that SART training or, correct me if I'm wrong but I think you said you thought it was annual training from that particular group?

SH: It's roughly, I can't – it's roughly, we get it about every year, we have somebody come in.

DF: Okay

SH: And I don't know if it's a set schedule, I don't think it is. It's the same training, they pass the same information.

DF: And, um, so that day you said you thought there were two patrol officers and possibly a trainee?

SH: Uh, huh – yes.

DF: Is that right?

SH: Yes

DF: And then how many detectives? If you remember.

SH: Uh, I remember Sergeant Arretche, maybe, maybe Detective Segura, S-e-g-u-r-a, and maybe Detective Nolan, N-o-l-a-n. I don't know if Detective Bennett was there or not.

DF: Bennett?

SH: Bennett, B-e-n-n-e-t-t.

DF: And were there any other employees besides the patrol officers, uh, yourself and the detectives?

SH: Uh, I think dayshift stuck around.

DF: Dayshift patrol officers?

SH: Dayshift patrol.

DF: Where were you seated during the training?

SH: Um, I was right in the front row, far left corner right in the front.

DF: Far left from when you walk in or -?

SH: When you walk in, first seat.

DF: On the left side?

SH: On the right side.

DF: On the right as you walk in?

SH: Uh, huh

DF: Is that your normal position?

SH: Yes

DF: And is that the position you conduct briefing from typically?

SH: Uh, unless I'm doing something on the computer and I got the Power Point.

DF: Is there a different station where the computer, is that located at some different-?

SH: It's a podium.

DF: Okay, you can control the computer and the screen from the podium?

SH: Yes

DF: Do you recall while the training was going on if you repeatedly looked at your watch?

SH: I don't wear a watch.

DF: Did you wear one that day?

SH: No

DF: You don't typically wear a watch?

SH: (inaudible)

DF: When the training was done you said it took around five minutes or so, um, did you tell them where to exit or how did they exit if you know?

SH: Uh, I don't know, I didn't walk with them.

DF: Did you have someone else tell them where to go or do you know?

SH: Huh, I think Sergeant Arretche might've walked with them out.

DF: Okay, but you're not a hundred percent sure that he did?

SH: Not a hundred – uh, it wasn't me.

DF: Okay, did you ask anyone to escort them out?

SH: No, because I, they, I think they were answering questions when me and the patrol guys cleared. I think they were still answering questions to people that were still lingering around.

DF: Okay, so you and the patrol officers from your team eventually went to go in-service?

SH: I think so, yes.

DF: Okay. After your initial interaction with the SART members in the lobby did you have any further verbal interaction with any of them?

SH: Um, not that I recall.

DF: At any point that day during your interactions with them were you discourteous or rude to any of them?

SH: I don't believe so.

DF: In your opinion were you professional in your interactions with the SART members that day?

SH: Yes, all, all – yes.

DF: You started to say all, what, something else?

SH: No. Yes.

DF: Is there anything else that you recall about your interactions with them that day?

SH: No

DF: Is there anything else you'd like to add?

SH: No

DF: Mr. Baumann, is there anything you'd like to add?

RB: Yeah, I just wanna ask one question. Did you, do you remember receiving notification that the SART members were gonna be there on that particular day?

SH: I, I found an email afterwards and I had already read it so I knew, I read it before the meeting. Before the, I had read it when the email came out but I forgot about it. I, I forget how far in advance it was.

RB: Do you know or recall how many pending calls there were at the time they showed up?

SH: I do not know, rather, not recall.

RB: Okay, that was it.

DF: Alright, I don't have any further questions at this time. We're gonna go ahead and conclude the interview, it's about 10:15 a.m., October 30, 2015.

To the best of my knowledge and ability, the above transcript is a true and accurate transcription of the recorded interview of Steve Hobb by RCS Investigations and Consulting LLC, transcribed by Karyn Flutts for the Banning Police Department.

# EXHIBIT L



BPD 15-04 / RCS 2015-044 (EXHIBIT L)
Compact Disc - Audio recordings of witness statements and subject employee interview.

# DVD


2015-044_Amezquita, Vivian_Banning PD_092315.WMA


2015-044_Davis, Gloria_Banning PD_092415.WMA


2015-044_Heaps, Debora_Banning PD_091715.WMA


2015-044_Hobb, Steve_Banning PD_103015.WMA


2015-044_Lampkin, Sharleen_Banning PD_092415.WMA


2015-044_Yadon, Nicole_Banning PD_092815.WMA

BPD 15-04 / RCS 2015-044 (EXHIBIT L)
Compact Disc - Audio recordings of witness statements and subject employee interview.

DVD-R

BPD 15-04 / RCS 2015-044 (EXHIBIT L)
Compact Disc - Audio recordings of witness statements and subject employee interview.