Geoffrey S. Sheldon, Bar No. 185560
gsheldon@lcwlegal.com
Joung H. Yim, Bar No. 216136
jyim@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045
Telephone:   310.981.2000
Facsimile:   310.337.0837

Attorneys for Defendant ALEX DIAZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| STEVE HOBB,<br><br>                     Plaintiff,<br><br>          v.<br><br>CITY OF BANNING, a public and/or municipal corporation; BANNING POLICE DEPARTMENT, a public agency and/or municipal corporation; ALEX DIAZ, individually and as Police Chief; DON PETERSON, individually; and DOES 1 THROUGH 10,<br><br>                     Defendants. | Case No.:  5:16-cv-01352 AB (JCx)<br><br>Complaint Filed: June 23, 2016<br>FAC Filed: August 8, 2016<br><br>**DEFENDANT ALEX DIAZ'S APPENDIX OF EVIDENCE IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES (VOLUME 3 OF 4 – EXHIBIT 9)**<br><br>Trial Date:          January 16, 2018<br>Final Pretrial Conf.:  December 18, 2017<br>Discovery Cut-Off:   August 18, 2017<br><br>Date:          September 22, 2017<br>Time:          10:00 a.m.<br>Courtroom:  7B |

DEFENDANT ALEX DIAZ'S APPENDIX OF EVIDENCE

8259397.1 BA060-035

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

# EXHIBIT 9

# ADMINISTRATIVE INVESTIGATION

# PREPARED FOR THE BANNING POLICE

# DEPARTMENT

## IA # 15-06
## IA # 15-09

### December 13, 2015

DAVID FLUTTS
RCS INVESTIGATIONS AND CONSULTING LLC
P.O. BOX 29798
ANAHEIM HILLS, CALIFORNIA 92809-9798
WWW.RCSINVESTIGATIONS.COM
714-779-2300

215

# TABLE OF CONTENTS

SECTION 1.........SUMMARY

SECTION 2.........CONCLUSIONS AND FINDINGS

SECTION 3.........EXHIBITS

Exhibit A......................Banning Police Department Policy Manual sections

Exhibit B......................E-mail complaint from Corporal Hobb to Lieutenant Holder

Exhibit C......................Memorandum from Sergeant Fisher to Chief Diaz

Exhibit D......................Corporal Hobb and Sergeant Fisher audio recording on CD

Exhibit E......................Patrol call summary and patrol shift bulletin

Exhibit F......................Sergeant Fisher Internal Affairs Investigation notice

Exhibit G......................Officer Tammany Administrative Investigation Witness notice

Exhibit H......................Corporal Hobb Internal Affairs Investigation notice

Exhibit I...................... Corporal Hobb interview transcript

Exhibit J......................Officer Tammany interview transcript

Exhibit K......................Chief Diaz interview transcript

Exhibit L......................Corporal Hobb second interview transcript

Exhibit M......................Sergeant Fisher interview transcript

Exhibit N......................Compact Disk containing audio recordings of witness and subject employee interviews

# SECTION 1

# INTRODUCTION AND SUMMARY

# SECTION 1

## INTRODUCTION

In August 2015, RCS Investigations and Consulting was retained by the City of Banning to conduct an administrative investigation regarding allegations of potential misconduct against Sergeant Robert Fisher. The investigation was initiated after Corporal Steve Hobb submitted a complaint against Fisher to Lieutenant Phil Holder on August 21, 2015. The nature of the complaint was an interaction between Hobb and Fisher on August 20, 2015.

In October 2015, RCS Investigators were advised that Sergeant Fisher completed a memorandum to Chief Alex Diaz, which documented his version of the events surrounding an interaction with Corporal Hobb. Fisher's memorandum was dated August 24, 2015; however, RCS Investigators were unaware of the counter-complaint at the time this investigation was initiated.

Because the complaints by Sergeant Fisher and Corporal Hobb concerned the same event, the two investigations were combined and are documented in this report [Banning Police Department Internal Affairs case numbers 15-06 and 15-09].

Corporal Hobb's complaint and Sergeant Fisher's memorandum documented their versions of the interaction they had on August 20, 2015. The interaction occurred while Hobb was the Acting Watch Commander and Fisher was assigned to an extra-duty event at Repplier Park. The dispute between Hobb and Fisher concerned the handling of an incident which occurred at Repplier Park. The dispute was eventually resolved by Chief Diaz, after he spoke to Hobb and Fisher via telephone at the time of the incident.

The original administrative investigation was initiated before RCS Investigators were aware of Sergeant Fisher's memorandum to Chief Diaz. As such, Corporal Hobb was interviewed as a witness, as was Officer Nissa Tammany, who was present at the time of Hobb and Fisher's interaction.

After receiving all relevant information, RCS Investigators determined Sergeant Fisher and Corporal Hobb were both witness and subject employees. The following possible allegations of misconduct were identified:

### Sergeant Robert Fisher

**Allegation "1"**– It was alleged that Sergeant Fisher failed to complete assigned work duties or to direct a subordinate to complete required work duties while he was assigned as the supervisor at an extra-duty event on August 20, 2015.

**Allegation "2"** – It was alleged that Sergeant Fisher exercised authority over Corporal Hobb in a disparate and unequal manner when he ordered him to handle an incident at an extra-duty event that Fisher was assigned to on August 20, 2015.

## Corporal Steve Hobb

**Allegation "1"** – It was alleged that Corporal Hobb violated the Department's chain of command when he contacted Chief Diaz to resolve a dispute with Sergeant Fisher on August 20, 2015.

**Allegation "2"** – It was alleged that Corporal Hobb demonstrated insubordination when he disputed the handling of an incident and refused to follow an order from Sergeant Fisher on August 20, 2015.

**Allegation "3"** – It was alleged that Corporal Hobb misrepresented material information to a supervisor during his interaction with Sergeant Fisher and during a phone conversation with Chief Diaz on August 20, 2015.

RCS Investigations and Consulting was retained to conduct a neutral and fair investigation on behalf of the City of Banning regarding allegations of misconduct against Sergeant Fisher and Corporal Hobb. Various documents were reviewed including policy sections, memorandums, patrol shift bulletins, CAD Incident reports and e-mails. Additional relevant materials, including audio recordings were also reviewed. Each of the documents and other relevant material was reviewed and interviews were conducted as part of the work product of the investigation.

## SUMMARY

The Banning Police Department has policies in place which were established in-part, as an equitable and uniform procedure for dealing with personnel matters. RCS Investigators reviewed and considered the following **Banning Police Department Policy Manual** sections as part of the work product of this investigation:

### 200.3.1 SUCCESSION OF COMMAND

The Chief of Police exercises command over all personnel in the Department. During planned absences the Chief of Police will designate a Division Commander to serve as the acting Chief of Police. Except when designated as above, the order of command authority in the absence or unavailability of the Chief of Police is as follows:

(a) - Administration Division Lieutenant
(b) - Investigation Division Lieutenant
(c) - Field Operations Division Lieutenant
(d) - On-duty Watch Commander

### 200.3.3 ORDERS

Members shall respond to and make a good faith and reasonable effort to comply with the lawful order of superior officers and other proper authority.

4

**219**

**338.3.2 CONDUCT**

(k) - Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department.

**338.3.5 PERFORMANCE**

(c) - Unsatisfactory work performance including, but not limited to, failure, incompetence, inefficiency or delay in performing and/or carrying out proper orders, work assignments or instructions of supervisors without a reasonable and bona fide excuse.

(e) - Disobedience or insubordination to constituted authorities, including refusal or deliberate failure to carry out or follow lawful directives and orders from any supervisor or person in a position of authority.

(f) - The wrongful or unlawful exercise of authority on the part of any employee for malicious purpose, personal gain, willful deceit or any other improper purpose.

(g) - Disparaging remarks or conduct concerning duly constituted authority to the extent that such conduct disrupts the efficiency of the Department or subverts the good order, efficiency and discipline of the Department or which would tend to discredit any member thereof.

(ab) - Any failure or refusal of an employee to properly perform the function and duties of an assigned position.

(ad) - Giving false or misleading statements, or misrepresenting or omitting material information to a supervisor, or other person in a position of authority, in connection with any investigation or in the reporting of any department-related business.

**338.3.8 SUPERVISION RESPONSIBILITY**

(c) - The unequal or disparate exercise of authority on the part of a supervisor toward any employee for malicious or other improper purpose

The Banning Police Department Policy Manual sections are included as **Exhibit "A"** in this report.

RCS Investigators reviewed the complaint submitted by Corporal Hobb. The complaint was sent on August 21, 2015 to Lieutenant Phil Holder via e-mail and contained the following verbatim information:

*I am filing a formal complaint against Sergeant Robert Fisher due to his actions on 8/20/15 at approximately 2132 hours. I would like to know what format you would like it in. The event is as follows.*

*On that date and time, Sergeant Fisher was working an overtime assignment at the annual Concerts in the Park for which he signed up for. While performing his duties, it was brought to his or Officer Tammany's attention of a stray dog at the venue. Officers were asked to take care of the dog. Sergeant Fisher called Dispatch via telephone and asked for an available patrol officer to respond to the park and take custody of the dog and take the dog to the City of Beaumont.*

*Dispatch advised me via police radio of Sergeant Fisher's request and I advised Dispatch to have one of the concert venue officers handle the situation as all the patrol officers were busy handling calls for service throughout the City. Sergeant Fisher then used the police radio and directed Dispatch to have the next available officer respond to take custody of the dog.*

*I responded to the concert venue to speak with Sergeant Fisher. When I arrived, I attempted to activate my issued digital recorder, but the battery failed. I then asked Sergeant Fisher to activate his recorder, which he did. I then advised him that patrol was busy and that if I used a patrol officer to handle the dog, I would be short an officer to handle calls for service. I asked him if he could take the dog to Beaumont and he said no. Sergeant Fisher then stated, "I'm giving you a direct order" to take the dog to Beaumont. I advised Sergeant Fisher that I was going to first call Lt. Holder, but then told him I would call Chief Diaz instead. At 2123 hours, I called and spoke to Chief Diaz about the situation and explained my position. Chief Diaz agreed with me and said he would speak to Sergeant Fisher. I advised Sergeant Fisher that Chief Diaz would be calling him at which point Sergeant Fisher received a phone call and stepped away. After a few minutes, Sergeant Fisher returned and told me that I could leave. Sergeant Fisher then asked me for the catch pole and I left the concert venue.*

*While at the concert venue I noted that the dog in question was a female who had been nursing puppies. She was not vicious and friendly to petting. I also noted that the concert was ending and the concert venue officers would be free to leave leading me to believe that their duties at the venue were almost at an end. I did not feel it was pressing for so much attention to be given to this matter as there was no threat to the public and using a patrol officer to handle this matter would have been counterproductive to the mission of patrol.*

*I also feel his direct order to me was unethical as it was counterintuitive to my duties as the watch commander for patrol team 3 which entails supervising three patrol officers who are responsible for handling calls for service throughout the City of Banning. Sergeant Fisher volunteered for the overtime assignment knowing that it entailed handling incidents that occurred at the concert venue.*

*I also feel him giving me a "direct order" was a disparate exercise of his authority over me and my position as I do not believe he would have attempted this course of action with another watch commander. His direct order to me was an attempt to intimidate me and avoid performing the duties of the overtime assignment he signed up for.*

*I feel this is ongoing harassment and retaliation on Sergeant Fisher's part due to a written notice of counseling I issued him last year when he held the rank of police officer and again failed to perform his duties in taking a crime report. Since that time, Sergeant Fisher has also filed a formal complaint against me with Human Resources through the city of Banning. A full investigation was conducted and his complaints were determined to be unfounded.*

A copy of the complaint is included as **Exhibit "B"** in this report.

RCS Investigators reviewed a memorandum from Sergeant Fisher to Chief Diaz, dated August 24, 2015. The memorandum contained in-part the following verbatim information:

To:          *Chief Diaz*

From:        *Sergeant Fisher*

Reference:   *Corporal Hobb*
             *Violation of:*
             *200.3.1 Chain of Command*
             *200.3.3 Not Following Orders*
             *340.3.5 (e) Insubordination*
             *340.3.5 (ab) Refusal to follow Orders*

*On August 20, 2015 I (Sergeant Fisher) along with Officer Tammany were detailed to work the Concert in the Park at Repplier Park. This assignment was to be three hours long from 1900 to 2200 hours. At approximately 2115 hours I was contacted by a volunteer who had captured a stray Pit Bull. The volunteer explained that, the canine had been running loose in the venue and she was concerned for the safety of the audience. Officer Tammany accepted the dog and placed it in patrol unit.*

*At this time I contacted Dispatch and advised of the captured canine. I also requested that a patrol officer respond to the park and transport the animal to the temporary holding facility in Beaumont. After several minutes, I heard the call being assigned to Officer Smith. I then heard Corporal Hobb comment that, there were two units assigned to the concert. It appeared that, Corporal Hobb had canceled my request for an officer. I then contacted Dispatch, via radio and indicated that once a unit was available, to have it respond to the park and transport the canine.*

*At approximately 2132 hours, Corporal Hobb arrived at the concert and indicated that he had three officers on patrol, and there were two officers working the park. Corporal Hobb eluded to splitting up the pair of officers assigned to the park and have one transport the canine, and the single officer could continue his/her foot patrol alone. As a Supervisor, the Corporal should know that for Officer Safety, a two man foot patrol unit cannot be split up. It should be noted that, upon Corporal Hobb's arrival he seemed agitated, and he was becoming argumentative and almost to the point of combative, as he expressed his desire to split the park team up.*

*After hearing enough of Corporal Hobb's excuses and refusals to transport the dog, I provided Corporal Hobb with a direct order to transport the dog to Beaumont Furthermore, Corporal Hobb's willingness to engage in this disobedience in the presence of one of our subordinates was wrong.*

*At this point, Corporal Hobb asked that, a department recorder be activated, and he said, "I think I'm being set up". Obviously for his protection as well as mine, I immediately activated my belt recorded.*

*However, Corporal Hobb continued his protests, and reiterated over and over that, he had only three officers assigned to patrol. I then ordered Corporal Hobb a second time, to transport the dog and again he refused. Corporal Hobb then stated," before I do that, I'm gonna call the Lieutenant". Corporal Hobb then walked away and mentioned that he was going to call the Chief of Police instead. After several minutes, Corporal Hobb returned and said that the Chief would be contacting me.*

7

222

*I subsequently received a telephone call from the Chief of Police. To comply with Departmental policy and state law, I did not record my telephone conversation with the Chief of Police. During the telephone call, it was determined that the canine would be transported to Beaumont by Officer Tammany and the Chief of Police would speak with Corporal Hobb at a later time.*

*Next, I instructed Corporal Hobb to leave a catch pole with Officer Tammany and to return himself to service. Officer Tammany then transported me to the Police Station and continued to Beaumont with the canine.*

*While at the Police Station, I contacted Dispatch and inquired how many calls were pending when Corporal Hobb had arrived at Repplier Park. The Dispatcher researched her log, and said that no calls were pending at that time.*

Sergeant Fisher included the CAD Incident report [#1508200095] with the memorandum. The report showed that Officer Brandon Smith was initially dispatched to Repplier Park at 9:20 p.m.; however, he was cancelled shortly thereafter and Corporal Hobb responded to the incident.

Copies of the memorandum and CAD Incident report are included as **Exhibit "C"** in this report.

RCS Investigators reviewed an audio recording of a portion of the contact between Corporal Hobb and Sergeant Fisher on August 20, 2015. The recording was difficult to hear, as there was loud music in the background. The incident apparently involved a stray dog officers had in their police unit at the venue. Hobb had already disputed Fisher's request for a patrol officer to respond to the venue to take custody of the dog. In the recording, Hobb told Fisher he had three officers in patrol and Fisher had two officers at the event and there did not seem to be any other incidents taking place at the time. Fisher then ordered Hobb to take custody of the dog, at which point Hobb responded and stated he was going to have to call the lieutenant [Lieutenant Holder]. No additional conversation between Hobb and Fisher was heard on the recording.

The recording was contained on a compact disk and the CD is included as **Exhibit "D"** in this report.

RCS Investigators reviewed a summary of patrol calls which occurred during the time frame of the incident. The patrol shift bulletin for night shift was also reviewed. RCS Investigators noted there were four calls between 9:00 and 10:00 p.m., one of which was Sergeant Fisher's request for patrol unit at 9:17 p.m. The remaining calls during that period of time included a suicidal subject, a commercial alarm and a family disturbance. The patrol deployment for that shift was three officers and a supervisor [Corporal Hobb].

Copies of the call summary and shift bulletin are included as **Exhibit "E"** in this report.

RCS Investigators reviewed an Internal Affairs Investigation notice issued to Sergeant Fisher on August 27, 2015.

A copy of the notice is included as **Exhibit "F"** in this report.

RCS Investigators reviewed an Administrative Investigation Witness notice issued to Officer Nissa Tammany on September 29, 2015.

A copy of the notice is included as **Exhibit "G"** in this report.

RCS Investigators reviewed an Internal Affairs Investigation notice issued to Corporal Hobb on November 12, 2015.

A copy of the notice is included as **Exhibit "H"** in this report.

## Interview of Corporal Steve Hobb

On September 23, 2015, RCS Investigator Flutts conducted an interview with Corporal Steve Hobb. Hobb was admonished to answer all questions completely and truthfully. The interview was recorded and a transcript is included as **Exhibit "I"** in this report. The following is a synopsis of the interview.

Corporal Hobb has been employed by the Banning Police Department for 10 years and was currently on administrative leave. Hobb was asked if he was on-duty Thursday, August 20, 2015, at approximately 9:30 p.m. and he said he was. Hobb acknowledged he was assigned as the Acting Watch Commander for Patrol Team 3 that day. Hobb was asked how many officers were on-duty at that time and he said three patrol officers were working on his team that day.

Corporal Hobb was asked if another team was working as well that day and he replied, "There's a special assignment overtime position for the Concerts in the Park." Hobb confirmed the patrol deployment that day was him plus three officers. Hobb was asked what time his shift began that day and he said the shift was 4:00 p.m. until 4:00 a.m. Hobb was asked if a Concert in the Park event was occurring that evening and he said it was. Hobb was asked where that event was held and he said it was in Repplier Park in Banning.

Corporal Hobb was asked if that event occurred every year and he stated it did. Hobb was asked if Banning Police Officers were working that event on an overtime basis on August 20, 2015, and he said they were. Hobb indicated two officers were working the event, Sergeant Fisher and Officer Nissa Tammany. Hobb was asked if Tammany's regular assignment was patrol and he said she was assigned as a School Resource Officer. Hobb was asked if he ever worked the Concerts in the Park event and he said he had.

Corporal Hobb was asked if he was aware of any guidelines officers working that event had regarding handling incidents and he replied, "They're responsible for handling calls for service there that stem from the concert." Hobb was asked the size of the venue and he said, "It's not an auditorium, I don't know what you'd call it. It's like a bowl-type setting with a stage that has seating for; I don't know how many people." Hobb confirmed it was an outdoor event.

Corporal Hobb was asked if two officers were typically assigned to that event and he said, "It could be two, I've seen it with three, sometimes reserves work it to get their hours in." Hobb was asked if he interacted with Sergeant Fisher at some point that evening and he replied, "Yes, I was at my desk, my patrol officers were all tied up on calls and dispatch, can I look at this note cause I don't know if they called me on the phone." Hobb checked his personal cell phone for an e-mail he sent himself regarding the events that took place and advised he would provide that e-mail for the investigation.

Corporal Hobb continued, "So dispatch came over the radio to me and asked me to send the next available patrol unit to the park to take custody of a stray dog that the park units had detained. At the time all my officers were busy and I felt this was a call that the park units should handle in addition to the two officers that were there, there was several volunteers and there might've been reserves units there, I didn't see them on this night but usually there's reserve units like I just stated earlier."

Corporal Hobb was asked if he was referring to police department senior volunteers and he replied, "It varies." Hobb was asked how many volunteers were present and he said, "I see usually three to four when I'm there. There's usually quite a few of them like in the venue." Hobb confirmed he was working at his desk in the station at the time and the three on-duty patrol officers were busy on other calls. Hobb was asked if any calls were holding at the time and he did not recall.

Corporal Hobb was asked if their computer system allowed him to determine if calls were holding from his office and he said they would appear on the screen. Hobb confirmed the call came out over the primary dispatch channel. When asked if the call actually came to him Hobb replied, "Yes, it was from dispatch to me advising that Sergeant Fisher was requesting a patrol officer to respond to the venue to take custody of this dog and take it to the City of Beaumont where their ACO office is, Animal Control Office."

Corporal Hobb confirmed the animal control office that Banning used was located in the City of Beaumont. Hobb was asked his initial impression when he heard the information and he replied, "I felt that this wasn't a patrol officer's function as there's officers there and including volunteers that could've handled this. So I told dispatch over the air, negative on that, have one of the venue officers handle that situation." Hobb acknowledged working those assignments in the past and it was the understanding that officers at the venue were responsible for calls or events that occurred there.

Corporal Hobb was asked if the request was unusual in his opinion given the fact that officers working the event were expected to handle their own calls and he said it was. Hobb was asked if dispatch specifically indicated officers at the park had contact with the dog and he said they did. Hobb was asked if any other specifics were given related to the call and he replied, "No, it wasn't like they needed assistance cause if they needed assistance on something major like if there was a fight, of course we would respond and back them, assist them. This was a dog, so I don't, they didn't say vicious or anything like that. It was a stray dog and so I told dispatch to have one of them handle it."

10

225

Corporal Hobb was asked what occurred at that point and he replied, "Sergeant Fisher came over the police radio and said 10-22 my response and have the next available unit respond. At that point I went out to the bay; I grabbed the catch pole, which is a dog-catching pole... where we park the vehicles. So I put that in my trunk and I drove right to the park. As I arrived I parked up close to the venue, I exited, I had the catch pole in my hand. Sergeant Fisher met me about halfway between where my car was and where their car, I say their, I don't know who brought the car there, it was a patrol unit parked over to the south side of the venue."

Corporal Hobb continued, "The first thing I said to him is hey my audio recorder, my digital audio recorder, the batteries are dead, I can't record, can you please turn on your audio recorder and record this. I asked that of Sergeant Fisher, he said sure." Hobb was asked if it was his understanding that Fisher recorded the contact and he said, "As far as I know he did." Hobb was asked if he observed Fisher manipulate any recording device and he said he did not pay attention.

Corporal Hobb was asked what occurred at that point and he replied, "We walked over to where the patrol unit was and there was Officer Tammany and there was a dog, I think it was in the backseat, it was already in the backseat of their car. It was some sort of pit bull mix or maybe it was a pit bull. It was gray, it was a female, it had been nursing you could tell it was nursing puppies. And the dog was calm, it was cooperative, it wasn't vicious and they were petting it." Hobb was asked who was petting the dog and he said, "Officer Tammany, I believe there's some kids there."

Corporal Hobb was asked if Sergeant Fisher or Officer Tammany gave any indication the dog was vicious or caused any type of problem at the venue and he said they did not. Hobb further stated, "We had a discussion about who should take this dog over and I told them I didn't feel we should because it's not patrol's function and he told me, I'm giving you a direct order to take this dog. I didn't feel it was a lawful order. He is a sergeant, I'm a corporal; however, I'm the Acting Watch Commander."

Corporal Hobb continued, "My job is to supervise the patrol which patrol is the primary, it's the primary mission for the Department. His position there at the venue is secondary. As I said, I didn't think it was a lawful order. I felt that he was doing this out of retaliation and he was giving me this order because he was trying to exercise his authority over me because now he could, now that he was a sergeant. So I told him, before I take this dog, I'm gonna call Lieutenant Holder. And I said no, I'm actually gonna call the Chief."

Corporal Hobb was asked why he believed Sergeant Fisher was attempting to retaliate against him and he explained, "Let's see, August... to about October 2014, I was the Acting Watch Commander of my patrol shift and he was working on my shift in overtime. A call came out, right out of the shoot, right at the beginning of shift to assist CPS. CPS went to a house, they did their investigation; they took some children from the home because the children had injuries sustained from like an extension cord or a hanger or something like that. Sergeant Fisher who was on scene at the time, he failed to do any investigation or take any action."

11

Corporal Hobb confirmed CPS was Child Protective Services and when asked if Sergeant Fisher was an officer in October 2014, he said he was. Hobb continued, "Basically he failed to take action. When I reviewed the call later, I saw that dispatch had had notes that the RP, the reporting person, which was CPS, called back and they wanted the police to respond back to the location but they didn't want Officer Fisher to respond. So I asked dispatch, why wasn't I informed of this? They didn't have an answer, so I ended up contacting CPS and asking what happened and a CPS worker told me that they were upset at Officer Fisher's performance on that call."

Corporal Hobb continued, "He failed to take photos, he failed to ask questions, he stood in the back and just had his arms crossed and he did not do his job. For his performance on that call, I wrote him up. I tried to do a written reprimand, Lieutenant Holder told me no I couldn't, I had to start with progressive discipline and it had to be a verbal notice of counseling. So I gave him a verbal notice of counseling after Lieutenant Holder had went through the notice of counseling and looked at it and he gave it back to me, said have him sign this."

Corporal Hobb further stated, "So I had asked Sergeant Fisher to sign it, or Officer Fisher at the time, to sign the verbal notice of counseling and he refused. At the time I had another sergeant there with me, Sergeant Loader. Because Lieutenant Holder told me to have him sign it, I told him I'm giving you a direct order to sign this. This is not, you're not signing it stating that you agree with it, you're just acknowledging receipt of this verbal notice of counseling and you have 30 days to respond to it. And he refused to sign it." Hobb confirmed Fisher, who was an officer at the time, refused to sign the verbal notice of counseling in Sergeant Loader's presence.

Corporal Hobb added, "He refused so I put, refused to sign, with Sergeant Loader there and Officer Fisher walked away. I gave it to Lieutenant Holder and that was that on that issue. That was in October, maybe October actually, then he filed a complaint, Officer Fisher filed a complaint with the City of Banning alleging that I was harassing him and alleged age discrimination. That was investigated in the early part of this year, I believe you conducted that investigation and that investigation was unfounded."

Corporal Hobb confirmed Officer Fisher's complaint against him included the issue with verbal notice, as well as several other allegations regarding other incidents and interactions. Hobb was asked if he was informed of the findings at the conclusion of the investigations and he said he was and they were unfounded. Hobb continued, "So this happened in August and approximately May, Sergeant Fisher was promoted to sergeant. I and other people in the POA took issue with his promotion because we felt that he, number one, didn't pass the test, and number two, he wasn't fit to be a sergeant."

Corporal Hobb further stated, "This was based on the fact of numerous people in the POA. You can probably talk to every member of the POA, there was issues about his officer safety, about his work ethic, about his response to officers needing assistance, how it'd be slow, how he would take the long way to get there, how he would drive the speed limit when an officer's asking for help. Going back to him not passing the test, he told an officer that he didn't pass the sergeant's test; he also wasn't invited by the Chief to do oral interviews. There was like eight people that took the test, six of us were asked back for oral interviews."

Corporal Hobb added, "Well, in May when he was promoted, we took issue with this. The POA contacted HR and Officer Callahan who's our POA President, got a memo from Rita Chapparosa who is our HR person, I forget her title, she's in charge of HR, she presented him a memo that she typed up that was allegedly attached to an e-mail that said that Officer Fisher passed the sergeant's test." Hobb confirmed the Police Officers' Association at the Banning Police Department had issues with Officer Fisher's promotion.

Corporal Hobb was asked if he took part in the same promotional process where Officer Fisher was promoted and he confirmed he did. Hobb believed eight officers took part in that process. Hobb indicated six of the eight individuals were invited to an interview with Chief Alex Diaz. Hobb was asked when that process occurred and he believed it was September 2014. Hobb was asked what the promotional process consisted of and he replied, "It starts with a written test and then an oral interview with a panel from outside agencies where outside agency members sit on the panel and ask the questions and then they grade us. Then after the oral you get a score, you either pass or fail based on a cumulative of both of them together, and the Chief asks you back for an oral interview with him."

Corporal Hobb was asked if a list was produced after the oral interviews with the Chief concluded and he said, "Typically in past there's been a list; however, this time the Chief did not put out a list." Hobb was asked if the Chief or Human Resources produced anything with the results of that process and he said they did not. Hobb was asked if the candidates taking part in the process were notified of their ranking and he replied, "No, if they wanted to find out, they had to contact Jodi Miller in HR. Joni Miller, and ask her what their score was and then she would give them their score. I don't know if she did it verbally or e-mail, but she would tell them or send it to them."

Corporal Hobb was asked if it was his understanding that Robert Fisher participated in the process; however, did not take part in a Chief's oral interview and he said, "To my knowledge he didn't based only, solely on the e-mail from the Chief to all the people who passed." Hobb was asked if he had a copy of the e-mail and he replied, "I'm looking for it now. It said congrat, I don't wanna say, I have such a terrible memory. If I don't write something down right after I do it or hear it, I'll forget it, but I do have it."

Corporal Hobb confirmed after his conversation with Sergeant Fisher at the park on August 20, 2015, he initially considered calling Lieutenant Holder and then decided to call Chief Diaz. Hobb was asked why he called Chief Diaz and he replied, "Because Chief Diaz is the one who promoted Fisher and Chief Diaz told not only me, he told the POA Board before the current one we have currently, which was at the time Brandon Smith, Mike Bennett, and Jennifer Segura, that he would not ever promote Bob Fisher, that he would be crazy if he promoted Bob Fisher." Hobb acknowledged Diaz made that statement to the board in 2014.

Corporal Hobb was asked if that occurred prior to the promotional process and he said, "It could've been before or after. They didn't tell me the dates but they were all there." Hobb confirmed Brandon Smith, Mike Bennett, and Jennifer Segura were the Association's board at the time and acknowledged there was a new board since that time.

13

228

Corporal Hobb was asked if his reason for calling Chief Diaz was to resolve the issue with Sergeant Fisher that day and he replied, "No, I felt that he created this situation by putting Bob Fisher in a position to supervise me when, not supervise me, because Fisher was not my supervisor on this day. He put Bob Fisher in a position to where Bob felt he had the authority over me and I felt Sergeant Diaz, I mean Lieutenant D, Chief Diaz created this monster so I felt he should probably have to deal with it."

Corporal Hobb was asked to describe his conversation with Chief Diaz and he replied, "I told Chief Diaz what had taken place. I told him my position where I felt that my officers on patrol were responsible for patrol that Sergeant Fisher signed up voluntarily for this overtime spot to handle the venue and any calls for service there. He had another officer there, he had reserves there and the venue was almost over. And I felt that he could've had Officer Tammany, he could've had one of the volunteers take the dog and it wouldn't have impacted patrol like Sergeant Fisher was trying to do."

Corporal Hobb confirmed the Animal Control facility was in Beaumont. When asked where that was located in relationship to Banning Hobb replied, "I don't know 12 miles, 15 miles, 10 miles. I've worked up here so long you'd think I would know." Hobb was asked how Chief Diaz responded and he said, "He said I was right. He said he would contact Sergeant Fisher and I said do you want me to hand him the phone because I had my phone. He said no, he'll call him. So I hung up with Chief Diaz, I walked back to Sergeant Fisher because I had to walk away from where Sergeant Fisher was because the concert was going on and it was loud, so I walked over by the skate park where I could hide behind one of the ramps."

Corporal Hobb continued, "When I walked back over to where Sergeant Fisher and Officer Tammany was, I told Sergeant Fisher Chief Diaz is gonna call you and Sergeant Fisher's phone rang. Sergeant Fisher answered it he stepped away; he was gone for like five minutes. During that time I spoke to Officer Tammany, she said that was uncomfortable and we proceeded to talk about the dog. She said that somebody at the venue brought it, told him about it, they went, found the dog, it wasn't a threat, it wasn't vicious, and it wasn't a big deal to her."

Corporal Hobb further stated, "Then some kids came up and started talking to us and after five minutes, Sergeant Fisher returned and said you can go. I started to walk away and he asked for the catch pole. So I turned around and gave it to him and I went back to my patrol unit and I left." Hobb was asked if Tammany was present during his initial interaction with Fisher at the park and he said, "Not when I asked him to turn on his recorder. I didn't say anything to him from that point until I got over to where Officer Tammany was."

Corporal Hobb confirmed from the point he requested Sergeant Fisher to turn his recorder on, he moved over to where Officer Tammany was located. Hobb was asked if Tammany witnessed the remainder of the conversation and he said she did, which was where the majority of the discussion occurred. Hobb was asked if he wanted the recorder to be turned on in an attempt to record the entire interaction and he stated he did. Hobb was asked if he believed Fisher's actions were an attempt to intimidate him and he replied, "Yes, the reason I say that is the way his body position and his language, he used a stern voice and you could tell, I could tell he was angry. He had had the same demeanor as he did when I gave him his written, verbal notice of counseling. He was upset."

14

229

Corporal Hobb was asked to summarize his concerns in his complaint aside from the intimidation and he replied, "He was trying to harass me on that incident, he tried to exercise his authority over me." Hobb indicated he felt Sergeant Fisher's order was unlawful or inappropriate and after he explained the situation to the Chief during the phone conversation, the Chief agreed with him. Hobb added, "The reason I say that was an inappropriate order is, he would've never given that order to another sergeant."

Corporal Hobb continued, "If I was a sergeant, he would've not ordered me to do that. He would not have had the authority to order me to do that. But because he's a sergeant and I'm only a corporal he believed he could do that but it was inappropriate because I was Acting Watch Commander. My duties revolve around patrol and calls for service." Hobb was asked if other patrol teams at the Banning Police Department had sergeants as Watch Commanders and he said they all did. Hobb was asked if he was performing in essence the same duties on his shift as a sergeant on any other shift was and he said, "Exact same duties."

Corporal Hobb was asked if he would have called Chief Diaz if he experienced a similar dispute with another employee and he replied, "No, more than likely not, it depends on circumstances but I can't say for sure I wouldn't but more than likely not. This was something that I felt the Chief needed to be aware of because I had voiced my concerns about ever having to work for Fisher because I knew he didn't like me and I felt he would do something like this and he did exactly that." Hobb confirmed that was the reason he decided to call Diaz directly, as opposed to calling Lieutenant Holder.

Corporal Hobb was asked if Lieutenant Holder was his direct supervisor that night and he said he was. Hobb confirmed Holder was the only lieutenant at the Banning Police Department. Hobb was asked if he listened to the recording between him and Sergeant Fisher that night and he said he did not. Hobb was asked if he knew what was on the recording and he said he did not. Hobb was asked if he prepared an e-mail to Holder later that shift regarding the interaction with Fisher and he acknowledged he did. Hobb was shown a copy of the e-mail and he identified it as the e-mail he created.

Corporal Hobb was asked if he had anything further to add regarding the incident and he replied, "I just think that was highly inappropriate of him to do that in front of another officer and if you ask that officer, they will say they felt uncomfortable and that'll probably tell you how inappropriate it was for him to do that." Hobb was asked if he was referring to School Resource Officer Tammany and he said he was. Hobb indicated Tammany normally worked Monday through Friday, day shift.

Corporal Hobb was asked if he had anything further to add regarding the promotional process he referred to earlier and he replied, "Sergeant Fisher might've been upset too because I did a public information request for e-mails for testing. And because I and others in the POA felt that memo that was presented to Officer Callahan by Rita Chapparosa was not legitimate, we felt it was odd that Rita would write a memo and attach it to an e-mail when she could've just e-mailed the Chief and said, a, b, c, d, passed the test, these are the ones that can move forward. So I did a public information request on that. The Chief was aware of it; I assume Sergeant Fisher was aware of it."

Corporal Hobb continued, "They are, they talk a lot. I don't know if they're friends, I won't go that far but I would assume that since he's the Admin Sergeant, they discuss these things. That might've upset him as well." Hobb was asked when he submitted the public information request and he said Monday, August 17, 2015, three days prior to his interaction with Sergeant Fisher on August 20, 2015. Hobb mentioned a memorandum from Rita Chapparosa and when asked if he indicated she attached the memorandum to an e-mail to Officer Callahan he replied, "I'm assuming, I never saw the e-mail from her to Callahan. I never saw the e-mail from her to the Chief."

Corporal Hobb further stated, "When I did my public information request, I did not get that e-mail from her to the Chief but the way Brian Callahan presented it to us in our POA meeting was, this memo was from an e-mail from Rita to the Chief and he only presented the memo." Hobb was asked what the memorandum contained and he replied, "It listed seven people as passing the test." Hobb was asked if the list was in any type of order and he did not recall.

Corporal Hobb was asked if the Banning Police Department typically listed people in ranked order on promotional tests and he replied, "If they put out, well, I don't know if they would do that. In times past, I don't know if it was in order, I think it was just these are the people who passed." Hobb was asked if Chief Diaz had the ability to promote whomever he chose from the selected group of individuals and he replied, "I would assume, I mean, if they passed it's probably his discretion. I think that's how it is at other agencies. He doesn't have to promote number one, he can skip number one and go to five if wanted." Hobb was asked if the process was outlined in their Memorandum of Understanding and he did not believe it was. Hobb was asked if he had anything further to add and he said he did not.

## Interview of Officer Nissa Tammany

On October 8, 2015, RCS Investigator Flutts conducted an interview with Officer Nissa Tammany. Tammany was admonished to answer all questions completely and truthfully. The interview was recorded and a transcript is included as **Exhibit "J"** in this report. The following is a synopsis of the interview.

Officer Tammany has been employed by the Banning Police Department for eight years and she is currently assigned as a School Resource Officer. Tammany was asked if she worked an extra-duty assignment at the Concerts in the Park event on August 20, 2015, and she said she did. Tammany was asked who she worked the event with and she said Sergeant Fisher. Tammany was asked if any other police personnel were assigned to the event and she did not believe there were. Tammany was asked if any reserves or volunteers were working the event and she replied, "I believe there were. I can't remember if a reserve worked that day but the volunteers were there."

Officer Tammany was asked what time the assignment began and ended and she believed it was 7:00 p.m. to 10:00 or 11:00 p.m. Tammany indicated the Concerts in the Park included cover bands and a main concert, and was held at Repplier Park in the City of Banning. Tammany was asked if she worked extra-duty events prior to that particular assignment and she said she did. Tammany was asked the expectations regarding officers working extra-duty events in terms of what they were to handle and she replied, "It could be anything, case by case basis, and on that assignment, typically we're just there for presence to make sure that there's no disruptive persons, make sure it's kept safe."

16

Officer Tammany was asked if officers working extra-duty assignments were expected to handle incidents occurring at the venue and she said, "I would expect it if I was, something went down that I could possibly be handing it, yeah." Tammany was asked if she was advised of a situation with a stray dog during the event on August 20, 2015 and she replied, "Yes, we had seen the stray dog wandering around and then a citizen had come up to me and they were concerned. The dog was not aggressive, and then we just monitored the dog and then eventually a volunteer kinda brought the dog over to us."

Officer Tammany confirmed a citizen informed her about the dog and she observed the dog as well, and it was not aggressive. Tammany acknowledged the citizen was concerned because the dog was a pit bull breed. Tammany confirmed she saw the dog and it appeared to be a pit bull. Tammany was asked if she observed any aggressive behavior by the dog and she said she did not. Tammany was asked if anyone ever advised her the dog had been vicious and she said no one did. Tammany was asked if anyone expressed any type of concern for their safety because of the dog and she replied, "They were concerned because it was a pit bull, not that it had done anything, just simply the fact of the breed."

Officer Tammany was asked if there were multiple reporting parties with respect to the dog and she said, "There was only one lady that came up to me directly. I don't know who she was." Tammany was asked if she observed the dog prior to being contacted by the female and she said she did, and it was just wandering around in the park. Tammany was asked where the dog was located in relation to where the concert was held and she replied, "The dog passed by, I parked in the grass by the, on the west side of the skate ramp and the dog wandered past my unit. The concert's down in the bowl on the stage but there's people everywhere."

Officer Tammany was asked if people were walking around the park and she said, "Yeah, and kids were walking around. The dog made no, any kind of movement toward anybody. It wasn't aggressive in any way." Tammany was asked if she believed there was an urgency to remove the dog from the venue and she said she did not. Tammany confirmed a volunteer brought the dog to her location at some point. Tammany was asked how that was accomplished and she replied, "They were coaxing it, calling it, kinda brought it over to us like, here's the dog and the dog stopped at my feet."

Officer Tammany was asked if the volunteer was alone and she only recalled one female and did not know her name. Tammany was asked if she had seen that particular volunteer in the past and she said she did. Tammany was asked if the volunteers at the Banning Police Department were generally senior citizens and she said they were. Tammany was asked if the volunteer who brought the dog to her was a senior and she said she was. Tammany acknowledged when the dog was at her feet, she held on to its collar. When asked if she saw any signs of aggressive behavior from the dog and she replied, "None, not the entire time."

Officer Tammany was asked if the dog had a nametag or license on the collar and she said it did not. Tammany was asked what she did with the dog at that point and she replied, "I held it and then figured out what we were gonna do with it and eventually put it in the backseat of my car." Tammany was asked if Sergeant Fisher was with her when the dog was brought to her location and she said, "Yes, I think he was standing by me, next to me, when the dog was brought over, yes. We were standing right by my car."

17

Officer Tammany was asked how far her vehicle was from the actual concert venue and she estimated 40 to 50 yards. Tammany was asked if a band was playing on stage at the time and she said, "I don't remember if they were playing at that exact time. They were on stage." Tammany was asked if it was loud and she did not recall. Tammany was asked if she and Sergeant Fisher had any discussion regarding the dog and she replied, "Yeah, just what to do with it." Tammany was asked if a decision was made and she replied, "He said he was gonna call Patrol to take it to animal control."

Officer Tammany was asked where animal control was located and she said, "Beaumont PD. They have a holding area in the building right across the street but it's their domain, yeah." Tammany was asked if dogs from Banning were normally taken to Beaumont and she replied, "Every time, yeah." Tammany was asked how far the Beaumont Police Department was from the venue and she said, "From here to the police department is probably three miles, four miles." Tammany was asked where the park was in relation to the Banning Police Department and she replied, "The park is north of us and about one block west."

Officer Tammany was asked if Sergeant Fisher ultimately requested a patrol officer over the radio and she said, "I don't remember if he got on the radio or if he made a phone call. Somehow he directed the request for Patrol to respond. I'm assuming he would've called directly to dispatch." Tammany was asked if Fisher made the request over the radio or by phone and she replied, "I can't remember. He was on both I think. On both the radio and the phone I think but I don't remember which happened first or what was said on which device."

Officer Tammany was asked prior to Sergeant Fisher contacting the station regarding the dog, if any other incidents were occurring at the venue requiring police attention and she said there were not. Tammany was asked if there were any disturbances at the park that night and she replied, "No, nothing happened." Tammany was asked if the dog was with her while people were walking in the area and she said, "Yeah, just people walking, people were sitting, kids were riding their skateboards and their scooters. It was just normal activity."

Officer Tammany was asked if she heard Corporal Hobb broadcast anything over the radio regarding Sergeant Fisher's request and she did not recall hearing anything. Tammany was asked if she was present when Hobb arrived at the location and she confirmed that she was. Tammany was asked if she witnessed Hobb's interaction with Fisher and she said she was standing within a couple feet of both of them. Tammany was asked if she could hear the conversation between Hobb and Fisher and she stated she could.

Officer Tammany was asked to describe the conversation and she replied, "It was something along the lines of, can you take the dog, our Patrol's not available. And at that point Fisher said no, I want you to take the dog. And at some point Fisher said I'm ordering you to take the dog and then Corporal Hobb stepped away, made a phone call, I'm assuming to somebody in admin regarding that, I think it was the chief, at which time he came back and said standby, the chief will be calling you on your phone. The chief called and talked to Fisher, Sergeant Fisher stepped away and then came back and that was it and then Corporal Hobb was not gonna be, end up taking the dog so he left and I ended up transporting the dog."

18

233

Officer Tammany was asked if Corporal Hobb had a catchpole when he arrived at the location and she said, "I think he brought it, I think he did bring it. We ended up with it so I assume it came from him." Tammany was asked if she ever utilized that tool in the past and she said she did and explained it was a pole with a loop at the end that went around the dog's neck for control of the animal. Tammany confirmed she used the pole in the past.

Officer Tammany was asked if she heard Corporal Hobb request Sergeant Fisher to turn his audio recorder on during any point of the conversation and she said, "Yes, well no, Corporal Hobb asked if he was recording and said I'm turning mine on and asked me to turn mine on. So yeah, that conversation came." Tammany was asked if Hobb requested Fisher to turn his recorder on and she replied, "I don't know if he asked specifically, can you turn it on, but it was like, do you, are you recording or can you, something like that. Can you record or I'm gonna record or something like that."

Officer Tammany confirmed at some point Sergeant Fisher ordered Corporal Hobb to take the dog. When asked about Hobb's reaction to the order Tammany stated, "I think that's when he decided to make a phone call." Tammany was asked if Hobb provided a verbal response to Fisher and she said he did not. Tammany was asked if she heard Hobb mention that Patrol was busy and she replied, "Right in the beginning remember I told you he said something about Patrol's not available right now or something along those lines. But I don't have, I didn't have my call screen up so I didn't know what he was referring to."

Officer Tammany was asked if she was monitoring the police radio for other activity and she replied, "Well I was monitoring the radio but I was not monitoring the calls on the screen in my unit. So I couldn't see if, what was pending or what officers were necessarily on." Tammany was asked if the police radio sounded busy and she did not recall. Tammany was asked if Corporal Hobb told Sergeant Fisher he was going to call someone and she said, "Yeah, I didn't know initially it was gonna be the chief until he came back and said the chief is gonna call you on your phone right now. So then I figured, I assumed that's who he had called."

Officer Tammany was asked if she ever heard Corporal Hobb mention he was initially going to call Lieutenant Holder and she said, "I don't remember him saying that." Tammany was asked what she meant when she indicated earlier that she thought Hobb called administration and she said, "It's either Lieutenant Holder or the Chief Diaz." Tammany was asked to describe Hobb and Sergeant Fisher's demeanor during their interaction and she replied, "It was very matter of fact." Tammany was asked if it sounded like Hobb and Fisher were arguing, being rude, discourteous or using profanity and she said it did not.

Officer Tammany acknowledged it appeared Corporal Hobb spoke to Chief Diaz on the phone when he returned to where they were standing and told Sergeant Fisher the chief would be calling him. Tammany confirmed Hobb stepped away from the area when he was speaking on his phone. Tammany also confirmed Fisher's phone rang almost immediately when Hobb returned to their location. Tammany was asked if Fisher stepped away when he took the call and she said he did. Tammany was asked if she heard any part of either Hobb's or Fisher's phone conversations and she said she did not.

19

Officer Tammany was asked if Corporal Hobb provided any indication to Sergeant Fisher about what Chief Diaz advised him and she said he did not. Tammany was asked if Fisher mentioned anything regarding his phone conversation with the chief when he returned to their location and she said he did not. Tammany confirmed when Fisher returned he told Hobb they would handle the dog. Tammany added, "We ended up being the ones that were going to transport or I was. He ended up telling me, you need to transport this dog. Once everything had ended and a lot of people had cleared out, then I transported the animal."

Officer Tammany was asked how much time passed from the time of the interaction between Corporal Hobb and Sergeant Fisher, until the event ended and people left the park and she estimated 15 to 20 minutes. Tammany confirmed she then transported the dog to Beaumont. Tammany was asked if anything else occurred with the dog or if it caused any problems and she said nothing occurred. Tammany was asked if she noticed whether or not the dog appeared to be nursing and she replied, "Yeah, she looked like she had given birth had her teats, I guess they call them for dogs. Yeah, it looks like she had given birth to a litter."

Officer Tammany was asked if she had an opinion regarding the actions of Corporal Hobb during that incident and she replied, "Nothing, it was a pretty straightforward interaction for both parties." Tammany was asked if she had an opinion regarding the actions of Sergeant Fisher during the incident and she said, "No, it was very straightforward, matter of fact kind of interaction between the two to them." Tammany was asked if she had any conversations with Hobb at any point during the incident and she said, "We were standing there chitchatting about nothing really."

Officer Tammany was asked if she made a comment to Corporal Hobb after Sergeant Fisher stepped away to answer his phone with respect to "that was awkward." She replied, "Probably, yeah. Just because whenever you see a corporal and a sergeant having some conversation about maybe a difference of opinion it's, for me, it's always awkward." Tammany was asked if she sensed a conflict between Hobb and Fisher and she replied, "Well it was clear that Corporal Hobb didn't feel that Patrol should be handling that. That was, I think, the disagreement."

Officer Tammany was asked after having worked those types of events in the past, if she found it unusual for Sergeant Fisher to ask Corporal Hobb or Patrol, to handle the dog situation. She replied, "I didn't really have an opinion. I would've done it; he made the choice to ask Patrol to do it. I was just; I wasn't that opinionated on it. Had he told me to do it, I would've done it without question." Tammany was asked if there were other types of extra-duty assignments at the Banning Police Department and she said, "Yes, we just recently had Stagecoach Carnival, being the SRO, I have football games that I do, we have a homecoming parade coming up."

Officer Tammany continued, "We do Stagecoach concerts in Coachella out there." Tammany was asked if they assisted with mutual aid for that event and she said they did. Tammany was asked if she worked those types of events and she said she did. Tammany was asked if it was typical for officers working those events to handle incidents, as opposed to calling Patrol and she replied, "It's not uncommon, we're there, we can handle event stuff that goes down at our event." Tammany was asked if that was expected of officers working the event and she said, "I would say, personally I would handle something that happened if I was there, yeah."

Officer Tammany was asked after Corporal Hobb left the location, if she had any conversations with Sergeant Fisher regarding his interaction with Hobb and she said she did not. Tammany was asked if Fisher made any comments at all or if he seemed angry and she said he did not. Tammany was asked if Hobb ever seemed angry and she replied, "I would say he was irritated." Tammany confirmed it appeared Hobb was irritated by Fisher's request to have Patrol handle the transport of the dog.

Officer Tammany was asked if it appeared Corporal Hobb had any visual reaction to Sergeant Fisher ordering him to take the dog and she replied, "I think he was kind of, maybe surprised, but that's my opinion. I don't know if he actually was or not... I can't remember if he said something back but that's when he went to make a phone call so it was clear that he didn't agree with what was happening." Tammany confirmed it was clear when Hobb arrived and told Fisher Patrol was not available that he did not agree with Fisher's decision.

Officer Tammany was asked if she made any other observations regarding the interaction between Sergeant Fisher and Corporal Hobb and she said she did not. Tammany was asked if she had any conversations with Fisher or Hobb regarding the incident since August 20, 2015, and she said she did not. Tammany was asked if she had anything further to add and she said she did not.

### Interview of Chief Alex Diaz

On November 4, 2015, RCS Investigator Flutts conducted an interview with Chief Alex Diaz. Diaz was admonished to answer all questions completely and truthfully. The interview was recorded and a transcript is included as **Exhibit "K"** in this report. The following is a synopsis of the interview.

Chief Diaz has been employed by the Banning Police Department for 10 years and has served as the Chief of Police for a year and two months. Diaz was asked if he received a telephone call from Corporal Steve Hobb on August 20, 2015, and he said he did. Diaz was asked if the phone call concerned an issue Hobb had with Sergeant Fisher over the handling of an incident and he confirmed it did.

Chief Diaz was asked if he found it unusual for Corporal Hobb to call him directly regarding the situation and he replied, "Yeah, absolutely because had there been any issues my first thought would've been that that call would've been to my lieutenant, who's the second in command here at the Department." Diaz confirmed Lieutenant Holder was the second in command and the only lieutenant at the Department. Diaz confirmed Fisher reported directly to Holder. Diaz was asked if Hobb was an Acting Watch Commander at the time of the incident and he said he was. Diaz confirmed Hobb would have been under the direct supervision of Holder as well.

Chief Diaz was asked if he would expect Corporal Hobb to initially contact Lieutenant Holder in the event of a dispute and he said he did with respect to the chain of command. Diaz was asked to describe what Hobb said to him regarding the issue he was having with Sergeant Fisher at the time and he replied, "I received the call initially and I was driving so I had to pull over. I was heading home and he talked about an incident that occurred at the Concerts at the Park, which is an event we have, we hold here in August. The incident had to deal with a loose pit bull that was in the area where a lot of people were present."

Chief Diaz continued, "Just to give you a brief background we assign officers to that venue for that concert just for crowd control and to make sure that things don't get out of hand. And the goal is for them to remain at that venue and anything; any other incidents around the vicinity are handled by patrol. So when he initially called me he said that, I believe he said that he was being set up and that Sergeant Fisher was ordering him to do something that he felt was not something that he should be dealing patrol wise. He did mention that there was an issue of a dog and that Sergeant Fisher had an officer there with him, that that officer could be used to transport that dog to the City of Beaumont to a secured cage. And he also added that he, at that time he had no officers available, that they were busy dealing with other incidents in the City."

Chief Diaz confirmed his expectation for the extra duty officers working the event would be to handle incidents at the actual venue; however, anything surrounding that area would typically be handled by patrol. Diaz acknowledged it was his understanding from talking with Corporal Hobb the situation involved taking a dog to a location in the City of Beaumont. Diaz was asked if that was the location Banning police officers typically took dogs and he replied, "We contract with Beaumont for animal services; however, they don't respond at night. So if there's ever an issue dealing with a dog then our officers would coral that dog, use the catch pole, and then transport that dog to their holding kennels in Beaumont."

Chief Diaz was asked if the holding kennels were located near the police department and he believed they were. Diaz was asked if Corporal Hobb indicated no patrol officers were available at the time of the incident and he said he did. Diaz was asked if Hobb advised him the officers were in essence busy with radio calls and he replied, "Yeah, they were handling calls in the City at that time." Diaz was asked if Hobb voiced an opinion that Sergeant Fisher or other officers at the venue should have handled the situation involving the dog and he said, "Yeah, based on the fact that he had no one available, said that it was more feasible to use the other officer that was there covering that event than to have to use patrol."

Chief Diaz was asked if Officer Tammany was working the event with Sergeant Fisher and he believed she was. Diaz was asked what conclusions he made after speaking with Hobb regarding how the incident should be handled. He replied, "Well after I spoke to him I believe he handed the phone to Sergeant Fisher and then Sergeant Fisher told me that they were dealing with this issue, they're dealing with a crowd and that he contacted dispatch to let them know that if they could send an officer over to deal with the dog and transport it to Beaumont. And he said that there were officers available to handle that call but for whatever reason they were cancelled and Corporal Hobb responded instead."

Chief Diaz continued, "Based on the information and not knowing, not being there, I told, and believing that Corporal Hobb didn't have anyone available, then I just asked Sergeant Fisher, you know what, just do what you have to do, get that dog out of there, get it secured, have your officer, the officer assigned there, even though my preference would've been to leave the officer there because we're paying that officer overtime to be at that facility, to just handle it. So they ended up handling it and the only thing I asked Sergeant Fisher was, just write me a memo indicating what happened and there was, they were recording. So there was, I don't know if Hobb or Fisher, one of them was recording the whole incident."

22

237

Chief Diaz acknowledged after his phone conversations with Corporal Hobb and Sergeant Fisher, he advised Fisher to handle the dog situation and write a memorandum as to what occurred. Diaz was asked if either Hobb or Fisher indicated during their phone conversations that Fisher gave Hobb a direct order to handle the dog situation and he said, "Yeah, both of them did. Hobb told me that, well, Fisher's ordering me to handle this incident and then when I spoke to Fisher when he handed the phone to Fisher, Fisher said I ordered him to do this and he never answered me. And he said well, I'm gonna call Lieutenant Holder and then he said well I'm just gonna call the chief directly."

Chief Diaz was asked if Corporal Hobb explained why he called him directly instead of contacting Lieutenant Holder and he said he did not. Diaz was asked if he questioned Hobb as to why he called him and he replied, "I didn't, I should have but I never did. I just, I was tired, I was driving home and there was an incident, I just wanted it dealt with." Diaz confirmed he directed Sergeant Fisher to write a memorandum regarding the incident at the conclusion of his phone conversations. Diaz was asked if Hobb ever indicated to him during their phone conversation that he intended to file a complaint against Fisher and he said, "No, no. I found out afterwards that he sent an e-mail to, no; actually he responded to me, I sent him a text from my work phone, Hobb. When I got home I sent him a text asking him, is everything taken care of?"

Chief Diaz continued, "He responded, yes. But he also responded that he felt that Sergeant Fisher was targeting him. I didn't respond to that and then I found out from Lieutenant Holder that he sent him an e-mail basically complaining about Sergeant Fisher targeting him and ordering him to do something." Diaz acknowledged he sent Corporal Hobb a text message to his cell phone when he arrived home. Diaz was asked if he indicated earlier that Hobb mentioned during his conversation that he felt like Fisher was setting him up and he replied, "I believe he mentioned it initially when he called me that he thought he was being set up. I didn't really delve into that too much because then he started explaining to me what was happening."

Chief Diaz was asked if Sergeant Fisher ever mentioned anything that he thought he was being set up and he said he did not. Diaz was asked after sending his text message to Corporal Hobb, if he had any further direct involvement regarding the incident that evening and he said he did not. Diaz was asked if he took any action related to the actions of either Hobb or Sergeant Fisher after the incident and he said, "No, it wasn't until I was contacted by Lieutenant Holder and he told me that Corporal Hobb had filed a complaint via e-mail."

Chief Diaz confirmed he became aware Corporal Hobb submitted an e-mail complaint to Lieutenant Holder on Tuesday following the incident. Diaz was asked if a decision was made at some point to conduct a formal investigation into the actions of Sergeant Fisher and he said there was. Diaz was asked how that decision was reached and he replied, "It was based on that e-mail. Since Corporal Hobb did file a formal complaint against Sergeant Fisher then I directed Lieutenant Holder to go ahead and pull a case number for it." Diaz was asked if he spoke to either Hobb or Fisher after that point and he said, "No, it wasn't until Fisher provided me the memo."

Chief Diaz confirmed Sergeant Fisher submitted the memorandum on August 24, 2015. Diaz was shown a copy of the memorandum and when asked if it appeared to be a true copy of the memorandum Fisher submitted he said it did. Diaz added Fisher also submitted a copy of the CAD Incident report. Diaz was asked if Fisher's memorandum indicated officers were available at the time of the incident and one officer had actually been dispatched to the call and he said it did. Diaz added, "Once I reviewed the CAD incident report I realized that not only were there officers available, but one was actually on his way to handle the call."

Chief Diaz was asked if Sergeant Fisher also indicated when he returned to the station that evening, he checked with dispatch and discovered no calls were holding at the time of the incident and he said he did. Diaz was asked if he actually spoke to Fisher when he submitted the memorandum and he said Fisher put the memorandum under his door and he did not believe they had any conversation at that point. Diaz confirmed he did not have a conversation with Fisher after that point since an internal affairs investigation was under way.

Chief Diaz was asked if he spoke to Corporal Hobb regarding the incident after receiving Sergeant Fisher's memorandum and he said he did not. Diaz confirmed he did not speak to Hobb regarding his complaint prior to receiving Fisher's memorandum. Diaz was asked if he took any action related to Hobb or Fisher after receiving Fisher's memorandum and he said he did not. Diaz confirmed after receiving Fisher's memorandum it was decided to conduct a counter-complaint against Hobb. Diaz added, "But that wasn't till maybe a couple of weeks after the fact." Diaz confirmed he provided a copy of the memorandum for the investigation a week prior to his interview. Diaz was asked if he had anything further to add regarding his involvement with the matter and he said he did not.

**Second Interview of Corporal Steve Hobb**

On November 23, 2015, RCS Investigator Flutts conducted an interview with Corporal Steve Hobb. Hobb was represented by his attorney, Robert Baumann. Hobb was admonished to answer all questions completely and truthfully and was admonished of his rights pursuant to the California Government Code. The interview was recorded and a transcript is included as **Exhibit "L"** in this report. The following is a synopsis of the interview.

Corporal Hobb acknowledged he was interviewed on September 23, 2015, as a witness and was advised he was currently being interviewed as a subject employee as well. Hobb was asked if he recalled the statement he provided on September 23, 2015, with respect to his complaint against Sergeant Fisher and he stated he did. Hobb was asked if there was anything he wished to change or add to the statement he provided on September 23, 2015, and he said he did not.

Corporal Hobb confirmed he previously stated when Sergeant Fisher requested a patrol unit; all the patrol officers were busy with other calls. Hobb was asked if he indicated during his first interview that he could not specifically recall if any pending calls were holding at the time and he replied, "To my recollection they were all busy and there was no calls, there was calls, I don't know if there was calls pending." Hobb added, "I know when I looked at that time, all the officers were busy." Hobb was asked if he was aware that Officer Brandon Smith was initially dispatched to the call and he said he was not.

Corporal Hobb was asked if he recalled whether or not he cancelled Officer Smith when he decided to respond to the park and he said, "I don't recall me doing that." Hobb confirmed he had a telephone conversation with Chief Diaz after his initial interaction with Sergeant Fisher at the park. Hobb was asked to summarize what he told Diaz and he replied, "The best of my recollection I told him that Sergeant Fisher was working an overtime spot there at the Concert in the Park, that he called for patrol to handle a call there, a dog, about a dog being, that needed to go to ACO."

Corporal Hobb continued, "I told Chief Diaz that the dog wasn't vicious and I didn't see a reason why patrol had to take the dog when Sergeant Fisher had himself plus Officer Tammany and four volunteers that could've took this dog over to Beaumont. I told him that it wasn't patrol's responsibility and that we were busy on other calls." Hobb was asked if it was his opinion that Diaz in essence agreed with his point of view and he said, "Yes, because he told me that he would handle it." Hobb confirmed Diaz called Fisher shortly thereafter.

Corporal Hobb was asked after Sergeant Fisher's conversation with Chief Diaz concluded, if it was decided that Fisher or Officer Tammany would take care of the stray dog and he replied, "Yeah, he just told me that I could leave, Sergeant Fisher did." Hobb was asked with respect to his interaction with Fisher, if he intentionally violated the Department's chain of command when he contacted Diaz to resolve the dispute and he said he did not. Hobb was asked why he decided not to follow Fisher's order to have a patrol officer handle the stray dog and he said, "Sergeant Fisher didn't, well, he ordered me to do it and I told him I would but I was gonna call the lieutenant first and then I said no, I'm gonna call the chief and then I called the chief and the chief told me, the chief agreed with me and told me that he would talk to Fisher."

Corporal Hobb confirmed Sergeant Fisher did not order him to have a patrol officer take the dog; he ordered him to take the dog. Hobb acknowledged he did not believe it was appropriate to have patrol handle the dog given the circumstances that there were two officers at the park as well as volunteers and that the patrol officers were busy on calls while under his supervision that night. Hobb was asked if he had anything further to add and he said he did not.

### Interview of Sergeant Robert Fisher

On November 23, 2015, RCS Investigator Flutts conducted an interview with Sergeant Robert Fisher. Fisher was admonished to answer all questions completely and truthfully and was admonished of his rights pursuant to the California Government Code. The interview was recorded and a transcript is included as **Exhibit "M"** in this report. The following is a synopsis of the interview.

Sergeant Fisher was asked if he was assigned to an extra duty event at the Concerts at the Park event on August 20, 2015, and he said he was and acknowledged the event took place at Repplier Park in the City of Banning. Fisher was asked if he voluntarily worked the assignment and he stated he did. Fisher believed the scheduled hours of the assignment were 7:00 p.m. to 10:00 p.m. Fisher confirmed he was assigned to the event with Officer Tammany and when asked if any Department volunteers or reserve officers were assigned to work the event as well he replied, "Yes, more than one volunteer was there." Fisher did not believe any reserves were present that night.

Sergeant Fisher was asked if he was the only supervisor at the event that night and he said he was. Fisher was asked if he recalled how many people were working the event and he did not recall. Fisher was asked what the expectations was of officers working extra duty events with regards to handling incidents at the venue and he replied, "Crowd control, unruly guests and concert goers." Fisher was asked if officers were expected to handle whatever events occurred at the location, if they could and he acknowledged they were.

Sergeant Fisher was asked if he was made aware of an apparent stray dog that night and he said he was. Fisher was asked how that came to his attention and he replied, "Well, one of the volunteers brought it up to me... they were pulling the dog." Fisher was asked what the volunteer told him and he said, "This stray pit bull was wandering around in the crowd." Fisher was asked if he recalled which volunteer told him that and he replied, "It was a female; I don't recall her name." Fisher was asked if the dog was on a leash and he said, "She was pulling it by the collar."

Sergeant Fisher was asked if he eventually contacted dispatch and requested a patrol officer to respond to the location and he said he did. Fisher was asked per normal practices at the Banning Police Department, if that required the officer to take the dog to a facility in Beaumont and he said it did. Fisher was asked how far away the facility was from the park and he estimated three or four miles. Fisher was asked if Officer Smith was initially dispatched to the call and he believed he was.

Sergeant Fisher was asked if Corporal Hobb cancelled the response of Officer Smith and he said, "Yes, he did." Fisher was asked if Hobb cancelled Smith's response verbally over the radio and he replied, "Yeah, he mentioned something to the effect of there's two units at the concert, over the radio." Fisher was asked if he did anything at that point and he replied, "I remember calling dispatch and saying to the effect, when there's officers free, when there's no calls pending, have somebody respond to the park."

Sergeant Fisher was asked if Corporal Hobb eventually responded to his location and he said he did. Fisher was asked if he interacted with Hobb when he arrived and he replied, "He did, yes. I did. He got out of the car and said something to the effect about, well you guys have two people here and I only have three people working the street. He didn't want to take the dog over to the kennel." Fisher was asked if he gave Hobb an order to transport the dog to Beaumont at some point and he said he did. Fisher was asked how Hobb responded to the order and he replied, "He said he was gonna contact the lieutenant and then he said no, I'm gonna contact the chief and he asked that a recorder be activated."

Sergeant Fisher was asked if Officer Tammany was present during his conversation with Corporal Hobb and he said she was. Fisher confirmed Hobb asked him to activate his audio recorder and he said he did. Fisher acknowledged he activated his recorder. Fisher was asked if Hobb initially indicated he was going to call Lieutenant Holder and he replied, "He said he was gonna call the lieutenant and then he changed his mind and said I'm gonna call the chief." Fisher was asked if Hobb eventually called Chief Diaz and he said he did. Fisher was asked if he was present during that conversation and he said, "I could not overhear what he saying to him because he had distanced himself." Fisher confirmed Hobb stepped away while he was speaking to the chief.

Sergeant Fisher was asked if he subsequently received a telephone call from Chief Diaz and he confirmed he did. Fisher was asked the content of that conversation and he replied, "He told me to go ahead and deal with the dog myself. He said he'd deal with it later." Fisher was asked what the chief was going to deal with later and he replied, "Hobb." Fisher was asked if Diaz gave any specifics as to what he meant by that and he said, "No, he just said he'd take care of it later." Fisher confirmed the chief directed him to take care of the dog in whatever manner he needed to.

Sergeant Fisher was asked what he did at that point and he replied, "The dog was in the back, we waited awhile till the concert started, the crowd started thinning out and I told Officer Tammany to go ahead and drop me off at the station and you can take the dog to Beaumont." Fisher confirmed the dog was sitting in the backseat of the patrol car during that period of time. Fisher was asked if the concert was nearing the end at that point and he said it was.

Sergeant Fisher confirmed Officer Tammany dropped him off at the station after the concert and transported the dog to Beaumont. Fisher was asked how far the police station was from the park and he said less than a mile. Fisher was asked if he contacted dispatch when he returned to the station and he replied, "I did, I asked the dispatcher how many calls were pending when Hobb arrived at the park. I was told there was no calls pending." Fisher was asked if he recalled which dispatcher he spoke to and he said he did not. Fisher was asked if he was shown any type of printout or document with that information and he said, "It was just verbal."

Sergeant Fisher was asked what concerns he had respective to Corporal Hobb's actions during their interaction and he said, "Well he lied to me, he lied to the chief. I knew that they weren't busy, I knew there was no calls pending and I'm making a logical presumption that he told the chief over the phone that he was busy and that's why they couldn't take the dog when in fact there was no calls pending." Fisher was asked if he ever received any information the dog was vicious or posed any sort of safety concerns and he replied, "My concern was that it was a pit bull and through my training and experience I know that a pit bull can be unpredictable."

Sergeant Fisher confirmed a volunteer initially handled the dog and when asked if Officer Tammany handled the dog he replied, "She had to have to get the dog out of the car and into the facility at Beaumont." Fisher was asked if Tammany petted the dog or handled it in any way while they were at the park and he said, "I don't recall, she could have." Fisher was asked if he observed any members of the public interacting with the dog and he said he did not.

Sergeant Fisher was asked if he considered any other alternatives to resolving the situation with the dog prior to requesting a patrol officer and then ordering Corporal Hobb to transport it and he replied, "Hmm, no." Fisher was asked if he had any concerns with removing officers from patrol to handle the dog and transport it to Beaumont and he said, "No, that's why I asked if there was any calls pending and since there was no calls pending I figured that would be okay."

Sergeant Fisher was asked if he believed his orders to Corporal Hobb were lawful and legitimate under the circumstances and he said he did. Fisher was asked if his orders to Hobb was an attempt to harass or intimidate him in any way and he said they were not. Fisher was asked if his orders to Hobb was the result of previous problems or negative interactions he had with him and he said they were not. Fisher was asked if his orders to Hobb was in any way related to a 'Verbal Notice of Counseling' Hobb gave him in 2014, and he said they were not.

Sergeant Fisher was asked if he wrote a memorandum to Chief Diaz documenting his observations of the interaction with Corporal Hobb and he said he did. Fisher was asked if he wrote the memorandum at the direction of Chief Diaz and he replied, "I believe so, yeah."

Sergeant Fisher's attention was directed to a copy of his memorandum dated August 24, 2015, to Chief Diaz. When asked if it was a true copy of that document, Fisher confirmed it was. Fisher was asked if he included the CAD incident report with his memorandum and he believed he did. Fisher was asked if he had anything further to add and he said he did not.

243

# SECTION 2

# CONCLUSIONS AND FINDINGS

# SECTION 2

## CONCLUSIONS AND FINDINGS

## SERGEANT ROBERT FISHER

This administrative investigation was initiated as a result of complaints filed by Corporal Hobb and Sergeant Fisher.  The complaints concerned an interaction Hobb and Fisher had on August 20, 2015, which included a disagreement between the two regarding the handling of an incident. Hobb's complaint was sent to Lieutenant Holder on August 21, 2015 and Fisher's complaint was contained in a memorandum which he submitted to Chief Diaz on August 24, 2015.  In their complaints, Hobb and Fisher accused each other of misconduct during the interaction.

## Allegation "1"

**It was alleged that Sergeant Fisher failed to complete assigned work duties or to direct a subordinate to complete required work duties while he was assigned as the supervisor at an extra-duty event on August 20, 2015.**

## Allegation "2"

**It was alleged that Sergeant Fisher exercised authority over Corporal Hobb in a disparate and unequal manner when he ordered him to handle an incident at an extra-duty event Fisher was assigned to on August 20, 2015.**

## CONCLUSIONS

Corporal Hobb was the Acting Patrol Watch Commander on August 20, 2015 when Sergeant Fisher, who was assigned at an extra-duty concert, requested a patrol officer to transport a stray dog.  An officer was initially dispatched and then cancelled shortly thereafter, presumably by Corporal Hobb.  Hobb responded to the concert venue and contacted Fisher.  Hobb and Fisher had a dispute with regards to whether or not patrol should handle the incident.  During their contact, Hobb told Fisher patrol officers were busy handling calls for service and he believed the officers assigned to the concert were responsible to handle the incident.  During their interaction, Fisher ordered Hobb to handle the stray dog, at which point Hobb indicated he was going to contact Lieutenant Holder. Eventually, instead of contacting Holder, Hobb called Chief Diaz in an attempt to resolve the dispute.  Diaz spoke to Fisher and it was subsequently decided that Officer Nissa Tammany, who was assigned to the concert would handle the stray dog.

29

## FINDINGS

After the dispute between Corporal Hobb and Sergeant Fisher was resolved by Chief Diaz, Officer Tammany eventually handled and transported the stray dog from the concert venue and patrol officers, including Hobb, were not impacted other than Hobb's initial response to the location. With regards to Hobb's complaint that Fisher failed to handle his assigned duties, RCS Investigators are of the opinion Fisher did eventually handle the incident after the intervention of Chief Diaz. **As such, Allegation "1" against Sergeant Fisher is EXONERATED.**

Regarding Sergeant Fisher's handling of the situation, RCS Investigators believe the dispute with Corporal Hobb could have been avoided. Because the incident originated at the concert venue; the event was nearly finished; no other incidents were occurring at the time; and the stray dog posed no immediate hazard to officers or members of the public, RCS Investigators believe there was no reason to request assistance from patrol officers. Officers assigned to extra-duties events are generally expected to handle incidents which occur at the venue and in that particular case, RCS Investigators are of the opinion Fisher should have completed the assignment at the concert venue and then directed Officer Tammany to transport the dog the short distance to the facility in the City of Beaumont.

Based on information obtained during this investigation, Corporal Hobb and Sergeant Fisher have experienced previous problems and negative interactions, which may have affected their actions during the incident at the park. With regards to Hobb's contention Fisher exercised authority over him in a disparate and unequal manner during their interaction, RCS Investigators were unable to prove or disprove that claim. **As such, Allegation "2" against Sergeant Fisher is NOT SUSTAINED.**

30

246

# SECTION 2

## CONCLUSIONS AND FINDINGS

## CORPORAL STEVE HOBB

This administrative investigation was initiated as a result of complaints filed by Corporal Hobb and Sergeant Fisher. The complaints concerned an interaction Hobb and Fisher had on August 20, 2015, which included a disagreement between the two regarding the handling of an incident. Hobb's complaint was sent to Lieutenant Holder on August 21, 2015 and Fisher's complaint was contained in a memorandum which he submitted to Chief Diaz on August 24, 2015. In their complaints, Hobb and Fisher accused each other of misconduct during the interaction.

## Allegation "1"

It was alleged that Corporal Hobb violated the Department's chain of command when he contacted Chief Diaz to resolve a dispute with Sergeant Fisher on August 20, 2015.

## Allegation "2"

It was alleged that Corporal Hobb demonstrated insubordination when he disputed the handling of an incident and refused to follow an order from Sergeant Fisher on August 20, 2015.

## Allegation "3"

It was alleged that Corporal Hobb misrepresented material information to a supervisor during his interaction with Sergeant Fisher and during a phone conversation with Chief Diaz on August 20, 2015.

## CONCLUSIONS

At the time of this incident, Corporal Hobb was the Acting Patrol Watch Commander and Sergeant Fisher was assigned as a supervisor at an extra-duty event. Fisher's regular assignment at the time was the Administrative Sergeant. Both Hobb and Fisher's immediate supervisor was Lieutenant Holder, the only lieutenant at the Department and second in command according to the Department's rank structure at the time.

31

With respect to the order given by Sergeant Fisher to Corporal Hobb to handle the stray dog incident, Hobb stated in his administrative interview that he did not believe it was lawful. Hobb believed the order was given as an act of retaliation against him by Fisher and as a way for Fisher to exercise authority over him, because he could. Hobb described a previous instance when he supervised Fisher and disciplined him for the handling of an incident. Hobb believed that incident was a way for Fisher to respond back to him, as a result of what occurred in the past.

Corporal Hobb also stated he intended to follow the order; however, first wanted to contact Lieutenant Holder. Hobb said he changed his mind and decided to contact Chief Diaz directly, which ultimately led to the resolution of his dispute with Sergeant Fisher. Officer Tammany was present during the interaction between Hobb and Fisher. Tammany stated after Fisher ordered Hobb to handle the dog, Hobb made no verbal response. Tammany stated Hobb immediately told Fisher he was going to contact Lieutenant Holder, although she stated he contacted Chief Diaz instead. The fact that Hobb did not respond to Fisher's order was corroborated by Chief Diaz during his interview. Diaz confirmed he spoke to Fisher at the time of the incident by telephone. Diaz said Fisher indicated Hobb did not answer when the order to handle the dog was given. Instead of responding to Fisher's order, Hobb immediately said he was going to call Lieutenant Holder.

During their interaction, Corporal Hobb told Sergeant Fisher that patrol officers were busy handling calls for service at the time Fisher initially requested an officer to take care of the stray dog. Hobb also said he believed Fisher and Officer Tammany should handle the stray dog since they were assigned to the venue where the incident originated. During his telephone call with Chief Diaz, Hobb indicated patrol officers were busy handling calls at the time and he reiterated his belief the incident should be handled by Fisher and Tammany.

## FINDINGS

At the time of the dispute between Corporal Hobb and Sergeant Fisher, Hobb initially told Fisher he was going to call Lieutenant Holder, presumably to resolve the dispute. Instead, Hobb called Chief Diaz directly. During his first interview, Hobb stated he called Diaz directly in essence because Diaz promoted Fisher and he felt that he should have to deal with the repercussions of that promotion.

RCS Investigators believe based on the evidence that Corporal Hobb violated the Banning Police Department chain of command when he contacted Chief Diaz instead of Lieutenant Holder to resolve the dispute with Sergeant Fisher. Holder was the direct supervisor of both Hobb and Fisher at the time of the incident and he should have been the person contacted to resolve the dispute. **As such, Allegation "1" against Corporal Hobb is SUSTAINED.**

Based on statements obtained, RCS Investigators believe Corporal Hobb did not verbally respond to Sergeant Fisher's order to transport the stray dog. Instead, Hobb told Fisher he was going to call Lieutenant Holder. Hobb instead chose to call Chief Diaz directly to resolve the dispute. During his administrative interview, Hobb stated he intended to follow the order from Fisher; however, first wanted to speak to Lieutenant Holder. As stated above, Hobb instead chose to call Chief Diaz.

RCS Investigators are of the opinion that Corporal Hobb's belief the order was unlawful, his belief that Sergeant Fisher was attempting to retaliate against him and his belief the incident was the responsibility of Fisher and Tammany, were reasons which led him to contact a supervisor before following the order. Hobb did not verbally respond to the order and did not directly refuse to follow the order. RCS Investigators are of the opinion Hobb's actions did not amount to insubordination. **As such, Allegation "2" against Corporal Hobb is EXONERATED.**

During his interaction with Sergeant Fisher, Corporal Hobb stated that patrol officers were busy handling calls for service at the time. Hobb provided the same information to Chief Diaz during their telephone call. Hobb provided the same information during his administrative interview and when asked if there were pending calls for service at the time, he did not recall. There was no information to suggest Hobb ever told Fisher or Diaz there were 'pending calls' for service at the time of the incident or at the time of his interaction with Fisher. Hobb stated he was not aware a patrol officer was initially dispatched to Fisher's request and he did not recall whether or not he cancelled the officer when he responded to meet with Fisher.

In his memorandum to Chief Diaz, as well as during his administrative interview, Sergeant Fisher alleged that Corporal Hobb lied to him and Diaz with regards to patrol's activity and whether or not there were calls for service pending. As stated previously, there was no information to establish the issue of 'pending calls' was ever discussed between Hobb and Fisher or between Hobb and Diaz. Fisher also stated at the time of his interaction with Hobb patrol officers were not busy; however, he provided no information to support that opinion. Fisher also stated after the incident occurred, he contacted Dispatch and was told at the time Hobb arrived at Repplier Park there were no patrol calls pending. Again, Fisher provided no documentation to support that statement. Fisher was also unable to recall which dispatcher he spoke to.

RCS Investigators are of the opinion the fact that a patrol officer was initially dispatched to Sergeant Fisher's request was not necessarily indicative of their level of activity or whether or not any calls for service were pending at the time. In a review of the patrol log for August 20, 2015, RCS Investigators noted four calls between 9:00 and 10:00 p.m., one of which was the request by Fisher. The additional calls were a suicidal subject, a commercial alarm and a family disturbance. The patrol deployment at the time was three officers and a supervisor [Hobb]. Whether or not patrol was, "busy" during that time period is subjective; however, it appeared there was significant activity for the level of available personnel.

RCS Investigators found no evidence that Corporal Hobb misrepresented information to Sergeant Fisher or Chief Diaz during his contacts with them on August 20, 2015. **As such, Allegation "3" against Corporal Hobb is EXONERATED.**

RCS Investigators submitted a compact disk containing audio recordings of witness and subject employee interviews. The CD is included as **Exhibit "N"** in this report.

# SECTION 3

# EXHIBITS

# EXHIBIT A

Banning Police Department Policy Manual Sections

200.3.1 SUCCESSION OF COMMAND

The Chief of Police exercises command over all personnel in the Department. During planned absences the Chief of Police will designate a Division Commander to serve as the acting Chief of Police. Except when designated as above, the order of command authority in the absence or unavailability of the Chief of Police is as follows:

(a) Administration Division Lieutenant
(b) Investigation Division Lieutenant
(c) Field Operations Division Lieutenant
(d) On-duty Watch Commander

200.3.3 ORDERS

Members shall respond to and make a good faith and reasonable effort to comply with the lawful order of superior officers and other proper authority.

338.3.2 CONDUCT

(k) Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department.

338.3.5 PERFORMANCE

(c) Unsatisfactory work performance including, but not limited to, failure, incompetence, inefficiency or delay in performing and/or carrying out proper orders, work assignments or instructions of supervisors without a reasonable and bona fide excuse.

(e) Disobedience or insubordination to constituted authorities, including refusal or deliberate failure to carry out or follow lawful directives and orders from any supervisor or person in a position of authority.

(f) The wrongful or unlawful exercise of authority on the part of any employee for malicious purpose, personal gain, willful deceit or any other improper purpose.

(g) Disparaging remarks or conduct concerning duly constituted authority to the extent that such conduct disrupts the efficiency of the Department or subverts the good order, efficiency and discipline of the Department or which would tend to discredit any member thereof.

(ab) Any failure or refusal of an employee to properly perform the function and duties of an assigned position.

(ad) Giving false or misleading statements, or misrepresenting or omitting material information to a supervisor, or other person in a position of authority, in connection with any investigation or in the reporting of any department-related business.

252

338.3.8 SUPERVISION RESPONSIBILITY

(c) The unequal or disparate exercise of authority on the part of a supervisor toward any employee for malicious or other improper purpose

# EXHIBIT B

**From:** Steve Hobb
**Sent:** Friday, August 21, 2015 2:42 AM
**To:** Phil Holder
**Cc:** stevehobb999@gmail.com
**Subject:** complaint

I am filing a formal complaint against Sergeant Robert Fisher due to his actions on 8/20/15 at approximately 2132 hours. I would like to know what format you would like it in. The event is as follows.

On that date and time, Sergeant Fisher was working an overtime assignment at the annual Concerts in the Park for which he signed up for. While performing his duties, it was brought to his or Officer Tammany's attention of a stray dog at the venue. Officers were asked to take care of the dog. Sergeant Fisher called Dispatch via telephone and asked for an available patrol officer to respond to the park and take custody of the dog and take the dog to the City of Beaumont. Dispatch advised me via police radio of Sergeant Fisher's request and I advised Dispatch to have one of the concert venue officers handle the situation as all the patrol officers were busy handling calls for service throughout the City. Sergeant Fisher then used the police radio and directed Dispatch to have the next available officer respond to take custody of the dog.

I responded to the concert venue to speak with Sergeant Fisher. When I arrived, I attempted to activate my issued digital recorder, but the battery failed. I then asked Sergeant Fisher to activate his recorder, which he did. I then advised him that patrol was busy and that if I used a patrol officer to handle the dog, I would be short an officer to handle calls for service. I asked him if he could take the dog to Beaumont and he said no. Sergeant Fisher then stated, "I'm giving you a direct order" to take the dog to Beaumont. I advised Sergeant Fisher that I was going to first call Lt. Holder, but then told him I would call Chief Diaz instead. At 2123 hours, I called and spoke to Chief Diaz about the situation and explained my position. Chief Diaz agreed with me and said he would speak to Sergeant Fisher. I advised Sergeant Fisher that Chief Diaz would be calling him at which point Sergeant Fisher received a phone call and stepped away. After a few minutes, Sergeant Fisher returned and told me that I could leave. Sergeant Fisher then asked me for the catch pole and I left the concert venue.

While at the concert venue I noted that the dog in question was a female who had been nursing puppies. She was not vicious and friendly to petting. I also noted that the concert was ending and the concert venue officers would be free to leave leading me to believe that their duties at the venue were almost at an end. I did not feel it was pressing for so much attention to be given to this matter as there was no threat to the public and using a patrol officer to handle this matter would have been counterproductive to the mission of patrol.

I also feel his direct order to me was unethical as it was counterintuitive to my duties as the watch commander for patrol team 3 which entails supervising three patrol officers who are responsible for handling calls for service throughout the City of Banning. Sergeant Fisher volunteered for the overtime assignment knowing that it entailed handling incidents that

occurred at the concert venue.

I also feel him giving me a "direct order" was a disparate exercise of his authority over me and my position as I do not believe he would have attempted this course of action with another watch commander. His direct order to me was an attempt to intimidate me and avoid performing the duties of the overtime assignment he signed up for.

I feel this is ongoing harassment and retaliation on Sergeant Fisher's part due to a written notice of counseling I issued him last year when he held the rank of police officer and again failed to perform his duties in taking a crime report. Since that time, Sergeant Fisher has also filed a formal complaint against me with Human Resources through the city of Banning. A full investigation was conducted and his complaints were determined to be unfounded.

**256**

# EXHIBIT C



**Banning Police Department**
125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

| | | | |
|---|---|---|---|
| **To:** | Chief Diaz | **Date:** | 08-24-2015 |
| **From:** | Sergeant Fisher | | |
| **Reference:** | Corporal Hobb | | |

Violations of:
200.3.1 Chain of Command
200.3.3 Not Following Orders
340.3.5(e) Insubordination
340.3.5(ab) Refusal to follow Orders

On August 20, 2015 I ( Sergeant Fisher ) along with Officer Tammany were detailed to work the Concert in the Park at Repplier Park. This assignment was to be three hours long from 1900 to 2200 hours. At approximately 2115 hours I was contacted by a volunteer who had captured a stray Pit Bull. The volunteer explained that, the canine had been running loose in the venue and she was concerned for the safety of the audience. Officer Tammany accepted the dog and placed it in patrol unit.

At this time I contacted Dispatch and advised of the captured canine. I also requested that a patrol officer respond to the park and transport the animal to the temporary holding facility in Beaumont. After several minutes, I heard the call being assigned to Officer Smith. I then heard Corporal Hobb comment that, there were two units assigned to the concert. It appeared that, Corporal Hobb had canceled my request for an officer. I then contacted Dispatch, via radio and indicated that once a unit was available, to have it respond to the park and transport the canine.

2

At approximately 2132 hours, Corporal Hobb arrived at the concert and indicated that he had three officers on patrol, and there were two officers working the park. Corporal Hobb eluded to splitting up the pair of officers assigned to the park and have one transport the canine, and the single officer could continue his/her foot patrol alone. As a Supervisor, the Corporal should know that for Officer Safety, a two man foot patrol unit cannot be split up. It should be noted that, upon Corporal Hobb's arrival he seemed agitated, and he was becoming argumentative and almost to the point of combative, as he expressed his desire to split the park team up.

After hearing enough of Corporal Hobb's excuses and refusals to transport the dog, I provided Corporal Hobb with a direct order to transport the dog to Beaumont. Furthermore, Corporal Hobb's willingness to engage in this disobedience in the presence of one of our subordinates was wrong.

At this point, Corporal Hobb asked that, a department recorder be activated, and he said, "I think I'm being set up". Obviously for his protection as well as mine, I immediately activated my belt recorder.

However, Corporal Hobb continued his protests, and reiterated over and over that, he had only three officers assigned to patrol. I then ordered Corporal Hobb a second time, to transport the dog and again he refused. Corporal Hobb then stated," before I do that, I'm gonna call the Lieutenant". Corporal Hobb then walked away and mentioned that he was going to call the Chief of Police instead. After several minutes, Corporal Hobb returned and said that the Chief would be contacting me.

I subsequently received a telephone call from the Chief of Police. To comply with Departmental policy and state law, I did not record my telephone conversation with the Chief of Police. During the telephone call, it was determined that the canine would be transported to Beaumont by Officer Tammany and the Chief of Police would speak with Corporal Hobb at a later time.

Next, I instructed Corporal Hobb to leave a catch pole with Officer Tammany and to return himself to service. Officer Tammany then transported me to the Police Station and continued to Beaumont with the canine.

While at the Police Station, I contacted Dispatch and inquired how many calls were pending when Corporal Hobb had arrived at Repplier Park. The Dispatcher researched her log, and said that no calls were pending at that time.

259



# BANNING POLICE DEPARTMENT
## CAD INCIDENT REPORT
### 1508200095

Page 1

10/30/2015

| Location | Cross Streets | City |
|---|---|---|
| REPPLIER PARK, 399 W GEORGE | 4TH ST /4TH ST | BANNING |

| Incident Type | Call Taker | Dispatcher |
|---|---|---|
| AOD/ACO - ANIMAL CALL | GIFFORD, AMBER | GIFFORD, AMBER |

| Date | Priority | Primary Unit | Beat | Fire Zone | Area | Map | Source |
|---|---|---|---|---|---|---|---|
| 08/20/2015 | 3 | P25 | 2 | | 20 | | TELEPHONE CALL |

| Caller Name | Caller Address | Caller Phone |
|---|---|---|
| | | |

| Dispositions | Weapon | Alm Level | Case Number |
|---|---|---|---|
| Assisted, Assisted | | | |

| Vehicles | Associated Incidents |
|---|---|
| | |

| Incident Times | | Special Circumstances |
|---|---|---|
| Received | 21:16:33 | |
| Created | 21:17:18 | |
| Dispatched | 21:20:11 | Persons          Sex  DOB          Race          DL |
| En Route | 21:20:25 | |
| On Scene | 21:32:58 | |
| Closed | 21:33:23 | |
| Rcvd-Closed | 16:50 | |

| Unit Times | Officers | Dispatched | Enroute | On Scene | Clear | Disp-On Scene | Enrt-On Scene | On Scene-Clear | Disp-Clear |
|---|---|---|---|---|---|---|---|---|---|
| P27 | Smith, Brandon | 21:20:11 | N/A | N/A | 21:20:29 | N/A | N/A | N/A | 00:18 |
| C10 | Hobb, Steve | 21:20:22 | 21:20:25 | 21:32:58 | 21:33:23 | 12:36 | 12:33 | 00:25 | 13:01 |
| P25 | Nissa Tammany/Robert Fisher | 21:41:50 | 21:42:22 | 21:52:21 | 22:05:01 | 10:31 | 09:59 | 12:40 | 23:11 |

**Incident Comments**
PER S9 // WANTS UNIT TO RESPOND TO THE PARK TO PICK UP A DOG AND TAKE IT TO BMT PD

| TIME | # | EVENT | BY |
|---|---|---|---|
| 21:17:18 | 1 | Incident initiated at Repplier Park, 399 W George, Banning | A. Gifford |
| 21:20:11 | 2 | P27 DISP. Repplier Park, 399 W George, Banning | A. Gifford |
| 21:20:22 | 3 | C10 DISP. Repplier Park, 399 W George, Banning | A. Gifford |
| 21:20:25 | 4 | C10 ENRT. | A. Gifford |
| 21:20:29 | 5 | P27 10-8. Freed | A. Gifford |
| 21:32:58 | 6 | C10 10-97. | A. Avery |
| 21:33:23 | 7 | C10 10-8. | A. Avery |
| 21:33:23 | 8 | C10 Closed - Disposition AS | A. Avery |
| 21:41:47 | 9 | Reopened | A. Gifford |
| 21:41:50 | 10 | P25 DISP. Repplier Park, 399 W George, Banning | A. Gifford |
| 21:42:22 | 11 | P25 ENRT. BMT PD | A. Gifford |
| 21:52:21 | 12 | P25 10-97. | A. Gifford |
| 21:58:22 | 13 | P25 Gray pit bull female that had recently had a litter of puppies / friendly / w collar, | N. Tammany |
| | 14 | no tags. | |
| 21:58:53 | 15 | P25 ENRT. ENRT TO THE CITY | A. Gifford |
| 22:05:01 | 16 | P25 10-8. Disposition: AS | N. Tammany |
| 22:05:01 | 17 | P25 Closed - Disposition AS | N. Tammany |

260

# EXHIBIT D



# EXHIBIT E



# BANNING POLICE DEPARTMENT

## INCIDENT SUMMARY
### 08/20/2015

Page 3

11/06/2015

| Date | Time | Inc # | Type | Dispo | Unit | Address |
|---|---|---|---|---|---|---|
| 08/20/2015 | 18:17 | 201508200082 | 911 | LN | | 1999 N 8TH, Banning |
| 08/20/2015 | 18:18 | 201508200083 | 653(M)PC | LN | P27 | 10-21, 125 E Ramsey, Banning |
| 08/20/2015 | 18:59 | 201508200084 | EXTRA PA | LN | S9 | Repplier Park, 399 W George, Banning |
| 08/20/2015 | 19:09 | 201508200085 | CODEN | OK | P34 | Subway, 933 W Ramsey, Banning |
| 08/20/2015 | 19:25 | 201508200086 | FU | IN | P32 | PD, 125 E Ramsey, Banning |
| 08/20/2015 | 19:36 | 201508200087 | ALARM/C | FA | P34 | Bank Of America, 1374 W Ramsey, Banning |
| 08/20/2015 | 20:05 | 201508200088 | 415 JUV | AR | P34 | Plan It Life, 755 W Hoffer, Banning |
| 08/20/2015 | 20:18 | 201508200089 | STREET | LN | | 552 N 3RD, Banning |
| 08/20/2015 | 20:31 | 201508200090 | ALARM/R | OK | P27 | 852 E Repplier, Banning |
| 08/20/2015 | 20:32 | 201508200091 | THEFT | LN | P27 | 10-21, 415 S Florida, Banning |
| 08/20/2015 | 20:45 | 201508200092 | 911 | LN | | Cell, 1999 N 8TH, Banning |
| 08/20/2015 | 20:53 | 201508200093 | WATER | LN | | Dmv, 1034 W Ramsey, Banning |
| 08/20/2015 | 21:03 | 201508200094 | 5150 | RT | P32 | 755 W Hoffer, Banning |
| 08/20/2015 | 21:17 | 201508200095 | AOD/ACO | AS | P25 | Repplier Park, 399 W George, Banning |
| 08/20/2015 | 21:21 | 201508200096 | ALARM/C | FA | P34 | Integrity Auto Service, 2415 W Ramsey, Banning |
| 08/20/2015 | 21:36 | 201508200097 | MEDICAL | OA | | Am PM Arco Gas Station, 2228 W Ramsey, Banning |
| 08/20/2015 | 21:37 | 201508200098 | 415 FAM | LN | P27 | 541 San Andreas, Banning |
| 08/20/2015 | 22:04 | 201508200099 | EXTRA PA | LN | | 215 N 3RD, Banning |
| 08/20/2015 | 22:16 | 201508200100 | 911 | LN | | Cell, 1999 N 8TH, Banning |
| 08/20/2015 | 22:43 | 201508200101 | 415/PAST | LN | P32 | 10-21, 3911 W Ramsey #204, Banning |
| 08/20/2015 | 22:58 | 201508200102 | LOCRUNWY | LN | | Ferree's Group Home, 1621 Durward, Banning |
| 08/20/2015 | 23:31 | 201508200103 | REQ INFO | LN | C10 | 1021 For Wc, 125 E Ramsey, Banning |
| 08/20/2015 | 23:42 | 201508200104 | 5150 | RT | | Margarita Motel, 1551 W Ramsey #2, Banning |
| 08/20/2015 | 23:49 | 201508200105 | PUBLIC | LN | P34 | 132 N 4TH #B, Banning |
| 08/20/2015 | 23:49 | 201508200106 | FIREWKS | OK | P27 | Peppertree Apartments, 456 E Nicolet, Banning |

264



| BANNING POLICE DEPARTMENT | Page 1 |
|---|---|
| SHIFT BULLETIN<br>NIGHT SHIFT --- Thursday, August 20, 2015 | 11/06/2015 |

**16:52   Commercial Alarm**                                                                 1508200071

William Auer, Patrick Kelly

Pacific Alarm, 800-631-2299, reported AUD  TR: 1650  COVERS: ROOM 401 PERIM MOTION  RESET: NONE LISTED  ATC RP PENDING OP:124. Incident location was 1151 W Wilson, Coombs Jr High School, Banning. . Disposition: Checks Ok by U452 - William Auer. Employees Still On Scene

**17:09     Runaway Juvenile**                                                               1508200073

Pamela Geren, 1621 Durward, Banning, 951-849-7066, reported FAXED HABITUAL RJ FORM RCVD ON BELL, TYLOR 032100. . Disposition: Log Note Only by Amber Gifford.

**17:22     Runaway Juvenile**                                                               1508200077

Brandon Smith

Larry Kelly, 910 E Indian School Ln, Banning, 951-663-2063, reported BRIANNA FENNELL 071099 WFJ BRO/BRO 504/200 LSW: WHI LONG SLEEVE SHIRT, JEANS // LEFT ON FOOT AFTER BEING VERBAL WITH FATHER // POSS WENT TO A FRIENDS IN THE AREA OF 4TH AND HAYS //. Spoke with RP who advised negative on daughter being a runaway, she was being defiant and left to hang out with a friend. He was advised to re-contact if he wanted to report her as a missing person. Disposition: Log Note Only by U427 - Brandon Smith.

**17:27     Disturbing the Peace**                                                           1508200078

Robert Castro

/Frank, 60 W Ramsey, Banning, 849-8770, reported SECOND HAND INFO // RP ADVD WAS TOLD SUBJS WERE OUTSIDE VERBAL UNK HOW MANY
Service Class: BUSN. . Disposition: Call Cancelled by Reporting Party by U451 - Robert Castro. Rp rell advd all subjs are goa

**18:15     Commercial Alarm**                                                               1508200081

Robert Castro, William Auer, Patrick Kelly

Pacific Alarm, 800-631-2299, reported AUD  TR: 1807  COVERS: EAST ALARM MIDDLE ALARM AND SOUTH ALARM  RESET: NONE LISTED UNABLE TO REACH ANY RPS  951-849-4631  OP: 589. Incident location was 2822 W Ramsey, Stagecoach Glass, Banning. Vehicle description: 1992 Toyota Pick Up, 4J43498/CA. Disposition: False Alarm by U451 - Robert Castro.

**18:18     Annoying Phone Calls**                                                           1508200083

Brandon Smith

Curtis Crakaal, 951-388-4557, reported RP STATES HES RCVING CALLS FROM UNK SUBJ STATING THEY WERE GOING TO 242 AND 261 HIM. Incident location was 125 E Ramsey, 10-21, Banning. . Disposition: Log Note Only by U427 - Brandon Smith. Number Doesnt Accept Calls

**18:59     Extra Patrol**                                                                   1508200084

Robert Fisher

Officer initiated activity at Repplier Park, 399 W George, Banning.REF CONCERT IN THE PARK. . Disposition: Log Note Only by U278 - Robert Fisher.

**19:09     Code N Activity**                                                                1508200085

Robert Castro, William Auer, Patrick Kelly

/Anon, 760-989-5804, reported WMA AND BMA SMOKING MJ IN FRONT OF THE BUSN // RP PASSER BY. Incident location was 933 W Ramsey, Subway, Banning. . Disposition: Checks Ok by U452 - William Auer. Subjs Checks Ok Advd Will Move Along

**19:36     Commercial Alarm**                                                               1508200087

William Auer, Patrick Kelly, Robert Castro

Bank Of America, 800-222-7511, reported AUD  TR: 1922  COVERS: LOBBY MOTION  RESET: 3 MINS  NEG ON SEEING ANY SUBJS INSIDE AT THIS TIME ON VIDEO AT THIS TIME  OP: JEREMY. Incident location was 1374 W Ramsey, Bank Of America, Banning. . Disposition: False Alarm by U452 - William Auer.

**265**



| BANNING POLICE DEPARTMENT | Page 2 |
| --- | --- |
| SHIFT BULLETIN<br>NIGHT SHIFT --- Thursday, August 20, 2015 | 11/06/2015 |

**20:05    415 Juvenile**                                                         15-2524/1508200088

Brandon Smith, William Auer, Patrick Kelly

Unknown caller at 755 W Hoffer, 922-0356, reported JUV PHY WITH STAFF //HALL MARKEES 022497 BMA // NEG WEAPONS, NEG HBD NEG H&S // 1 PRIOR CONTACT FOR 5150

Service Class: VOIP. . Disposition: Arrest by U452 - William Auer.

**20:31    Residential Alarm**                                                          1508200090

Brandon Smith, Robert Castro

Adt, 877-238-7730, reported COVERS: ENTRY AND LIVING ROOM// ACT: 2028 HRS// RP: SPOKE WITH HOMEOWNER REQ DISPATCH// OP: URM. Incident location was 852 E Repplier, Banning. POSS A  NEW 594 TO THE REAR DOOR // NOTHING APPEARS TO BE MISSING  FROM INSIDE. Disposition: Checks Ok by U427 - Brandon Smith.

**20:32    Theft**                                                          1508200091

Brandon Smith

Rebecca Zarres, 415 S Florida, Banning, 760-288-1609, reported FOSTER SON TOOK HER JEWELRY AND PAWNED IT IN SAN BERNARDINO // JUV IS IN SAN BERNARDINO AT THIS TIME //RPS PHONE WAS CUTTING IN AND OUT AND UNABLE TO GET ANY INFO ON JUV. Taken was a $800 yellow gold ring with 8-10 diamonds on it.

Foster son Carlos Cruz 05/22/97 Non-desirous of prosecution and was only requesting a report # to put a hold on item so she could recover it. INC # provided. Disposition: Log Note Only by U427 - Brandon Smith.

**21:03    Mental Disorder**                                                          15-2525/1508200094

Robert Castro, Steve Hobb

Lonnie Johnson, Banning, 909-645-8275, reported RP ADVD JUV CLIENT ADVD HE IS GOING TO WALK ONTO THE FWY // JUV WALKING EAST BOUND RAMSEY FROM APPROACHING 8TH // ANDRES LYLES BMJ LSW: GRN HOODIE BLK PANTS NO SHOES // RP FOLLOWING IN SILVER DODGE VAN // JUV REFUSING TO GET INTO THE VEH

Cellular E911 Call:

Lat:33.943677  Lon:-116.89354

Service Class: W911. Incident location was 755 W Hoffer, Banning. . Disposition: Report Taken by U451 - Robert Castro.

**21:17    Animal Call**                                                          1508200095

Steve Hobb, Nissa Tammany, Robert Fisher

PER S9 // WANTS UNIT TO RESPOND TO THE PARK TO PICK UP A DOG AND TAKE IT TO BMT PD. Incident location was 399 W George, Repplier Park, Banning. . Disposition: Assisted by U419 - Nissa Tammany.

**21:21    Commercial Alarm**                                                          1508200096

William Auer, Patrick Kelly

Pacific Alarms, 877-432-1, reported COVERS: BACK UP RADIO//NORTH BUILDING MOTION DETECTORS// ACT: 2113 HRS// RP: PAT DUNN DID NOT GIVE PASSCODE AND WAS 415 WITH ALARM COMPANY// OP: F286. Incident location was 2415 W Ramsey, Integrity Auto Service, Banning. Vehicle description: 2004 Freightliner Corp., 44057M1/CA.bldg secure from outside, 1 fed ex truck on blocks out front. Disposition: False Alarm by U452 - William Auer.

266



## BANNING POLICE DEPARTMENT

SHIFT BULLETIN
NIGHT SHIFT --- Thursday, August 20, 2015

Page 3

11/06/2015

**21:37    415 Family**

1508200098

Brandon Smith, William Auer, Patrick Kelly

Jamie Festa, 541 San Andreas, Banning, 951-426-9434, reported OVER CHILD CUSTODY //RP ADVD SHE PICKED UP HER 16 YO NEPHEW FROM FOOD 4 LESS BECAUSE THE NEPHEW DOESNT WANT TO BE WITH DAD WHEN DAD IS HBD, DAD HAS TEMP CUSTODY // RP STATED THE FATHER HE WILL BE ENRT FROM BMT TO HER RESD TO GET THE JUV // MOTHER OF THE JUV RESD AT THE LOC WITH THE RP

Cellular E911 Call:
Lat:33.943376 Lon:-116.89326
Service Class: W911. Vehicle description: 2004 Honda, 7HUZ732/CA.10-8. Disposition: Log Note Only by U427 - Brandon Smith. Neg On 415 Just A Family Discussion They Will Figure It Out

**22:04    Extra Patrol**

1508200099

//anon, 249 N 3RD, 951-282-6565, reported REF ON HIGHER THAN NORMAL VEH TRAFFIC ON HER STREET // THINKS THE NEIGHS ARE SELLING MJ // NEG CONTACT // ON GOING ISSUES. Incident location was 215 N 3RD, Banning. P34 COPIED. Disposition: Log Note Only by Amber Gifford.

**22:43    Past Disturbance**

1508200101

Robert Castro

Montaha Naime, 3911 W Ramsey #204, Banning, 951-500-9294, reported 415 NEIGHS // ON GOING ISSUES WITH NEIGHS BEING VERBAL WITH ADULT CHILDREN // NEG ON IT HAPPENING AT THIS TIME. RP advised on going issues with a neighbor and continues to be an issue involving her children. RP has talked to on site manager about having the neighbor moved to another apartment but now apartments available at this time. RP stated she did not need BPD to respond to the location just wanted to call and speak to an Officer about the issue. I explained to the RP that I would respond to the location to speak to the other half, RP told not needed at this time. No further assistance needed. Disposition: Log Note Only by U451 - Robert Castro.

**22:58    Locate Runaway Juvenile**

1508200102

Pamela Geren, 1621 Durward, Banning, 951-849-7066, reported FAXED RETURNED HABITUAL RJ FORM RCVD ON BELL, TYLOR 032100 //REF INC 1508200073. . Disposition: Log Note Only by Amber Gifford.

**23:42    Mental Disorder**

15-2526/1508200104

Robert Castro, William Auer, Patrick Kelly

Giselle Singh, 1551 W Ramsey #2, Banning, 909-236-0210, reported RP ADVD EX BOYFRIEND HAS BEEN INGESTING OLIANDER LEAVES TO KILL HIMSELF//JUSTIN JAMES 090685 WMA LSW: BLK SHIRT BLK SHORTS // NEG ON COMBATIVE

Cellular E911 Call:
Lat:33.943376 Lon:-116.89326
Service Class: W911. Vehicle description: 2001 Ford, 90316P1/CA.10-8. Disposition: Report Taken by Amber Gifford.

**23:49    Fireworks Violation**

1508200106

Brandon Smith

/Anon, 951-350-6323, reported ON GOING ISSUES // COMING FROM INSIDE THE COMPLEX. Incident location was 456 E Nicolet. Peppertree Apartments, Banning. . Disposition: Checks Ok by U427 - Brandon Smith.

**00:40    Extra Patrol**

1508210002

Robert Castro

Officer initiated activity at 300 S Highland Springs, Banning. . Disposition: Log Note Only by Amber Gifford.

267

# EXHIBIT F



**Banning Police Department**
125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

| | | | | |
|---|---|---|---|---|
| **To:** | Sgt. Robert Fisher | | **Date:** | August 27, 2015 |
| **From:** | Lieutenant Phil Holder | | | |
| **Reference:** | Internal Affairs Investigation #15-06 | | | |

A complaint has been filed against you alleging that on Thursday, August 20, 2015, your interaction with another employee was contrary to the department's policy and procedures. In the complaint, it is alleged the orders you gave the employee were unethical, counterintuitive to his duties and a disparate exercise of your authority over him. Furthermore, it is alleged your actions were an attempt to intimidate him and to avoid performing the duties of the overtime assignment you were working. Subsequently, the City has an obligation by law to conduct an investigation into this allegation.

At his request and with his knowledge, the complaining party indicated you recorded your interaction with him on your recorder. Please ensure this recording is preserved by down loading and saving it according to the department's policy and procedure.

Based on the allegations, I must advise you it is unacceptable for you to take any adverse actions against any person(s) for their involvement in the filing of the complaint.

David Flutts, a private investigator, will be the fact-finder in this matter. However, at this time, a time and date for your interview has not been scheduled. When the interview takes place you will be directed to cooperate in the interview and to respond in a complete, accurate, and truthful manner. The interview will be recorded.

During the interview you will have the right to be accompanied by a representative of your choice who may be present at all times during the interview. However, this representative shall not be a person subject to the same investigation. In order to maintain the integrity of the investigation process, you are ordered to refrain from discussing this notice, the interview, or the investigation itself, with anyone other than your representative. Before you discuss the matter with your representative you must first notify me of who you've selected so that I can ensure they are not subject to the same investigation or are a possible witness.

If you have any questions prior to the interview please do not hesitate to call me at 951-849-1097. *R. F. 8-27-15*

269



**Banning Police Department**
125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

| | | | |
|---|---|---|---|
| **To:** | Sgt. Robert Fisher | **Date:** | November 13, 2015 |
| **From:** | Chief Alex Diaz | | |
| **Reference:** | Internal Affairs Investigation #15-05 & #15-06 | | |

Your initial interviews for Internal Affairs Investigations #15-05 & 15-06 have been scheduled for **Monday, November 23, 2015 at 1:00 p.m.** in the small conference room of Banning City Hall. Investigation #15-05 involves a complaint alleging you provided inadequate service while handling incidents involving vandalism in 2014 and an alleged report of hit-and-run in March of 2015 at the same residence in the City of Banning. Investigation #15-06 alleges on Thursday, August 20, 2015, the orders you gave an employee were unethical, counterintuitive to his duties and a disparate exercise of your authority over him. Furthermore, it is alleged your actions were an attempt to intimidate him and to avoid performing the duties of the overtime assignment you were working.

Based on the allegations, I must advise you it is unacceptable for you to take any adverse actions against any person(s) for their involvement in the filing of the complaint.

The City has retained outside investigator David Flutts from RCS Investigations and Consulting, LLC. to conduct the administrative internal affairs investigation, including your administrative interview. Accordingly, you are hereby ordered to cooperate fully with the investigator. You are to answer his questions in a complete and truthful manner, in accordance with your obligations under the Banning Police Department Policy Manual. You are further ordered to obey any lawful order given by the outside investigator as though such order was coming from a superior in your chain of command with the City of Banning. During the interview you will be afforded all rights permitted by City and Departmental rules and the state's Public Safety Officers Procedural Bill of Rights Act (Gov't Code Sections 3300-3313).

You are advised in advance that the interview will be recorded. You will have access to the recording if any further proceedings are contemplated or prior to any further interrogation relating to this investigation at a subsequent time. You have the right to bring your own recording device and to record any and all aspects of your interview.

You have the right to be accompanied by a representative of your choice who may be present at all times during the administrative interview. However, this representative shall not be a person subject to the same investigation. If you plan to choose an employee representative, you are directed not to contact this person until you have informed Lieutenant Phil Holder of the

270

individual's name so that he may advise whether or not they are a potential witness in this administrative investigation.

If you have any questions regarding this memorandum or the investigation or have any scheduling conflicts, please call Lieutenant Holder.

**RECEIVED AND ACKNOWLEDGED**

_____  11-13-15
Employee        Date

_____  11-13-15
Witness         Date

271

# EXHIBIT G



**Banning Police Department**
125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

| | | | | |
|---|---|---|---|---|
| **To:** | Officer Nissa Tammany | | **Date:** | September 29, 2015 |
| **From:** | Lieutenant Phil Holder | | | |
| **Reference:** | Administrative Investigation Witness | | | |

You have been identified as a potential witness in an administrative investigation relating to a possible charge of misconduct against Sergeant Robert Fisher. The Banning Police Department is conducting an investigation into this matter.

Your involvement in this investigation is to obtain facts related to this matter. David Flutts, a private investigator, will be the fact-finder in this matter. You are scheduled for an interview with Mr. Flutts regarding this matter on Wednesday, October 7, 2015 at 1000 hours at the Banning Police Department. The interview will be audio recorded.

In order to maintain the integrity of the investigation process, you are ordered to refrain from discussing this notice or investigation with anyone. If you have any questions regarding this matter, please feel free to contact Chief Alejandro Diaz or myself.

9-29-15

273

# EXHIBIT H



**Banning Police Department**

125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

| | | | | |
|---|---|---|---|---|
| **To:** | Corporal Hobb | **Date:** | October 20, 2015 |
| **From:** | Chief Diaz | | |
| **Reference:** | Administrative Investigation #2015-09 | | |

The Banning Police Department is conducting an administrative internal affairs investigation in which you have been identified as a subject. The nature of the investigation involves allegations that you violated chain of command, did not follow a lawful order from a supervisor, were insubordinate, and provided disingenuous information to Police Administration during an incident which occurred on or about August 20, 2015. The nature of the allegations are such that if sustained, discipline could result for violations of Department and/or City ordinances, resolutions, rules, regulations, policies, orders and/or directives.

The City has retained outside investigator David Flutts from RCS Investigations and Consulting, LLC. to conduct the administrative internal affairs investigation, including your administrative interview. Accordingly, you are hereby ordered to cooperate fully with the investigator. You are to answer his questions in a complete and truthful manner, in accordance with your obligations under the Banning Police Department Policy Manual. You are further ordered to obey any lawful order given by the outside investigator as though such order was coming from a superior in your chain of command with the City of Banning. You will be advised of the time, date and location of the interview and afforded all rights permitted by City and Departmental rules and the state's Public Safety Officers Procedural Bill of Rights Act (Gov't Code Sections 3300-3313).

You are advised in advance that the interview will be recorded. You will have access to the recording if any further proceedings are contemplated or prior to any further interrogation relating to this investigation at a subsequent time. You have the right to bring your own recording device and to record any and all aspects of your interview.

You have the right to be accompanied by a representative of your choice who may be present at all times during the administrative interview. However, this representative shall not be a person subject to the same investigation. If you plan to choose an employee representative, you are directed not to contact this person until you have informed Lieutenant Phil Holder of the individual's name so that he may advise whether or not they are a potential witness in this administrative investigation.

275

If you have any questions regarding this memorandum or the investigation or have any scheduling conflicts, please call Lieutenant Holder.

**RECEIVED AND ACKNOWLEDGED**

| | | |
|---|---|---|
| Employee | Date | Witness | Date |

276



**Banning Police Department**

125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

| | | | |
|---|---|---|---|
| **To:** | Cpl. Steve Hobb | **Date:** | November 12, 2015 |
| **From:** | Chief Alex Diaz | | |
| **Reference:** | Internal Affairs Investigations #15-08 & 15-09 | | |

Your initial interviews for Internal Affairs Investigations #15-08 and #15-09 have been scheduled for **Monday, November 23, 2015 at 10:00 a.m.** in the small conference room of Banning City Hall. Investigation #15-08, involves a complaint against you alleging you engaged in misconduct, including but not limited to, discrimination, harassment and retaliation against Sergeant Vincent Avila causing him to experience a hostile work environment and in an attempt to undermine his authority. Investigation #15-09 alleges you violated the chain-of-command, did not follow a lawful order from a supervisor, were insubordinate, and provided disingenuous information to Police Administration during an incident which occurred on or about August 20, 2015.

Based on the allegation, I must advise you it is unacceptable for you to take any adverse actions against any person(s) for their involvement in the filing of the complaint.

The City has retained outside investigator David Flutts from RCS Investigations and Consulting, LLC. to conduct the administrative internal affairs investigation, including your administrative interview. Accordingly, you are hereby ordered to cooperate fully with the investigator. You are to answer his questions in a complete and truthful manner, in accordance with your obligations under the Banning Police Department Policy Manual. You are further ordered to obey any lawful order given by the outside investigator as though such order was coming from a superior in your chain of command with the City of Banning. During the interview you will be afforded all rights permitted by City and Departmental rules and the state's Public Safety Officers Procedural Bill of Rights Act (Gov't Code Sections 3300-3313).

You are advised in advance that the interview will be recorded. You will have access to the recording if any further proceedings are contemplated or prior to any further interrogation relating to this investigation at a subsequent time. You have the right to bring your own recording device and to record any and all aspects of your interview.

You have the right to be accompanied by a representative of your choice who may be present at all times during the administrative interview. However, this representative shall not be a person subject to the same investigation. If you plan to choose an employee representative, you are directed not to contact this person until you have informed Lieutenant Phil Holder of the

277

individual's name so that he may advise whether or not they are a potential witness in this administrative investigation.

If you have any questions regarding this memorandum or the investigation or have any scheduling conflicts, please call Lieutenant Holder.

**RECEIVED AND ACKNOWLEDGED**

_____              _____
Employee          Date                        Witness              Date

**278**

# EXHIBIT I

CITY OF BANNING POLICE DEPARTMENT


INTERVIEW WITH
STEVE HOBB


INTERVIEWED BY
DAVID FLUTTS


ADMINISTRATIVE INVESTIGATION
RCS #2015-045


SEPTEMBER 23, 2015 @ 1:00 PM


Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

Investigator David Flutts                     (DF)
RCS Investigations and Consulting

Steve Hobb                                    (SH)
Police Corporal
Banning Police Department


DF:     Today's date is Wednesday, September 23, 2015, the time is 1:00 p.m. My name
        is David Flutts, I'm a private investigator from RCS Investigations and
        Consulting. Our firm was retained by the City of Banning to conduct this
        administrative investigation. The investigation concerns allegations of potential
        misconduct against Sergeant Robert Fisher and resulted from an email complaint
        submitted by Corporal Steve Hobb. The incident under investigation occurred on
        August 20, 2015. The RCS case number is 2015-045 and the Banning Police
        Department IA number is 15-06.

        This is an interview with Corporal Hobb and the interview is being conducted at
        the Banning City Hall. Corporal Hobb is a witness and is not the subject of this
        investigation. On behalf of Chief Diaz I am directing you to answer all questions
        completely and truthfully. Do you understand this admonishment?

SH:     Yes, I do.

DF:     Please state and spell your name.

SH:     Steve Hobb, S-t-e-v-e, H-o-b-b.

DF:     And what is your current assignment?

SH:     I'm a police officer currently assigned to administrative leave.

DF:     Were you on duty on Thursday, August 20, 2015, at approximately 2130 hours?

SH:     Yes, I was.

DF:     And at that time were you, what was your assignment?

SH:     I was assigned as the Acting Watch Commander for Patrol Team-3.

DF:     And was your official title corporal at that point?

SH:     Yes

DF:     And, um, you partially answered this but you were the, uh, in essence the Watch
        Commander on duty that day?

2

SH:   Yes

DF:   And how many other officers were on duty at that time?

SH:   Three

DF:   Three patrol officers?

SH:   Yes, on my team.

DF:   Okay, was there another team that was overflow?

SH:   There's a special assignment overtime position for the concerts in the park.

DF:   Okay, I'll get to that in a second.

SH:   Okay

DF:   Uh, so the patrol deployment that day was you plus three officers?

SH:   Yes, it was.

DF:   Okay, and your shift started at what time that day?

SH:   Sixteen hundred.

DF:   And does it go till 4:00 in the morning?

SH:   Yes, it did.

DF:   And at the same time that evening was there an event called Concerts in the Park going on?

SH:   Yes, there was.

DF:   And where was that event held?

SH:   At, uh, Replier Park.

DF:   Can you spell that for me?

SH:   R-e-p-l-i-e-r Park.

DF:   And that's obviously in Banning?

3

**282**

SH:     Yes

DF:     Is that event something that occurs every year?

SH:     Yes

DF:     And were there Banning Police Officers working that event on an overtime basis?

SH:     Yes, there were.

DF:     How many officers, do you know?

SH:     Two.

DF:     And do you know which officers they were?

SH:     Uh, Sergeant Fisher and Officer Tammany.

DF:     How do you spell Tammany's name?

SH:     T-a-m-a-n-n-y. It could be two "m's" and one "n", but I forget.

DF:     Okay, and is Tammany, um, his regular assignment is what? Patrol Officer?

SH:     Her regular assignment –

DF:     Oh

SH:     -is the SRO.

DF:     School Resource Officer?

SH:     Yes

DF:     What's her first name?

SH:     Nissa, N-i-s-s-a.

DF:     Okay, and this Concerts in the Park event, have you ever worked that specific event?

SH:     Yes, I have.

DF:     Are you aware of any guidelines that officers working that event have regarding handling incidents at that location?

4

283

SH:     They're responsible for handling calls for service there that stem from the concert.

DF:     How big of a venue is this place?

SH:     Huh, it's, uh, an audi – not an auditorium, I don't know what you'd call it. It's like a bowl type setting with a stage that has seating for, I don't know how many people, um –

DF:     So obviously this is an outdoor event?

SH:     Outdoor event.

DF:     Okay, and, um, the two officers that were assigned to the event, is that what's typically assigned to that event?

SH:     Uh, it could be two, I've seen it with three, sometimes reserves work it to get their hours in.

DF:     Okay. Now at some point that evening, um, did you interact with Sergeant Fisher?

SH:     Yes

DF:     Please describe what occurred if you would.

SH:     Alright, um, I was at my desk, uh, my patrol officers were all tied up on calls and dispatch - can I look at this note?

DF:     Sure

SH:     Cause I don't know if they called me on the phone or –

DF:     Just for the record, you're looking at something on a phone. What is that?

SH:     This is my personal cellphone. It's an email I sent myself-

DF:     Okay

SH:     -about the events that took place so I –

DF:     Are these in essence notes you wrote to yourself?

SH:     Yes

DF:     Okay

SH:     I could forward them to you if you'd like.

DF: · Sure, that's fine.

SH: Oh yeah, okay, so dispatch came over the radio to me and asked me to, uh, uh, send the next available patrol unit to the park to take custody of a stray dog that the park units had detained. Um, at the time all my officers were busy and I felt this was a call that the park units should handle cause in addition to the two officers that were there, there was several volunteers and there might've been reserves units there, I didn't see them on this night but usually there's reserve units like I just stated earlier.

DF: When you say volunteers you mean police department volunteers?

SH: Yes

DF: Okay, are those, uh, are they senior volunteers or is there some, is there any, in other words is your volunteer program all seniors or does it vary?

SH: It varies.

DF: Okay, so there were, uh, how many volunteers, do you know?

SH: Um, I see usually three to four when I'm there.

DF: Okay

SH: Um, there's usually quite a few of them like in the venue.

DF: And you said that you were at your desk, is that in the station?

SH: Yes

DF: And, um, the three on duty patrol officers were busy on other calls?

SH: Yes

DF: Do you recall whether or not there were any calls holding at that time?

SH: I do not recall.

DF: Okay, and do you have a way and does your system allow you from say, where you were at your desk, to look to see if there are calls holding?

SH: Uh, they would show right on the screen.

6

285

DF:    Okay. Alright, so you, the call came over your actual, your primary, um, dispatch channel?

SH:    Yes

DF:    Okay, and, uh, the call was to you in particular?

SH:    Yes, it was from dispatch to me advising that Sergeant Fisher was requesting a patrol officer to respond to the venue to take custody of this dog and take it to the City of Beaumont where their ACO office is.

DF:    What's ACO stand for?

SH:    Animal Control Office.

DF:    Okay, and the local, the one that you use in Banning is located in Beaumont?

SH:    Yes

DF:    Okay, and, um, uh, what was your initial impression when you heard that information?

SH:    I felt that this wasn't a patrol officer's function as there's officers there and including, uh, volunteers that could've handled this. So I told dispatch over the air, uh, negative on that, have one of the venue officers handle that situation.

DF:    And, uh, as you said earlier, your understanding from work -- having worked those assignments before is that, uh, is it the understanding that those officers working that event are responsible for calls or events that occur at the venue?

SH:    Yes

DF:    Okay, and was this, was this request in your opinion unusual given the fact that they, the expectation was that they were to handle calls there?

SH:    Yes

DF:    And was the call, when you received the call from dispatch, was it, did they specifically indicate that officers at the park had had some sort of contact with this dog?

SH:    Yes

DF:    Okay, were there any other specifics given related to the call?

SH: No, it, it wasn't like they needed assistance cause if they needed assistance on something major like if there was a fight, of course we would respond and back them, assist them. This was a dog, um, so, um, I don't bel – they didn't say vicious or anything like that. So, um, it was a stray dog and, uh, so I told dispatch to have one of them handle it.

DF: And what happened at that point?

SH: Uh, Sergeant Fisher came over the police radio and said, uh, twenty-two my response and have the next available unit respond.

DF: Okay, and what occurred at that point?

SH: At that point I went out to the bay, I grabbed the catch pole which is a dog catching pole-

DF: When you say bay, is that your vehicle bay at your station?

SH: Yes, yes, where we park the vehicles.

DF: And you have, there's an animal catch device that you keep there?

SH: Yes

DF: Okay

SH: So I put that in my trunk and I drove right to the park. Um, as I arrived I parked up close to the venue, I exited, I had the catch pole in my hand, um, Sergeant Fisher met me about halfway between where my car was and where their car – I say their – I don't know who brought the car there, it was a patrol unit parked over to the south side of the venue. And, uh, the first thing I said to him is, hey, my, my audio recorder, my digital audio recorder, the batteries are dead, I can't record, can you please turn on your audio recorder and record this?

DF: And –

SH: I asked that of Sergeant Fisher.

DF: And what response did he have if any?

SH: He said, sure.

DF: Okay, and to your understanding did he in fact record the contact?

SH: As far as I know he did.

8

287

DF:   Did you see him manipulate something?

SH:   Uh, I didn't pay attention.

DF:   Okay, and what occurred then?

SH:   Uh, we walked over to where the dog, where, to where the patrol unit was and there was Officer Tammany and there was a dog, I think it was in the backseat, uh, it was already in the backseat of their car. Um, it was some sort of pit bull mix or maybe it was a pit bull. It was gray, um, it was a female, it had been nursing, you could tell it was nursing puppies. And the dog was calm, it was cooperative, it wasn't vicious, and they were petting it.

DF:   They being whom?

SH:   Uh, Officer Tammany, I believe there's some kids there.

DF:   Okay, and, uh, at any point did either Fisher or Tammany give any indication to you that the dog at any point had been vicious or had been causing any sort of issue at the venue?

SH:   No, they did not.

DF:   Okay, and, uh, what happened next?

SH:   Um, we had a discussion about who should take this dog over and I told 'em I didn't feel we should cause it's not patrol's function and, uh, he told me, I'm giving you a direct order to take this dog.

DF:   And what happened next?

SH:   Um, I didn't feel it was a lawful order. He is a sergeant, I'm a corporal, however, I'm the Acting Watch Commander. My job is to supervise the patrol which patrol is the primary, my, it's the primary mission for the department. Um, his position there at the venue is secondary. Uh, as I said, I didn't think it was a lawful order. I felt that he was doing this out of retaliation and he was giving me this order because he was trying to exercise his authority over me cause now he could, now that he was a sergeant. So I told him, before I take this dog, I'm gonna call Lieutenant Holder. And I said, no, I'm actually gonna call the Chief.

DF:   Okay, I'm gonna get to that in just a moment here. So, uh, you, you indicated that you felt that Fisher was attempting to retaliate against you, is that correct?

SH:   Yes

DF:   What would the retaliation be from?

9

SH:   Okay, um, let's see – Uh, in, uh, see, August… to about October 2014, I was the Acting Watch Commander of my patrol shift and, uh, he was working on my shift in overtime. Um, a call came out, right out of the shoot, right at the beginning of shift to assist CPS. Uh, CPS went to a house, they did their investigation, they took some children from the home because the children had injuries sustained from like an extension cord or a hanger or something like that. Uh, Sergeant Fisher who was on scene at the time, he failed to do any investigation or take any action. Um-

DF:   Let me stop you for just a second, I wanna clarify a couple things. So CPS is Child Protective Services?

SH:   Yes

DF:   And at the time of that incident, October 2014, Fisher was an officer?

SH:   Yes

DF:   Okay, go ahead, continue.

SH:   So, uh, he, basically he failed to take action. Um, when I reviewed the call later, um, I saw that dispatch had had notes that the RP, the reporting person which was CPS, called back and they wanted the police to respond back to the location but they didn't want Officer Fisher to respond. So I asked dispatch, why wasn't I informed of this? They didn't have an answer. Um, so I ended up contacting CPS and asking what happened and a CPS worker told me that, um, they were upset at Officer Fisher's performance on that call. He failed to take photos, he failed to ask questions, he stood in the back and just had his arms crossed and he did not do his job. Um, for that, for his performance on that call, I wrote him up. I tried to do a written reprimand, uh, Lieutenant Holder told me, no, I couldn't, I had to start with progressive discipline and it had to be a verbal notice of counseling. So I gave him a verbal notice of counseling after Lieutenant Holder had went through the notice of counseling and looked at it and he, he gave it back to me, said, have him sign this. So I had asked Sergeant Fisher to sign it, or Officer Fisher at the time, to sign the verbal notice of counseling and he refused. At the time I had another sergeant there with me, Sergeant Loader. Because Lieutenant Holder told me to have him sign it, I told him, I'm giving you a direct order to sign this. This is not, you're not signing it stating that you agree with it, you're just acknowledging receipt of this verbal notice of counseling and you have 30 days to respond to it. And he refused to sign it. So –

DF:   Let me just clarify one thing with you – At the time you had Fisher, then Officer Fisher, into, uh, sign this, um, I'm sorry, what do you call the document? Verbal?

SH:   Verbal notice of counseling.

10

289

DF:   Verbal notice of counseling – and you said that Sergeant Loader was present?

SH:   Yes

DF:   Is that L-o-a-d-e-r?

SH:   Yes

DF:   Okay, alright, go ahead.

SH:   Um, he refused so I put, refused to sign, with Sergeant Loader there and Officer Fisher walked away. Um, I gave it to Lieutenant Holder and that was that on that issue. That was in October, um, maybe October actually, then he filed a complaint, Officer Fisher filed a complaint with the City of Banning alleging that I was harassing him and alleged age discrimination. Um, that was investigated in the early part of this year, I believe you conducted that investigation and that investigation was unfounded.

DF:   Let me just clarify something with you – And, uh, just for the record, um, Fisher's complaint against you not only included the issue with the verbal notice, uh, and, but he then, he made several other allegations regarding other incidents or interactions with you, is that correct?

SH:   Yes

DF:   And as you said that was investigated, correct?

SH:   Yes

DF:   And, uh, at some point after that investigation was completed were you informed of the findings?

SH:   Yes

DF:   And what were you told about what the findings of that investigation were?

SH:   They were unfounded.

DF:   Okay, and, uh, go ahead, continue.

SH:   Okay, um, by the time this is all done, you're really gonna know a lot about our department. Um, okay – so this happened in August, um, and approximately May, Sergeant Fisher was promoted to sergeant. Um, I and other people in the POA took issue with his promotion because we felt that he, number one, didn't pass the test, and number two, he wasn't fit to be a sergeant. This was based on the fact of

numerous people in the POA. You can probably talk to every member of the POA. Uh, there was issues about his officer safety, about, um, his work ethic, uh, about his response to officers needing assistance, how it'd be slow, how he would take the long way to get there, how he would drive the speed limit when an officer's asking for help. Um, going back to him not passing the test, he told an officer that he didn't pass the sergeant's test, he also, um, wasn't invited by the Chief to do oral interviews. There was like eight people that took the test, six of us were asked back for oral interviews. Well, in May when he was promoted, um, we took issue with this. The POA, um, contacted HR and Officer Callahan who's our POA President, got a memo from Rita Chapparosa who is our HR person, I forget her title, she's in charge of HR – She presented him a memo that she typed up that was allegedly attached to an email that said that Officer Fisher passed the sergeant's test. Well, huh, um –

DF:    Let me stop you for just a second. I'm gonna clarify just a couple things you just said. So, um, in essence the POA, the Police Officers' Association at Banning PD, had issues with Fisher's promotion, is that correct?

SH:    Yes

DF:    And the promotional process by which, uh, Fisher was ultimately promoted, um, you took part in that as well?

SH:    Yes

DF:    And, uh, you said that there were eight applicants that took part in that process?

SH:    If I, if memory serves me right I believe it was eight.

DF:    And of those eight, you indicated that six were invited to an interview with the Chief of Police, is that right?

SH:    Yes

DF:    And that's Chief Alex Diaz?

SH:    Yes

DF:    And when was that process going on? Or when did that process go on? If memory serves, I, I believe that was prior to October of last year, is that correct?

SH:    I wanna say it was in September, yes.

DF:    Okay, so it was approximately a year ago?

SH:    Yes

DF:   And, um, what is the, just so I have it straight, what is the, what does the promotional process consist of?

SH:   It starts with a, uh, written test and then an oral interview with a panel from outside agencies where outside agency members sit on the panel and ask the questions and then they grade us.

DF:   And what happens after the oral?

SH:   Then after the oral you get a score, you either pass or fail based on a cumulative of both of them together, and the Chief, um, asks you back for an oral interview with him.

DF:   Now after the oral interviews with the Chief, is there then a list produced of some sort?

SH:   Typically in past there's been a list, however, this time the Chief did not put out a list.

DF:   Okay. Was there any, um, uh, public or any publication of results of any sort from that process?

SH:   I'm sorry, say that again.

DF:   Yeah, uh, you said there wasn't a list. Was there any sort of, anything produced by the Chief's Office presumably or HR that indicated what the results of that process were?

SH:   No

DF:   Were the candidates who took part in that process notified of their, of where they ranked or how they finished?

SH:   No, if they wanted to find out, they had to contact Jodi Miller in HR.

DF:   Okay

SH:   Joni Miller, and ask her what their score was and then she would give them their score. I don't know if she did it verbally or email, um, but she would tell them or send it to them.

DF:   And it was your understanding that, uh, that Robert Fisher, um, was, participated in the process, however, he did not take part in a Chief's oral?

SH:   To my knowledge he didn't based only, solely on the email from the Chief to all the people who passed.

DF:   And what did that, do you have that, a copy of that email?

SH:   I'm looking for it now.

DF:   In essence what did that email say?

SH:   It said, uh, congrat – I don't wanna say, I have such a terrible memory. If I don't write something down right after I do it or hear it, I, I'll forget it, but I do have it.

DF:   Alright, we can find that in a minute. That's fine.

SH:   Okay

DF:   Um, so, uh, we kinda got off track on this thing but let me get back to this, let me just finish this part and then we'll continue with the other issue. Um, so after your conversation with Fisher at the park you initially considered calling Lieutenant Holder, is that correct?

SH:   Yes

DF:   And then you ended up changing your mind and calling Chief Diaz?

SH:   Yes

DF:   Why was that?

SH:   Cause Chief Diaz is the one who promoted Fisher and Chief Diaz told not only me, he told the POA Board before the current one we have currently which was at the time Brandon Smith, Mike Bennett, and, uh, Jennifer Segura, that he would not ever promote Bob Fisher, that he would be crazy if he promoted Bob Fisher.

DF:   And this is Chief Diaz?

SH:   Telling this to the board.

DF:   And that was when? Do you know?

SH:   It was in 2014.

DF:   Okay, was that previous to the promotional process or was it after that process?

SH:   It could've been before or after. Uh, they didn't, they didn't, um, they didn't tell me the dates but they were all there.

14

293

DF:     And those three people you just mentioned, those were, uh, part of your POA Board?

SH:     They were the board at the time, yes.

DF:     And there's a new board now?

SH:     Yes

DF:     Okay. So, um, so you're, so let me just make sure I have this correct. Your thought process was that you wanted to contact Chief Diaz to in essence resolve this issue with Fisher that day?

SH:     When I called him?

DF:     Yes

SH:     No, I felt that he created this situation by putting Bob Fisher in a positon to supervise me when – not supervise me cause Fisher was not my supervisor on this day – He put Bob Fisher in a positon to where Bob felt he had the authority over me and I felt Sergeant Diaz, I mean Lieutenant D – huh, Chief Diaz created this monster so I felt he should probably have to deal with it.

DF:     And so, um, you called Chief Diaz, is that right?

SH:     Yes

DF:     And describe that conversation if you would.

SH:     I, I told Chief Diaz what had taken place. I told him my positon where I felt that my officers on patrol were responsible for patrol, that Sergeant Fisher signed up voluntarily for this overtime spot to handle the venue and any calls for service there. He had another officer there, he had reserves there and the venue was almost over. And I felt that he could've had Officer Tammany, he could've had one of the volunteers take the dog and it wouldn't've impacted patrol like Sergeant Fisher was trying to do.

DF:     And the, you said that the Animal Control facility is in Beaumont?

SH:     Yes

DF:     Approximately how far away is that?

SH:     Driving time or miles?

15

294

DF:     Distance – either one.

SH:     Uh, I would say, I don't know, 12 miles, 15 miles, 10 miles. I've worked up here so long you'd think I would know.

DF:     Um, so what did, what was Chief Diaz' response to you?

SH:     He said I was right. He said he would contact Sergeant Fisher and I said, do you want me to hand him the phone cause I had my phone. He said, no, he'll call him. So I hung up with Chief Diaz, I walked back to Sergeant Fisher, because I had to walk away from where Sergeant Fisher was because the concert was going on and it was loud, so I walked over by the skate park where I could hide behind one of the ramps. Um, so when I walked back over to where Sergeant Fisher and Officer Tammany was, I told Sergeant Fisher, Chief Diaz is gonna call you and Sergeant Fisher's phone rang. Sergeant Fisher answered it, he stepped away, he was gone for like five minutes. During that time I spoke to Officer Tammany, uh, she said, that was uncomfortable, and we proceeding to talk about the dog. She said that somebody at the venue brought it, uh, told him about it, they went, found the dog, it wasn't a threat, it wasn't vicious, and it wasn't a big deal to her. Um, and then some kids came up and started talking to us and after five minutes, Sergeant Fisher returned and said, you can go. I started to walk away and he asked for the catch pole. So I turned around and gave it to him and I went back to my patrol unit and I left.

DF:     Now, uh, during your initial interaction with Fisher at the park there, was Officer Tammany present?

SH:     Not when I asked him to turn on his recorder. Um, I didn't say anything to him from that point until I got over to where Officer Tammany was.

DF:     Okay, and, um, so from the point you asked Fisher to turn his recorder on, uh, you had moved over to where Tammany was?

SH:     Yes

DF:     And, um, did she then witness the remainder of the conversation?

SH:     Yes

DF:     And, uh, is that where the, is that where the majority of the discussion occurred?

SH:     Yes

DF:     Okay. With the issue, with regard to the recorder, um, did you want the recorder on to, in an attempt to record the entire interaction?

16

SH:   Yes

DF:   Okay. And, uh, if you could just, um, uh, or let me ask you this – Do you believe Fisher's actions were an attempt to intimidate you?

SH:   Yes

DF:   And, um –

SH:   The reason I say that is the way his body position and his language, he used a stern voice and, uh, you could tell, I could tell he was angry. He had had the same demeanor as he did when I gave him his written, uh, verbal notice of counseling. He was upset.

DF:   And, uh, summarize the remaining, your other concerns, uh, aside from the intimidation, what were the other concerns that you had?

SH:   In my complaint?

DF:   Yeah, just briefly. Just the main points. We've already covered them, I just want you to summarize if you would.

SH:   Um, he, he was trying to harass me on that incident, um, he tried to exercise his authority over me. Um –

DF:   You also indicated earlier that you felt that his order was an unlawful order, is that right?

SH:   Yes

DF:   An inappropriate order?

SH:   Yes

DF:   And as you stated, after you explained the situation to the Chief during that phone call, um –

SH:   He wouldn't –

DF:   –he agreed with you?

SH:   The Chief?

DF:   Yes

SH:   Yes

17

**296**

DF:   Okay

SH:   And the reason I say that was a, uh, inappropriate order is, he would've never given that order to another sergeant. If I was a sergeant, he would've not ordered me to do that. He would not have had the authority to order me to do that. But because he's a sergeant and I'm only a corporal he believed he could do that but it was inappropriate because I was Acting Watch Commander. My duties revolve around patrol and calls for service.

DF:   Do the other patrol teams at Banning PD have sergeants as the Watch Commanders?

SH:   Yes

DF:   All of them?

SH:   Yes

DF:   And you're performing in essence the same duties on your shift as a sergeant on any other shift does?

SH:   Exact same duties.

DF:   Now you've already explained why in this particular instance you called Chief Diaz, um, if this had not been a dispute with Fisher would you have called Chief Diaz? In other words, if you were having a similar dispute with another employee, would you have called the Chief?

SH:   No

DF:   Okay

SH:   More than likely not, it depends on circumstances but I can't say for sure I wouldn't but more than likely not. This was something that I felt the Chief needed to be aware of because I had voiced my concerns about ever having to work for Fisher cause I knew he wouldn't, he didn't like me and I felt he would do something like this and he did exactly that.

DF:   And as you said earlier, let me just clarify, um, that's why you decided to call the Chief directly as opposed to calling Lieutenant Holder?

SH:   Yes

DF:   And is Lieutenant Holder in essence your direct supervisor in that capacity that you were in that night?

18

297

SH:   Yes

DF:   Is Holder the only lieutenant?

SH:   Yes

DF:   Okay. And, um, we've already – the next question I had here was, you know, regarding previous disputes. You've already kind of covered that. Other previous disputes with Fisher, you've covered those, correct?

SH:   Yes

DF:   Uh, with regard to the recording that was made presumably by Fisher, have you listened to that?

SH:   No

DF:   Okay, do you have any idea what's on it?

SH:   No

DF:   Uh, later that shift into the next morning, did you prepare an email to Lieutenant Holder regarding this interaction with Fisher?

SH:   Yes, I did.

DF:   I'm gonna show you a copy I have here and ask you to just take a look at that and verify that that's a copy of the complaint you sent.

SH:   Um, yes. I noticed that up here it says it's the third IA?

DF:   Oh, that's just his notes to me. No, this is, cause I have three IA's from your department at the same time, so, yeah – no, it's not the third involving you.

SH:   Okay

DF:   No, I got three from your department all at one time, that's all that is, so. I'm just asking you to look at the bottom part, how about that? Does that appear to be a true copy of the email you sent to Lieutenant Holder?

SH:   Yes

DF:   Okay. Now, uh, let me get back to this promotional thing, is there more information you wanna – did you find your email you were looking for or what do you have there?

19

SH:   I found an email, I found that email that I was looking for.

DF:   Okay

SH:   Um, the promotion email, it's in this mess somewhere.

DF:   Okay

SH:   I've been going through it day after day so it's kind of mixed up. I didn't think that one would be, uh, um, important.

DF:   Well, it's not really relevant to this case per se but is there, let me finish off with this incident with Fisher. Is there anything else you wanna add to that incident?

SH:   Huh, uh, I just think that was highly inappropriate of him to do that in front of another officer and, uh, if you ask that officer, they will say they felt uncomfortable and that'll probably tell you how inappropriate it was for him to do that.

DF:   And, um, you said earlier that Officer Tammany is a School Resource Officer?

SH:   Yes

DF:   Do you happen to know her workdays?

SH:   Monday through Friday.

DF:   Okay, daytime hours?

SH:   Daytime hours.

DF:   Alright. Now with regard – did you want to add anything else with regard to the portion we were talking about, about the promotional process?

SH:   Um, uh, Sergeant Fisher might've been upset too because I did a, uh, I did a public information request for emails for testing. And, um, because I and others in the POA felt that memo that was presented to Officer Callahan by Rita Chapparosa was not legitimate. Um, we felt it was odd that Rita would write a memo and attach it to an email when she could've just emailed the Chief and said, a, b, c, d, passed the test, these are the ones that can move forward. So I did a public information request on that. The Chief was aware of it, um, I assume Sergeant Fisher was aware of it. They are, they talk a lot. I don't know if they're friends, I won't go that far but I would assume that since he's the Admin Sergeant, they discuss these things. Um, that might've upset him as well.

20

299

DF:     Now this public information request that you did, when was that?

SH:     That was done Monday, August 17th.

DF:     Okay, so that was the Monday before this interaction with him, right? This interaction occurred on the 20th of August, so.

SH:     Yes

DF:     Okay. Now this memo that you've mentioned a couple of times from Rita Chapparosa, um, that was a memo, she attached the memo to an email she sent to Callahan?

SH:     I'm assuming, I never saw the email from her to Callahan. I never saw the email from her to the Chief. When I did my public information request, I did not get that email from her to the Chief but the way Brian Callahan presented it to us in our POA meeting was, this memo was from an email from Rita to the Chief and he only presented the memo.

DF:     Okay, and the memo, what was the gist of the memo?

SH:     It listed seven people as passing the test.

DF:     And were they listed in any sort of order?

SH:     Uh, I do not recall.

DF:     Okay, does your department typically list people in ranked order on promotionals?

SH:     If they put out, well, I don't know if they would do that. In times past, I don't know if it was in order, I think it was just these are the people who passed.

DF:     And the way your system is, does the Chief then have the ability to promote whomever he chooses out of that select group that passed?

SH:     I would assume, I mean, if they passed it's probably his discretion. I think that's how it is at other agencies. He doesn't have to promote number one, he can skip number one and go to five if wanted.

DF:     Does that outline in your MOU, do you know?

SH:     I don't think it does.

DF:     Alright. Alright, anything else you wanna cover about that part of it?

SH:   No

DF:   Okay, is there anything else you'd like to add about this interaction? I think we've covered that. Is there anything else that we've missed?

SH:   Um, no. Off the top of my head, no.

DF:   Okay, I don't have any further questions at this point. I'm gonna go ahead and conclude this interview. It is approximately 1:40 p.m.

301

To the best of my knowledge and ability, the above transcript is a true and accurate transcription of the recorded interview of Steve Hobb by RCS Investigations and Consulting LLC, transcribed by Karyn Flutts for the City of Banning Police Department.

**302**

# EXHIBIT J

BANNING POLICE DEPARTMENT


INTERVIEW WITH
NISSA TAMMANY


INTERVIEWED BY
DAVID FLUTTS


ADMINISTRATIVE INVESTIGATION
RCS #2015-045


OCTOBER 8, 2015 @ 10:10 AM


Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

Investigator David Flutts                    (DF)
RCS Investigations and Consulting

Nissa Tammany                               (NT)
School Resource Officer
Banning Police Department

DF:     Okay, today's date is October 8, 2015, the time is approximately 10:10 a.m. My
        name is David Flutts, I'm a private investigator from RCS Investigations and
        Consulting. Our firm was retained by the City of Banning to conduct this
        administrative investigation. The investigation concerns allegations of potential
        misconduct against Sergeant Robert Fisher and resulted from an interaction
        between Fisher and Corporal Steve Hobb on August 20, 2015. The RCS case
        number is 2015-045 and the Banning PD, IA number is 15-06.

        This is an interview with corporal, or I'm sorry, Officer Nissa Tammany and the
        interview is being conducted at the Banning Police Department. Officer
        Tammany is a witness and is not the subject of this investigation. On behalf of
        Chief Diaz I am directing you to answer all questions completely and truthfully.
        Do you understand this admonishment?

NT:     Yes

DF:     Please state and spell your name.

NT:     Officer Nissa, N-i-s-s-a, Tammany, T-a-m-m-a-n-y.

DF:     And what is your current assignment and how long have you been employed by
        the department?

NT:     I've been employed for approximately eight years and my current assignment is
        School Resource Officer.

DF:     Did you work an extra-duty assignment at the Concerts in the Park event on
        August 20, 2015?

NT:     Yes

DF:     Who were you working with at that event?

NT:     Sergeant Fisher.

DF:     And were any other police department personnel assigned to that event?

NT:     No, I don't believe so

2

DF:   Do you recall if there were any reserves or any volunteers at the event?

NT:   I believe there were.

DF:   Both?

NT:   Uh, I can't remember if, uh, a reserve worked that day but the volunteers were there.

DF:   Okay, and, um, what time did the assignment begin and what time was it scheduled to end?

NT:   Oh, gosh, um, I think 7:00 to 10:00 maybe? Or 7:00 to 11:00? I don't remember.

DF:   7:00 p.m.?

NT:   Something like that.

DF:   And was the event, this Concerts in the Park, was this obviously concerts?

NT:   Cover bands, yeah, concerts.

DF:   Okay, and what's the name of the park the event was held?

NT:   Repplier Park.

DF:   Do you know how to spell that?

NT:   R-e-p-p-l-i-e-r

DF:   And that's in Banning?

NT:   Correct

DF:   Have you worked extra-duty events prior to this particular assignment?

NT:   Yes

DF:   And what are the expectations regarding officers working extra-duty events in terms of what they are expected to handle?

NT:   It could be anything, case by case basis, and on that assignment, typically we're just there for presence to make sure that there's no disruptive persons, make sure it's kept safe.

3

DF:   Are officers that work extra-duty assignments, are they expected to handle any incidents that occur at that venue?

NT:   Could be.

DF:   Could be or-?

NT:   I would expect it if I was, something went down that I could possibly be handing it, yeah.

DF:   And at some point during that event were you advised of a situation with a stray dog?

NT:   Yes

DF:   How did that come about?

NT:   We had seen the stray dog wandering around and then, um, a citizen had come up to me and they were concerned, uh, the dog was not aggressive, uh, and then we just monitored the dog and then eventually a volunteer kinda brought the dog over to us.

DF:   You said that a citizen told you about it and you had seen the dog as well?

NT:   Correct

DF:   And you said the dog was not vicious?

NT:   Not aggressive.

DF:   Okay, and what, do you remember what the citizen, what concerns the citizens, the citizen told you about?

NT:   The citizen was concerned that it was a pit bull breed. That was the main concern.

DF:   And you had seen the dog as well?

NT:   Correct

DF:   And was it, did it appear to be a pit bull?

NT:   It looked like a pit bull, yeah.

DF:   Okay. Did you see any aggressive behavior by the dog?

NT:   No

4

DF: And, uh, did at any point that citizen or anyone else ever advise you that the dog had been vicious?

NT: No

DF: Did anyone express any sort of concern for their safety because of the dog?

NT: They were concerned because it was a pit bull, not that it had done anything, just simply the fact of the breed.

DF: Okay, and was this just the one reporting party or were there others?

NT: There was only one lady that came up to me directly.

DF: Okay

NT: I don't know who she was.

DF: And prior to her coming up to you, you said you had seen the dog?

NT: Uh, huh

DF: And when you saw the dog, what was it doing?

NT: Just kind of wandering around.

DF: And, uh, this is obviously in a park?

NT: Correct

DF: And, uh, in relation to where the concert was being held, where was the dog or where did you see the dog?

NT: The dog passed by, I parked in the grass by the, on the west side of the skate ramp and the dog wandered past my unit. Uh, the concert's down in the bowl on the stage but there's people everywhere.

DF: Okay, and there's people walking around?

NT: Yeah, and kids were walking around. The dog made no, any kind of movement toward anybody. It wasn't aggressive in any way.

DF: Okay, and in your opinion was there an urgency to remove the dog from the venue?

5

308

NT:    No

DF:    And you said that, um, that a volunteer at some point sort of brought the dog over to you?

NT:    Correct

DF:    Okay, did they carry the dog or did they -?

NT:    No, no –

DF:    -kinda of just call it or -?

NT:    They were coaxing it, calling it, kinda brought it over to us like, here's the dog.

DF:    Okay

NT:    And, uh, you know, the dog stopped at my feet so.

DF:    Was it just one volunteer or were there more than one?

NT:    I only remember one female volunteer.

DF:    Do you know her name?

NT:    No

DF:    Had you ever seen her before?

NT:    I've seen her. I'm bad with that, unfortunately I don't memorize their names.

DF:    Are the volunteers at Banning PD, are they generally seniors?

NT:    Yes

DF:    Was she in fact a senior?

NT:    Yes

DF:    And, um, so the dog she brought, in essence, brought the dog over to you. You said the dog came to your feet?

NT:    She kinda brought it over and it walked to where I just put, grabbed it by the collar at that point. I was like, okay, I have the dog.

6

309

DF:    When she brought the dog over to you did you see any sort of aggressive behavior by the dog at all?

NT:    None, not the entire time.

DF:    And you grabbed – so the dog had a collar?

NT:    The dog had a collar.

DF:    Did it have a nametag or a license?

NT:    No, it had nothing, just a collar.

DF:    And, um, when you grabbed onto the dog what did you do with it?

NT:    I held it and then figured out what we were gonna do with it and eventually put it in the backseat of my car.

DF:    And, um, at the time that the dog came over to you was Sergeant Fisher there?

NT:    Yes, I think he was standing by me, next to me, when the dog was brought over, yes.

DF:    And how far, and you said, um, obviously your police car was right there?

NT:    Yeah, we were standing right by my car.

DF:    And how far away from the actual concert venue were you?

NT:    From the stage?

DF:    Yes

NT:    Oh, gosh, I'm horrible at this. Um, 50 yards maybe?

DF:    Okay

NT:    Forty yards? It's –

DF:    Was the concert, was a band playing at that time?

NT:    Uh, I don't remember if they were playing at that exact time. They were on stage, the stage was –

DF:    Okay, was it loud?

7

310

NT: I don't remember.

DF: Did you and Sergeant Fisher have any discussion regarding the dog?

NT: Yeah, just what to do with it.

DF: And what was the decision, if any?

NT: Uh, he said he was gonna call Patrol to take it to animal control.

DF: And, uh, where's animal control?

NT: Beaumont PD.

DF: At the PD?

NT: Yeah, they have a holding area in the building right across the street but it's, there domain, yeah.

DF: Is that, uh, is that where you normally would take dogs in –

NT: Yeah

DF: -from Banning?

NT: Every time, yeah.

DF: Okay, how far away is that from the venue?

NT: Uh, from here to the police department is probably three miles, four miles.

DF: And, um, where's the park in relation to the police station?

NT: To our police station?

DF: Yes

NT: The park is north of us.

DF: Okay

NT: And about one block, uh, west.

DF: Okay, north and west of here?

NT: Uh, huh

8

311

DF:   So, um, you said that Sergeant, uh, or let me ask it this way – Did Sergeant Fisher then ultimately get on the radio and request a patrol officer?

NT:   I don't remember if he got on the radio or if he made a phone call.

DF:   Okay. Um-

NT:   Somehow he directed the request for Patrol to respond.

DF:   And did he call, do you know if he called dispatch? If in fact he used the phone would he have called dispatch or do you know?

NT:   He, yeah, I, I'm assuming he would've called directly to dispatch.

DF:   Okay, and you're not sure if this was over the radio or over the phone?

NT:   I can't remember. He was on both I think.

DF:   He was what?

NT:   On both the radio and the phone I think but I don't remember which happened first or what was said on which device.

DF:   Now prior to Sergeant Fisher contacting the station regarding the dog, um, was there, were there any other incidents going on that required police attention?

NT:   Uh, I don't know, I wasn't monitoring.

DF:   No, I'm talking about at your venue.

NT:   No

DF:   Okay, so there was no disturbances or anything –

NT:   No

DF:   -going on at the park?

NT:   No, not at all.

DF:   Had there been any that night?

NT:   No, nothing happened.

9

312

DF:   Okay, and you said at the time the dog was over there with you there were people all over?

NT:   Yeah, just people walking, people were sitting, kids were riding their skateboards and their scooters. It was just normal activity.

DF:   Now at any point after Fisher made his request did you hear Corporal Steve Hobb broadcast anything on the radio regarding Fisher's request?

NT:   I don't remember if he did or not.

DF:   You don't recall hearing anything?

NT:   I don't recall hearing anything.

DF:   Were you present when Corporal Hobb arrived at your location?

NT:   Yes

DF:   Did you witness Corporal Hobb's interaction with Sergeant Fisher?

NT:   Yes

DF:   And where were you in relation to the two of them when they were talking?

NT:   I was right next to them.

DF:   Next to both of them?

NT:   Uh, huh

DF:   So within a couple feet?

NT:   Oh, absolutely.

DF:   Could you hear their conversation?

NT:   Yes

DF:   Please describe what you heard.

NT:   Uh, it was something along the lines of, can you take the dog, our Patrol's not available. And at that point Fisher said, no, I want you to take the dog. And at some point Fisher said, I'm ordering you to take the dog and then Corporal Hobb stepped away, made a phone call, um, I'm assuming to somebody in admin regarding that, I think it was the chief, at which time he came back and said,

10

313

standby, the chief will be calling you on your phone. Um, the chief called and talked to Fisher, Sergeant Fisher stepped away and then came back and that was it and then Corporal Hobb was not gonna be, end up taking the dog so he left and I ended up transporting the dog.

DF:   When Sergeant, I'm sorry, Corporal Hobb, when he arrived at the location, did he have what's called a catchpole?

NT:   I think he brought it, I think he did bring it. We ended up with it so I assume it came from him.

DF:   Have you ever utilized that tool before?

NT:   Yes

DF:   Has it got like a, something to harness a dog, to grab onto a dog? What does it do?

NT:   Yeah, it's a long pole –

DF:   Uh, huh

NT:   –and on the end there's a, it twists –

DF:   Uh, huh

NT:   –and there's a, like a big wire wrapped in plastic sticking out the end and then it loops around this end. So when you put it on the dog's neck, you pull the wire to make it taut around the neck and then you tighten to make it so it sticks in place.

DF:   Okay, and is that something that, you said that you've used that before?

NT:   I've used it.

DF:   Okay. So at any point during the conversation between Hobb and Fisher, did you ever, uh, hear Hobb ask Fisher to turn his audio recorder on?

NT:   Yes

DF:   When, when did –

NT:   Well, no, yeah, well I asked – Corporal Hobb asked if he was recording and said, I'm turning mine on and asked me to turn mine on. Um, so yeah, that conversation came.

DF:   So Hobb asked Fisher to turn his on?

NT: I, I don't know if he asked specifically, can you turn it on, but it was like, do you, are you recording or can you -- something like that. Can you record or I'm gonna record or something like that.

DF: Now, um, you mentioned that at some point Fisher said he was, he said, I'm ordering you to take the dog?

NT: Correct

DF: And what reaction if any did Hobb have at that point?

NT: I think that's when he decided to make a phone call.

DF: Did he make any verbal response to Fisher?

NT: I don't, no.

DF: Did you hear any discussion about, um, or from Hobb about, hey, Patrol's busy or any, any conversation like that?

NT: Right in the beginning remember I told you he said something about Patrol's not available right now or something along those lines.

DF: Okay

NT: But I don't have, I didn't have my call screen up so I didn't know what he was referring to.

DF: And you said earlier that you weren't really monitoring the police radio for other activity?

NT: Well I was monitoring the radio but I was not monitoring the calls on the screen in my unit.

DF: Okay

NT: So I couldn't see if, what was pending or what officers were necessarily on.

DF: When you were monitoring the police radio did it sound like it was busy?

NT: I don't remember.

DF: So at some point you said that Hobb told Fisher, hey, he was gonna call someone and you said the chief, is that right?

12

315

NT:   Yeah, I didn't know initially it was gonna be the chief until he came back and said the chief is gonna call you on your phone right now. So then I figured, I assumed that's who he had called.

DF:   Did you ever, um, did you ever hear Hobb mention he was initially going to call Lieutenant Holder?

NT:   I don't remember him saying that.

DF:   You said earlier, you mentioned the term admin. Um, what does that mean to you here?

NT:   It's either Lieutenant Holder or the Chief Diaz.

DF:   Okay, so Holder's the only lieutenant, correct?

NT:   Correct

DF:   And then there's Chief Diaz?

NT:   Correct

DF:   Okay. How would you describe the demeanor of both Hobb and Fisher during their interaction?

NT:   Uh, it was very matter of fact.

DF:   Okay, did it sound to you like they were arguing?

NT:   No

DF:   Okay, did you hear any, um, um, discourtesy, rudeness, profanity, anything like that?

NT:   No

DF:   Okay. So, ultimately as you mentioned, um, it appeared to you that Hobb spoke to someone on the phone?

NT:   Correct

DF:   Ultimately the chief?

NT:   I believe it was.

13

316

DF:   Okay, and then he came back and told Fisher, hey, the chief's going to be calling you?

NT:   I believe that's what he said, he was gonna call.

DF:   When Hobb was on his phone call, did he step away?

NT:   Yes

DF:   Okay, and, um, and when he came back and said, and told Fisher, hey, the chief's going to be calling you, was it at that point that Fisher's phone rang?

NT:   It was almost immediate.

DF:   Okay

NT:   Correct

DF:   And when Fisher took the call, did he step away?

NT:   Yes

DF:   Did you hear any part of that conversation?

NT:   No

DF:   Did you hear any part of Hobb and presumably the chief's conversation?

NT:   No

DF:   When Hobb came back and told him that, told Fisher that the chief was going to be calling, did he make any indication to Fisher what the chief had said?

NT:   No

DF:   When Fisher came back from talking, having talked to the chief on the phone, did he say anything about his conversation with the chief?

NT:   No

DF:   And, uh, at that point I think you said that Fisher then told Hobb, uh, we'll handle it? Or what did he say?

NT:   Something along those lines.

DF:   Okay

14

317

NT:   We ended up being the ones that were going to transport.

DF:   Okay

NT:   Or I was. He ended up telling me, you need to transport this dog.

DF:   And did you do that right after that?

NT:   Um, once everything had ended and a lot of people had cleared out, yeah, then I transported the animal.

DF:   Okay, and how much time passed from the time of this whole interaction between Hobb and Fisher until the event basically dwindled out and ended?

NT:   It was ending when this happened so I would say it was probably 15, fairly quickly.

DF:   Okay

NT:   Fifteen minutes maybe? Twenty minutes?

DF:   Okay, and, uh, when you transported – so you transported the dog, um, to Beaumont?

NT:   Correct

DF:   Did anything occur with regard to the dog?

NT:   No

DF:   Did the dog give you any problems?

NT:   No

DF:   And, um, did you notice whether or not the dog appeared to be nursing?

NT:   Yeah, she looked like she had given birth had her teats, I guess they call them for dogs.

DF:   Uh, huh, okay.

NT:   Yeah, it looks like she had given birth to a litter.

DF:   Okay. Now what opinion if any did you have regarding any of the actions by Corporal Hobb during this incident?

15

**318**

NT:     Nothing, it was a pretty straightforward interaction for both parties.

DF:     How about, uh, I'll ask you the same question with regard to the action, any of the actions of Fisher?

NT:     No, it was very straightforward, matter of fact kind of interaction between the two to them.

DF:     Did you have any conversations with Hobb at any point during this incident?

NT:     Regarding this inter – I mean, we were standing there chitchatting about nothing really.

DF:     When Fisher stepped away after he received the phone call from the chief –

NT:     Yeah

DF:     -um, did you make any comment to Hobb like, this, that was awkward, or anything like that?

NT:     Probably, yeah.

DF:     Okay, why would you have said that?

NT:     Just because whenever you see a corporal and a sergeant having some conversation about maybe a difference of opinion it's, for me, it's always awkward.

DF:     Okay, so, um, so there was some, between the two of them there was some conflict? Would you say that?

NT:     Well it was clear that Corporal Hobb didn't feel that Patrol should be handling that. That was, I think, the disagreement.

DF:     Okay. Now, um, having worked those kind of events before –

NT:     Uh, huh

DF:     -did you find it unusual that Fisher asked, um, Hobb to have Patrol handle the dog situation?

NT:     You know, I didn't really have an opinion. Um, I would've done it, he made the choice to ask Patrol to do it. I was just, I wasn't that opinionated on it. Had he told me to do it, I would've done it without question.

16

319

DF:   Now are there other types of extra-duty assignments at Banning PD?

NT:   Oh, yes.

DF:   Like what?

NT:   Um, we just recently had Stagecoach Carnival. Uh, being the SRO, I have football games that I do, um, we have a homecoming parade coming up. We do Stagecoach concerts in Coachella out there, uh –

DF:   So you do mutual aid there?

NT:   Yeah

DF:   Okay

NT:   Uh, huh. They did the Stagecoach Carnival Parade that morning on the Saturday, so there's, there's events.

DF:   So, and you've worked these types of events?

NT:   Yes

DF:   Is it typical for officers working those type of events to handle incidents that occur at those events as opposed to –

NT:   Yeah

DF:   -calling Patrol.

NT:   It's not uncommon, we're there, we can handle event stuff that goes down at our event.

DF:   Is it expected that you do?

NT:   I would say, personally I would handle something that happened if I was there, yeah.

DF:   Now after this, um, after Corporal Hobb left, did you have any conversations with Sergeant Fisher about his interaction with Hobb?

NT:   No

DF:   Did he make any comment about it at all?

NT:   No

17

**320**

DF:    Did he seem angry at any point?

NT:    No

DF:    How about Hobb, did he ever seem angry?

NT:    I would say he was irritated.

DF:    In your opinion did it appear he was irritated just because of Fisher's request?

NT:    To have Patrol handle the transport?

DF:    Yeah

NT:    Yeah

DF:    Okay. Did it appear to you that Hobb had any visual reaction to Fisher ordering him to take the dog?

NT:    Um, I think he was kind of, maybe surprised, but that's my opinion. I don't know if he actually was or not.

DF:    I'm just asking you for our observation.

NT:    Yeah, I mean, when he said it he was, I can't remember if he said something back but that's when he went to make a phone call so it was clear that he didn't agree with what was happening.

DF:    So it was clear to you from the get-go that the two of them were not in agreement on this?

NT:    As soon as he came, had he just taken the dog and said we'll handle it, yeah.

DF:    Right

NT:    But then he said, we're not available so it was clear that he did not agree with the decision.

DF:    Okay. Did you make any other observations regarding the interaction between Fisher and Hobb that, other than what we've talked about?

NT:    No

DF:    Now since that time, August 20th, have you had any conversations with Fisher about that incident?

18

321

NT:     No

DF:     Any conversations with Hobb about that incident?

NT:     No

DF:     Is there anything else you'd like to add?

NT:     No

DF:     Okay, we're gonna go ahead and conclude the interview. I don't have any more questions. It is 10:35, Thursday, October 8, 2015.

To the best of my knowledge and ability, the above transcript is a true and accurate transcription of the recorded interview of Nissa Tammany by RCS Investigations and Consulting LLC, transcribed by Karyn Flutts for the Banning Police Department.

322

# EXHIBIT K

BANNING POLICE DEPARTMENT


INTERVIEW WITH
ALEJANDRO DIAZ


INTERVIEWED BY
DAVID FLUTTS


ADMINISTRATIVE INVESTIGATION
RCS #2015-045
RCS #2015-059


NOVEMBER 4, 2015 @ 9:10 AM

Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

Investigator David Flutts                 (DF)
RCS Investigations and Consulting

Alejandro Diaz                            (AD)
Chief of Police
Banning Police Department

DF:     Today's date is November 4, 2015, the time is about 9:10 a.m. My name is David
        Flutts, I'm a private investigator from RCS Investigations and Consulting. Our
        firm was retained by the City of Banning to conduct this administrative
        investigation. The investigation concerns allegations of potential misconduct
        against Sergeant Robert Fisher and Corporal Steve Hobb and resulted from an
        interaction Fisher and Hobb had on August 20, 2015. Corporal Hobb submitted an
        email complaint against Sergeant Fisher on August 21, 2015, and Sergeant Fisher
        submitted a counter-complaint against Hobb with a memorandum to Chief Diaz
        on August 24, 2015. The Banning Police Department Internal Affairs case
        numbers for these investigations are 15-06 and 15-09. The RCS case numbers are
        2015-045 and 2015-059.

        This is an interview with Chief Alex Diaz and the interview is being conducted at
        the Banning Police Department. Chief Diaz is a witness and is not the subject of
        this investigation. On behalf of the City of Banning I'm directing you to answer
        questions completely and truthfully. Do you understand this admonishment?

AD:     Yes

DF:     Please state and spell your name for the record.

AD:     First name Alejandro, A-l-e-j-a-n-d-r-o, last name Diaz, D-i-a-z.

DF:     And what is your current position?

AD:     I'm the Chief of Police.

DF:     And how long have you been in your position?

AD:     Uh, approximately a year and two months as the, uh, permanent chief.

DF:     And how long have you been employed at the department overall?

AD:     Ten years.

DF:     Did you work at an agency prior to Banning?

AD:     Yes

2

325

DF:     Where was that?

AD:     San Diego PD.

DF:     And on August 20, 2015 at approximately 9:30 p.m., did you receive a telephone call from Corporal Steve Hobb?

AD:     Yes, I did.

DF:     And did the phone call concern an issue that Hobb had with Sergeant Fisher over the handling of an incident?

AD:     Yes

DF:     Did you find it unusual at the time that Corporal Hobb called you directly regarding the situation?

AD:     ·Yeah, absolutely because, um, had there been any issues my first thought would've been that that call would've been to my lieutenant who's the second in command here at the department.

DF:     And, uh, the way the department here is structured, Lieutenant Phil Holder is the second in command?

AD:     Yes

DF:     And is he the only lieutenant?

AD:     Yes, current, yes.

DF:     And given the structure of the department, um, would Sergeant Fisher be directly under Lieutenant Hobb?

AD:     No, not, uh –

DF:     In terms of would he be supervised by, um -

AD:     Lieutenant Holder

DF:     I'm sorry, Holder, Lieutenant Holder?

AD:     Yes, yes.

DF:     Okay, and, uh, at the time of this incident Corporal Hobb was an Acting Watch Commander, is that correct?

AD:   Yes

DF:   And would he also have been under the direct supervision of Lieutenant Holder?

AD:   Yes

DF:   And would you have then expected, as you said, uh, for them to contact Lieutenant Holder first in the event of a dispute?

AD:   Yes

DF:   Okay

AD:   Chain of command.

DF:   And, um, please describe what Corporal Hobb told you about the issue he was having with Sergeant Fisher at that time.

AD:   I received the call initially and I was driving so I had to pull over. I was heading home, um, and he talked about an incident that occurred at, at, uh, the Concerts at the Park which is an event we have, we hold here in August. And the incident had to deal with a loose pit bull that was in the area where a lot of people were present. Um, and just to give you a brief background we assign officers to that venue for that concert just for crowd control and to make sure that, you know, things don't get out of hand. And the goal is for them to remain at that venue and anything, any other incidents around the vicinity are handled by patrol. So when he initially called me he, uh, he said, that, you know, that, I believe he said that he was being set up and that officer, or that Sergeant Fisher was ordering him to do something that he felt was not something that he should be dealing patrol wise. And he did mention that there was an issue of a dog and that Sergeant Fisher had an officer there with him, that that officer could be used to transport that dog to the City of Beaumont to a secured cage. And he also added that he, at that time he had no officers available, that they were busy dealing with other incidents in the city.

DF:   And as you mentioned in terms of the extra duty officers working this particular event, um, I just wanna clarify that your expectation would be that they were to handle incidents at that actual venue but that anything surrounding that area would be typically handled by patrol?

AD:   Yes

DF:   And, uh, was it your understanding from your phone call with Hobb that the situation involved the removal of a dog to another location?

AD:   Correct

DF:   And is that location located in the City of Beaumont?

AD:   Yes, it is.

DF:   And is that the typical and only place Banning Police Officers take dogs?

AD:   We contract with Beaumont for animal services, however, they don't respond at night.

DF:   Okay

AD:   So if there's ever an issue dealing with a dog then our officers would coral that dog, use the catch pole, and then transport that dog to their holding kennels in Beaumont.

DF:   Okay, and the holding kennels are they located near the police department, do you know?

AD:   I believe they are.

DF:   Okay. And so as you mentioned Corporal Hobb indicated to you that at the time of this incident there were no patrol officers available?

AD:   Yes

DF:   And did he say that they were in essence busy with radio calls?

AD:   Yeah, they were handling calls in the city at that time.

DF:   Okay, and did Hobb suggest to you or was it his opinion from what he told you on the phone call that Fisher and the other officers should've handled this dog situation?

AD:   Yeah, based on the fact that he had no one available, said that it was more feasible to use the other officer that was there covering that event than to have to use patrol.

DF:   And was that Officer Tammany, do you know?

AD:   I believe it was her, yes.

DF:   Okay. Now after speaking to Hobb what if any conclusions did you make regarding how the incident should be handled?

5

328

AD:   Well after I spoke to him I believe he handed the phone to Sergeant Fisher and then Sergeant Fisher told me that, you know, they were dealing with this issue, they're dealing with a crowd and that he contacted dispatch to let them know that if they could send an officer over to deal with the dog and transport it to Beaumont. And he said that there were officers available to handle that call but for whatever reason they were cancelled and Corporal Hobb responded instead.

DF:   Okay

AD:   Based on the information and not knowing, not being there, I told – and believing that Corporal Hobb didn't have anyone available, then I just asked Sergeant Fisher, you know what, just do what you have to do, get that dog out of there, get it secured, have your officer, the officer assigned there – even though my preference would've been to leave the officer there because we're paying that officer overtime –

DF:   Right

AD:   -to be at that facility, to just handle it. So they ended up handling it and, uh, the only thing I asked Sergeant Fisher was, just write me a memo indicating what happened and there was, they were recording. So there was, I don't know if Hobb or Fisher, one of them was recording the whole incident.

DF:   So after your phone calls with both Hobb and Fisher you, um, would it be accurate to say that you just basically told him, hey – told Fisher, just basically go ahead and handle this dog situation and then write me a memo as to –

AD:   Yes

DF:   -as to what his observations about what occurred?

AD:   Yes

DF:   At any point during your phone calls did either Hobb or Fisher say anything to you about, uh, Fisher giving Hobb direct orders to handle this dog situation?

AD:   Yeah, both of them did.

DF:   So they both acknowledged that?

AD:   Yeah, Hobb told me that, well, Fisher's ordering me to handle this incident and then when I spoke to Fisher when he handed the phone to Fisher, Fisher said, I ordered him to do this and he never answered me. And he said, well, I'm gonna call Lieutenant Holder. And then he said well, I'm just gonna call the chief directly.

6

**329**

DF:    When Corporal Hobb first contacted you did he say anything to you as to why he was calling you directly instead of Lieutenant Holder?

AD:    No, no, no.

DF:    And did you ask him why he was calling you?

AD:    I didn't.

DF:    Okay

AD:    I should have but I never did. I just, I, I was tired, I was driving home and there was an incident, I just wanted it dealt with.

DF:    Okay, and so at the conclusion of your phone call with Sergeant Fisher you directed him to write a memo?

AD:    Yes

DF:    Okay, and, uh, at any point during your phone call with Corporal Hobb did he ever indicate to you that he was, uh, he had the intention of filing a complaint against Fisher?

AD:    No, no. I found out afterwards that he sent an email to – no, actually he responded to me – I sent him a text from my work phone.

DF:    Sent Holder?

AD:    No, uh –

DF:    I'm sorry, Hobb.

AD:    Hobb. When I got home I sent him a text asking him, is everything taken care of? And he responded, yes. But he also responded that he felt that he was being targeted by Sergeant Fisher. I didn't respond to that and then I found out from Lieutenant Holder that he sent him an email basically complaining about Sergeant Fisher targeting him and ordering him to do something.

DF:    Okay, so when you got home you sent Hobb a text, was that to his cellphone?

AD:    Yeah

DF:    Okay, and, um, now you mentioned it just now and you also mentioned it earlier, did Hobb at some point mention to you that he felt like he was being set up somehow?

AD:   I believe he mentioned it initially when he called me that he thought he was being set up.

DF:   And —

AD:   I didn't really delve into that too much because then he started explaining to me what was happening.

DF:   Okay. At any point did Fisher ever say anything to you that he thought he was being set up?

AD:   No

DF:   Okay. Now, uh, after your text message that night did you have any further direct involvement with anything to do with that incident that evening?

AD:   No, no, that was the end of that.

DF:   And, um, after the incident did you take any action related to the actions of either Corporal Hobb or Sergeant Fisher?

AD:   No, it wasn't until I was contacted by Lieutenant Holder and he told me that Corporal Hobb had filed a complaint —

DF:   Okay

AD:   -via email.

DF:   And, uh, that was my next question — So in essence at some point you became aware that Corporal Hobb submitted this email complaint to Lieutenant Holder?

AD:   Yeah, I believe it was the following Monday.

DF:   Okay

AD:   Or, I'm sorry, the following Tuesday.

DF:   Alright. At some point was it decided to conduct a formal investigation into the actions of Sergeant Fisher?

AD:   Yeah

DF:   How did that decision come about?

8

331

AD: It was based on that email. Since Corporal Hobb did file a formal complaint against Sergeant Fisher then I directed Lieutenant Holder to go ahead and pull a case number for it.

DF: Okay. Now at any point after that did you speak to either Hobb or Fisher directly about the incident?

AD: No, it wasn't until Fisher provided me the memo.

DF: Okay, and as we've discussed, on or about August 24th, did Sergeant Fisher submit a memorandum to you?

AD: Yes

DF: And I'm gonna show you a copy and for the record this is a memorandum dated August 24, 2015, to Chief Diaz from Sergeant Fisher and it appears to be a two-page memo with a CAD incident report attached. I'm gonna ask you to look at that and just verify if you would that that appears to be a true copy of the memorandum that Fisher submitted to you.

AD: Correct, that is.

DF: Okay, and as I mentioned, uh, in his memorandum or with his memorandum Fisher also submitted the CAD incident report?

AD: Yes

DF: Okay, and from the memorandum did you in essence get, Fisher's version was that, uh, at the time there were officers available and in fact one had actually been dispatched?

AD: Yes

DF: Okay

AD: And that's, you know, once I, once I reviewed the CAD incident report I realized that not only were there officers available but one was actually on his way to handle the call.

DF: And, uh, at some point in the memorandum did Fisher also indicate that when he returned to the station that evening he checked with dispatch and discovered that at the time of the incident there were not any calls holding?

AD: Yes

9

332

DF: Okay, and when Fisher submitted that memo did you actually speak to him directly or did he just submit the memo to you?

AD: No, he just handed me the memo.

DF: Okay, did you have any conversation at that point?

AD: I don't think we did.

DF: Okay

AD: As a matter of fact I think he, I think he put the memo under, under my door.

DF: Okay. At any point after he submitted the memo did you have any conversations with Sergeant Fisher about the incident?

AD: No, because at that point we knew that we were doing an internal affairs investigation.

DF: Okay. At any point after you received Sergeant Fisher's memo did you speak to Corporal Hobb about the incident?

AD: No

DF: At any point prior to receiving Sergeant Fisher's memo did you speak to Corporal Hobb about his complaint against Fisher?

AD: No

DF: Now after receiving Sergeant Fisher's memo did you take any action related to either Hobb or Fisher?

AD: Other than having Lieutenant Holder pull a case number.

DF: Okay, so you had no, you took no action against them, you had no conversations with them?

AD: No, no.

DF: Okay, and as you said at some point after receiving Fisher's memo it was decided to conduct a formal investigation?

AD: Correct

DF: And how did that decision come about?

AD:    Well actually the initial on Fisher?

DF:    No, I'm sorry, after you received his, Fisher's memo with in essence the counter-
complaint against Hobb –

AD:    Uh, huh

DF:    It was decided to conduct an investigation?

AD:    Yes

DF:    Okay

AD:    But that wasn't till maybe a couple of weeks after the fact.

DF:    Okay, and at some point, uh, today's November 4th, uh, last week sometime you
provided that memorandum to me, is that correct?

AD:    Yes

DF:    Okay. Is there anything else you'd like to add or is there anything else that we
have not covered about your involvement with this situation?

AD:    No, that's about it.

DF:    Okay, I don't have any further questions at this point. We're gonna go ahead and
conclude the interview, it's about 9:30 p.m., Wednesday, November 4, 2015.

334

To the best of my knowledge and ability, the above transcript is a true and accurate transcription of the recorded interview of Alejandro Diaz by RCS Investigations and Consulting LLC, transcribed by Karyn Flutts for the Banning Police Department.

335

# EXHIBIT L

BANNING POLICE DEPARTMENT


INTERVIEW WITH
STEVE HOBB


INTERVIEWED BY
DAVID FLUTTS


ADMINISTRATIVE INVESTIGATION
RCS #2015-045


NOVEMBER 23, 2015 @ 10:50 AM


Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

Investigator David Flutts                    (DF)
RCS Investigations and Consulting

Steve Hobb                                   (SH)
Police Corporal
Banning Police Department

Robert Baumann                               (RB)
Attorney/Representative for Steve Hobb

DF:   Today's date is Monday, November 23, 2015, the time about 10:50 a.m. This
      interview is being conducted at Banning City Hall. My name is David Flutts, I'm
      a private investigator from RCS Investigations retained on behalf of the City of
      Banning to conduct this investigation. I'm the authorized designee assigned to
      investigate this matter. Corporal Steve Hobb, his attorney Robert Baumann, and I
      are the only persons present during this interview. Mr. Baumann, can you identify
      yourself please?

RB:   Yes. Robert Bauman, B-a-u-m-a-n-n, representative of Corporal Hobb.

DF:   Thank you. The City of Banning is conducting an administrative investigation
      into allegations that Corporal Hobb failed to follow orders from a supervisor and
      violated the department's chain of command during an interaction with Sergeant
      Robert Fisher on August 20, 2015. There are two RCS case numbers for these
      investigations, 2015-045 and 2015-059. There are also two Banning Police
      Department IA numbers, they are 15-06 and 15-09. And based on the
      circumstances you are deemed both a witness and a subject employee. On
      September 23, 2015, you provided a statement to me regarding the complaint you
      made against Sergeant Fisher concerning this matter, is that correct?

SH:   Yes

DF:   At the time of your statement I was unaware that Sergeant Fisher had submitted a
      memo of complaint against you concerning this matter, as such, you were only
      interviewed as a witness employee. Because of the counter complaint filed by
      Fisher you are also considered a subject employee as I stated earlier. Do you
      understand that?

SH:   Yes

DF:   Okay. I've been authorized to communicate an order from Chief Alex Diaz that
      you are admonished to answer all questions asked of you completely and that all
      of your answers are to be truthful. Knowingly making false or misleading
      statements will be considered a separate violation that could result in discipline up
      to and including dismissal. Do you understand?

2

338

SH:     Yes

DF:     Now, do you understand all the rights afforded to you pursuant to the government code are in effect for this interview?

SH:     Yes

DF:     Do you waive the reading of those provisions?

SH:     Yes

DF:     And, uh, okay, do you recall the statement you provided on September 23rd to me about your complaint against Sergeant Fisher?

SH:     Yes

DF:     And, uh, with regard to your statement is there anything you wish to change or add?

SH:     No

DF:     Now I just want to clarify a couple short points, um, I just want to confirm with you. You said previously that at the time Sergeant Fisher requested a patrol unit all the patrol officers were busy on calls, is that correct?

SH:     Yes

DF:     And, um, you also told me that you could not recall specifically whether or not there were any pending calls holding, is that also correct?

SH:     To my recollection they were all busy and there was no calls, there was calls – I don't know if there was calls pending.

DF:     In other words – yeah, that, that was my question.

SH:     Yeah

DF:     And you told me, and you were in the station I believe at the time, and you have a, the ability to see if there were, there are calls that are holding and you said you couldn't recall specifically?

SH:     I didn't recall that. I know when I looked at that time, all the officers were busy.

DF:     Okay, and were you aware that Officer Brandon Smith was initially sent by dispatch to the call?

3

SH:    No

DF:    Okay, and do you recall whether or not you cancelled Officer Smith when you decided to respond to the park?

SH:    I don't recall me doing that.

DF:    Okay, and, um, you got to the park, you had your interaction with Sergeant Fisher, um, and at some point you eventually spoke to Chief Diaz while you were still at the park, is that right?

SH:    Yes

DF:    And, um, can you just summarize briefly if you could what you told Chief Diaz about the situation?

SH:    Um-

RB:    Just do the best of your recollection.

SH:    Okay, yeah, the best of my recollection I told him that, uh, Sergeant Fisher was working an overtime spot there at the, at the Concert in the Park, that he called for patrol to handle a call there, uh, a dog, about a dog being, that needed to go to ACO. I told Chief Diaz that, um, the dog wasn't vicious and I didn't see a reason why patrol had to take the dog when he had, when Sergeant Fisher had himself plus Officer Tammany and four volunteers that could've took this dog over to Beaumont. I told him that it wasn't patrol's responsibility and that we were busy on other calls.

DF:    And, uh, after speaking to Chief Diaz was it your opinion that he in essence agreed with your point of view?

SH:    Yes, cause he told me that he would handle it.

DF:    Okay, and then shortly thereafter Chief Diaz called Sergeant Fisher, correct?

SH:    Yes

DF:    And, uh, after the phone call between Fisher and Chief Diaz it was eventually decided that Sergeant Fisher and or Officer Tammany would take care of the stray dog?

SH:    Uh, yeah, he just told me that I could leave.

DF:    Okay

SH:    Sergeant Fisher did.

4

340

DF:     Now with regard specifically to your interaction with Fisher did you intentionally violate the department's chain of command when you contacted Chief Diaz to resolve the dispute?

SH:     No

DF:     And, um, final question that I have — Please describe why you decided not to follow the order by Sergeant Fisher to have a patrol officer handle the stray dog.

SH:     Sergeant Fisher didn't, well, he ordered me to do it.

DF:     Okay

SH:     And I told him I would but I was gonna call the lieutenant first and then I said, no, I'm gonna call the chief and then I called the chief and the chief told me, the chief agreed with me and told me that, um, he would talk to Fisher.

DF:     So Fisher never ordered you to get a patrol officer, he in essence —

SH:     He ordered me.

DF:     -ordered you to take the dog?

SH:     Yes

DF:     Okay. And as you've already explained, you didn't believe that was appropriate given the circumstances, the fact that there were not only two officers at the park, there were also volunteers there and that the patrol officers under your supervision that night were busy on calls?

SH:     Yes

DF:     Okay. Is there anything else you'd like to add?

SH:     No

DF:     Okay, Mr. Baumann?

RB:     No

DF:     Okay, we're gonna go ahead and conclude the interview, it's 10:55 a.m.

To the best of my knowledge and ability, the above transcript is a true and accurate transcription of the recorded interview of Steve Hobb by RCS Investigations and Consulting LLC, transcribed by Karyn Flutts for the Banning Police Department.

# EXHIBIT M

BANNING POLICE DEPARTMENT

INTERVIEW WITH
ROBERT FISHER

INTERVIEWED BY
DAVID FLUTTS

ADMINISTRATIVE INVESTIGATION
RCS #2015-045

NOVEMBER 23, 2015 @ 2:10 PM

Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

343

Investigator David Flutts                    (DF)
RCS Investigations and Consulting

Robert Fisher                                (RF)
Police Sergeant
Banning Police Department

DF:   Today's date is November 23, 2015, the time is 2:10 p.m. This interview is being conducted at Banning City Hall. My name is David Flutts, I'm a private investigator from RCS Investigations retained on behalf of the City of Banning to conduct this investigation. I am the authorized designee assigned to investigate this matter. Sergeant Robert Fisher and I are the only persons present during this interview. The City of Banning is conducting an administrative investigation into allegations that Sergeant Fisher issued an improper order to Corporal Steve Hobb, exercised disparate order over Hobb, and demonstrated a pattern of harassment and retaliation against Hobb. The actions alleged occurred on August 20, 2015, during an interaction between Fisher and Hobb. This interview is also related to another administrative investigation which resulted from a memo submitted by Sergeant Fisher to Chief Alex Diaz concerning the same interaction between Fisher and Corporal Hobb. There are two case numbers for these two investigations, the RCS case numbers are 2015-045 and 2015-059. The Banning PD Internal Affairs case numbers are 15-06 and 15-09.

      Based on the circumstances of these investigations you are deemed both a witness and subject employee. I have been authorized to communicate an order from Chief Diaz that you are admonished to answer all questions asked of you completely and that all of your answers are to be truthful. Knowingly making false or misleading statements during this interview will be considered a separate violation that could result in discipline up to and including dismissal. Do you understand?

RF:   Yes

DF:   Do you understand all of the rights afforded to you pursuant to the government code are in effect for this interview?

RF:   Yes

DF:   Do you waive the reading of those provisions?

RF:   Yes

DF:   As the authorized designee of Chief Diaz I am directing you to answer questions completely and truthfully. Do you understand?

2

344

RF:    Yes

DF:    On August 20, 2015, were you assigned an extra duty event at the Concerts at the
       Park event?

RF:    Yes

DF:    And was that at a park in Banning?

RF:    Yes

DF:    What's the name of the park?

RF:    Repplier Park.

DF:    Repplier?

RF:    Yes

DF:    Okay, for the record, for the transcriber it's R-e-p-p-l-i-e-r?  Is that correct?

RF:    That's correct, yes.

DF:    And did you voluntarily work this assignment?

RF:    Yes

DF:    And what were the scheduled hours of the assignment?

RF:    Um, 7:00 to 10:00 I believe.

DF:    7:00 to 10:00 p.m.?

RF:    Yes

DF:    And were you assigned to the event with Officer Tammany?

RF:    Yes

DF:    Were any department volunteers or reserve officers assigned to work the event?

RF:    Yes

DF:    Do you, can you recall how many?

RF:    No

3

345

DF:     More than one? One?

RF:     More than one volunteer was there.

DF:     And how about reserve officers?

RF:     I don't believe any reserves were there.

DF:     So there were two or more volunteers?

RF:     Could've been.

DF:     Were you the supervisor at the event?

RF:     Yes

DF:     You don't recall how many people were there?

RF:     That was back in August, no, I don't recall.

DF:     Were you the only supervisor at the event?

RF:     Yes

DF:     What are the expectations of officers working extra duty events with regard to handling incidents at the actual location or venue?

RF:     Uh, crowd control, um, uh, unruly guests and, um, concert goers.

DF:     So are officers expected to handle whatever events occur at the location if they can?

RF:     If they can.

DF:     Toward the end of the event were you made aware of an apparent stray dog that was at the venue?

RF:     Yes, I was.

DF:     How did that come to your attention?

RF:     Well, one of the volunteers brought it up to me.

DF:     Physically brought the dog?

RF:     Yeah, they were pulling the dog.

DF:     And what did they say?

RF:     This, uh, stray pit bull was wandering around in the crowd.

DF:     Do you recall which volunteer that was?

RF:     It was a female, I don't recall her name.

DF:     And the volunteer, was, was the dog, I mean, how was she bringing it? Was the dog on a leash or how was she-?

RF:     She was pulling it by the collar.

DF:     Okay. Did you eventually contact dispatch and request a patrol officer to come to the location?

RF:     Yes, I did.

DF:     And per your normal practices at Banning PD would that require the officer to take the dog to a facility in Beaumont?

RF:     That's correct.

DF:     How far away from the park is that facility?

RF:     Uh, I don't know, three or four miles.

DF:     And, um, was Officer Brandon Smith initially dispatched to the call?

RF:     I believe he was.

DF:     Did Corporal Steve Hobb then cancel the response of Officer Smith?

RF:     Yes, he did.

DF:     And did Corporal Hobb do that over the radio?

RF:     Um, yeah, he mentioned something to the effect of there's two units at the concert, over the radio.

DF:     That was verbally over the air?

RF:     Yes

DF:   What if anything did you do at that point?

RF:   Um, I remember calling dispatch and saying to the effect, when there's, when there's officers free, when there's no calls pending, have somebody respond to the park.

DF:   And did Corporal Hobb eventually respond to your location?

RF:   He did.

DF:   Did you interact with him when he arrived?

RF:   He did, yes.

DF:   You did?

RF:   I did.

DF:   And please describe that contact.

RF:   Uh, he got out of the car and, and said something to the effect about, well you, you guys have two people here and I only have three people, uh, working the street.

DF:   What else?

RF:   Oh, he, uh, he didn't want to take the dog over to the, um, the kennel.

DF:   Okay, and at some point did you give him an order to transport the dog to Beaumont?

RF:   I did.

DF:   And what if any response did Corporal Hobb have to that order?

RF:   He said he was gonna contact the lieutenant and then he said, no, I'm gonna contact the chief and, uh, he asked that a recorder be activated.

DF:   And during your conversation with Corporal Hobb was Officer Tammany present?

RF:   She was.

DF:   And you've already answered this but at some point Corporal Hobb in fact asked you to activate your audio recorder?

6

348

RF:   That's correct.

DF:   Did you?

RF:   I did.

DF:   And, uh, you said that Hobb initially said he was gonna call Lieutenant Holder?

RF:   He said he was gonna call the lieutenant and then he changed his mind and said, I'm gonna call the chief.

DF:   Okay, and did he eventually call Chief Diaz?

RF:   He did.

DF:   And did, uh, were you present during that conversation?

RF:   I could not overhear what he saying to him cause he had distanced himself between me-

DF:   So he stepped away?

RF:   He did.

DF:   And, um, did you subsequently receive a phone call from Chief Diaz?

RF:   I did.

DF:   And what was the content of that phone call?

RF:   He told me to go ahead and, uh, deal with the dog myself.

DF:   Was there any other discussion?

RF:   He said he'd deal with it later.

DF:   Deal with what later?

RF:   Hobb

DF:   He said that?

RF:   Yes

DF:   Did he give any specifics as to what he meant by that?

7

**349**

RF: No, he just said he'd, he'd take care of it later.

DF: So he in essence directed you to take care of the dog in whatever manner you needed to?

RF: That's correct.

DF: And what did you do at that point?

RF: Uh, we, the dog was in the back, we waited awhile till the concert started, the crowd started thinning out and I told Officer Tammany to go ahead and drop me off at the station and you can take the dog to Beaumont.

DF: And so, um, the, during that time the dog was, what, sitting in the car? The backseat of the car?

RF: Yes

DF: Of the patrol car?

RF: Yes

DF: And you said at that point, uh, the concert was nearing, uh, almost finished?

RF: That's correct.

DF: And Tammany dropped you off and then took the dog to Beaumont?

RF: Yes

DF: And, uh, how far away is the station from the park?

RF: Oh, half mile, three quarters of a mile.

DF: When you were at the station did you contact dispatch?

RF: I did.

DF: For what purpose?

RF: I asked the dispatcher how many calls were pending when Hobb arrived at the park.

DF: Okay, and what were you told if anything?

RF: I was told there was no calls pending.

8

350

DF:   And did anyone, were you speaking to a dispatcher?

RF:   Yes

DF:   And, um, do you recall which dispatcher?

RF:   I do not.

DF:   And were you shown any sort of printout or document or was this just verbal?

RF:   It was just verbal.

DF:   What concerns did you have with the actions of Corporal Hobb during your interaction with him?

RF:   Well he lied to me, he lied to the chief.

DF:   Anything else?

RF:   No

DF:   Lied to you in what, with regard to what?

RF:   Well I knew that they weren't busy, I knew there was no calls pending and I'm making a logical presumption that he told the chief over the phone that he was busy and that's why they couldn't take the dog when in fact there was no calls pending.

DF:   Regarding the dog, uh, did you ever receive any information that the dog was vicious or posed any sort of safety concerns?

RF:   Uh, my concern was that it was a pit bull and through my training and experience I know that a pit bull can be unpredictable.

DF:   And, uh, you said that the volunteer initially was handling the dog, did Officer Tammany handle the dog in any way?

RF:   Oh, she had to have to get the dog out of the car and into the facility at Beaumont.

DF:   Or prior to that when you were there present making observations, did Officer Tammany pet the dog, did she handle the dog in any way?

RF:   I don't recall, she could have.

DF:   Did you observe any members of the public interacting with the dog?

9

351

RF:   I did not.

DF:   Prior to requesting a patrol officer and prior to ordering Corporal Hobb to transport the dog, did you consider any other alternatives to resolving the situation?

RF:   Hmm, no.

DF:   Did you have any concerns with removing officers from patrol to handle the dog and transport it to Beaumont?

RF:   No, that's why I asked if there was any calls pending and since there was no calls pending I figured that would be okay.

DF:   Did you believe your orders to Corporal Hobb were lawful and legitimate under the circumstances?

RF:   Yes, they were.

DF:   Were your orders to Corporal Hobb an attempt to harass or intimidate him in any way?

RF:   They were not.

DF:   Were your orders to Corporal Hobb the result of previous problems or negative interactions you have had with him?

RF:   They were not.

DF:   Were your orders to Corporal Hobb in any way related to a verbal notice of counseling he gave you when he supervised you in 2014?

RF:   They were not.

DF:   Did you write a memorandum to Chief Diaz which documented your observations of the interaction with Corporal Hobb?

RF:   Yes, I did.

DF:   And did you write that memorandum at the direction of Chief Diaz?

RF:   I believe so, yeah.

DF:   I'm gonna show you a copy of, um, and ask you to take a look at this and for the record, this is dated August 24, 2015, to Chief Diaz from Sergeant Fisher. I'm just

352

gonna ask you to take a look and verify that that's a true copy of your memorandum.

RF:    Yes

DF:    And did you include the CAD incident report with your memorandum?

RF:    I believe so.

DF:    Alright, do you have anything else you'd like to add?

RF:    Nope

DF:    We're gonna go ahead and conclude the interview. It is 2:20 p.m., Monday, November 23, 2015.

353

To the best of my knowledge and ability, the above transcript is a true and accurate transcription of the recorded interview of Robert Fisher by RCS Investigations and Consulting LLC, transcribed by Karyn Flutts for the Banning Police Department.

12

354

# EXHIBIT N

Banning PD - IA # 15-06; IA # 15-09
December 13, 2015 (Exhibit N)

# DVD

| Name | Date modified | Type | Size |
|------|---------------|------|------|
| ▲ Files Currently on the Disc (6) | | | |
| 2015-045 Hobb Steve Banning PD 092315 - Copy | 9/23/2015 1:37 PM | Windows Media Au... | 7,520 KB |
| 2015-045 Hobb Steve Banning PD 092315 | 9/23/2015 1:37 PM | Windows Media Au... | 7,520 KB |
| 2015-045 Tammany Nissa Banning PD 100815 - Copy | 10/8/2015 10:35 AM | Windows Media Au... | 20,987 KB |
| 2015-045 Tammany Nissa Banning PD 100815 | 10/8/2015 10:35 AM | Windows Media Au... | 20,987 KB |
| Fisher Hobb Recording - Copy | 9/24/2015 8:06 AM | Windows Media Au... | 9,938 KB |
| Fisher Hobb Recording | 9/24/2015 8:06 AM | Windows Media Au... | 9,938 KB |



Banning PD - IA # 15-06; IA # 15-09
December 13, 2015 (Exhibit N)

Banning PD - IA # 15-06; IA # 15-09
December 13, 2015