1  Geoffrey S. Sheldon, Bar No. 185560
   gsheldon@lcwlegal.com
2  Joung H. Yim, Bar No. 216136
   jyim@lcwlegal.com
3  LIEBERT CASSIDY WHITMORE
   A Professional Law Corporation
4  6033 West Century Boulevard, 5th Floor
   Los Angeles, California 90045
5  Telephone:  310.981.2000
   Facsimile:   310.337.0837
6
7  Attorneys for Defendant ALEX DIAZ

8                    UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

10

11 STEVE HOBB,                          Case No.:  5:16-cv-01352 AB (JCx)

12              Plaintiff,              Complaint Filed: June 23, 2016
                                        FAC Filed: August 8, 2016
13      v.
                                        **DEFENDANT ALEX DIAZ'S**
14 CITY OF BANNING, a public            **APPENDIX OF EVIDENCE IN**
   and/or municipal corporation;        **SUPPORT OF ITS MOTION FOR**
15 BANNING POLICE                       **SUMMARY JUDGMENT OR, IN THE**
   DEPARTMENT, a public agency          **ALTERNATIVE, SUMMARY**
16 and/or municipal corporation; ALEX   **ADJUDICATION OF ISSUES**
   DIAZ, individually and as Police     **(VOLUME 4 OF 4 – EXHIBITS 10**
17 Chief; DON PETERSON,                  **THROUGH 17)**
   individually; and DOES 1
18 THROUGH 10,

19              Defendants.             Trial Date:        January 16, 2018
                                        Final Pretrial Conf.: December 18, 2017
20                                      Discovery Cut-Off:  August 18, 2017

21                                      Date:        September 22, 2017
                                        Time:        10:00 a.m.
22                                      Courtroom:  7B

23

24

25

26

27

28

8259397.1 BA060-035

# EXHIBIT 10

# ADMINISTRATIVE INVESTIGATION

# PREPARED FOR THE BANNING POLICE

# DEPARTMENT

## IA # 15-08

### December 12, 2015

DAVID FLUTTS
RCS INVESTIGATIONS AND CONSULTING LLC
P.O. BOX 29798
ANAHEIM HILLS, CALIFORNIA 92809-9798
WWW.RCSINVESTIGATIONS.COM
714-779-2300

357

# TABLE OF CONTENTS

SECTION 1..........SUMMARY

SECTION 2..........CONCLUSIONS AND FINDINGS

SECTION 3..........EXHIBITS

Exhibit A......................Banning Police Department Policy Manual sections

Exhibit B......................Sergeant Vincent Avila complaint documents

Exhibit C......................Puma Audit Log Report

Exhibit D......................Sergeant Avila Administrative Investigation Witness Notice

Exhibit E......................Corporal Hobb Internal Affairs Investigation Notices

Exhibit F......................Corporal Hobb Administrative Leave notices

Exhibit G......................Sergeant Avila interview transcript

Exhibit H......................Corporal Hobb interview transcript

Exhibit I......................Compact disk containing audio recordings of witness and subject
                             employee interviews

358

# SECTION 1

# INTRODUCTION AND SUMMARY

# SECTION 1

## INTRODUCTION

RCS Investigations and Consulting was retained by the City of Banning to conduct an administrative investigation regarding allegations of potential misconduct against Corporal Steve Hobb. The investigation was initiated after Sergeant Vincent Avila filed a complaint against Hobb with the Banning Human Resources Department on September 15, 2015.

Sergeant Avila alleged Corporal Hobb disclosed confidential information related to a personnel investigation and discipline that Avila received in 2015. The disclosure by Hobb was made in an e-mail that was sent to members of the Banning Police Officers Association [BPOA] on September 14, 2015.

Sergeant Avila also alleged that Corporal Hobb attempted to create problems related to an on-duty injury that Hobb suffered on May 28, 2015.  Avila stated in his complaint that Hobb mentioned the injury; however, never followed up with him. Avila alleged that Hobb subsequently contacted the Human Resources Department about his injury. As a result, the Human Resources Department contacted Avila on July 7, 2015, and asked why the required documents respective to Hobb's injury were not completed.  In essence, Avila inferred that Hobb purposely did not follow-up with him about the injury and instead directly notified the Human Resources Department.

Finally, Sergeant Avila alleged during a Banning Police Officers Association meeting on September 23, 2015, that Corporal Hobb discussed Avila's personnel investigation and subsequent discipline. Avila further stated during the meeting that Hobb acknowledged reviewing audio recordings related to the investigation. Avila stated Hobb was not authorized to review the recordings and was not assigned to investigate the complaint and therefore violated Department policy and his right to confidentiality.

In his complaint, Sergeant Avila stated Corporal Hobb was "out" for him and that he was being targeted, harassed and he was in fear for his safety, because of Hobb's temper and past treatment of other Banning police officers.

Based on the content of Sergeant Avila's complaint, RCS Investigators deemed Corporal Hobb a subject employee and identified the following allegations of misconduct:

**Allegation "1"**– It was alleged that Corporal Hobb demonstrated unbecoming conduct and violated policy when he disclosed confidential personnel information about Sergeant Avila in e-mails to members of the Banning Police Officer's Association and during a meeting in September 2015.

**Allegation "2"** – It was alleged on June 5, 2015, that Corporal Hobb reviewed audio recordings of an incident involving Sergeant Avila when he was not assigned to investigate the matter, or authorized to do so.

**Allegation "3"** - It was alleged that Corporal Hobb engaged in harassing and retaliatory conduct towards Sergeant Avila related to injury claim[s] filed by Hobb between May and July 2015.

RCS Investigations and Consulting was retained to conduct a neutral and fair investigation on behalf of the City of Banning regarding allegations of misconduct against Corporal Hobb. Various documents were reviewed including policy sections, memorandums and e-mails. Interviews were also conducted as part of the work product of the investigation.

## SUMMARY

The Banning Police Department has policies in place which were established in-part, as an equitable and uniform procedure for dealing with personnel matters. RCS Investigators reviewed and considered the following *Banning Police Department Policy Manual* sections as part of the work product of the investigation:

### 338.3.2 CONDUCT

[k] - Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department.

### 338.3.5 PERFORMANCE

[g] - Disparaging remarks or conduct concerning duly constituted authority to the extent that such conduct disrupts the efficiency of the Department or subverts the good order, efficiency and discipline of the Department or which would tend to discredit any member thereof.

[h] - Knowingly making false, misleading or malicious statements that are reasonably calculated to harm or destroy the reputation, authority or official standing of the Department or members thereof.

[z] - Violating any misdemeanor or felony statute.

[aa] -Any other on-duty or off-duty conduct which any employee knows or reasonably should know is unbecoming a member of the Department or which is contrary to good order, efficiency or morale, or which tends to reflect unfavorably upon the Department or its members.

### 338.3.7 SECURITY

[a] - Unauthorized, intentional release of designated confidential information, materials, data, forms or reports.

### 450.9 REVIEW OF RECORDED MEDIA FILES

When preparing written reports, members should review their recordings as a resource. However, members should not use the fact that a recording was made as a reason to write a less detailed report. Supervisors are authorized to review relevant recordings any time they are investigating alleged misconduct, reports of meritorious conduct or whenever such recordings would be beneficial in reviewing the member's performance.

Recorded files may also be reviewed:

[a] - Upon approval by a supervisor, by any member of the Department who is participating in an official investigation, such as a personnel complaint, administrative investigation or criminal investigation.

The Banning Police Department Policy Manual sections are included as **Exhibit "A"** in this report.

RCS Investigators reviewed the complaints submitted by Sergeant Avila to the Banning Human Resources Department. The first document submitted on September 15, 2015, included the following verbatim information and referenced the e-mail sent by Corporal Hobb:

*I [Vincent Avila] would like to file a complaint against Steve Hobb for the email that was sent out yesterday on [09-14-2014] to Banning Police Officers on their personal email that was sent by using the BPOA [Banning Police Officers Association] email.*

*Yesterday, I received a telephone call from Steve Hobb at approximately 11:39 am, on my personal cellphone. Steve Hobb asked me if the Chief [Alex Diaz] handled the compliant that was filed against me. I told Steve Hobb, I received a written reprimand for the incident by Chief Diaz. I did not tell Steve Hobb, what findings nor explanation why I was given a written reprimand for the incident and my conversation ended with Steve Hobb.*

*At approximately 2:44 pm, I along with other Banning Police Officers received the email listed below. I believe the email was sent by Steve Hobb because he was the only one who had knowledge and gave the compliant form to Chief Diaz that is said in the email listed below.*

*I talked to the Board Members of the BPOA and they [3] told me they did not know about the email that was sent out nor did they write the email. Because of the email that was sent out regarding my compliant that was filed against me, I believe this will harm, destroy and discredit the reputation as an authority figure for this department. Disciplinary matters should not be exposed to other personnel on the outcomes for findings of the complaints.*

*Back on May 28, 2015, Steve Hobb informed me that he hurt his arm with a drunk guy and he was going to let me know about filling out paperwork regarding the injury, which he never did.*

*On July 7, 2015, I received an email from Joni Miller [Human Resources] regarding Steve Hobb filling 2 injury claims. I was asked by Human Resources why I didn't fill out paperwork on Steve Hobb reference his injury. I told Human Resources that Steve Hobb did inform me about the 1 injury and he was going to let me know about filling out a claim but he never did. I told Human Resources, Steve Hobb was not on my shift and that he supervised a nightshift and that Lt. Holder is his immediate supervisor. I have attached the email that was sent by Joni Miller to me and a Rims message from Steve Hobb that was sent to me. I believe Steve Hobb was trying to get me in trouble or get me demoted reference this incident.*

*Steve Hobb is known to intimidate, bully and even assault Banning Police Officers in the past. As a supervisor for this department it is a stressful position and knowing that Steve Hobb is out for me, it makes me more stressful and is making my day to day life un-healthy. I feel like, I'm being targeted, harassed and I fear for my safety because of Steve Hobb's temper and his past experience on how he treated other Banning Police Officers. I'm asking Human Resources to investigate this matter.*

EMAIL: [Listed below]

*I would like to have an emergency POA meeting as I have concerns about Chief Diaz's decision making ability, unfair discipline practices and his ethical compass. These are serious issues and I believe every member of the POA should be a part of the discussion and decision on how to address them. I have already addressed my concerns with Chief Diaz and his position has not changed. His response to me was that I had to do whatever it took to protect myself.*

*Regarding his decision making abilities, I know based on conversations with him that he is strongly influenced by outside entities to include an ex-city manager, a certain council member and HR personnel who are bias. His decisions have led to unfair discipline practices, primarily towards me. While this mainly affects me, I have to tell you it is not comfortable knowing someone is after your career and your leader will not take the appropriate steps to protect you or look out for your well-being.*

*Most importantly, I know of a particular incident that could be very damming to our agency if made public. Because of the current atmosphere towards police agencies in this country, I think that we have to maintain standards and the integrity of our agency even if our Chief does not want to.*

*Recently, a complaint came in towards Sgt. Avila. Sgt. Avila told me the complaint might come in and it in fact did so. The blue card was already filled out when it came in and the complainant handed it to me. I gave the complaint to Chief while he was in his office. As of this date, the complaint has been handled internally. I know this because the Chief told me himself that he "handled it" and "it has been taken care of." Sgt. Avila told me that he received a written reprimand. The problem with the way this was handled is that there is no accountability and the incident was quite embarrassing and illegal as it involved a threat under the color of authority by Sgt. Avila. If anyone else would have conducted themselves in this manner, they would and should be put on administrative leave and severely punished if not terminated.*

*This issue directly relates to Chief Diaz's ethical decision making. I am concerned about the future and image of our department. This information will be shared with City Council and the press as soon as possible once the POA has been fully informed. Please attend this meeting. Will the POA Board please schedule a meeting as soon as possible. Thank you for your attention to this matter. Can someone send this to Fisher. His email was not in the POA contact list.*

RCS Investigators reviewed two additional e-mails sent by Corporal Hobb, which were forwarded to the Human Resources Department by Sergeant Avila. The e-mails were sent by Hobb to members of the Banning Police Officers Association on September 16, 2015. The e-mails forwarded by Avila contained the following verbatim information:

6

363

First e-mail sent on September 16, 2015 by Corporal Hobb:

*For those of you that don't know I have been put in admin leave for no stated reason. I think what I have to say has scared someone. Also someone in the POA went to the Chief with my email.*

*Sent from my iPhone*

Second e-mail sent on September 16, 2015 by Corporal Hobb:

*I asked for an emergency POA meeting on Sunday because I want to bring up issues that are directly related to the future of our department and the fact that Chief Diaz is not the right person for the job. When he took the position he promised he would not run the department like Purvis did. Well if you are in my shoes, things haven't changed. I care about our department and want it to exist and be a place where good police work can be done even if the city doesn't want to pay us.*

*I think there are a lot of good people there with the right intentions who want the same thing. The fact that we stay and work there for the pay they offer is a testament to who we are.*

*I was informed by the POA attorney, Mike McCoy, that I cannot discuss personnel matters. Brian Callahan was also advised this as he asked for advice after I sent my email. This is respectable as it appears he wants to do the right thing for the whole POA.*

*With that said; It's convenient to hide behind the excuse that it's a personnel matter when you want to hide wrong doing and you know the law protects you to a certain extent [speaking of the Chief]. Well I can avoid bringing up the specifics about the personnel matter I referenced in the last email because this is really about the Chief and his accountability to not only the citizens of Banning, but to us as well. I think that members of the POA should hear what I have to say because this affects everyone of us and our future and viability as a police agency.*

*I believe that since I am a member of the POA I have a right to address all of you with my concerns. If the general membership of the POA does not want to hear what I have to say, I will do what I have to that coincides with my principals all by my lonesome.*

*I chose this path I am on because I feel a moral obligation to do the right thing. Remember, I already went to the Chief and gave him an opportunity to fix this, but he did not as he has taken this personal and placed his feelings and position in life ahead of all of us and our futures. With Respect, Steve Hobb "Courage is not the absence of fear, but rather the judgement that something else is more important than fear."*

RCS Investigators reviewed a memorandum Sergeant Avila submitted to Human Resources Director Rita Chapparosa via e-mail and by hard copy. The memorandum was submitted following a Banning Police Officers Association meeting and contained the following verbatim information:

*To: Rita Chapparosa [Human Resources]*

On September 23, 2015 at approximately 1600 hours, The Banning BPOA [Banning Police Officer's Association] held a quarterly meeting at Banning High School Library. During the discussion Cpl. Steve Hobb talked about a complaint that was turned in by a citizen against me and how I was disciplined for that incident. Cpl. Hobb stated he did not agree with the way I was disciplined.

Cpl. Hobb went on to say that he listened to the audio recording on the day of the incident. Cpl. Hobb said he listened to the audio in case I [Sgt. Avila] went to him for advice. I never approached Steve Hobb for any advice in regards to the incident. Steve Hobb told the BPOA that he went on his own to listen to my audio recording the day of the incident. Cpl. Hobb was not assigned to investigate the incident and was not my supervisor. I did not give Cpl. Hobb authorization to review the audio recording nor did I let him listen to my audio recording the day of the incident.

I believe by Cpl. Hobb listening to my audio recording, he started his own investigation as a Corporal to investigate me as a Sergeant. When Cpl. Hobb listened to the audio recording, I believe he was not authorized by the administrative staff to do so. I believe this is in violation of Banning Police Policy listed below. Cpl. Hobb sent out an email on [September 16, 2015] that he was informed by POA attorney [Mike McCoy] that he cannot discuss personnel matters. See attached for further.

Cpl. Hobb was a Corporal at the time of my compliant that was filed against me and was an acting Watch Commander and was not my supervisor. I would like to add this new complaint to my original complaint against Cpl. Steve Hobb.

### 450.9 REVIEW OF RECORDED MEDIA FILES

When preparing written reports, members should review their recordings as a resource. However, members should not use the fact that a recording was made as a reason to write a less detailed report.

Supervisors are authorized to review relevant recordings any time they are investigating alleged misconduct, reports of meritorious conduct or whenever such recordings would be beneficial in reviewing the member's performance.

Recorded files may also be reviewed:

[a] - Upon approval by a supervisor, by any member of the Department who is participating in an official investigation, such as a personnel complaint, administrative investigation or criminal investigation.

RCS Investigators reviewed an e-mail sent by Joni Miller from the Banning Human Resources Department to Sergeant Avila on July 7, 2015, as well as the internal Department message sent by Corporal Hobb to Avila on May 28, 2015. Both of those documents were referenced by Avila in his initial complaint.

Copies of all the complaint documents submitted by Sergeant Avila as well as the related documents are included as **Exhibit "B"** in this report.

RCS Investigators reviewed the PUMA Audit Log Report for Sergeant Avila's audio recordings from the incident which resulted in a personnel complaint being filed against him. The report showed that Corporal Hobb [ID # U373] accessed the recordings several times on June 5, 2015.

A copy of the PUMA Audit Log Report is included as **Exhibit "C"** in this report.

RCS Investigators reviewed a witness notice that was issued to Sergeant Avila on October 1, 2015.

A copy of the notice is included as **Exhibit "D"** in this report.

RCS Investigators reviewed Administrative Investigation notices that were issued to Corporal Hobb on September 29, 2015 and November 12, 2015.

Copies of the notices are included as **Exhibit "E"** in this report.

RCS Investigators reviewed Administrative Leave notices issued to Corporal Hobb on September 15 and 18, 2015.

Copies of the notices are included as **Exhibit "F"** in this report.

## Interview of Sergeant Vincent Avila

On October 8, 2015, RCS Investigator Flutts conducted an interview with Sergeant Vincent Avila. Avila was admonished to answer all questions completely and truthfully. The interview was recorded and a transcript is included as **Exhibit "G"** in this report. The following is a synopsis of the interview.

Sergeant Avila has been employed by the Banning Police Department for nine years and is currently assigned as a Patrol sergeant. Avila was asked if he contacted the City of Banning Human Resources Department in September 2015, regarding complaints he had against Corporal Steve Hobb and he said he did. Avila was asked when he contacted Human Resources and he replied, "I believe it was on September 15th, 2015. It was in, through e-mail. I wrote it up."

Sergeant Avila was asked if he e-mailed his complaint to Human Resources and he said he did. Avila was asked if he contacted anyone at the police department regarding his complaint prior to contacting Human Resources and he said he contacted Chief Diaz. Avila acknowledged he sent his e-mail complaint to Rita Chapparosa in Human Resources and added, "I think I gave it to her, I think I gave her a hard copy and then she said she wanted it e-mailed or I e-mailed it to her and she didn't have it yet."

Sergeant Avila was asked the following questions: If he later submitted additional information to the Human Resources Department concerning ongoing actions by Corporal Hobb after his initial correspondence; if the complaints he submitted included actual e-mails from Hobb; if he submitted additional information to Rita Chapparosa after a Banning Police Officers Association meeting, which was held on September 23, 2015; if that information included additional behavior by Hobb he was concerned with. Avila responded yes to all of those questions.

Sergeant Avila's attention was directed to a two-page document with a written narrative and an e-mail that appeared to have been sent by Corporal Hobb. Avila was asked if that was a true copy of his initial complaint and he said it was. Avila was shown a one-page document with the top portion in blue, which appeared to be an e-mail sent by Hobb and the bottom portion appeared to be the original e-mail from Hobb. Avila stated, "Correct, the blue is sent from his iPhone I believe because it says, sent from my iPhone." Avila was asked if he submitted that document to the Human Resources Department and he said he did.

Sergeant Avila was shown a third document, which consisted of one page containing what appeared to be the second e-mail sent by Corporal Hobb. When asked if that appeared to be a true copy of what he submitted to the Human Resources Department, Avila said it did. Avila was show a final document containing two pages that appeared to be a narrative written by him to Rita Chapparosa. When asked if that document appeared to be a copy of the document he sent to Chapparosa, Avila said it did.

Sergeant Avila was asked if Corporal Hobb called him on September 14, 2015, at approximately 11:39 a.m. and he said he did. Avila was asked if Hobb questioned him regarding a complaint filed against him and he said he did. Avila was asked the general nature of the complaint and he replied, "That complaint was, I cursed out a guy and I got a written reprimand for that." Avila was asked if he was on or off-duty when Hobb called and he said he was on-duty and Hobb was off-duty at the time.

Sergeant Avila was asked if he found it unusual that Corporal Hobb would call to question him about the complaint and he replied, "Yes, but prior weeks he's been asking me hey, did that complaint get dealt with yet, did it get dealt with. And then I finally got tired of it so when he called me on September 14, I just told him, yeah, I got a written for it." Avila confirmed Hobb asked him several times prior to September 14, 2015, with respect to the results of the complaint. Avila was asked when the complaint was filed and he said, "Either June or July, I can't recall."

Sergeant Avila was asked why he provided the information to Corporal Hobb and he replied, "He just wanted, it wasn't his information, his business, but just to have him stop calling me or asking about it, it just, I got written up for it. That's it. I didn't give him details or nothing like that." Avila was asked if Hobb continued to question him for more details after informing him that he received a written reprimand and he replied, "He was going to but then he said I'm not gonna ask, he said thanks, whatever, and we just hung up. It was very short."

Sergeant Avila was asked if that conversation took place over the phone and he replied, "Yeah, and I took a picture of the date. Just, it says yesterday, so this is Corporal Hobb, yesterday, September 15th is when I took the picture and let's see, the 15th and it still shows Corporal Hobb yesterday, is when he called me." Avila confirmed his phone indicated Hobb called him on his personal cell phone on September 14, 2015. Avila was asked the length of the phone call and he said, "Maybe 20 seconds, if that. It wasn't that long."

Sergeant Avila was asked how many times Corporal Hobb questioned him about the complaint and he said at least twice. Avila was asked if Hobb ever indicated what his interest was and he said he did not. Avila was asked if he wondered what Hobb's interest was and he replied, "Yeah, he's always trying to fish for stuff, you know. I just had the, had a feeling, ever since I got promoted." Avila was asked when he was promoted and he said October 27, 2014.

10

367

Sergeant Avila was asked to describe his relationship with Corporal Hobb since he was promoted and he said, "When I first got promoted, I would walk by him, he's, won't even acknowledge me or say hi or anything like that until like maybe a month later." Avila was asked to describe his relationship with Hobb prior to his promotion and he replied, "It was okay, I don't really hang out with anybody here, nothing like that. Hi, bye, how ya doing, but not buddy, buddy." Avila was asked if there was ever any conflict between the two of them prior to his promotion and he said there was not.

Sergeant Avila was asked if Corporal Hobb took part in the same promotional process that he participated in and was ultimately promoted from and he said he did. Avila was asked if Hobb ever complained to him about the process and he replied, "Not to me but he's made comments and stuff like that in our POA board and stuff like that." Avila was asked if he and other Banning Police Officers Association members received an e-mail from Hobb on September 14, 2015, and he said they did. Avila was asked if association members received association related e-mails on their personal e-mail addresses and he stated they did.

Sergeant Avila was again shown the one-page document he previously acknowledged and when asked if that was the original e-mail Corporal Hobb sent he replied, "That's original but the e-mail from the first complaint is listed below." Avila was asked if the time listed on that e-mail was 2:44 p.m. and he said it was. Avila confirmed the e-mail address it was sent from appeared to be BanningPOA@gmail.com. When asked if that was the association e-mail address, Avila said it was. Avila was asked if that document showed the entirety of the e-mail and he confirmed it did.

Sergeant Avila was asked if the e-mail was signed anywhere and he said, "No, it doesn't look, appear signed." Avila was asked if he believed Corporal Hobb sent the e-mail and if so, why and he replied, "Yes, because I talked other Banning POA board members, three of them, and they said that they had no knowledge of that e-mail or sent an e-mail." Avila was asked how Hobb would have access to that e-mail address and he said, "I believe maybe when he was a prior, like vice-president or president of the POA, he still had access to it." Avila believed the association had that e-mail address for some time.

Sergeant Avila acknowledged Corporal Hobb was a board member prior to that point. Avila indicated he spoke to some board members when the e-mail was sent on September 14, 2015. When asked who he spoke to, Avila said Detective Brian Walker, Sergeant Mike Loader and Officer Brian Callahan. Avila was asked what he said to those individuals and he said he verbally asked them if they knew about the e-mail the day he received it.

Sergeant Avila was asked what he said about the e-mail and he replied, "I said you guys know about this e-mail, they had no idea about this e-mail or anything like that. I just wanted to know, because to my knowledge only board members had access to the e-mail because I don't even know how to get on that e-mail and send things out. So that's why I went to the board members." Avila was asked if that e-mail address required a password to get into it and he said, "I believe it does because I believe Officer Callahan was changing it a few weeks ago."

Sergeant Avila was asked if he questioned Detective Walker, Sergeant Loader or Officer Callahan about the password and he said he did not. Avila was asked based on the content of the e-mail, if he believed Corporal Hobb sent it and he replied, "Yes, because on his, on the second e-mail he sent out, he goes for those of you who don't know, I have been put on admin leave for no stated reason. I think what I have to say has scared someone. Also someone in the POA went to the chief with my e-mail." Avila was asked if Hobb, in essence, admitted he sent the first e-mail and he said, "Yeah, that's how I took it."

Sergeant Avila was asked if Detective Walker, Sergeant Loader or Officer Callahan expressed any opinion as to who they thought the author of the e-mail was and he replied, "Well, everybody suspected it was Hobb." Avila was asked if he submitted additional information to Rita Chapparosa after an association meeting, which was held on September 23, 2015 and he said he did. Avila was asked if the information included additional behavior by Corporal Hobb he had concerns with and he said, "Yes, because my name is listed in it."

Sergeant Avila was asked his complaint regarding the e-mail and he replied, "He told everybody about my business, about my complaint, my discipline and how he doesn't think it's right. I should've been put on administrative leave or severely punished if not terminated. By putting that out, since this e-mail people have been, I feel like people have been, like just not looking at me the same. Like okay, did this really happen, did you treat like, did he treat people like this. To me it seems like I, like people think, like I'm this bad person and I'm really not. Before this incident, I have never got a citizen complaint from anybody, the years I've been here. It just ruined my reputation."

Sergeant Avila was asked with respect to his complaint, to explain what occurred regarding the injury claims by Corporal Hobb. He replied, "So what happened is on July 7th I received an e-mail from Joni Miller, she works City Hall Human Resources, regarding Steve Hobb filing two injury claims. I was asked by Human Resources why I didn't fill out the paper work. I explained to them, I'm not Hobb's immediate supervisor, that it should've been Holder. I told them, well they had the impression that he was on my team. He was not, he works nightshift, I work dayshift."

Sergeant Avila continued, "So I tell them... I'm not his supervisor but he still told me about this claim. But he's sending me an e-mail prior to that saying that, if it hurts, if my arm hurts, I'll let you know if I'm filling out paperwork and he never did." Avila was asked if he had the e-mail and he said he did. Avila was asked if he informed Joni Miller in Human Resources that Corporal Hobb's immediate supervisor was Lieutenant Holder and he stated he did.

Sergeant Avila was asked his impression with respect to what Corporal Hobb was trying to do with the injury claims and he replied, "I believe he was trying to set me up. Trying to just throw me under the bus and get me in trouble. Like he reported to me and I didn't do nothing about it which, that wasn't the case." Avila was asked if Hobb contacted the Human Resources Department regarding those alleged injuries at some point and he replied, "Yes, so, Hobb sent me this on May 28th. I got an e-mail from Joni reference these claims on July 7th, so, I mean, I have no know, I thought he was fine, he wasn't gonna make a claim, he never told me anything about it or I thought he would contact Lieutenant Holder."

12

369

Sergeant Avila was asked what, if anything, he told Corporal Hobb after he sent the e-mail regarding the injury to his arm and he replied, "Well he said, he told me verbally that morning, hey I kinda like hurt my arm struggling with a drunk guy or something like that and I said okay. He goes I'll see if I wanna fill out some paperwork later on it. I said okay, just let me know or let Holder know. He said okay, and then he sent me this e-mail, I mean that RIMS message. It's not an e-mail; it's a RIMS message on our RIMS system." Avila confirmed he was referring to the Records Management System.

Sergeant Avila was asked if he responded to Corporal Hobb's message verbally and he said he did. Avila confirmed he did not hear anything further until Joni Miller contacted him via e-mail on July 7, 2015. Avila acknowledged Hobb's message was from the Records Management System and Miller's was an e-mail and he could provide copies of both for the investigation. Avila confirmed the message from Hobb had Banning Police Department at the top, dated Thursday, May 28, 2015, 0358, and Miller's e-mail was addressed to Chief Diaz, Chief Diaz' assistant, and to him.

Sergeant Avila confirmed the e-mail from Joni Miller referred to medical injury forms requiring signatures by a supervisor. Avila was asked if it was apparent to him at that point that Corporal Hobb filed those forms without telling him or another supervisor and he said, "I don't know if he told another supervisor. He told me but, as a Watch Commander, to my knowledge he should tell his immediate supervisor." Avila confirmed Hobb was an Acting Watch Commander at the time and Lieutenant Holder was his supervisor.

Sergeant Avila was asked if employees had the option of whether or not they wanted to file injury forms and he said, "Yes, because I had an option before. I mean, I've never filed a claim, I just go get cleaned up or... but if it's something major, we do it. Like some guy, an officer got bit the other day, I filled it out." Avila confirmed it was typically the practice at the Banning Police Department that supervisors filled out those forms on significant injuries.

Sergeant Avila mentioned in his first complaint of Corporal Hobb's history of intimidation, bullying, and assaulting Banning Police Officers and when asked what he meant by that statement he replied, "Just prior officers that used to work here; one, at a POA meeting years ago, I believe it was back in '08 or '09, he pushed an officer off the steps. And he was never disciplined for that." Avila was asked if that occurred at an association meeting and he said it did. Avila continued, "Just arguing with people, just trying to push them around. Being intimidating."

Sergeant Avila was asked what he observed and he replied, "Well what I've heard, he's getting in arguments with other officers like Michael Bennett, he's a, a sergeant now. He was a POA president, Michael Bennett was, and Bennett signed this form with nobody's knowledge and I guess he told him, Hobb told him, I'll beat your ass or I'm gonna, somehow he was gonna kick his ass, something like that. I don't know what kind of form it was, it was just like for, I think for, either for money, to get more money or to stay where we're at and not get a raise." Avila acknowledged it concerned contract negotiations a few years ago.

13

370

Sergeant Avila was asked if he knew of any other incidents with respect to Corporal Hobb's behavior and he replied, "Just arguing with officers, getting in their face." Avila was asked if he observed that behavior and he replied, "I just heard. He used to come at me and like, when I was on a shift, when I was an officer, telling me my reports suck, blah, blah, blah. Just puts you down, just puts you down and then he's known to, like he did to me on that day, oh, I'm sorry, I shouldn't have acted like that, he just… it's uncalled for."

Sergeant Avila was asked what he meant when he mentioned Corporal Hobb's temper and he replied, "He gets mad easily. He really does. I seen it before in POA meetings, stuff like that. Where he just gets very mad." Avila was asked if he had any concerns regarding what Hobb may do and he said, "It just, he assaulted an officer before and it just, he has a bad temper, you don't know what a person can do."

Sergeant Avila's attention was directed to the previous document with the blue message. When asked if that was an e-mail sent by Corporal Hobb on September 16, 2015, Avila replied, "Yes, because it was sent from his, it was an e-mail but sent from his iPhone." Avila was asked if that message was also sent to all of the Banning Police Officers Association members and he believed it was. Avila was asked what that message related and he said, "He wrote, for those of you that don't know I have been put on admin leave for no stated reason. I think what I have to say has scared someone. Also someone in the POA went to the chief with my e-mail. Regarding the first e-mail he sent out."

Sergeant Avila believed the message clearly referred to the first e-mail that was sent, which indicated that Corporal Hobb in fact sent the e-mail. Avila acknowledged the words "sent from my iPhone" indicated the second message was sent from Hobb's cell phone. Avila was asked if he ever received other messages from Hobb that contained "sent from my iPhone" and he replied, "I can't say I have but I have from other people where it says that, or I send it, if I get e-mail here, I'm home, it says, sent from my iPhone."

Sergeant Avila acknowledged the e-mail sent on September 16, 2015, was a group e-mail, from the Gmail address to the members of the police officers association. When asked how many members were in the association, Avila estimated 22 or 23. Avila was asked if that included officers and sergeants and he said it did. Avila was asked if the printing in blue on the document was the entire message and he said it was. Avila confirmed Corporal Hobb's name was not on the message.

Sergeant Avila's attention was directed to a second e-mail dated September 16, 2015, which was fairly lengthy. When asked if that message was sent to the association members, Avila said it was from the Gmail address. Avila was asked if Corporal Hobb acknowledged sending the previous information and he replied, "Yeah, cause he signed it on the bottom." Avila was asked if Hobb expressed some of his opinions regarding Chief Diaz' leadership in the first paragraph of that e-mail and he said he did.

Sergeant Avila's attention was directed to the document he sent to Rita Chapparosa by e-mail, as well as hard copy. When asked if he referenced the Banning Police Officers Association meeting on September 23, 2015, Avila said he did.

14

Sergeant Avila was asked if that was a regular or emergency meeting and he replied, "It was a, well they were saying it was a quarterly meeting. We needed a meeting anyways but they just said we're having a meeting, we're having it over at the high school because, for Hobb to come and talk." Avila was asked if the September 23, 2015, meeting date was already set up prior to the e-mails and he said, "No, they set it up after all this."

Sergeant Avila was asked if an emergency meeting was set up to address the issues with Corporal Hobb after he generated the e-mails and he said, "Yeah, but they didn't wanna, they didn't want him to speak on the issues he has, they wanted to just have a regular POA meeting but they let him attend. So at first it was gonna be at the Banning Police Department, but later on in the day we got word that it's gonna be at the Banning High School Library." Avila confirmed the meeting was held in the high school library. When asked if he attended the meeting, Avila confirmed he did.

Sergeant Avila was asked if regular business was discussed during the meeting and he said it was. Avila was asked if Corporal Hobb spoke at some point and he said he did. Avila confirmed Hobb spoke about the complaint against him. Avila was asked what Hobb conveyed at the meeting and he replied, "He talked about how discipline should be equal and he talked about his IA's and when he got discipline before and you shouldn't show favoritism on people. And then he talked about my incident and that how he took it upon himself to listen to my recording on the day my complaint was filed and his knowledge, what he remembered what was on my audio from the incident."

Sergeant Avila was asked if he indicated in his e-mail to Rita Chapparosa the fact that Corporal Hobb acknowledged he listened to the recordings and he said he did. Avila was asked if Hobb specifically said he did not agree with the way he was disciplined regarding the one specific complaint and he said he did. Avila confirmed Hobb believed he was treated unfairly during his previous internal affairs investigations. Avila was asked if that was with respect to the discipline he received and he said it was.

Sergeant Avila was asked if Corporal Hobb acknowledged during the meeting with respect to his complaint, that he listened to recordings of the incident and he replied, "Yes, my incident, yes." Avila was asked if Hobb also indicated he received the actual complaint from the citizen and he said he did. Avila confirmed it was a citizen-generated complaint. Avila was asked if Hobb was working that day and personally received the complaint and he said, "Yes, because what happened is the day the incident happened, I was downstairs downloading my recording and we brief each other before we, I leave and he goes home."

Sergeant Avila continued, "So I told him hey, I just gave this guy a complaint form, he's gonna file a complaint against me. He should be coming in and I'm downloading the recording and go from there. He said okay, no problem. So later on that, when I came in the next day in the morning he goes, hey, that guy filed a complaint. I said okay, no problem, whatever happens, happens." Avila was asked if he was the dayshift sergeant and he said he was. Avila confirmed he left at 4:00 p.m. and Sergeant Hobb started his shift at 4:00 p.m. as the nightshift supervisor.

15

372

Sergeant Avila was asked if it was normal practice for supervisors to brief one another when they changed shifts and he replied, "I do, yes." Avila was asked if Corporal Hobb was present when he downloaded the recording and he replied, "He was, I believe he was getting something out of the printer, probably was the shift bulletin, what happens during the day. So I just told him, I told him, nothing major, I was giving him my little briefing, we didn't have nothing. I just had this incident, whatever." Avila was asked if he told Hobb anything specific regarding the incident and he said he did not; however, he did advise Hobb he was downloading his recordings.

Sergeant Avila was asked where that took place and he replied, "Well, you just go on your computer, you log on and then you just find the incident and you put the incident number or case number and you push download and it just downloads in the system." Avila was asked if Corporal Hobb accessed the system and listened to the recordings at some point and he said he did. Avila was asked if he knew when that occurred and he replied, "No, from the meeting, the POA on the 23rd, my understanding was that later on that night after we left, I left." Avila believed Hobb listened to the recording that night after the incident occurred in June or July 2015.

Sergeant Avila was asked his opinion as to why Corporal Hobb brought up his complaint and the discipline in the e-mails and during the meeting. He replied, "Because I believe he's jealous and he wants to see me demoted and I believe he's very upset, mad that he has not got promoted for the third time as a sergeant." Avila was asked if it was his understanding that Hobb went through the promotional process three times and he said, "Yes, well he was a sergeant, got demoted, became a sergeant again, got demoted to corporal and then he's been a corporal ever since."

Sergeant Avila confirmed Corporal Hobb was demoted from sergeant twice. When asked in what span of time that occurred and he replied, "I believe he made sergeant like in '07 the first time. So from '07 to now, I mean, maybe 2014, he got demoted, so about seven years." Avila confirmed Hobb was promoted twice and demoted twice. Avila was asked what the complaint was with respect to Hobb listening to his recording and he said, "Well he wasn't assigned to investigate my complaint so he has no authorization just to go in and view anybody's recording."

Sergeant Avila was asked if he mentioned in his complaint to Rita Chapparosa that he believed Corporal Hobb potentially violated some Department policy sections and he replied, "Yes, 450.9: Review of recording media files, subsection A." Avila confirmed based on the fact that Hobb acknowledged he listened to the recordings, it was his opinion that he was potentially in violation of the section, because he had no authorization to go into his recordings and review them.

Sergeant Avila was asked if there were any parameters in the system that allowed certain people to listen to the recordings and he replied, "I believe it's just only supervisors. I don't think as an officer you can go on other officer's recordings because I have, I believe just supervisors can do that." Avila confirmed Hobb was a corporal. When asked if he was in essence working as a Watch Commander on his shift Avila replied, "Yeah, so, in the system, I don't know how the system works but IT, can authorize different people to access different stuff in the Department." Avila acknowledged Hobb had access to the system.

Sergeant Avila was asked if Corporal Hobb served as an Acting Watch Commander since he was last demoted from sergeant to corporal and he said he did. Avila was asked if that occurred the entire time since his demotion and he said, "Yes, I believe so." Avila was asked if he and Hobb had any specific problems with each other prior to that incident and he said they did not. Avila was asked to summarize his overall concerns regarding the actions of Hobb and the e-mails, as well as at the association meeting. He replied, "I feel like I'm being a target against him, I mean, from him. I'm just, he's just trying to find something to get me demoted and I don't think he's happy and he just wants everybody else to be miserable too."

Sergeant Avila was asked if it was his opinion that Corporal Hobb was not happy with his position at the Department and he replied, "No, I don't. At the meeting it just, it was all about him getting demoted, he should be promoted, just, it's all about him, him, him." Avila was asked if he had any concerns for his personal safety and he said, "I look out my door every day before I go to work at 2:00, 3:00 in the morning. My home, yeah, and just, with the last incident I dealt with, with that fireman killing people, ex-fireman, I just, you just don't know about people these days."

Sergeant Avila was asked if Corporal Hobb had access to his home address and he said he said, "Yes, or someone can look it up." Avila was asked if that caused him concern and he replied, "Yeah, I do. I do, I don't know what this guy's capable of, you know. He just, how he gets so angry and how he just came out of nowhere with all this stuff, I'm like, wow, what is he trying to do, is he trying to take everybody down in the Department." Avila was asked if the association attorney admonished Hobb with respect to his third e-mail and that he was not to discuss personnel issues and he said he did. Avila was asked if Corporal Hobb mentioned anything about that during the meeting and he replied, "I can't recall but prior to that the POA, Callahan said that he's not gonna bring up personnel issues. He was told not to and he did anyways."

Sergeant Avila confirmed Corporal Hobb was told prior to the meeting not to bring up personnel issues. When asked by whom Avila replied, "Well in his e-mails, from the attorney and Callahan who is the POA president told me that day on the 23rd prior to going out there that he was told that he could not talk about personnel issues." Avila was asked if Hobb was given the directive due to personnel issues he disclosed in the e-mails and he said it was. Avila was asked if he had any contact with Hobb since the meeting on September 23, 2015, and he said he had not. Avila was asked if he had anything further to add and he said he did not.

## Interview of Corporal Steve Hobb

On November 23, 2015, RCS Investigator Flutts conducted an interview with Corporal Steve Hobb. Hobb was represented by his attorney, Robert Baumann. Hobb was admonished to answer all questions completely and truthfully and was admonished of his rights pursuant to the California Government Code. The interview was recorded and a transcript is included as **Exhibit "H"** in this report. The following is a synopsis of the interview.

Corporal Hobb has been employed by the Banning Police Department for 10 years and he is currently assigned as a corporal in Patrol. Hobb was asked his Department identification number and he said #U373. Hobb was asked if he was aware of Department policies as well as several State laws regulating the release of confidential personnel information and he said he was. Hobb was asked if he called Sergeant Vincent Avila on his personal cell phone on September 14, 2015, at approximately 11:39 a.m. and he acknowledged he did.

Corporal Hobb was asked if he questioned Sergeant Avila during that conversation about a previous personnel complaint filed against him and he said he did. Hobb was asked if he questioned Avila as to whether Chief Diaz handled the complaint and he replied, "Ask him if the chief did it? No, I believe I just asked him what was the outcome of it." Hobb confirmed he asked Avila about the outcome of the complaint. Hobb was asked if Avila disclosed that he received a written reprimand as a result of the complaint and he stated he did.

Corporal Hobb was asked his purpose in questioning Sergeant Avila about the complaint and/or the discipline he received and he replied, "I was looking to find out how the chief handled it because the chief had, just gave me notice of an IA a few days prior and I felt that the chief was being unfair in discipline." Hobb was asked what he based that on and he said, "I wanna say on August 21st I was given notification of an IA that I was, let's see, the focus of. That was IA 15-04 and that IA was regarding contact with some nurses in June or July or something like that, July. That IA number, like I said, was 15-04 and I knew that and I thought, and I thought when I saw the nature of the IA for rude and discourteous or arguing or something like that."

Corporal Hobb continued, "I thought it was kinda ridiculous that I got an IA for arguing or being rude to a nurse and that Sergeant Avila didn't get an IA for his action when he got a complaint from a citizen in, earlier than my incident, for which I knew about. I knew that incident that, where he got the complaint was actually a blue card because the blue card came in and I received the blue card and I gave the blue card to the chief and I felt that the chief would investigate that but when I saw that I had IA 15-04, I knew I had IA 15-01, I knew Officer Bulrice had IA 15-02, and I knew Sergeant Feola had IA 15-03, I knew there'd been no, no IA opened on it."

Corporal Hobb was asked if he was referring to the incident that Sergeant Avila eventually received a written reprimand for and he said he was. Hobb was asked if he believed there was no underlying investigation with respect to Avila's incident and he replied, "Well the chief told me that he handled it." Hobb confirmed he believed the incident was not handled fairly since an IA number was not issued to it. Hobb was asked to explain what a blue card was and he replied, "It's a formal complaint card that comes in." Hobb indicated blue cards were the complaint forms they received from the public. Hobb was asked if he had any further conversation with Sergeant Avila and he said he did not.

Corporal Hobb was asked if Sergeant Avila questioned him as to why he wanted the information and he said he did not. Hobb was asked if he sent an e-mail to all of the members of the Banning Police Officers Association on September 14, 2015, at 2:44 p.m. and he said he did. Hobb was shown a copy of the e-mail and when asked if it appeared to be a copy of the e-mail he sent, he said he did. Hobb was asked if he sent the e-mail from an address of: BanningPOA@gmail.com and he said he did, which was the standard association e-mail address. Hobb was asked how he had access to the e-mail account and he replied, "When I was on the board, I had access to it."

18

375

Corporal Hobb confirmed he was a previous board member. When asked if he was on the board at the time he sent the e-mail, Hobb acknowledged he was not. Hobb was asked if the same password was in place that allowed him to access the account and he replied, "It was at that time." Hobb was asked if the e-mail account required a password and he said it did. Hobb was asked if he mentioned the complaint against Sergeant Avila in his e-mail and he said he did. Hobb confirmed he was on-duty the day the blue card complaint was turned in against Avila and he accepted the information from the complainant.

Corporal Hobb was asked the following questions: If he stated in the e-mail that he sent to the Banning Police Officers Association the incident involving Sergeant Avila related to an illegal act committed by Avila; if he stated in the e-mail the incident involved a threat under the color of authority committed by Avila; if he disclosed in the e-mail that Avila told him he received a written reprimand as a result of the complaint; if Avila's incident occurred sometime in June 2015; if he requested an emergency meeting in his e-mail to the association. Hobb responded yes to all of those questions.

Corporal Hobb was asked if he sent another e-mail to the Banning Police Officers Association on September 16, 2015, and he said he did. Hobb's attention was directed to the e-mail and he identified it as the second e-mail he sent to the association using the same e-mail address. Hobb was asked if he indicated he had been placed on administrative leave in that e-mail and he stated he did. Hobb was asked if he also indicated in his e-mail that his first e-mail scared someone and they went to the chief with it and he said he did. Hobb was asked if that was his belief at the time and he replied, "Well, no, well, I knew somebody went to the chief with it, my belief that I got put on admin leave was that I scared the chief."

Corporal Hobb believed his first e-mail generated some fear on the part of the chief, which led to him being placed on administrative leave. Hobb was asked what information he was given when he was initially placed on administrative leave and he replied, "I wasn't given any reason, we believe." Hobb was asked if he was provided any documentation at the time he was placed on administrative leave and he said he was. Hobb added, "Just for clarification, that second e-mail, this one right here that I sent, I might've sent that from my personal, SteveHobb999@gmail.com."

Corporal Hobb was asked if the documentation he received when he was placed on administrative leave provided information concerning why he was placed on leave and he replied, "There's no reason." Hobb was asked if he was provided verbal information when he was presented with the document and he said he was not. Hobb indicated Lieutenant Holder presented him with the document dated September 15, 2015.

Corporal Hobb's attention was directed to the e-mail dated September 16, 2015. When asked if he sent another e-mail to the association members later that same day Hobb replied, "I did send a second one. Hobb was asked if that e-mail was sent from the BanningPOA@gmail or from his personal e-mail address and he said, "If I sent the other one I probably sent it from my personal one as well."

Corporal Hobb was asked if his administrative leave was effective immediately after Lieutenant Holder presented him with the document and he said it was, on September 15, 2015. Hobb was asked if he was given any provisions with respect to his availability and he said, "It said that I had to be available Monday through Friday, 9:00 to 5:00."

19

376

Corporal Hobb was asked if there were any instructions as to whether or not he was required to call Lieutenant Holder at a certain time every day and he said, "Call in at 9:00. I was doing that and then Lieutenant Holder told me that I only had to call on Tuesdays and Fridays because he was off on Mondays and I was filling up his voicemail."

Corporal Hobb was asked when he referenced the Sunday meeting in the second e-mail, if he was referring to the content of the first e-mail and he said he was. Hobb was asked if he also mentioned in the e-mail the association's attorney informed him he could not discuss personnel matters and he replied, "In this one I did. Well he was, he gave me misinformation, it was wrong." Hobb was asked if he actually wrote in the e-mail the attorney advised him of that and he said he did. Hobb was asked if the majority of the remaining narrative in the e-mail covered his concerns about Chief Diaz and he said it did. Hobb confirmed he typed his name at the bottom of the e-mail.

Corporal Hobb was asked if he attended the Banning Police Officers Association meeting at Banning High School on September 23, 2015, and he confirmed he did. Hobb was asked if he discussed the specifics of Sergeant Avila's complaint and he replied, "It was a closed meeting so I had an opportunity to one, express to the POA what was going on in regards to Chief Diaz's unfair discipline practices, retaliatory demeanor, his behavior towards me. That was one reason why I asked for it and I discussed it there. I also brought up Sergeant Avila's incident as a reference because it outlined and it showed how Chief Diaz was being unfair."

Corporal Hobb continued, "I was also making them aware of, I think I even mentioned it somewhere about how perception of law enforcement in this day and age and he knew what we were going through and how we need to be better at doing our jobs. But this was also to make them aware that we can't be doing this kind of stuff out there in public so it was kinda a teaching moment too." Hobb confirmed he was referring to Sergeant Avila's conduct. Hobb was asked at the time of the meeting, if he felt Chief Diaz had in some ways retaliated against him and he said he did. Hobb was asked what he meant by that and he replied, "Well he did an IA on me for nurses making a complaint which boiled down to them accusing me of sighing and rolling my eyes, did the whole IA with you as an investigator."

Corporal Hobb continued, "Now that was after the fact but I knew he did an IA, assigned an investigator, assigned it an IA number and then, but he didn't do an IA on Sergeant Avila for his conduct on that particular incident in June which was egregious. It was criminal and it was improper and he didn't handle it the same, not even, not that he didn't handle it the same, he just handled it totally inappropriately." Hobb said he based his reasoning on the fact that an IA number was not issued in Avila's case and he received a written reprimand.

Corporal Hobb further stated, "The reason I say that, that he got a written reprimand, I had been a sergeant a few months before and I got my probation terminated. I got terminated on probation as a sergeant a few days prior to my one year probation, so I was gonna be off probation. And they did it because I had some sustained IA's for language I said some inappropriate things. I said dingbat and I used the F-word. But Sergeant Avila who's also on probation has contact with this guy and he cursed 20 plus times using the F-word and threatened him and he did not get demoted on probation and now he's off probation, so I felt that was unfair."

20

377

Corporal Hobb confirmed Sergeant Avila was on probation when the incident occurred. Hobb was asked if he spoke about Avila's incident during the association meeting and he said he did. Hobb was asked if he discussed how Avila was disciplined and he replied, "Well, in the meeting I discussed the incident so I could make aware to the people how one person is treated versus how I'm treated and two, to let them know that we can't act this way and this is bad behavior and we don't need this as an agency cause we're so small." Hobb confirmed he described the matter as a learning opportunity.

Corporal Hobb was asked if he also referred to his administrative investigations and how he felt he was not treated fairly and he said, "Yes, I showed them my IA's, the results and to show that they, the unfair treatment." Hobb was asked if the administrative investigation he was referring to was handled internally or went to an outside investigator and he replied, "It went to an outside investigator." Hobb was asked if he mentioned to the group at the association meeting that Sergeant Avila received a written reprimand and he said he did. Hobb was asked during the meeting, if he acknowledged he listened to the audio recordings from the Sergeant Avila incident and he confirmed he did.

Corporal Hobb was asked if he acknowledged that he in fact accessed the recordings and listened to them and he replied, "I did as a supervisor because at the time I was a supervisor and I felt there was an opportunity when, before I listened to them I didn't know their content, all I knew was Sergeant Avila told me he cursed at someone, he said the F-word. I'm, okay, I'm a corporal right now but I have four years as a sergeant and I've been to all the training. I felt that while I might be a corporal and he does ask me questions on how to do things, I can still be a mentor and I think the chief would want me to be a mentor to him."

Corporal Hobb continued, "I felt I would review it and see if I can give him some insight on what I went through cause like I said, I was demoted for saying dingbat and using the F-word. So when I listened to them, I did so because, like I said, I wanted to maybe take an opportunity to give him some insight, be a mentor, train him on maybe how to avoid it in the future." Hobb confirmed he based his decision on the fact that he had been a sergeant for four years and at the time, Sergeant Avila was still new as a sergeant. Hobb was asked if Avila contacted him about the incident initially and he said, "Yes, at the end of his shift he came to me and told me that there would be a complaint, that there might be a complaint coming in."

Corporal Hobb was asked if he received the 'blue card' complaint against Sergeant Avila prior to listening to the recordings and he said, "Yeah, usually, yes, it did. Usually when a complaint comes in, if somebody comes in to complain you'll listen to the person as a supervisor, Watch Commander, you'll listen to the person and you'll get their side of the story and see if they actually wanna complain, just vent, or maybe have you just talk to the officer or get an understanding of what took place. So oftentimes what we'll do is, they'll come in and I was taught never to discourage, first thing you do is give them a blue card. You wanna complain, here's your blue card and why don't you tell me what happened."

Corporal Hobb continued, "So maybe you get an understanding, maybe you can educate them on what happened and maybe they might not fill out the complaint cause then once they understand why what happened, happened, they'll understand and they'll go, okay, the officer really didn't do nothing wrong. So usually when those complaints come in you'll go back if there's audio video that will help you understand what took place, you'll review it and then you can share that with that person and go, well, looking at this, it didn't actually happen that way and I see this, maybe this, those are all, what ifs but, and that's how you would try to handle it. I mean, you're not trying to protect the officer but you're trying to, you don't need a complaint to come in if it doesn't need to come in especially if the citizen just needs to be educated."

Corporal Hobb further stated, "So on this particular day the person came in with a card already filled out so, I mean, I was gonna talk to this person but this person came in, gave it to me, and turned around and walked right out. So that might, in my mind they had, they just wanted to file a complaint." Hobb confirmed he did not have a discussion with the male complainant. Hobb was asked if he and Sergeant Avila were working different shifts at the time and he said they were. Hobb confirmed Avila came to him after the incident and advised him he may be receiving a complaint. Hobb was asked if he received the complaint that night and he said he did.

Corporal Hobb was asked if anyone requested that he conduct an investigation into the complaint against Sergeant Avila and he said, "No, I never did an investigation." Hobb was asked if anyone requested that he inquire into the incident and he said no one did. Hobb was asked if he was assigned as a corporal when he reviewed the recordings and he replied, "I was a Watch Commander, which is also a supervisor." Hobb confirmed his official title was corporal and he was working as the Watch Commander for Team 3. Hobb acknowledged Avila was a sergeant assigned to Team 4 on dayshift. Hobb confirmed Avila was on probation in June 2015. When asked if he supervised Avila in any manner at the time, Hobb stated he did not.

Corporal Hobb was asked on May 28, 2015, if he sent a message to Sergeant Avila using the RIMS internal message system regarding a possible injury that he sustained to his arm and he said he did. Hobb was asked if the injury was related to an incident with an intoxicated subject and he said it was. Hobb was asked if he told Avila that he would advise him whether or not he was going to complete the paperwork with respect to his injury and he replied, "I don't remember, it was a short message, I don't recall that. I told him I got hurt and I said I think I might've said I'll let you know how I feel or something like that."

Corporal Hobb was asked if he ever followed up with Sergeant Avila regarding the injury and he said, "I think, let's see, I wanna say he got chewed out for something on that because he didn't file the forms right away and I apologized to him on that one because I probably should have filled them out but I wasn't, I didn't know if I was gonna be injured at that time cause I've been hurt before. I broke my shoulder and I didn't do the paper, I did the paperwork but I never went and followed up on it and I worked a whole year with a broken shoulder and didn't know it. I don't file a lot of worker comp stuff like that but, I sent him that and then I know I went and filed a claim on it because it was still hurting."

Corporal Hobb was asked if it was part of the process to fill out forms at the Banning Police Department after an injury occurred and he said it was. Hobb was asked where those forms were submitted and he said to the Human Resources Department. Hobb was asked if he submitted injury claims at some point after that and he said he did. Hobb was asked if he filed more than one claim and he replied, "It was two claims. When I hurt my arm it was from that May, it was May 27th when it happened and I sent him the e-mail on May 28th, cause I, like I said I don't file complaints on my injuries."

Corporal Hobb continued, "When I broke this shoulder I also tore my rotator cuff. I went to the doctor, I tore it, nothing they could do about it, I just worked through it and then it wasn't until a year later I was getting x-rays because I hurt it doing something else. They're, hey, you broke your shoulder. I'm like, didn't even know it, maybe that's why I was hurting so much. Anyways, so I don't go out on injuries and that type of thing so when I filed, when I told him that I was just letting him know cause it did feel weird, cause I hurt it before working out and I didn't know if it was the same injury or not and it wasn't. So that happened in May. I remember him telling me he got chewed out because the paperwork wasn't done right away and I apologized to him for that. I'm sorry dude that was; we should've did it then. Something along those lines."

Corporal Hobb was asked if he was working as the Watch Commander on Team 3 at the time and he said he was. Hobb confirmed Lieutenant Holder was his direct supervisor at the time and not Avila. Hobb was asked how Avila became involved in the matter and he replied, "Honest, I wanted just a record that I told someone because I didn't want somebody to come back and say, oh, you're, you hurt yourself playing paintball or something. I wanted, there was plenty of audio and video at the incident when it happened but I wanted someone, I wanted there to be a record that I notified someone at the time."

Corporal Hobb continued, "Like my back injury which I resubmitted this time, when I submitted it the first time they said well, it's too late, you waited too long to report it and that was the first time, that was a couple years before so they shot that down so I didn't want that same thing to happen." Hobb was asked if he took any actions with respect to his injury in an attempt to make Sergeant Avila appear negligent in his duties and he said he did not. Hobb was asked with respect to the e-mails he sent to the Banning Police Officers Association, or during the association meeting, if he ever requested Sergeant Avila's permission to release information related to the complaint against him and he said he did not.

Corporal Hobb was asked if he had anything further to add and he replied, "Just that at a union meeting it's, I feel it's protected speech there. We're there to discuss issues that, that happen with, we're a collective bargaining unit so collectively we can talk about things that are, issues that are affecting individuals or groups and that's why I brought this issue up to the POA to bring up that I was being treated unfairly and I wanted them to support me cause I didn't want to take this on by myself cause it does affect them too. I'm not gonna go into all the history, but it's affecting them now and they're dealing with it their way. But anyways, I brought it up to the union because I believed it was union business."

23

# SECTION 2

# CONCLUSIONS AND FINDINGS

# SECTION 2

## CONCLUSIONS AND FINDINGS

This administrative investigation was initiated after Sergeant Vincent Avila submitted complaint documents to the Banning Human Resources Department, which alleged misconduct on the part of Corporal Steve Hobb. Avila's allegations against Hobb included the following: Hobb disclosed confidential personnel information about him in e-mails and during a Banning Police Officers Association [BPOA] meeting; Hobb accessed audio recordings of an incident which involved Avila without authorization and in violation of Department policy and; Hobb demonstrated harassing and retaliatory conduct toward him related to an injury claim.

## Allegation "1"

It was alleged that Corporal Hobb demonstrated unbecoming conduct and violated policy when he disclosed confidential personnel information about Sergeant Avila in e-mails to members of the Banning Police Officer's Association and during a meeting in September 2015.

## Allegation "2"

It was alleged on June 5, 2015, that Corporal Hobb reviewed audio recordings of an incident involving Sergeant Avila when he was not assigned to investigate the matter, or authorized to do so.

## Allegation "3"

It was alleged that Corporal Hobb engaged in harassing and retaliatory conduct towards Sergeant Avila related to injury claim[s] filed by Hobb between May and July 2015.

## CONCLUSIONS

During his administrative interview, Corporal Hobb acknowledged that he called Sergeant Avila and inquired about the disposition of a complaint filed against him. During the conversation, Avila told Hobb he received a written reprimand as a result of the complaint. Hobb stated the purpose of his inquiry with Avila was to determine the outcome of the complaint, because he believed Chief Diaz was not treating him [Hobb] fairly with respect to complaints against him. Hobb acknowledged he sent the three indicated e-mails to members of the Banning Police Officers Association [BPOA] on September 14, 2015 and September 16, 2015. Again, Hobb explained his intent was to demonstrate how he was not being treated fairly and he also wanted to express his concerns about the leadership of Chief Diaz.

Corporal Hobb acknowledged that he disclosed in his e-mails the specifics of the incident which involved Sergeant Avila, as well as the fact Avila received a written reprimand. Hobb stated he attended the Banning Police Officers Association meeting on September 23, 2015, and acknowledged he discussed the Avila incident, as well as the discipline received by Avila.

During his administrative interview, Corporal Hobb acknowledged he accessed the audio recordings of Sergeant Avila from the incident which led to the complaint. Hobb acknowledged he was assigned as a corporal at the time and Avila was a sergeant. Hobb further acknowledged he did not supervise Avila at the time and he was not assigned to conduct an inquiry/investigation into the incident or the personnel complaint which was subsequently filed. Finally, Hobb acknowledged during the September 23, 2015, Banning Police Officers Association meeting he indicated he listened to Avila's audio recordings.

With regards to Corporal Hobb's injury, he did eventually file two claims after he initially reported the possible injury to Sergeant Avila. With respect to his initial notification to Avila, Hobb explained that he wanted to have the possible injury on record, if he later decided to file claim[s]. Hobb admitted he forgot to follow-up with Avila before he filed the claims and he said he apologized to him at the time. Hobb stated he did not intentionally attempt to make Avila appear negligent in his duties when he failed to follow-up with him.

## FINDINGS

The Banning Police Department has specific policies which prohibit the unauthorized and intentional release of confidential information. RCS Investigators are of the opinion that Corporal Hobb violated the policies and demonstrated unbecoming conduct and potentially damaged the reputation of Sergeant Avila when he disclosed confidential personnel information about him in e-mails and during the Banning Police Officers Association meeting. **As such, Allegation "1" against Corporal Hobb is SUSTAINED.**

RCS Investigators reviewed the Puma Audit Log Report, which established that Corporal Hobb accessed the audio recordings from the incident resulting in the personnel complaint being filed against Sergeant Avila. During his administrative interview, Hobb acknowledged he accessed and listened to the recordings even though he was not assigned to investigate the matter. Hobb also acknowledged that he admitted during the Banning Police Officers Association meeting to listening to Avila's audio recordings. Hobb had no authority to listen to Avila's recordings and by doing so violated policy and further demonstrated unbecoming conduct. **As such, Allegation "2" against Corporal Hobb is SUSTAINED.**

With respect to the issue concerning Corporal Hobb's injury claim[s], RCS Investigators were unable to determine whether or not Hobb intentionally withheld information or failed to follow-up with Sergeant Avila, after he initially notified him of the injury. RCS Investigators were unable to determine if any of Hobb's actions concerning the injury were intentionally done in an attempt to harass, retaliate against or in any way cause problems for Sergeant Avila. **As such, Allegation "3" against Corporal Hobb is NOT SUSTAINED.**

RCS Investigators submitted a compact disk containing audio recordings of witness and subject employee interviews. The CD is included as **Exhibit "I"** in this report.

383

# SECTION 3

# EXHIBITS

# EXHIBIT A

<u>Banning Police Department Policy Manual Sections</u>

338.3.2 CONDUCT

[k] Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department.

338.3.5 PERFORMANCE

[g] Disparaging remarks or conduct concerning duly constituted authority to the extent that such conduct disrupts the efficiency of the Department or subverts the good order, efficiency and discipline of the Department or which would tend to discredit any member thereof.

[h] Knowingly making false, misleading or malicious statements that are reasonably calculated to harm or destroy the reputation, authority or official standing of the Department or members thereof.

[z] Violating any misdemeanor or felony statute.

[aa] Any other on-duty or off-duty conduct which any employee knows or reasonably should know is unbecoming a member of the Department or which is contrary to good order, efficiency or morale, or which tends to reflect unfavorably upon the Department or its members.

338.3.7 SECURITY

[a] Unauthorized, intentional release of designated confidential information, materials, data, forms or reports.

450.9 REVIEW OF RECORDED MEDIA FILES

When preparing written reports, members should review their recordings as a resource. However, members should not use the fact that a recording was made as a reason to write a less detailed report.

Supervisors are authorized to review relevant recordings any time they are investigating alleged misconduct, reports of meritorious conduct or whenever such recordings would be beneficial in reviewing the member's performance.

Recorded files may also be reviewed:

[a] Upon approval by a supervisor, by any member of the Department who is participating in an official investigation, such as a personnel complaint, administrative investigation or criminal investigation.

# EXHIBIT B

I (Vincent Avila) would like to file a complaint against Steve Hobb for the email that was sent out yesterday on (09-14-2014) to Banning Police Officers on their personal email that was sent by using the BPOA (Banning Police Officers Association) email.

Yesterday, I received a telephone call from Steve Hobb at approximately 11:39 am, on my personal cellphone. Steve Hobb asked me if the Chief (Alex Diaz) handled the compliant that was filed against me. I told Steve Hobb, I received a written reprimand for the incident by Chief Diaz. I did not tell Steve Hobb, what findings nor explanation why I was given a written reprimand for the incident and my conversation ended with Steve Hobb.

At approximately 2:44 pm, I along with other Banning Police Officers received the email listed below. I believe the email was sent by Steve Hobb because he was the only one who had knowledge and gave the compliant form to Chief Diaz that is said in the email listed below.

I talked to the Board Members of the BPOA and they (3) told me they did not know about the email that was sent out nor did they write the email. Because of the email that was sent out regarding my compliant that was filed against me, I believe this will harm, destroy and discredit the reputation as an authority figure for this department. Disciplinary matters should not be exposed to other personnel on the outcomes for findings of the complaints.

Back on May 28, 2015, Steve Hobb informed me that he hurt his arm with a drunk guy and he was going to let me know about filling out paperwork regarding the injury, which he never did.

On July 7, 2015, I received an email from Joni Miller (Human Resources) regarding Steve Hobb filling 2 injury claims. I was asked by Human Resources why I didn't fill out paperwork on Steve Hobb reference his injury. I told Human Resources that Steve Hobb did inform me about the 1 injury and he was going to let me know about filling out a claim but he never did. I told Human Resources, Steve Hobb was not on my shift and that he supervised a nightshift and that Lt. Holder is his immediate supervisor. I have attached the email that was sent by Joni Miller to me and a Rims message from Steve Hobb that was sent to me. I believe Steve Hobb was trying to get me in trouble or get me demoted reference this incident.

Steve Hobb is known to intimidate, bully and even assault Banning Police Officers in the past. As a supervisor for this department it is a stressful position and knowing that Steve Hobb is out for me, it makes me more stressful and is making my day to day life un-healthy. I feel like, I'm being targeted, harassed and I fear for my safety because of Steve Hobb's temper and his past experience on how he treated other Banning Police Officers.

I'm asking Human Resources to investigate this matter.

**EMAIL: (Listed below)**

**I would like to have an emergency POA meeting as I have concerns about Chief Diaz's decision making ability, unfair discipline practices and his ethical compass. These are serious**

issues and I believe every member of the POA should be a part of the discussion and decision on how to address them. I have already addressed my concerns with Chief Diaz and his position has not changed. His response to me was that I had to do whatever it took to protect myself.

Regarding his decision making abilities, I know based on conversations with him that he is strongly influenced by outside entities to include an ex-city manager, a certain council member and HR personnel who are bias. His decisions have led to unfair discipline practices, primarily towards me. While this mainly affects me, I have to tell you it is not comfortable knowing someone is after your career and your leader will not take the appropriate steps to protect you or look out for your well-being.

Most importantly, I know of a particular incident that could be very damming to our agency if made public. Because of the current atmosphere towards police agencies in this country, I think that we have to maintain standards and the integrity of our agency even if our Chief does not want to.

Recently, a complaint came in towards Sgt. Avila. Sgt. Avila told me the complaint might come in and it in fact did so. The blue card was already filled out when it came in and the complainant handed it to me. I gave the complaint to Chief while he was in his office. As of this date, the complaint has been handled internally. I know this because the Chief told me himself that he "handled it" and "it has been taken care of." Sgt. Avila told me that he received a written reprimand. The problem with the way this was handled is that there is no accountability and the incident was quite embarrassing and illegal as it involved a threat under the color of authority by Sgt. Avila. If anyone else would have conducted themselves in this manner, they would and should be put on administrative leave and severely punished if not terminated.

This issue directly relates to Chief Diaz's ethical decision making. I am concerned about the future and image of our department. This information will be shared with City Council and the press as soon as possible once the POA has been fully informed. Please attend this meeting. Will the POA Board please schedule a meeting as soon as possible.
Thank you for your attention to this matter.

Can someone send this to Fisher. His email was not in the POA contact list.

389

**Email sent on Sept 16, 2015 (Highlighted in Blue Below from Steve Hobb):**

For those of you that don't know I have been put in admin leave for no stated reason. I think what I have to say has scared someone. Also someone in the POA went to the Chief with my email.

Sent from my iPhone

On Sep 14, 2015, at 2:44 PM, Banning POA < banningpoa@gmail.com> wrote:

I would like to have an emergency POA meeting as I have concerns about Chief Diaz's decision making ability, unfair discipline practices and his ethical compass. These are serious issues and I believe every member of the POA should be a part of the discussion and decision on how to address them. I have already addressed my concerns with Chief Diaz and his position has not changed. His response to me was that I had to do whatever it took to protect myself. Regarding his decision making abilities, I know based on conversations with him that he is strongly influenced by outside entities to include an ex-city manager, a certain council member and HR personnel who are bias. His decisions have led to unfair discipline practices, primarily towards me. While this mainly affects me, I have to tell you it is not comfortable knowing someone is after your career and your leader will not take the appropriate steps to protect you or look out for your well-being.
Most importantly, I know of a particular incident that could be very damming to our agency if made public. Because of the current atmosphere towards police agencies in this country, I think that we have to maintain standards and the integrity of our agency even if our Chief does not want to. Recently, a complaint came in towards Sgt. Avila. Sgt. Avila told me the complaint might come in and it in fact did so. The blue card was already filled out when it came in and the complainant handed it to me. I gave the complaint to Chief while he was in his office. As of this date, the complaint has been handled internally. I know this because the Chief told me himself that he "handled it" and "it has been taken care of." Sgt. Avila told me that he received a written reprimand. The problem with the way this was handled is that there is no accountability and the incident was quite embarrassing and illegal as it involved a threat under the color of authority by Sgt. Avila. If anyone else would have conducted themselves in this manner, they would and should be put on administrative leave and severely punished if not terminated. This issue directly relates to Chief Diaz's ethical decision making. I am concerned about the future and image of our department. This information will be shared with City Council and the press as soon as possible once the POA has been fully informed. Please attend this meeting. Will the POA Board please schedule a meeting as soon as possible.
Thank you for your attention to this matter.

Can someone send this to Fisher. His email was not in the POA contact list.

**390**

**Email sent from Steve Hobb on September 16, 2015 (Listed Below)**

I asked for an emergency POA meeting on Sunday because I want to bring up issues that are directly related to the future of our department and the fact that Chief Diaz is not the right person for the job. When he took the position he promised he would not run the department like Purvis did. Well if you are in my shoes, things haven't changed. I care about our department and want it to exist and be a place where good police work can be done even if the city doesn't want to pay us.

I think there are a lot of good people there with the right intentions who want the same thing. The fact that we stay and work there for the pay they offer is a testament to who we are.

I was informed by the POA attorney, Mike McCoy, that I cannot discuss personnel matters. Brian Callahan was also advised this as he asked for advice after I sent my email. This is respectable as it appears he wants to do the right thing for the whole POA.

With that said; It's convenient to hide behind the excuse that it's a personnel matter when you want to hide wrong doing and you know the law protects you to a certain extent (speaking of the Chief). Well I can avoid bringing up the specifics about the personnel matter I referenced in the last email because this is really about the Chief and his accountability to not only the citizens of Banning, but to us as well. I think that members of the POA should hear what I have to say because this affects everyone of us and our future and viability as a police agency.

I believe that since I am a member of the POA I have a right to address all of you with my concerns. If the general membership of the POA does not want to hear what I have to say, I will do what I have to that coincides with my principals all by my lonesome.

I chose this path I am on because I feel a moral obligation to do the right thing. Remember, I already went to the Chief and gave him an opportunity to fix this, but he did not as he has taken this personal and placed his feelings and position in life ahead of all of us and our futures.


With Respect,

Steve Hobb


"Courage is not the absence of fear, but rather the judgement that something else is more important than fear."

391

## To: Rita Chapparosa (Human Resources)

On September 23, 2015 at approximately 1600 hours, The Banning BPOA (Banning Police Officer's Association) held a quarterly meeting at Banning High School Library. During the discussion Cpl. Steve Hobb talked about a complaint that was turned in by a citizen against me and how I was disciplined for that incident. Cpl. Hobb stated he did not agree with the way I was disciplined.

Cpl. Hobb went on to say that he listened to the audio recording on the day of the incident. Cpl. Hobb said he listened to the audio in case I (Sgt. Avila) went to him for advice. I never approached Steve Hobb for any advice in regards to the incident. Steve Hobb told the BPOA that he went on his own to listen to my audio recording the day of the incident. Cpl. Hobb was not assigned to investigate the incident and was not my supervisor. I did not give Cpl. Hobb authorization to review the audio recording nor did I let him listen to my audio recording the day of the incident.

I believe by Cpl. Hobb listening to my audio recording, he started his own investigation as a Corporal to investigate me as a Sergeant. When Cpl. Hobb listened to the audio recording, I believe he was not authorized by the administrative staff to do so. I believe this is in violation of Banning Police Policy listed below. Cpl. Hobb sent out an email on (September 16, 2015) that he was informed by POA attorney (Mike McCoy) that he cannot discuss personnel matters. See attached for further.

Cpl. Hobb was a Corporal at the time of my compliant that was filed against me and was an acting Watch Commander and was not my supervisor. I would like to add this new complaint to my original complaint against Cpl. Steve Hobb.

## 450.9 REVIEW OF RECORDED MEDIA FILES

When preparing written reports, members should review their recordings as a resource. However, members should not use the fact that a recording was made as a reason to write a less detailed report.

Supervisors are authorized to review relevant recordings any time they are investigating alleged misconduct, reports of meritorious conduct or whenever such recordings would be beneficial in reviewing the member's performance.

**Recorded files may also be reviewed:**

(a) Upon approval by a supervisor, by any member of the Department who is participating in an official investigation, such as a personnel complaint, administrative investigation or criminal investigation.

393

## Vincent Avila

| | |
|---|---|
| **From:** | Joni Miller |
| **Sent:** | Tuesday, July 07, 2015 8:30 AM |
| **To:** | Alex Diaz; Daniele Savard; Vincent Avila |
| **Subject:** | Steve Hobb |

The DWC 1 forms are not signed in the Employer Representative sections for Steve Hobb's two claims he is submitting.

*Joni Miller*

Human Resources Technician

City of Banning
Human Resources/Risk Management Division
99 E  Ramsey Street
Banning  CA  92220
Phone: (951) 922-3155
Fax:     (951) 922-3157
jmiller@ci.banning.ca.us
www.ci.banning.ca.us



The City of Banning promotes and supports a high quality of life that ensures a safe and friendly environment, fosters new opportunities and provides responsive, fair treatment to all and is the pride of its citizens.

*As a reminder, due to budget and staff reductions, City Hall is closed every Friday.*

1

394

BANNING POLICE DEPARTMENT

09/15/2015

From:  SHOBB
Date:  Thursday, May 28, 2015
Time:  03:58:56

I hurt my arm with that drunk guy. Im gonna see how it feels tonight to see if I need to fill out any paperwork. I'll let you know.

395

# EXHIBIT C

## *PUMA Audit Log Report*

| EntryDate | UserID | UniqueID | Description |
|---|---|---|---|
| 6/5/2015 4:47:58 PM | U373 | | User Logged Into the Pu |
| 6/5/2015 4:49:32 PM | U373 | | User Logged out of the I |
| 6/5/2015 4:54:11 PM | U373 | | User Logged Into the Pu |
| 6/5/2015 4:54:50 PM | U373 | U37311410508201600291 6 | User Listened to Audior |
| 6/5/2015 5:01:04 PM | U373 | | User Logged out of the I |
| 6/5/2015 5:01:16 PM | U373 | | User Logged Into the Pu |
| 6/5/2016 5:01:25 PM | U373 | U4042890606201515253 9 | User Listened to Audior |
| 6/5/2016 5:02:05 PM | U373 | U4042900605201515254 0 | User Listened to Audior |
| 6/5/2015 5:02:24 PM | U373 | U4042910606201515254 0 | User Listened to Audior |
| 6/5/2015 5:03:03 PM | U373 | U4042900605201515254 0 | User Listened to Audior |
| 6/5/2015 5:03:16 PM | U373 | U4042920605201515254 0 | User Listened to Audior |
| 6/5/2015 5:04:11 PM | U373 | U4042890605201515253 9 | User Listened to Audior |
| 6/5/2015 5:20:37 PM | U373 | | User Logged out of the I |

Page NO: 1

397

# EXHIBIT D



**Banning Police Department**
125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

**To:**  Sgt. Vince Avila                    **Date:**  October 1, 2015

**From:**  Lieutenant Phil Holder

**Reference:**  Administrative Investigation Witness

---

You have identified yourself as a victim/witness in an administrative investigation relating to a potential charge of misconduct against Corporal Steve Hobb. The Banning Police Department is conducting an investigation into this matter.

Your involvement in this investigation is to obtain facts related to this matter. David Flutts, a private investigator, will be the fact-finder in this matter. You are scheduled for an interview with Mr. Flutts regarding this matter on Thursday, October 8, 2015 at 1100 hours in the Banning Police Department. The interview will be audiotape recorded.

In order to maintain the integrity of the investigation process, you are ordered to refrain from discussing this notice or investigation with anyone. If you have any questions regarding this matter, please feel free to contact Chief Alejandro Diaz.

10-1-15

399

# EXHIBIT E



# Banning Police Department

125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

## *Memorandum*

**To:**    Corporal Steven Hobb               **Date:**   September 29, 2015

**From:**    Chief Alex Diaz

**Reference:**    Administrative Investigation #15-08

The Banning Police Department is commencing the above reference administrative internal affairs investigation in which you have been identified as the subject. The preliminary allegations involve claims that you engaged in misconduct, including but not limited to, discrimination, harassment and retaliation against Sergeant Vincent Avila over the last few months causing him to experience a hostile work environment and in an attempt to undermine his authority. These allegations also include claims that you improperly accessed departmental records in your efforts to discredit and undermine him and then disseminated such information along with protected disciplinary information related to Sergeant Avila to others, including members of the BPOA through emails and at a general meeting. The nature of the allegations are such that if sustained, discipline could result for violations of City and/or Department ordinances, resolutions, rules, regulations, policies, orders and/or directives.

The City has retained outside investigator David Flutts from RCS Investigations and Consulting LLC to conduct the administrative internal affairs investigation, including your administrative interview. Accordingly, you are hereby ordered to cooperate fully with the investigator. You are to answer questions in a complete and truthful manner, in accordance with your obligations under the Banning Police Department Policy Manual. You are further ordered to obey any lawful order given by the outside investigator as though such order was coming from a superior in your chain of command with the City of Banning.

At this time, your administrative interview has not been scheduled. When the interview is scheduled you will receive advanced notification of the time and place of where it is to occur. When the interview does take place it will recorded. You will have access to the recording if any further proceedings are contemplated or prior to any further interrogation relating to this investigation at a subsequent time. You have the right to bring your own recording device and to record any and all aspects of your interview.

You have the right to be accompanied by a representative of your choice who may be present at all times during the interview. However, this representative shall not be a person subject to or a

witness in the same investigation.   You have the right to discuss this investigation with a representative of your choice.

If you have any scheduling conflicts when the interview is scheduled, please call Investigator Dave Flutts immediately at 951-310-4842.   If you have any questions prior to the interview please do not hesitate to contact Lt. Holder at 951-849-1097.

**RECEIVED AND ACKNOWLEDGED**


Steven Hobb          Date                    Witness                    Date

**402**



**Banning Police Department**
125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

| | | | |
|---|---|---|---|
| **To:** | Cpl. Steve Hobb | **Date:** | November 12, 2015 |
| **From:** | Chief Alex Diaz | | |
| **Reference:** | Internal Affairs Investigations #15-08 & 15-09 | | |

Your initial interviews for Internal Affairs Investigations #15-08 and #15-09 have been scheduled for **Monday, November 23, 2015 at 10:00 a.m.** in the small conference room of Banning City Hall. Investigation #15-08, involves a complaint against you alleging your engaged in misconduct, including but not limited to, discrimination, harassment and retaliation against Sergeant Vincent Avila causing him to experience a hostile work environment and in an attempt to undermine his authority. Investigation #15-09 alleges you violated the chain-of-command, did not follow a lawful order from a supervisor, were insubordinate, and provided disingenuous information to Police Administration during an incident which occurred on or about August 20, 2015.

Based on the allegation, I must advise you it is unacceptable for you to take any adverse actions against any person(s) for their involvement in the filing of the complaint.

The City has retained outside investigator David Flutts from RCS Investigations and Consulting, LLC. to conduct the administrative internal affairs investigation, including your administrative interview. Accordingly, you are hereby ordered to cooperate fully with the investigator. You are to answer his questions in a complete and truthful manner, in accordance with your obligations under the Banning Police Department Policy Manual. You are further ordered to obey any lawful order given by the outside investigator as though such order was coming from a superior in your chain of command with the City of Banning. During the interview you will be afforded all rights permitted by City and Departmental rules and the state's Public Safety Officers Procedural Bill of Rights Act (Gov't Code Sections 3300-3313).

You are advised in advance that the interview will be recorded. You will have access to the recording if any further proceedings are contemplated or prior to any further interrogation relating to this investigation at a subsequent time. You have the right to bring your own recording device and to record any and all aspects of your interview.

You have the right to be accompanied by a representative of your choice who may be present at all times during the administrative interview. However, this representative shall not be a person subject to the same investigation. If you plan to choose an employee representative, you are directed not to contact this person until you have informed Lieutenant Phil Holder of the

403

individual's name so that he may advise whether or not they are a potential witness in this administrative investigation.

If you have any questions regarding this memorandum or the investigation or have any scheduling conflicts, please call Lieutenant Holder.


**RECEIVED AND ACKNOWLEDGED**


---

Employee              Date                    Witness                Date


404

# EXHIBIT F

# City of Banning Police Department



## OFFICE OF THE CHIEF OF POLICE

September 15, 2015

Corporal Steve Hobb
384 Steiner Drive
Hemet, CA 92543

Dear Corporal Hobb:

This letter is to notify you that effective immediately you are placed on administrative leave from your position as a corporal with the Banning Police Department.

> Your peace officer powers per Penal Code section 830 et seq. are immediately suspended including your authorization to possess Banning Police Department weapons, identification cards and any Police badges. Pending further notice, these items are to be surrendered to the Banning Police Department.

> You are ordered to take no action as a Police Officer, and to not wear any department uniforms while this action is in effect. Your authorization to carry a concealed weapon, either on or off duty, is hereby immediately suspended. Additionally, you are not permitted to enter any Police Department facilities without a supervisory escort.

You are ordered to contact Police Administration, Lieutenant Phil Holder at (951) 849-1097, except for weekends and holidays, at 0900 hours. You are temporarily assigned to a different shift (Monday through Friday, 0900 hours to 1700 hours) except for weekends and holidays. You are also ordered to be at your residence during your assigned shift hours.

These actions will remain in effect until revoked by the Chief of Police.

Sincerely,

Alex Diaz
Chief of Police

I acknowledge receipt of the original of this letter and understand that my peace officer powers and authorization for outside employment have been temporarily revoked.

9/15/15
Date

Signature



## City of Banning Police Department

### OFFICE OF THE CHIEF OF POLICE

**VIA PERSONAL DELIVERY**

September 18, 2015

Corporal Steve Hobb
384 Steiner Drive
Hemet, CA 92543

Dear Corporal Hobb:

I understand that you are questioning the reasons for your being placed on administrative leave and believe that it may be connected with your recent communications with BPOA members. Accordingly, I want to dispel any perception that you were placed on administrative leave because of any protected labor activity. This letter is to formally notify that the reason for your recent administrative leave is the rapid accumulation of internal affairs investigations in which you are the subject. You currently have one active internal affairs investigation, and two additional Internal Affairs awaiting a case number and assignment to an outside investigator. Given that you will now have three outstanding internal affairs investigations at one time, I determined that it would be in the Department's best interests to place you on administrative leave until such time as these are resolved and to avoid any further incidents in the meantime.

You should continue to follow the paid Administrative Leave directive dated September 15, 2015 that you received from me. You remain subject to being called to work or some other work related location during your administrative leave work hours. In the event that you are sick and unable to be called in, you must immediately notify the City in accordance with City reporting policies. In the event that you want to take leave time and be excused from having to be available, you must seek advanced approval for such personal leave from Lt. Holder. You shall not retaliate, harass or discriminate in any way against any person who made a complaint against you or against any person participating or perceived to have participated in the pending administrative investigation of such a complaint.

The above directives will remain in effect until revoked by the Chief of Police.

Sincerely,

Alex Diaz
Chief of Police

I acknowledge receipt of the original of this letter.

9/21/15
_____
Date

_____
Signature

# EXHIBIT G

BANNING POLICE DEPARTMENT


INTERVIEW WITH
VINCENT AVILA


INTERVIEWED BY
DAVID FLUTTS


ADMINISTRATIVE INVESTIGATION
RCS #2015-050


OCTOBER 8, 2015 @ 10:55 AM


Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

Investigator David Flutts                    (DF)
RCS Investigations and Consulting

Vincent Avila                                (VA)
Police Sergeant
Banning Police Department


DF:    Today's date is October 8, 2015, the time is 10:55 a.m. My name is David Flutts,
       I'm a private investigator from RCS Investigations and Consulting. Our firm was
       retained by the City of Banning to conduct this administrative investigation. The
       investigation concerns allegations of potential misconduct against Corporal Steve
       Hobb and resulted from a complaint filed by Sergeant Vincent Avila. The alleged
       misconduct occurred in September of 2015. The RCS case number is 2015-050
       and the Banning PD Internal Affairs case number is 15-08.

       This is an interview with Sergeant Avila and the interview is being conducted at
       the Banning Police Department. Sergeant Avila is a witness only and is not the
       subject of this investigation. On behalf of Chief Alex Diaz I am directing you to
       answer all questions completely and truthfully. Do you understand this
       admonishment?

VA:    Yes, I do.

DF:    Please state and spell your name.

VA:    Vincent Avila, V-i-n-c-e-n-t, A-v-i-l-a.

DF:    What is your current assignment and how long have you been employed at the
       department?

VA:    Uh, my current assignment is Patrol Sergeant and I've been employed since
       August 21, 2006.

DF:    Did you have law enforcement experience at another agency prior to that?

VA:    Yes

DF:    Where was that?

VA:    Uh, Pomona PD, as a reserve.

DF:    Okay. Did you contact the City of Banning Human Resources Department in
       September of 2015, regarding complaints you had against Corporal Steve Hobb?

VA:    Yes, I did.

2

410

DF:     And when did you contact Human Resources?

VA:     Um, I believe it was on September 15th, 2015.

DF:     And was your complaint in writing?

VA:     It was in, through email.

DF:     Okay

VA:     I wrote it up.

DF:     Written form and was emailed to Human Resources?

VA:     Yes

DF:     Okay. Prior to going to Human Resources did you contact anyone here at the department about your complaint?

VA:     Uh, Chief Diaz.

DF:     Okay, and, um, who was your contact person at HR?

VA:     Um, Rita Chapparosa.

DF:     Okay, and you already answered this but, your initial correspondence and complaint with her was via email?

VA:     Uh, I told her and, and, let's see, I think I gave it to her, I think I gave her a hardcopy and then she said she wanted it emailed.

DF:     Okay

VA:     Or I emailed it to her and she didn't have it yet and, initially.

DF:     Okay, and, um, after your initial correspondence, did you later submit additional information to Human Resources concerning ongoing actions taken by Corporal Hobb?

VA:     Yes, I did.

DF:     Did the complaints that you submitted include actual emails that had been sent by Corporal Hobb?

VA:     Yes

3

**411**

DF:    Did you submit additional information to Rita Chapparosa after a Banning Police Officers' Association meeting which was held on September 23, 2015?

VA:    Yes, I did.

DF:    Did that information include additional behavior by Hobb that you had concerns with?

VA:    Yes

DF:    Now I wanna show you some documents and I'm just gonna ask you to verify that these are true copies. This, uh, I have a two-page document here that is a written narrative and then at the bottom in blue it appears to be an email that had been sent by Hobb. I'm gonna ask you to look at that and ask if that is a true copy of your initial complaint.

VA:    Yes, this is my first complaint.

DF:    Okay. I'm gonna show you a second document, it's a one-page document, uh, first portion is in blue, um, and this appears to be an email that had been sent by Corporal Hobb. I'm gonna ask you to look at this and ask if that appears to be the case.

VA:    Yes

DF:    And is that portion in blue there, is that one email and then the bottom portion is the original email?

VA    Correct, the blue is sent from his IPhone I believe because it says, sent from my IPhone.

DF:    Okay, and is that a document that you submitted to HR?

VA:    Yes

DF:    Okay. The third document I'm going to show you, um, is a one-page document and this appears to just be the second email sent by Hobb. I'm gonna ask you to take a look at that one if you would.

VA:    Yes

DF:    Does that appear to be a true copy of what you submitted to HR?

VA:    Yes

4

DF:   Okay, and the final document I'm gonna ask you to look at is a two-page document and it appears to be a narrative document sent I believe by you to Rita Chapparosa. I'm gonna ask you to take a look at that document.

VA:   Yes

DF:   Does that appear to be a copy of the document you sent to Rita Chapparosa?

VA:   Yes

DF:   Okay, thank you. Now on September 14, 2015, at about 11:39 a.m., did Steve Hobb call you?

VA:   Yes, he did.

DF:   And, um, did Hobb ask you about a complaint that had been filed against you?

VA:   Yes, he did.

DF:   And what was the general nature of that complaint?

VA:   Uh, that complaint was, I cursed out a guy and I got a written reprimand for that.

DF:   And, um, when Corporal Hobb called you, um, were you on-duty or off-duty?

VA:   I was on-duty.

DF:   And was he on-duty or off-duty, do you know?

VA:   He was off-duty.

DF:   And, um, did you find it unusual that he called you to ask you about this?

VA:   Yes, but prior weeks he's been asking me, hey, did that complaint get, um, dealt with yet? Did it get dealt with? And then I finally got tired of it so when he called me on September 14, I just told him, yeah, I got, I got written for it.

DF:   So he had asked you prior to that date several times about the complaint?

VA:   Yes

DF:   When did that complaint come into the department?

VA:   Either June or July.

DF:   Okay

5

**413**

VA:     I can't recall.

DF:     So that had been, some time had passed?

VA:     Yes

DF:     And, um, so why would you provide the information to Hobb? I mean, what business was it of his?

VA:     Uh, he just wanted, you know, I, it wasn't his information, his business, but just to have him stop calling me or asking about it, it just, I got written up for it.

DF:     Okay

VA:     That's it. I didn't give him details or nothing like that.

DF:     Did he, uh, when you told him you got, I think you said you got a written reprimand?

VA:     Yes

DF:     And when you told him that did he continue to ask questions about it?

VA:     He was going to but then he said, you know, I'm not gonna ask, um, he said, thanks, whatever, and we just hung up. It was very short.

DF:     The phone call?

VA:     Yeah, and I took a picture of the date. Just, it says yesterday – so this is Corporal Hobb, um, yesterday, September 15th is when I took the picture and, let's see, the 15th and it still shows Corporal Hobb yesterday, is when he called me.

DF:     Okay, so which indicates September 14th?

VA:     Yes

DF:     Okay, now, and that was on your personal cellphone?

VA:     Yes, it was.

DF:     And what did he call you from, do you know what number? Was it his cellphone?

VA:     It would have to be, I'll have to look it up.

DF:     Okay, that's fine. Now how long would you say that conversation, the entire conversation lasted?

6

414

VA:     Oh, maybe 20 seconds, if that.

DF:     That was it?

VA:     Yeah, it wasn't that long.

DF:     And prior to that how many times would you estimate that Hobb had asked you about this complaint against yourself?

VA:     At least two times.

DF:     Okay, and did he ever, at any point did Hobb ever indicate to you what his interest was?

VA:     No, he didn't.

DF:     Did you ever wonder what his interest was?

VA:     Yeah, just, um, he's, he's always trying to fish for stuff, you know? Uh, I just had the, had a feeling, ever since I got promoted.

DF:     And when did you get promoted?

VA:     Uh, last year, November 20 – no, October 27th.

DF:     Of 2014?

VA:     2014

DF:     Okay, and, uh, so ever since you were promoted to sergeant there's been, how would you describe your relationship with Hobb?

VA:     Huh, when I first got promoted, I mean, I would walk by him, he's, won't even acknowledge me or say hi or anything like that until like maybe a month later.

DF:     So prior to you being promoted to sergeant how was your relationship with Hobb?

VA:     It was okay, I mean, I don't really hang out with anybody here, nothing like that. Uh, you know, hi, bye, how ya doing, you know, but not buddy, buddy.

DF:     Okay, was there ever any conflict between the two of you prior to you being promoted?

VA:     No

DF:    Okay. Now, um, the promotional process that you participated in and ultimately were promoted by, did Hobb take part in that process?

VA:    Yes, he did.

DF:    Okay. Did he ever complain to you about the process, that process in any way?

VA:    Um, not to me but he's made comments and stuff like that, you know, in our POA board and stuff like that.

DF:    Okay. Now, uh, later that same day, again, we are referring to September 14, 2015, at about 2:44 p.m., did you and other BPOA members receive an email from Corporal Hobb?

VA:    Yes, we did.

DF:    And, um, do BPOA members receive associated related emails on their personal email addresses?

VA:    Yes

DF:    Okay, and from the documents that I showed you earlier, I'm gonna refer to this one-page document – is this the original email that he sent?

VA:    That's original but the email from the first complaint is listed below, so that'll be all –

DF:    Okay, yeah, but this is, just for the record, this is the document here? This is the email that he sent?

VA:    Yes, yes, it is.

DF:    And it's listed at 2:44 p.m.?

VA:    Correct

DF:    And now the email address that it came from appears to be BanningPOA@gmail.com, is that correct?

VA:    That's correct.

DF:    Is that the police officers' association email address?

VA:    Yes, it is.

DF:    Okay, and did, uh, does this document show the entirety of that email?

VA:     Yes, it does.

DF:     And was that email signed anywhere on it?

VA:     Um, no, it doesn't look – appear signed.

DF:     Okay, and did you believe it was sent by Corporal Hobb?

VA:     Yes

DF:     Why did you believe that?

VA:     Because I talked other, um, Banning POA board members, three of them, and they said that they had no knowledge of that email or sent an email.

DF:     Now, um, how would Corporal Hobb have access to that email address?

VA:     I believe maybe when he was a prior, like vice-president or president of the POA, uh, he still had access to it.

DF:     Okay, so has that, um, has the association had that email address for some time?

VA:     Yes, I believe so.

DF:     Okay. Now you said the prior, uh, at some point prior to this, um, Hobb was a board member?

VA:     Yes

DF:     Okay. Now when this email was sent out on September 14th, you said that you spoke to some board members?

VA:     Yes

DF:     Who did you speak to?

VA:     Um, Walker –

DF:     What's his first – is that a he?

VA:     Uh, yeah, Brian Walker

DF:     Is that an officer?

VA:     Officer, yeah, a detective now.

9

417

DF:   Uh, huh

VA:   Uh, Sergeant Mike Loader.

DF:   Okay

VA:   And then the third one is Brian Callahan, Officer Brian Callahan.

DF:   How do you spell – is it C-a-l?

VA:   C-a-l-l-a-h-a-n

DF:   Okay, and you asked the three of them?

VA:   Yeah

DF:   In what context did you ask them?

VA:   Just asked –

DF:   In email or how-?

VA:   Yeah, the email, he goes, you guys know about this? I'm like, no, I mean, not altogether but –

DF:   Right

VA:   -I asked 'em.

DF:   Okay, that same day?

VA:   Yeah, I believe it was the same day.

DF:   Okay, and was your request to them or your question to them, was that via email?

VA:   No, it was verbal.

DF:   Okay, so you saw them?

VA:   Yeah, I saw them.

DF:   That day?

VA:   Yeah

DF:   Or you called them?

VA:   Well I called them or I saw them, you know, Callahan was working that day.

DF:   Okay

VA:   I believe so and then, uh, Walker and Loader, I contacted them.

DF:   Okay, so you verbally spoke to them?

VA:   Yeah

DF:   Okay, and what did you ask them in essence?

VA:   I said, you guys know about this email? They, they had no idea about this email-

DF:   Okay

VA:   -or anything like that. I just wanted to know, because to my knowledge only board members had access to the email.

DF:   Right

VA:   Cause I don't even know how to get on that email-

DF:   Okay

VA:   -and send things out. So that's why I went to the board members.

DF:   And presumably or let me ask it this way -- Do you know if that email address requires a password to get into it?

VA:   Uh, I believe it does because I believe Officer Callahan was changing it a few weeks ago.

DF:   Okay. Did you ask either Walker, Loader, or Callahan about, anything about the password?

VA:   No, I didn't.

DF:   Did, uh, based on the content of the email that was sent, um, you said that it was your belief that that was Hobb that sent that?

VA:   Uh, huh

DF:   What -- is that yes?

11

**419**

VA:   Yes, it is, because on his, uh, on the second email he sent out, um, he goes, for those of you who don't know, I have been put on admin leave for no stated reason. I think what I have to say has scared someone. Also someone in the POA went to the chief with my email.

DF:   So he in essence admitted that it was him?

VA:   Yeah, and I, that's how I took it.

DF:   When you spoke to Walker, Loader, and Callahan, did they express any opinion to you as to who they thought the author of that email was?

VA:   Well, everybody suspected it was Hobb.

DF:   Okay. Now did you submit additional information to Rita Chapparosa after a BPOA meeting which was held on September 23, 2015?

VA:   Yes

DF:   And did that information include additional behavior by Hobb that you had concerns with?

VA:   Yes

DF:   And, um, I think I may have asked you that already but, um, uh, bear with me a second here – Now the content of the first email, um, you had concerns with?

VA:   Yes, cause my name's listed in it.

DF:   Okay, and, um, in essence, what was your complaint about that email?

VA:   Um, that he told everybody about my business, about my complaint, my discipline.

DF:   Okay

VA:   And how he doesn't think it's right and, you know? Um, you know? You know, I should've been put on administrative leave or, you know, severely punished if not terminated.

DF:   Okay

VA:   By putting that out, I mean, you know, since, since this email people have been, I feel like people have been, like just not looking at me the same.

DF:   Okay, how do you mean?

12

**420**

VA:  Um, like, okay, did this really happen? Did you treat like, did he treat people like this? You know? It, it, to me it seems like I, you know, like people think, like I'm this bad person and I'm really not.

DF:  Okay

VA:  Before this incident, uh, you know, I have never got a citizen complaint from anybody, the years I've been here. You know, just, it just ruined my reputation.

DF:  Now in your first complaint document you mentioned a situation regarding some injury claims by Corporal Hobb?

VA:  Yes

DF:  Now, um, please explain what occurred with regard to those claims.

VA:  So what happened is, uh, on July 7th I received an email from Joni Miller, she works City Hall Human Resources, regarding Steve Hobb filing two injury claims. Uh, I was asked by Human Resources why I didn't fill out the paperwork. I explained to 'em, I'm not Hobb's immediate supervisor, that it should've been Holder. I, I told 'em, well, they, they had the impression that he was on my team. He was not. He works nightshift, I work dayshift. So I tell 'em, I'm not a supervisor but, um-

DF:  You're not his, you weren't his supervisor?

VA:  I'm not his supervisor.

DF:  Okay

VA:  But he still told me about this claim. But he's sending me an email prior to that saying that, you know, if it hurts, if my arm hurts, I'll let you know if I'm filling out paperwork. And he never did.

DF:  Okay, and you have that email?

VA:  So they made it sound – Yeah, it's, it's right here.

DF:  Okay

VA:  It's from him.

DF:  Okay. Alright, so, uh, and I just wanna clarify, the person at HR that contacted you about this is Joni, J-o-n-i, Miller, is that right?

13

VA: Yes

DF: Okay, so, um did you inform Miss Miller that Hobb's immediate supervisor was Holder?

VA: Yes, I explained that to him, to her and, uh, Rita.

DF: Okay, and so what was your impression with regard to what Hobb was trying to do with these injury claims?

VA: I believe he was trying to set me up.

DF: How so?

VA: Um, trying to, just, uh, throw me under the bus and get me in trouble. Like he reported to me and I didn't do nothing about it which, that wasn't the case.

DF: So was it apparent that at some point, um, Hobb contacted HR about these supposed injuries?

VA: Yes, so, Hobb sent me this on May 28th. I got an email from Joni reference these claims on July 7th, so, I mean, I have no know – I thought he was fine, he wasn't gonna make a claim, he never told me anything about it or I thought he would contact Lieutenant Holder.

DF: So what if anything did you tell him after he sent you that first email about the injury to the arm? What did you tell him?

VA: Well, he, he, he said, he told me verbally that morning, hey, um, I kinda like hurt my arm, uh, struggling with a drunk guy or something like that and I said, okay. He goes, I'll, I'll, I'll see if I wanna, um, fill out some paperwork later on it. I said, okay, just let me know or let Holder know. He said, okay, and then he sent me this email, I mean, that RIMS message. It's not an email, it's a RIMS message on our, um, RIMS system.

DF: On your, that's your Records Management System?

VA: Yeah

DF: Okay

VA: So that's how I got, I was like, okay, and I just, um, went from there.

DF: So your response to him was in person, verbally?

VA: Uh, huh

14

DF:   Okay, is that yes?

VA:   Yes, it is.

DF:   Okay, and, so did you then not hear anything further about any of that until you were contacted by Joni Miller?

VA:   Yes, through email.

DF:   And that was in July?

VA:   July 7th.

DF:   Okay

VA:   Did you want copies of those?

DF:   Eventually, yes.

VA:   Okay

DF:   So the message that you just showed me a moment ago, that's from your RIMS system?

VA:   Yes

DF:   The one from Hobb to you?

VA:   Yes

DF:   Okay, and the message from Joni Miller to you was, um, that was a regular email?

VA:   Yes

DF:   Okay

VA:   You can have those.

DF:   Alright

VA:   I have them saved, this one you need copies.

DF:   No, this is fine. So, uh, just for the record I'm gonna identify these documents. One of them is, uh, the one that says Banning Police Department on top, that's a RIMS message?

VA:   Yes, it is.

DF:   And that, um, what's, okay – from S. Hobb, dated Thursday, May 28th, 2015, uh, 0358, I believe. Uh, that's the one where he indicates he hurt his arm. And then the second one you gave me is an actual email from Joni Miller in HR, uh, and it's to Chief Diaz, to Chief Diaz' assistant, and to you, is that correct?

VA:   That's correct.

DF:   And, um, and this talks about these medical injury forms, is that right?

VA:   That's correct.

DF:   Okay, so the forms that are typically submitted for that type of situation, they require some, uh, some signatures by a supervisor?

VA:   Yes, they do.

DF:   Okay, and so was it apparent to you then that Hobb filed these forms without telling your or another supervisor? Or do you know?

VA:   I don't know if he told another supervisor.

DF:   Okay

VA:   He told me but, as a Watch Commander, to my knowledge he should tell his immediate supervisor.

DF:   And being in the position that Hobb is in as an Acting Watch Commander, correct? Is that right?

VA:   Yes, it is.

DF:   Holder would be his supervisor?

VA:   Yes

DF:   Okay, and do, in general here with injury forms, do officers or employees, do they have the option of whether or not they want to file paperwork?

VA:   Yes, cause I, I had an option before. I mean, I've never filed a claim, I just go get cleaned up or, you know –

DF:   Okay

VA:   But if it's something major –

16

DF:     Right

VA:     You know, we do it. Like some guy, an officer got bit the other day, I filled it out.

DF:     Okay, so on significant injuries, do, typically the practice at Banning PD on significant injuries, do supervisors fill out those forms?

VA:     Yes

DF:     Okay. You also mentioned in your first complaint document, um, you mentioned, um, Corporal Hobb's history of intimidation, bullying, and assaulting Banning Police Officers. What did you mean by that statement?

VA:     Um, just prior officers that used to work here, you know, uh, one, at a POA meeting years ago, I believe it was back in '08 or '09, he pushed an officer off the steps. And he was never, you know, disciplined for that. Uh-

DF:     That occurred at a BPOA meeting?

VA:     Yes, at the old station, at the old bank.

DF:     Okay

VA:     Um, just arguing with people, you know, just trying to push 'em around. Being intimidated.

DF:     Okay, when you say being intimidating, what, what do you specifically mean? What have you seen, I guess, is my question?

VA:     Well what I've heard, he's getting in arguments with other officers like Michael Bennett, um, with –

DF:     Michael Bennett's an officer?

VA:     He's a, a sergeant now.

DF:     Okay

VA:     Uh, cause, uh, last, uh, he was a POA president, Michael Bennett was, and Bennett signed this form with nobody's knowledge and I guess he told him, Hobb told him, I'll beat your ass or I'm gonna – somehow he was gonna kick his ass, something like that.

DF:     What, what form? What kind of form was it?

17

425

VA:    I don't know what kind of form it was, it was just like for, I think for, either for money, for money, to get more money or to stay where we're at and not get a raise.

DF:    Oh, you're talking about like contract negotiations?

VA:    Yeah, like contract – yeah, something like that.

DF:    Okay

VA:    But that was like a few years ago.

DF:    What other, if any other incidents do you know about with regard to Hobb's behavior?

VA:    Um, just arguing with officers, getting in their face, you know?

DF:    Have you seen that?

VA:    Um, I just heard.

DF:    Okay

VA:    He, he, you know, he used to come at me and like, when I was on a shift, when I was an officer, I mean, telling me my (unintelligible) reports suck, blah, blah, blah. Just puts you down, just puts you down and then he's known to, like he did to me on that day, oh, I'm sorry, you know, I shouldn't have acted like that, you know, he just – it's uncalled for.

DF:    You also mentioned concerns about Corporal Hobb's temper, what, what did you mean about that?

VA:    He gets mad easily. He really does.

DF:    Have you seen that?

VA:    Yeah, I seen it before in, uh, POA meetings, stuff like that.

DF:    Okay

VA:    Where he just gets very mad.

DF:    Now with regard to Hobb specifically, do you have concerns about what he might do?

VA: It just, um, you know, he, he assaulted an officer before and it just, he has a bad temper, you don't know what a person can do.

DF: Now I wanna show you one of the documents I showed you earlier. This is the one with just the little short message on top in blue. Do you see that?

VA: Yes

DF: Now is that another email that Hobb sent on September 16th?

VA: Yes, because it was sent from his, uh, it was an email but sent from his IPhone.

DF: Did that also go to all the BPOA members?

VA: I believe so, yes, it did.

DF: Okay, and what is that message – what did that message in essence say?

VA: Um, like I explained earlier, for, he wrote, for those of you that don't know, I have been put on admin leave for no stated reason. I think what I have to say has scared someone. Also someone in the POA went to the chief with my email.

DF: Okay

VA: Regarding the first email he sent out.

DF: Okay, so to your, to, uh, you believe that that clearly refers to the first email that was sent?

VA: Yes, I do.

DF: And in your mind does that show that Hobb in fact sent the first email?

VA: Yes

DF: Okay, and, um, sent from my IPhone, that was obviously sent from his cellphone, is that right?

VA: That's how I'm taking it, yes, his cellphone.

DF: Have you ever received other messages from Hobb that have that bottom, uh, thing, sent from my IPhone?

VA: Um, I can't say I have but I have from other people where it says that, or I send it, if I get email here, I'm home, it says, sent from my IPhone.

19

427

DF:   Okay, and that second email on September 16th, did that show the, that Gmail address? The Banning POA?

VA:   I would have to go back and look.

DF:   Okay

VA:   But I believe so because all this was sent to the POA.

DF:   Okay, it was like group email?

VA:   Oh, yeah, a group email, everybody in the POA.

DF:   How many members are in the POA, do you know?

VA:   Maybe roughly, now with the officers, about 22, 23 maybe?

DF:   Now does that include officers and sergeants?

VA:   Yes

DF:   Okay. Now, um, what we just looked at here in blue print on this document, was that the entirety of the message?

VA:   Yes, it was.

DF:   So his name was not on there?

VA:   No

DF:   Okay. Now I wanna refer to, um, another email, a third email I guess in essence, uh, also sent on September 16th. Um, this one here – Now this body here, was that the email that was sent on September 16th?

VA:   Yes, it was.

DF:   Now was that after this September 16th one?

VA:   Yes, it was.

DF:   Okay, and this one is fairly lengthy, is that correct?

VA:   Yes

DF:   Okay, and again, did that go to BPOA members?

VA:     Yes

DF:     Did it come from the Gmail address, do you know?

VA:     Yes

DF:     And, uh, in essence, did he acknowledge sending the previous information? Is that right?

VA:     Yeah, cause he signed it on the bottom.

DF:     Okay

VA:     Is that what you're asking?

DF:     Yes

VA:     Yes

DF:     Alright, let me look at that for a moment. And, uh, in this email, uh, in the first paragraph, does Hobb talk in essence about his, um, some of his opinions about Chief Diaz' leadership?

VA:     Yes

DF:     Okay. Now I'd like to refer to the document that you sent to Rita Chapparosa, um, here. Now in that, again, was, this was an email to Rita?

VA:     An email and a hardcopy to her.

DF:     Okay, and, um, did you reference the BPOA meeting on September 23rd that we've already talked about?

VA:     Yes

DF:     Okay, and was that a regular meeting or was that an emergency meeting?

VA:     It was a, well, they were saying it was a quarterly meeting. We needed a meeting anyways but they just said we're having a meeting, we're having it over at the high school because, for Hobb to come and talk.

DF:     Okay, so was the September 23rd date, had that already been set as a date for the meeting?

VA:     No, they set it up after all this.

21

**429**

DF:     Okay, so when Hobb started generating these emails is when this meeting was set up?

VA:     Yes

DF:     So in essence it was an emergency meeting to address the issues with Hobb?

VA:     Um-

DF:     Or at least to let him speak?

VA:     Yeah, but they didn't wanna, they didn't want him to speak on the issues he has.

DF:     Okay

VA:     They wanted to just have a regular POA meeting.

DF:     Okay, and –

VA:     But they let him attend – so at first it was gonna be at the Banning Police Department but later on in the day we got a, we got word that it's gonna be at the, um, Banning High School Library.

DF:     Okay, and is that in fact where it was held?

VA:     Yes

DF:     The high school library?

VA:     Yes

DF:     Did you attend that meeting?

VA:     Yes, I did.

DF:     And, um, during the course of that meeting was normal business discussed?

VA:     Yes, it was.

DF:     As if it was a normal meeting?

VA:     Yes

DF:     Now at some point did Hobb speak?

VA:     Yes

DF:   And, um, did he talk about the complaint that had been received against you?

VA:   Yes

DF:   What did he say specifically?

VA:   Um, he, basically, you know, he talked about, um, how discipline should be equal and, uh, he talked about his IA's and when he got discipline before and, um, you shouldn't show favoritism on people. And then he talked about my incident and that how he took it upon himself to listen to my recording on the day of, uh, my complaint was filed.

DF:   And –

VA:   And what he, and what, and his knowledge, what he remembered what was on my audio.

DF:   Okay

VA:   From the, from the incident.

DF:   Okay, and was there something in there, um, in your message to Rita about the fact that Hobb acknowledged that he listened to recordings?

VA:   Uh, yes.

DF:   Okay

VA:   Yes

DF:   And did he also, did Hobb also specifically say that he did not agree with the way that you were disciplined regarding that one specific complaint?

VA:   Yes

DF:   And did he – you mentioned this I think but – did he, did Hobb, uh, indicated he believed that he had been treated unfairly on his previous IA's?

VA:   Yes

DF:   Okay, and was that regards specifically to discipline he received?

VA:   Yes

23

**431**

DF: Okay, and I've already asked this but I just wanna confirm – He acknowledged when he spoke at this meeting that with regard to your complaint that he had listened to recordings of that incident?

VA: Yes, my incident, yes.

DF: Okay, and, um, did he also say something about that he had received the actual complaint from a citizen?

VA: Yes

DF: And was a, that was a citizen generated complaint?

VA: Yes

DF: Okay, and so the day that that complaint was submitted Hobb was working and actually physically received that complaint?

VA: Yes, cause what, what happened is, uh, the day the incident happened, um, I was downstairs downloading my recording and we brief each other before we, uh, I leave and he goes home. So I told him, hey, I just, uh, gave this guy a complaint form, he's gonna file a complaint against me. He should be coming in and I'm downloading the recording and go from there.

DF: Okay

VA: He said, okay, no problem. So later on that, when I came in the next day in the morning he goes, hey, that guy filed a complaint. I said, okay, no problem, you know, whatever happens, happens. You know?

DF: Okay, so is it normal practice here for, or let me ask you this first – So that dayshift shift, you were the sergeant?

VA: Yes

DF: And he was taking over for you as the Acting Watch Commander?

VA: No, no, his shift started at 4:00.

DF: Okay, so the shifts overlap?

VA: Yes

DF: Okay, but he was the nightshift supervisor?

VA: Yeah, so I leave at 4:00, he comes in at 4:00.

24

432

DF:   Okay, and so you informed him about this?

VA:   Yes

DF:   And is that normal practice?

VA:   Yeah

DF:   Okay, is it normal practice for supervisors to brief one another when they change shifts?

VA:   I do, yes.

DF:   Okay, and, um, did you tell him or was he there when you were downloading this recording?

VA:   He was, I believe he was getting something out of the printer. Probably was the shift bulletin, what happens during the day.

DF:   Uh, huh

VA:   So I just told him.

DF:   Okay

VA:   I told him, nothing major, you know, I was giving him my little briefing, we didn't have nothing, I just had this incident, whatever.

DF:   Okay, and did you tell him any specifics about what had happened?

VA:   No, I did not.

DF:   Okay, and did you tell him you were downloading your recordings?

VA:   Yeah, I did.

DF:   Okay, and, uh, at that time that you were physically downloading – I don't know how it works, how does it work here? Do you go to a specific location and do it?

VA:   Well, you just go on your computer, you logon and then you just find the incident and you put the incident number or case number and you push download and it just downloads in the system.

DF:   Okay, so, um, now, uh, at some point he obviously went into the system and listened to the recordings?

25

433

VA:    Yes

DF:    Do you know when he did that?

VA:    No, I, from the, the meeting, the POA on the 23rd, um, my understanding was that later on that night after we left, I left.

DF:    The same night of the incident?

VA:    Yes

DF:    Okay, and you said that was like back in June?

VA:    Yeah, June or July, I don't know the exact date.

DF:    Okay, and, um, what is your opinion with regard to why Hobb brought up your complaint as well as the discipline? Why he keeps bringing up this issue and all these emails and during the meeting?

VA:    Because I believe he's jealous and he wants to see me demoted and, um, I believe he's very upset, mad that he has not got promoted for the third time as a sergeant.

DF:    Okay, so it's your understanding he has gone through the promotional process three times?

VA:    Yes

DF:    Is that right?

VA:    Yes, well he was a sergeant, got demoted, uh, became a sergeant again, got demoted to corporal and then he's been a corporal ever since.

DF:    Okay, so he's been demoted from sergeant twice?

VA:    Twice

DF:    Okay, in what span of time, do you know?

VA:    Let's see, I believe he made sergeant like in '07 the first time. So from '07 to now, I mean, maybe 2014, he got demoted, so about seven years.

DF:    Okay, and he was promoted twice and demoted twice?

VA:    Yes

DF:    Okay. Now, um, what was your, what is your complaint in essence with regard to Hobb listening to your recordings?

26

434

VA:    Well he wasn't assigned to investigate my complaint so he has no authorization just to go in and view anybody's recording.

DF:    Okay, and, uh, in your complaint or in your, you know, your narrative to Rita Chapparosa, did you mention some department policy sections that you believe Hobb potentially violated?

VA:    Yes

DF:    Okay, and what are those sections?

VA:    Uh, 450.9: Review of recording media files, um, A, subsection A. Subsection A, do you want me to read that?

DF:    No, that's, fine.

VA:    Okay

DF:    That's fine. Um, so it's your opinion that based on his behavior and based on the fact that he acknowledged that he did this that he was potentially in violation of that section?

VA:    Yes, I do.

DF:    So your belief is that Hobb had no authorization in essence to go into your recordings and review them?

VA:    That's correct.

DF:    The way your system works here, obviously in this case, he was able to go into the recordings. Now are there any perimeters in the system that allow certain people to do that or how does that work?

VA:    I believe it's just only supervisors. Uh, I don't think as an officer you can go on other officers' recordings because I have, I believe just supervisors can do that.

DF:    Okay, so Hobb is a corporal, correct?

VA:    Yes

DF:    And, but yet he is in essence a Watch Commander on his shift?

VA:    Yeah, so, in the system, I don't know how the system works but IT, uh, can authorize different people to access different stuff in the department.

27

435

DF:     So is it apparent to you that Hobb has access?

VA:     Oh, yeah, he has access, yes.

DF:     Okay, and, um, since he was demoted last from sergeant to corporal has he, during that time period, has he been an Acting Watch Commander?

VA:     Yes

DF:     Okay, that whole time?

VA:     Yes, I believe so.

DF:     Okay. Now I touched on this at the beginning of the interview but, um, prior to all this occurring, um, had you and Hobb had any previous specific problems with one another?

VA:     No

DF:     Please summarize your overall concerns regarding the actions of Corporal Hobb with the emails as well as his actions at the association meeting.

VA:     I feel like I'm being a target against him, I mean, from him. Um, it's just, you know, I'm just, he's just trying to find something, uh, to get, to get me demoted and, um, I don't think he's happy and he just wants everybody else to be miserable too.

DF:     You don't think he's happy with regard to his position here or -?

VA:     No, I don't. I, you know, at the meeting it just, it was all about him getting demoted, he should be promoted, you know, just, it's all about him, him, him.

DF:     Okay, do you have any, uh, do you have concerns for your personal safety?

VA:     I mean, I look out my door every day before I go to work at 2:00, 3:00 in the morning.

DF:     The door of your home?

VA:     My home, yeah, and just, you know, you know, with the last incident I dealt with, with that fireman killing people, ex-fireman, you know, I just, you just don't know about people these days.

DF:     Which one was that? What is that incident?

VA:   Um, on September 26th where the ex-fireman was going around Banning shooting people.

DF:   Oh, okay, the big, the big shooting incident?

VA:   Yeah

DF:   I didn't realize it was an ex-fireman, okay. Okay.

VA:   So just, you know, just, it just opens your eyes a lot.

DF:   He was a former firefighter?

VA:   Yes, he was.

DF:   In Banning?

VA:   Um, yeah, he was at Beaumont. I think it's Banning/Beaumont, the fire station on Highland Springs.

DF:   On what?

VA:   Highland Springs and Ramsey.

DF:   Okay, and those are the streets? Highland Springs?

VA:   Yeah

DF:   Okay

VA:   Across from Stater Bros. down the street.

DF:   Alright

VA:   So it's just, you don't, you just can't trust anybody these days, you know? It's, it's sad.

DF:   In Hobb's position as a corporal, does he have access to your home address and that kind of information or does he know where you live?

VA:   He's never been to my house, no.

DF:   Okay, is there a database here at the department that he would have access to or –?

VA:   Yes, or someone can look it up.

DF:    Okay, do you have concerns about that?

VA:    Yeah, I do. I do, I'm like, I don't know what this guy's capable of, you know? He just, uh, how he gets so angry and how he just came out of nowhere with all this stuff, I'm like, wow, what is he trying to do? Is he trying to take everybody down in the department?

DF:    So, um, and I think it was the third email that Hobb, saying he acknowledged that, um, I guess the, the, uh, the association attorney admonished him that he's not to be obviously discussing personnel issues, is that right?

VA:    Yes

DF:    Okay. Did, um, what if anything did he say about that during the meeting? If anything.

VA:    Uh, I can't recall but prior to that the POA, Callahan said that he's not gonna bring up personnel issues. He was told not to and he did anyways.

DF:    He was told not to prior to the meeting, correct?

VA:    Correct

DF:    Okay, by whom, do you know? Was it the attorney?

VA:    Um, well in his emails, from the attorney.

DF:    Okay

VA:    Um, and Callahan who is the POA president told me that day on the 23rd prior to going out there that he was told that he could not talk about personnel issues.

DF:    Okay, and that was because he had disclosed all these personnel issues in the emails?

VA:    Correct

DF:    Okay. Now since all this, since the meeting of September 23rd, have you had any contact with Hobb?

VA:    No

DF:    Okay. Alright, is there anything else you'd like to add?

VA:    No

30

438

DF:    Okay. We're gonna go ahead and conclude the interview at this point. It is approximately 11:40 a.m.

To the best of my knowledge and ability, the above transcript is a true and accurate transcription of the recorded interview of Vincent Avila by RCS Investigations and Consulting LLC, transcribed by Karyn Flutts for the Banning Police Department.

31

**439**

# EXHIBIT H

BANNING POLICE DEPARTMENT


INTERVIEW WITH
STEVE HOBB


INTERVIEWED BY
DAVID FLUTTS


ADMINISTRATIVE INVESTIGATION
RCS #2015-050


NOVEMBER 23, 2015 @ 9:55 AM


Transcribed by Karyn Flutts
For
RCS Investigations and Consulting LLC
Post Office Box 29798
Anaheim Hills, California 92809-9798
(714) 779-2300

Investigator David Flutts                         (DF)
RCS Investigations and Consulting

Steve Hobb                                        (SH)
Police Corporal
Banning Police Department

Robert Baumann                                    (RB)
Attorney/Representative for Steve Hobb

DF:   Today's date is Monday, November 23, 2015, the time is 9:55 a.m. This interview
      is being conducted at Banning City Hall. My name is David Flutts, I'm a private
      investigator from RCS Investigations retained on behalf of the City of Banning to
      conduct this investigation. I am the authorized designee assigned to investigate
      this matter. Corporal Steve Hobb, his attorney Robert Baumann, and I are the only
      persons present during this interview. Mr. Baumann, can you please identify
      yourself for the record?

RB:   Yes. Robert Baumann, last name B-a-u-m-a-n-n, representative of Corporal Hobb.

DF:   Thank you. The City of Banning is conducting an administrative investigation
      into allegations that Corporal Hobb improperly accessed department records
      including audio recordings from other employees without authorization.
      Additionally, it is alleged Corporal Hobb disseminated confidential personnel
      information of a department employee to other employees through emails and
      during a Banning Police Officers' Association meeting. The alleged acts occurred
      in June and September of 2015. The RCS case number for this investigation is
      2015-050 and the Banning PD, IA number is 15-08.

      The nature of the allegations is such that you are deemed a subject employee of
      this investigation. I have been authorized to communicate an order from Chief
      Alex Diaz that you are admonished to answer all questions asked of you
      completely and that all of your answers are to be truthful. Knowingly making
      false or misleading statements during this interview will be considered a separate
      violation that could result in discipline up to and including dismissal. Do you
      understand this admonishment?

SH:   Yes, I do.

DF:   The nature of this investigation is such that the department deems that you could
      be charged with a criminal offense. Therefore, I will now advise you of your
      constitutional rights even though I am only involved in the administrative aspect
      of this interview. You have the right to remain silent. Do you understand?

SH:   Yes, I do.

DF:     If you give up the right to remain silent anything you say can be used against you. Do you understand?

SH:     Yes, I do.

DF:     You have the right to be represented by an attorney before any questions are asked. Do you understand?

SH:     Yes, I do.

DF:     Do you waive your constitutional right to remain silent?

SH:     No

DF:     Although you have refused to waive your constitutional rights be advised I will now proceed with the administrative aspect of this interview. Therefore, you are now ordered to fully and truthfully answer all questions asked of you during this interview. Your failure to do so will in and of itself constitute a disciplinary act of insubordination and will result in a recommendation of disciplinary action against you up to and including dismissal. Statements made by you in response to this order and the threat of such discipline cannot be used against you in a criminal proceeding.

        I will now advise you of your rights under the Public Safety Officers' Procedure Bill of Rights as outlined in the California Government Code: You have the right to have a representative of your choice with you during this interview and you have chosen to exercise that right, correct?

SH:     Yes

DF:     This interview is being recorded. You have the right to make your own recording of any and all aspects of this interview and you are doing so through your attorney?

SH:     Yes

DF:     You will have access to the department's recording of your interview if any further proceedings are contemplated or prior to any further interrogation at a subsequent time. There will be no more than two persons questioning you and for this interview I will be the only person asking questions of you. If this interrogation is taking place during your off duty time you will be compensated in accordance with regular department procedures and you will not be released from employment for any time missed. Are you now on duty or off duty?

SH:     On duty.

DF:     This interview session will be for a reasonable period of time based on the circumstances. Please ask if you need to take a break during the interview. At no time will you be threatened with punitive action or promised any type of reward or inducement. No offensive language will be used during the course of this interview. You will not be subject to a visit by the press or news media without your expressed consent. Do you wish to give such consent?

SH:     No, I do not.

DF:     Neither your home address nor photograph will be given to the press or news media without your expressed consent. Do you wish to give such expressed consent?

SH:     No

DF:     Do you fully understand what I have said so far?

SH:     Yes

DF:     Are you under the influence of any medication, drugs, or alcohol which may impair your ability to participate in this interview?

SH:     No

DF:     Do you have any physical, mental, or emotional disability which may impair your ability to participate in this interview?

SH:     No

DF:     Do you have any questions before we begin?

SH:     No

DF:     As the authorized designee of Chief Diaz I am now ordering you to answer questions completely and truthfully. Do you understand?

SH:     Yes, I do.

DF:     Please state and spell your name for the record.

SH      Steve Hobb, S-t-e-v-e, Hobb, H-o-b-b.

DF:     What is your current assignment and how long have you been employed at the department?

4

SH:   I'm a corporal assigned to patrol and I've been with the department approximately 10 and a half years.

DF:   What is your department ID number?

SH:   U373

DF:   Are you aware of department policies as well as several state laws that regulate the release of confidential personnel information?

SH:   Yeah

DF:   On September 14, 2015, at about 11:39 a.m., did you call Sergeant Vincent Avila on his personal cellphone?

SH:   Was that a Sunday?

DF:   I could look, I'm not entirely sure.

SH:   What, what date was it?

DF:   September 14th.

RB:   That was a Sunday.

SH:   I think it was the, it was the 13th.

DF:   Okay, the 13th was a Sunday?

SH:   I, yes.

DF:   Was it a Sunday to your recollection that you called him?

SH:   To my recollection it was a Sunday.

DF:   Okay, and that was on his personal cellphone?

SH:   Yes

DF:   And during the conversation with Avila did you ask him about a previous personnel complaint that was filed against him?

SH:   Yes

DF:   And did you at some point, during the conversation did you ask Sergeant Avila if Chief Diaz handled that complaint?

5

445

SH: Ask him if the chief did it? Uh, no, I believe I just asked him what was the outcome of it.

DF: Okay, so, um, you asked him what the outcome of whatever that complaint was?

SH: Yes

DF: Okay, and, uh, in response did Avila disclose to you that he received a written reprimand as a result of the complaint?

SH: Yes

DF: And at the time of that phone call what was your purpose in questioning Sergeant Avila about this complaint and or his discipline?

SH: I was looking to find out how the chief handled it because the chief had, uh, just gave me notice of an IA a few days prior and, uh, I felt that the chief was being unfair in discipline.

DF: What did you base that on?

SH: Um, let's see that was September, you said, uh, 13th?

DF: I had it as the 14th but, yeah.

SH: Um-

DF: The date of the phone call.

SH: I wanna say on August 21st I was given notification of an IA that I was, uh, let's see, uh, the focus of. That was IA 15-04 and that IA was regarding contact with, um, some nurses in June or July or something like that, July. And, uh, that IA number, like I said, was 15-04 and I knew that and I thought, and I thought when I saw the nature of the IA for rude and discourteous or arguing or something like that, I thought it was kinda ridiculous that I got an IA for arguing or being rude to a nurse and that Sergeant Avila didn't get an IA for his action when he got a complaint from a citizen in, uh, earlier, earlier than my incident, um, for which I knew about. And, uh, I knew that, that incident that, where he got the complaint was actually a blue card because the blue card came in and I received the blue card and I gave the blue card to the chief and I felt that the chief would investigate that but when I saw that I had IA 15-04, I knew I had IA 15-01, I knew Officer Bulrice had IA 15-02, and I knew Sergeant Feola had IA 15-03, I knew there'd been no, no IA opened on it.

6

DF:    Okay, so the, um, you're referring to the incident that Avila eventually received a written reprimand for?

SH:    Yes

DF:    So was it your belief at that time than that although Avila apparently received this written reprimand there had been no underlying investigation?

SH:    Well the chief told me that he handled it.

DF:    Okay

SH:    When I asked – go ahead.

DF:    But your, so, if I understand you correctly you believed, at the time you believed it wasn't fair because, in part because there had not been, there obviously had not been an IA number issued to that?

SH:    Yes

DF:    Okay, and the underlying complaint you referred to, I think you said blue card, is that, what does that mean?

SH:    It's a formal complaint card that comes in.

DF:    Okay, and those come in, those are the forms that come in by members of the public?

SH:    Yes

DF:    Okay. Was there any further, uh, to that conversation you had with Sergeant Avila?

SH:    No

DF:    Okay, and at any point during the conversation did Avila ask you why you wanted to know that information?

SH:    Not once.

DF:    Okay. Later that same day at about 2:44 p.m. did you send an email to all the members of the Banning Police Officers' Association?

SH:    Uh, on Monday, September 14th, yes.

447

DF:   Okay, and I'm gonna show you a copy of that and after you look at it I'm gonna ask, in essence, does that appear to be a, the same, a copy of the email that you sent?

SH:   Yes

DF:   and, um, was the email sent from the email address: BanningPOA@gmail.com?

SH:   Um, BAnningPOA@gmail.com, I don't know, hold on one second. Uh, the, the paragraph breaks are a little different than the original one I sent out. This is a copy of what I sent out.

DF:   Okay

SH:   But, so I, it looked a little bit different cause this paragraph says, recent, started off but mine says, most important – there's a paragraph break.

DF:   Oh, okay.

SH:   So I don't know if somebody –

DF:   I, I cut and pasted this so-

SH:   Okay

DF:   Yeah, that's probably why it looks different but-

SH:   Okay

DF:   I guess my question is, does the content appear to be consistent with what you sent that day?

SH:   Yes

DF:   Okay. Now, um, the question in regards to the email address, the BanningPOA@gmail, is that the standard, uh, is that the POA email address?

SH:   Yes

DF:   Okay, and that's where you sent that from that day?

SH:   Yes

DF:   And how did you have access to that?

SH:   Um, when I was on the board I, I had access to it.

DF:   Okay, so you were a previous board member?

SH:   Yes

DF:   Okay, at the time of this were you a board member?

SH:   No

DF:   Okay. So, uh, in terms of access or getting into that specific email address, the same password or whatever is still in place or at least it was at this time?

SH:   It was at that time.

DF:   Okay, does that email address in fact have some kind of a password you have to enter to get into it?

SH:   Yes

DF:   Okay. Now in that email did you mention the complaint that came in against Sergeant Avila?

SH:   Yes

DF:   And, um, and you answered part of this already but at the time that the complaint originally came in against Avila were you on duty and did you accept the complaint from the complainant?

SH:   Yes

DF:   And you described that earlier as a blue card?

SH:   Yes

DF:   In the email to the BPOA did you state that the incident involving Sergeant Avila involved an illegal act committed by Avila?

SH:   Yes

DF:   And did you also state the incident involved a threat under the color of authority committed by Sergeant Avila?

SH:   Yes

DF:   And also in the email did you disclose that Sergeant Avila told you he had received a written reprimand as a result of the complaint?

SH:    Yes

DF:    And the, regarding the underlying incident involving Avila that resulted in his complaint, did that occur sometime in approximately June of 2015?

SH:    Yes

DF:    And in this email that you sent to the BPOA did you request an emergency meeting?

SH:    Yes

DF:    Now two days later on September 16th, did you send another email to BPOA members?

SH:    Uh, yes. I don't know if I have a copy of that.

DF:    I may have. If you don't, I've got a copy here.

SH:    Okay

DF:    So the first one, uh, do you, do you have a copy?

SH:    Uh, is it that long thing?

DF:    No, the second one I'm referring to right now is just, uh-

SH:    Yes

DF:    It's just this.

SH:    I have that.

DF:    Just that one.

RB:    What's the date on it?

DF:    September 16th. And as I said, I'm just referring to the short one. Do you see that one there?

SH:    Uh, huh

DF:    Did you send that email?

SH:    Yes

DF:   Okay, and again, was that sent from the same email address?

SH:   Yes

DF:   The Gmail address?

SH:   Uh, huh

DF:   And in that email did you indicate that you had been placed on administrative leave?

SH:   Yes

DF:   And did you also indicate in that email that, um, your first email scared someone and someone went to the chief with it?

SH:   Yes

DF:   And was that your belief at that time?

SH:   Well, no, well, I knew somebody went to the chief with it, my belief that I got put on admin leave was that I scared the chief.

DF:   Okay, and, um, so your belief than, let me just make sure I have it right, is that your first email generated some fear or something on the part of the chief which led to you being placed on administrative leave?

SH:   Yes

DF:   Okay. When you were initially placed on administrative leave what information if any were you given?

SH:   I wasn't given any reason, we believe.

DF:   Okay, were you given any documentation at the time you were placed on administrative leave?

SH:   Yes

DF:   What did that say?

SH:   I could find it.

DF:   Sure

11

451

SH:   Oh, maybe I sent it from—

RB:   Uh, huh

SH:   Oh, okay.

RB:   Wanna clarify that—

SH:   Just for clarification, that second email, this one right here that I sent—

DF:   Okay

SH:   I might've sent that from my personal.

DF:   Okay, and, um, what's that email address?

SH:   SteveHobb999@gmail.com

DF:   Okay. So did you, were you able to locate some documents or something that, regarding your administrative leave?

SH:   Yes, yes.

DF:   What if any information is in there concerning the reasons for being placed on administrative leave?

SH:   There's no reason.

DF:   Okay. Were you given any verbal information when you were presented with that?

SH:   No

DF:   And were you presented that, or, I'm sorry, who—let me ask you this way—Who presented that actually to you?

SH:   Lieutenant Holder.

DF:   Okay

RB:   And what's the date of that letter?

SH:   September 15th.

12

452

DF:   Okay, I wanna now focus your attention to this, the email number two here that's listed. Um, later on that same day, September 16th, did you send another email to the BPOA members?

SH:   On the 16th?

DF:   Yes

SH:   I did send a second one.

DF:   You're just not sure if it was the 16th or not?

SH:   Yeah, I don't remember the date.

DF:   Okay

SH:   I remember, yeah, I sent that email.

DF:   Okay. Now, um-

RB:   Can we read it?

SH:   Can we read it first?

DF:   Sure, yeah. Absolutely.

SH:   I don't know if I have a copy of it.

DF:   Okay, so, um, that second email there whether or not it was the 16th or not, uh, you do acknowledge that you sent that?

SH:   Yes

DF:   Was that sent from the BanningPOA@gmail or was that sent from your personal email address, if you recall?

SH:   Hmm, I would, if I sent the other one I probably sent it from my personal one as well.

DF:   Okay. Now let me back up for just a second, I wanna ask you a question about your administrative leave – Uh, when Lieutenant Holder presented you with the document indicating that you were being placed on administrative leave, was that taking effect immediately?

SH:   Yes

13

453

DF:   And you said that date was the 15th of September?

SH:   Uh, huh

DF:   Is that right?

SH:   Yes

DF:   Okay, and, uh, was there, did the document have any provisions or did Lieutenant Holder give you any provisions as to, okay, here are your workdays, you're, you know, you're supposed to be available, anything like that?

SH:   It said that I had to be available Monday through Friday, 9:00 to 5:00.

DF:   Okay, were there any instructions in there as to, uh, whether or not you had to call Lieutenant Holder at a certain time every day or anything like that?

SH:   Call in at 9:00.

DF:   9:00 a.m.?

SH:   9:00 a.m.

DF:   Every day?

SH:   I was doing that and then Lieutenant Holder told me that I only had to call on Tuesdays and Fridays because he was off on Mondays.

DF:   Okay

SH:   And I was filling up his voicemail.

DF:   Alright. Now in the content of this second email here that you have, uh, did you, uh, in the, in the body of that did you acknowledge that you had sent the first email?

SH:   I don't think so.

DF:   May I see it? Let me rephrase my question.

SH:   (Unintelligible) what?

DF:   Well let me rephrase my question, it's not really clear. Basically the first line indicates something about you asked for a meeting on Sunday.

SH:   Uh, huh

14

454

DF:     Is that referring to the content of that very first email?

SH:     Yes

DF:     Okay, and, uh, also in this email that we're talking about now did you state in there that the POA attorney had informed you that you could not discuss personnel matters?

SH:     In this one I did.

DF:     Okay, and-

SH:     Well he was, he gave me misinformation, it was wrong.

DF:     Okay, I'm just, understand, I'm just asking what was in the content.

SH:     Oh

DF:     Did in fact you write that that attorney had told you that?

SH:     Yes

DF:     Okay, and did the majority of the rest of the narrative in that email cover your concerns about Chief Diaz?

SH:     Yes

DF:     And did you sign or at least write your name at the bottom of that?

SH:     Yes

DF:     I'm sorry, you wanted to add something?

SH:     Uh, no, fine.

DF:     Okay. On September 23, 2015, did you attend the BPOA meeting?

SH:     Yes, I did.

DF:     And was that held at Banning High School?

SH:     Yes

DF:     And, uh, during the meeting did you discuss the specifics of the Sergeant Avila complaint?

15

455

SH:   Huh, it was a closed meeting so I, I had an opportunity to one, express to the POA what was going on in regards to Chief Diaz's, um, unfair discipline practices, retaliatory demeanor, his behavior towards me. Um, that was one reason why I asked for it and I discussed it there. Um, I also brought up Sergeant Avila's incident as a reference because it outlined and it showed how Chief Diaz was being unfair and, uh, I was also making them aware of, I think I even mentioned it somewhere about how perception of law enforcement in this day and age and he knew what we were going through and how we need to be better at doing our jobs. But this was, this was also to make them aware that we can't be doing this kind of stuff out there in public so it was kinda a teaching moment too.

DF:   Are you referring to what Sergeant Avila supposedly did on this incident?

SH:   His conduct, yes.

DF:   Okay, and you – let me just, let me just ask, let me just clarify something you just said – You said that at the time of the meeting you obviously felt that Chief Diaz had in some ways retaliated against you?

SH:   Yes

DF:   Okay, what do you, what did you mean or what do you mean by that?

SH:   Um, well he did an IA on me for nurses making a complaint which boiled down to them accusing me of sighing and rolling my eyes, did the whole IA with you as an investigator. Now that was after the fact but I knew he did an IA, assigned an investigator, assigned it an IA number and then, but he didn't do an IA on Sergeant Avila for his conduct on this, on that particular incident in June which was egregious. It was criminal and, uh, it was improper and he didn't handle it the same, not even, he didn't, not that he didn't handle it the same, he just handled it totally inappropriately.

DF:   And was part of that as you said earlier the, was part of that reasoning in your mind the fact that there was not an IA number issued?

SH:   And he got a written reprimand.

DF:   Okay, and he did get a written reprimand, however, uh-

SH:   Because, and the reason I say that, that he got a written reprimand, I had been a sergeant a few months before and I got my, uh, my probation terminated. I got terminated on probation as a sergeant a few days prior to my one year probation, so I was gonna be off probation. And they did it because I had some sustained IA's for language and, uh, language, I, I said some inappropriate things. I said dingbat and I used the F-word. But Sergeant Avila who's also on probation has

16

contact with this guy and he cursed 20 plus times using the F-word and threatened him and he did not get demoted on probation and now he's off probation. So I felt that was unfair.

DF: Okay, so at the time of Avila's incident in June, he was on probation?

SH: Yes

DF: Okay. And you said that you did, obviously you put your name at the bottom of that email?

SH: Yes

DF: Okay, and you said you did talk some about Avila's incident, is that right?

SH: In the second one?

DF: I'm sorry, I'm to the meeting, I'm talking about – I'm sorry, I'm talking about back to the meeting.

SH: Yes

DF: So you did talk about his incident?

SH: Yes

DF: And did you discuss how he was disciplined?

SH: Well, in the meeting I discussed the incident so I could make aware to the people, you know, how one person is treated versus how I'm treated and two, to let them know that we can't act this way and this is bad behavior and we don't need this as an agency cause we're so small. Um–

DF: And you described that as a learning opportunity, is that right?

SH: Yes

DF: Okay, and during the meeting also, did you also reference back to your IA's and how you felt you had not been treated fairly?

SH: Yes, I, I showed them my, my, uh, IA's, the results and, um, to show that they, the unfair treatment.

DF: And the IA's that specifically that you're referring to that were, uh, in which you were the subject, were those handled internally? In other words, were they handled at the department level or did they go to an outside investigator?

17

457

SH:   It went to an outside investigator.

DF:   Okay, and, uh, so back to the meeting – You also mentioned to the group that, uh, or let me ask you – Did you mention to the group that Avila had received a written reprimand?

SH:   Yes, I did.

DF:   Also during the meeting, did you acknowledge that you had listened to the audio recordings from the Sergeant Avila incident?

SH:   Uh, yes, I did.

DF:   And do you acknowledge now that you did in fact access those recordings and listen to them?

SH:   I did as a supervisor because at the time I was a supervisor and I felt there was an opportunity when, before I listened to them I didn't know their content, all I knew was Sergeant Avila told me he cursed at someone, he said the F-word. I'm, okay, I'm a, I'm a corporal right now but I have four years as a sergeant and, uh, I've been to all the training. Um, I felt that while I might be a corporal and he does ask me questions on how to do things, I can still be a mentor and I think the chief would want me to be a mentor to him, so I felt I would review it and see if I can give him some insight on what I went through cause like I said, I was demoted for saying dingbat and using the F-word. Um, so, um, when I, when I listened to them I, uh, I did so because, like I said, I wanted to maybe take an opportunity to give him some insight, be a mentor, train him on maybe how to avoid it in the future.

DF:   And part of that is as you just said, you base on you had been a sergeant for a period of four years?

SH:   Yes

DF:   Okay, and at that time Sergeant Avila was still new as a sergeant?

SH:   Yes

DF:   Okay

RB:   And let me just clarify something – You stated Sergeant Avila came to you about this, about the incident prior?

SH:   At the, yes, at the end of his shift he came to me and told me that there would be a complaint, that there might be a complaint coming in.

18

**458**

RB:   Okay

DF:   So that's part of my next question – So when you actually accessed and listened to those recordings, um, had the complaint actually come in by that time?

SH:   Yeah, usually -- yes, it did. Usually when a complaint comes in, if somebody comes in to complain you'll listen to the person as a supervisor, Watch Commander, you'll listen to the person and you'll get their side of the story and see if they actually wanna complain, just vent, or, you know, maybe have you just talk to the officer or get an understanding of what took place. So oftentimes what we'll do is, they'll come in and I was taught never to discourage, first thing you do is give them a blue card. You wanna complain, here's your blue card and why don't you tell me what happened. So maybe you get an understanding, maybe you can educate them on what happened and, um, maybe they might not fill out the complaint cause then once they understand why what happened, happened, they'll understand and they'll go, okay, the officer really didn't do nothing wrong. So, um, usually when those complaints come in you'll go back if there's audio video that will help you understand what took place, you'll review it and then you can share that with that person and go, well, looking at this, it didn't actually happen that way and I see this, maybe this, you know, those are all, you know, what ifs but, um, and that's how you, you would try to handle it. I mean, you're not trying to protect the officer but you're trying to, you don't need a complaint to come in if it doesn't need to come in especially if the citizen just needs to be educated. So on this particular day the person came in with a card already filled out so, I mean, I was gonna talk to this person but this person came in, gave it to me, and turned around and walked right out. So that might, in my mind they had, they just wanted to file a complaint.

DF:   So you had no discussion with that complainant?

SH:   No

DF:   Okay, was it a male or female?

SH:   It was a male.

DF:   Okay, and, uh, at that time you and Sergeant Avila were working on different shifts?

SH:   Yes

DF:   Okay. So, you partially mentioned this but, Avila came to you at some point after the incident just to tell you, hey, you might be getting a complaint?

19

**459**

SH: Yeah, whatever time it happened during his shift, dayshift, I came in on nightshift and we were doing our passing, passing on what happened, he told me I, there might be a complaint coming in on him.

DF: Okay, and did the complaint come in that night?

SH: Yes

DF: Okay. And, um, were you requested by anyone to conduct an investigation into the complaint made against Sergeant Avila?

SH: I never did an investigation.

DF: Okay, were you requested by anyone to inquire into that incident in any way?

SH: No

DF: At the time you reviewed those recordings you were assigned as a corporal you mentioned, is that right?

SH: I was a Watch Commander which is also a supervisor.

DF: I understand. The question was, your official title was corporal?

SH: Yes

DF: And you were on, uh, you were the Watch Commander for, is it Team-3?

SH: Yes

DF: And, um, Sergeant Avila was, obviously his rank was sergeant at that time?

SH: Yes

DF: What team was he on?

SH: I think Team-4.

DF: That's a dayshift team?

SH: Dayshift.

DF: And you said that at that time which was back in June of 2015, Sergeant Avila was still on probation?

SH: Yes

20

**460**

DF:   And at that time did you supervise Sergeant Avila in any way?

SH:   No

DF:   Okay, I just wanna cover one last thing and then we're gonna wrap up here – Um, regarding interactions with Sergeant Avila, um, on May 28th of 2015, did you send an internal RIMS, R-I-M-S, message to Sergeant Avila regarding a possible injury you sustained to your arm?

SH:   Yes

DF:   And, uh, was that, was that related to some sort of incident with an intoxicated subject?

SH:   Yes

DF:   Okay, and RIMS is, that's your internal way you send messages internally?

SH:   Yes

DF:   Okay

RB:   What was the date of this?

DF:   Uh, May 28th of 2015. And did you tell him you were gonna let him know how it felt and whether or not you were gonna complete paperwork or something to that effect?

SH:   Huh, I don't remember, it was, it was a short message, um, I don't recall that. I told him I got hurt and I said, I think I might've said I'll let you know how I feel or something like that.

DF:   Okay, and did you ever get back to him about that to your recollection?

SH:   Hmm, I think, uh, let's see, I wanna say he got chewed out for something on that.

DF:   Regarding that incident?

SH:   Yeah, because he didn't file the forms right away and, uh, I apologized to him on that one because I probably should have filled them out but I wasn't, I didn't know if I was gonna be injured at that time.

DF:   Uh, huh

461

SH:   Cause I've been hurt before. I, I broke my shoulder and I didn't do the paper – I did the paperwork but I never went and followed up on it and I worked a whole year with a broken shoulder and didn't know it. Um, so like, I don't, I didn't, I don't file a lot of worker comp stuff like that but, um, I sent him that, um, and then I know I went and filed a claim on it because, uh, it was still hurting.

DF:   Okay, and so you, I don't know, what's, what's the process at Banning PD? Is there, there's obviously doc, forms you have to fill out?

SH:   Uh, huh

DF:   And where do those get – is that right?

SH:   Yes

DF:   Where do those get submitted?

SH:   To HR.

DF:   Okay, and so you, at some point later you did submit injury claims?

SH:   Yes

DF:   And was it just one claim or were there more than one?

RB:   I wanna hold on one second. Is, is, I mean, there's no notice of anything discussing about any of his injury claims and the –

DF:   Well, it's not his injury claim per se, this is, this is part of the complaint made by Sergeant Avila.

RB:   What, what, what part of that complaint is this addressing exactly?

DF:   Uh, he claimed, part of his complaint was that, um, Corporal Hobb was trying to make him look bad by not filling out forms or something to that effect.

RB:   Oh

DF:   So that's why I'm asking the questions. It's not part-

RB:   Oh, yeah, I just wanted clarification cause at the beginning it was just, it was about the disclosure, the information, and this wasn't specifically brought up.

DF:   Um, you, you got a notice for this, right? For this? It's in the notice, I know that much. It's not specific, I, I'll grant you that, it's not specific. It just says

something about retaliation or harassment or something like that. It's very general in the, in the notice that was given to you.

SH: Yes

DF: So. Do you wanna take a break or do you want me to continue?

SH: (Unintelligible)

RB: You can go on.

DF: Okay, um, so I think my last – so, uh, so you did file an injury claim regarding your injury, and was it, I think my question was, was there more than one claim or was it just one claim?

SH: I, it was two claims. Uh, when I hurt my arm it was from that May, it was May 27th when it happened and I sent him the email on May 28th, um, cause I, like I said, I don't, I don't file complaints on my injuries. I, like I said, when I broke, when I broke this shoulder I also tore my rotator cuff. I went to the doctor, I tore it, nothing they could do about it, I just worked through it and then it wasn't until a year later I was getting x-rays cause I hurt it doing something else. They're, hey, you broke your shoulder. I'm like, didn't even know it, maybe that's why I was hurting so much. Anyways, um, so I don't, I don't go out on injuries and that type of thing so when I filed, when I told him that I was just letting him know cause it did feel weird, um, cause I hurt it before working out and I didn't know if it was the same injury or not and it wasn't. Um, so that happened in May. Uh, I remember him telling me he got chewed out because the paperwork wasn't done right away and I apologized to him for that. I'm like, uh, I'm sorry dude, that was, we should've did it then.

DF: Okay

SH: Something along those lines.

DF: Alright, so at that time you were, you were still at the, you were the Watch Commander on Team-3 at that time, right?

SH: Yes

DF: So Sergeant Avila was not supervising you, right?

SH: No

DF: Okay, and would your direct supervisor have been Lieutenant, um-

SH: Holder?

23

463

DF:     Holder? So how – is that right?

SH:     Yes

DF:     So how would, I'm just trying to understand – how, how would Avila have been involved? Why would he be involved if you, if he didn't supervise you? Why would you even have to tell him anything or -?

SH:     I just, honest, I wanted just a record that I told someone cause I didn't want –

DF:     Okay

SH:     -somebody to come back and say, oh, you're, you, you hurt yourself playing paintball or something. I wanted, there's, there was plenty of audio and video at the incident when it happened but I wanted someone, I wanted there to be a record that I notified someone at the time.

DF:     Okay

SH:     Cause I, like my back injury which I resubmitted this time, when I submitted it the first time they said, well, it's too late, you didn't, you waited too long to, to report it. And that was the first time, that was a couple years before so they shot that down so I didn't want that same thing to happen.

DF:     Okay, so let's wrap up that point – Did you do anything with regard to your injury in an attempt to make Avila appear to be negligent in his duties?

SH:     No, not at all.

DF:     Okay, and final question I have, uh, regarding this whole, the whole, uh, situation. Regarding any of this information about Sergeant Avila that you disclosed in either the emails or during the BPOA meeting, did you ever request his permission to release that information?

SH:     No, I did not.

DF:     Is there anything else you'd like to add about anything that we've talked about?

SH:     Just that at a union meeting it's, uh, I feel it's protected speech there. We're there to discuss, you know, issues that, uh, that happen with, we're a collective bargaining unit so collectively we can talk about, you know, things that are, issues that are affecting individuals or groups and, uh, that's why I brought this issue up to the POA was to bring up that I was being treated unfairly and, uh, um, I wanted them to support me cause I didn't want to take this on by myself, uh, cause it does affect them too. I'm not gonna go into all the, the history, but it's affecting them

24

464

now and, uh, they're dealing with it their way. But anyways, I, uh, brought it up to the union cause I believed it was union business, so.

DF:     Okay. Mr. Baumann, anything?

RB:     No

DF:     Okay, we're gonna go ahead and conclude the interview. It's about 10:40 a.m.


To the best of my knowledge and ability, the above transcript is a true and accurate transcription of the recorded interview of Steve Hobb by RCS Investigations and Consulting LLC, transcribed by Karyn Flutts for the Banning Police Department.

**465**

# EXHIBIT I



# EXHIBIT 11

 **Gmail**                                    Steve hobb <stevehobb999@gmail.com>

## Emergency POA Meeting

**Banning POA <banningpoa@gmail.com>**                        Mon, Sep 14, 2015 at 2:44 PM
To: Brandon Smith <bsmith17@hotmail.com>, Brian Callahan <tenringer1@juno.com>, Brian Walker
<bngpd363@yahoo.com>, Derek Thesier <derekthesler@yahoo.com>, Erich Oertel <erich978@msn.com>, Jennifer
Segura <jrolguin22@yahoo.com>, Joe Feola <j.feola@att.net>, Mike Bennett <mabenn4@msn.com>, Mike Loader
<md.loader@yahoo.com>, Mike Nolan <mikenolan85@yahoo.com>, Nissa Tammany <tammany35@gmail.com>, Patrick
Kelly <bapd2849@yahoo.com>, Ray Arretche <fifty311@yahoo.com>, Rick Youngblood <clrtwoopy@msn.com>, Sandra
Perea <s.perea101@yahoo.com>, Steve Hobb <stevehobb999@gmail.com>, Vincent Avila <vavilagolf@aol.com>

I would like to have an emergency POA meeting as I have concerns about Chief Diaz's decision making
ability, unfair discipline practices and his ethical compass. These are serious issues and I believe every
member of the POA should be a part of the discussion and decision on how to address them. I have
already addressed my concerns with Chief Diaz and his position has not changed. His response to me
was that I had to do whatever it took to protect myself.

Regarding his decision making abilities, I know based on conversations with him that he is strongly
influenced by outside entities to include an ex-city manager, a certain council member and HR
personnel who are bias. His decisions have led to unfair discipline practices, primarily towards me. While
this mainly affects me, I have to tell you it is not comfortable knowing someone is after your career and
your leader will not take the appropriate steps to protect you or look out for your well-being.

Most importantly, I know of a particular incident that could be very damming to our agency if made
public. Because of the current atmosphere towards police agencies in this country, I think that we have
to maintain standards and the integrity of our agency even if our Chief does not want to. Recently, a
complaint came in towards Sgt. Avila. Sgt. Avila told me the complaint might come in and it in fact did
so. The blue card was already filled out when it came in and the complainant handed it to me. I gave the
complaint to Chief while he was in his office. As of this date, the complaint has been handled internally. I
know this because the Chief told me himself that he "handled it" and "it has been taken care of." Sgt.
Avila told me that he received a written reprimand. The problem with the way this was handled is that
there is no accountability and the incident was quite embarrassing and illegal as it involved a threat
under the color of authority by Sgt. Avila. If anyone else would have conducted themselves in this
manner, they would and should be put on administrative leave and severely punished if not terminated.

This issue directly relates to Chief Diaz's ethical decision making. I am concerned about the future and
image of our department. This information will be shared with City Council and the press as soon as
possible once the POA has been fully informed. Please attend this meeting. Will the POA Board please
schedule a meeting as soon as possible.

Thank you for your attention to this matter.

Can someone send this to Fisher. His email was not in the POA contact list.

EXHIBIT

16

Hobb

9/15/16 2:18 PM

Page 2 of 2

P000021

**469**

# EXHIBIT 12

# City of Banning Police Department



OFFICE OF THE CHIEF OF POLICE

September 15, 2015

Corporal Steve Hobb
384 Steiner Drive
Hemet, CA 92543

Dear Corporal Hobb:

This letter is to notify you that effective immediately you are placed on administrative leave from your position as a corporal with the Banning Police Department.

> Your peace officer powers per Penal Code section 830 et seq. are immediately suspended including your authorization to possess Banning Police Department weapons, identification cards and any Police badges. Pending further notice, these items are to be surrendered to the Banning Police Department.

> You are ordered to take no action as a Police Officer, and to not wear any department uniforms while this action is in effect. Your authorization to carry a concealed weapon, either on or off duty, is hereby immediately suspended. Additionally, you are not permitted to enter any Police Department facilities without a supervisory escort.

You are ordered to contact Police Administration, Lieutenant Phil Holder at (951) 849-1097, except for weekends and holidays, at 0900 hours. You are temporarily assigned to a different shift (Monday through Friday, 0900 hours to 1700 hours) except for weekends and holidays. You are also ordered to be at your residence during your assigned shift hours.

These actions will remain in effect until revoked by the Chief of Police.

Sincerely,

Alex Diaz
Chief of Police

I acknowledge receipt of the original of this letter and understand that my peace officer powers and authorization for outside employment have been temporarily revoked.

9/15/15
Date

Signature

# EXHIBIT 13



# CITY OF BANNING
# MEMORANDUM

**DATE:**       February 4, 2016

**TO:**         Alex Diaz, Chief of Police

**FROM:**       Rochelle Clayton, Deputy City Manager

**cc:**         Michael Rock, City Manager

**SUBJECT:**    Authorization to Propose Termination of Steven Hobb, Police Corporal

---

The City Manager has designated Personnel Director authority to me, as the Deputy City Manager. As the City Manager's designee, I hereby authorize you to serve a Notice of Proposed Disciplinary Action – Termination, to Steven Hobb, Police Corporal. This action is in accordance with the City of Banning's Administrative Policy No. AP 09, and is supported by the results of Internal Affairs Investigation numbers 15-04, 15-08, and 15-09.

## ATTACHMENTS

Notice of Proposed Disciplinary Action -- Termination
Administrative Policy No. AP 09

Prepared and Approved by:

Rochelle Clayton
Deputy City Manager
Administrative Services Director

**471**

# EXHIBIT 14



**Banning Police Department**

125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

| | | | |
|---|---|---|---|
| **To:** | Steven Hobb, Police Corporal | **Date:** | **February 4, 2016** |
| **From:** | Alex Diaz, Chief of Police | | |
| **Reference:** | Notice of Proposed Disciplinary Action - Termination | | |

## I.   INTRODUCTION

The purpose of this Memorandum is to provide you with notice of my preliminary determination that you be **terminated effective February 19, 2016** from your employment as a City of Banning ("City") Police Corporal. My preliminary determination is based upon the materials attached to this Memorandum which are incorporated herein by this reference, including but not limited to Internal Affairs Investigation #15-04, Internal Affairs Investigation #15-08, Internal Affairs Investigation #15-09; the Administrative Investigation Reports prepared by outside investigator David Flutts of RSC Investigations And Consulting LLC, and pertinent City and departmental documents, rules and regulations cited therein or provided herewith. Summaries of your administrative interviews and copies of the interview recordings are also attached hereto and/or provided herewith.

This disciplinary action is proposed pursuant to the applicable provisions of Title 2 of the Code of the City of Banning, the City of Banning Personnel Rules (Resolution No. 1974-22), the Memorandum of Understanding Between the City of Banning and the City of Banning Police Officers Association, and the Banning Police Department Policy Manual, and is based on the grounds individually and collectively, as stated herein and hereafter.

## II.   FACTUAL BASIS FOR PROPOSED DISCIPLINARY ACTION

The specific details of the facts supporting this disciplinary action are set forth in full, and hereby incorporated herein by this reference, in the attached Administrative Investigation Reports for Internal Affairs Investigations #15-04, #15-06, #15-08, and #15-09. Additional facts, documents and charges not discussed in the attached Administrative Investigation Reports are also described herein and/or provided herewith. A brief summary of the underlying allegations, facts and findings is set forth below.

472

Steven Hobb, Police Corporal
Notice of Proposed Disciplinary Action - Termination
February 3, 2016
Page 2

## Internal Affairs Investigations #15-04

In August 2015, the Banning Police Department received two complaints via e-mail regarding conduct by you which allegedly occurred on July 30, 2015. Briefing training was scheduled for that day and representatives from the Riverside County Sexual Assault Response Team [SART] arrived and provided sexual assault response training to officers from the Banning Police Department. You were the Acting Watch Commander at the time. The complaints alleged that you were rude, discourteous and unprofessional to the SART Team members who provided the briefing training, which allegation was sustained by the investigator in his Administrative Investigation Report. The investigator also sustained the allegation that you demonstrated unbecoming conduct and poorly represented the Banning Police Department during your interaction with SART Team members on that day. The investigator found that your rude and discourteous conduct towards the SART Team members made them feel uncomfortable during the time they were at the Department.

## Internal Affairs Investigations #15-08

This investigation was initiated after Sergeant Vincent Avila filed a complaint against you with the Banning Human Resources Department on September 15, 2015. Sergeant Avila alleged that you disclosed confidential information related to a personnel investigation and discipline that Sergeant Avila received in 2015. The disclosure by you was allegedly made in an e-mail that was sent to members of the Banning Police Officers Association ("BPOA") on September 14, 2015. Sergeant Avila also alleged during a Banning Police Officers Association meeting on September 23, 2015, that you discussed Sergeant Avila's personnel investigation and subsequent discipline and admitted to reviewing audio recordings related to Sergeant Avila's personnel investigation which you were not authorized to access or review and therefore violated Department policy and Sergeant Avila's right to confidentiality. In his complaint, Sergeant Avila stated that you were "out" for him and that he was being targeted, harassed and was in fear for his safety, because of your temper and past treatment of other Banning police officers.

The investigator concluded that the Banning Police Department has specific policies which prohibit the unauthorized and intentional release of confidential information and they found that you violated these policies and demonstrated unbecoming conduct and potentially damaged the reputation of Sergeant Avila when you disclosed confidential personnel information about Sergeant Avila in e-mails and during the Banning Police Officers Association meeting. The investigator also reviewed the Puma Audit Log Report, which established that you had accessed the audio recordings from the incident resulting in the personnel complaint being filed against Sergeant Avila. During your administrative interview, you acknowledged that you had accessed and listened to the recordings even though you were not assigned to investigate the matter. You further acknowledged admitting during the Banning Police Officers Association meeting to listening to the audio recordings involved in the complaint against Sergeant Avila. The investigator concluded that you had no authority to listen to the subject recordings and by doing so violated policy and further demonstrated unbecoming conduct.

473

Steven Hobb, Police Corporal
Notice of Proposed Disciplinary Action - Termination
February 3, 2016
Page 3

<u>Internal Affairs Investigations #15-09</u>

It was alleged that you violated the Department's chain of command when you contacted Police Chief Diaz to resolve a dispute you were having with Sergeant Robert Fisher on August 20, 2015. At the time of this incident, you were the Acting Patrol Watch Commander and Sergeant Fisher was assigned as a supervisor at an extra-duty event. Sergeant Fisher's regular assignment at the time was as the Administrative Sergeant. Both your and Sergeant Fisher's immediate supervisor at the time was Lieutenant Phil Holder, the only lieutenant at the Department and second in command according to the Department's rank structure at the time.

The investigator found that at the time of the dispute between you and Sergeant Fisher, you initially told Sergeant Fisher that you were going to call Lieutenant Holder, presumably to resolve the dispute, which would have been within the chain of command. Instead, you called Police Chief Diaz directly, violating the chain of command. Your later explanation for doing so was allegedly because Chief Diaz had promoted Sergeant Fisher and you felt that the Chief should have to deal with the repercussions of that promotion. Accordingly, the investigator sustained the allegation against you for violating the Department's chain of command when you contacted Police Chief Diaz rather than Lieutenant Holder to resolve the dispute between Sergeant Fisher and you.

## III.   RULE, REGULATION, ORDER AND STATUTORY VIOLATIONS

By signing this Memorandum, you acknowledge that the decision that you be disciplined is not based upon a finding that your above described conduct violates each and every one of the rules, regulations, orders and/or statutes described below. Your violation of any one of the following rules, regulations, orders and/or statutes would in and of itself support my preliminary determination that you be disciplined under the circumstances presented herein.

### CHARGE ONE

The preponderance of evidence supports a finding that on or about on July 30, 2015, you engaged in conduct unbecoming of an officer and Acting Watch Commander of this Department by being rude, discourteous and unprofessional to the SART Team members making them uncomfortable visiting and working with the Department. Your actions constitute a violation of the following rules, regulations, orders and polices of the City:

Violation of Policy 338 of the Banning Police Department Policy Manual, which provides in pertinent part:

### 338.3  CONDUCT WHICH MAY RESULT IN DISCIPLINE

"The following list of causes for disciplinary action constitutes a portion of the disciplinary standards of this department. This list is not intended to cover every possible type of misconduct and does not preclude the recommendation of disciplinary action for specific action or inaction that is detrimental to efficient department service:

474

*Steven Hobb, Police Corporal*
Notice of Proposed Disciplinary Action - Termination
February 3, 2016
Page 4

. . .

### 338.3.2   CONDUCT

. . .

(k)   Discourteous, disrespectful or discriminatory treatment of any member of
the public or any member of this department.

. .

### 338.3.5   PERFORMANCE

(m)   Any knowing or negligent violation of the provisions of the department
manual, operating procedures or other written directive of an authorized
supervisor. The Department shall make this manual available to all
employees. Employees shall familiarize themselves with this manual and
be responsible for compliance with each of the policies contained herein.

. . .

(aa)   Any other on-duty or off-duty conduct which any employee knows or
reasonably should know is unbecoming a member of the Department or
which is contrary to good order, efficiency or morale, or which tends to
reflect unfavorably upon the Department or its members.

## CHARGE TWO

The preponderance of evidence supports a finding that on or about August 20, 2015, you
engaged in conduct unbecoming of an officer and Acting Watch Commander of this Department
when you misrepresented to Sergeant Fisher who you were calling and violated the chain of
command by calling your Police Chief, instead of your immediate supervisor Lt. Holder, to
resolve the dispute you were having with Sergeant Fisher on that day. Your actions constitute a
violation of the following rules, regulations, orders and polices of the City:

Violation of Policy 200 of the Banning Police Department Policy Manual, which
provides in pertinent part:

**200.3 COMMAND PROTOCOL**

**200.3.1 SUCCESSION OF COMMAND**

The Chief of Police exercises command over all personnel in the Department. During
planned absences the Chief of Police will designate a Division Commander to serve as
the acting Chief of Police.

Steven Hobb, Police Corporal
Notice of Proposed Disciplinary Action - Termination
February 3, 2016
Page 5

Except when designated as above, the order of command authority in the absence or
unavailability of the Chief of Police is as follows:

(a) - Administration Division Lieutenant
(b) - Investigation Division Lieutenant
(c) - Field Operations Division Lieutenant
(d) - On-duty Watch Commander

**200.3.2 UNITY OF COMMAND**

The principles of unity of command ensure efficient supervision and control within the
Department. Generally, each employee shall be accountable to one supervisor at any time
for a given assignment or responsibility. Except where specifically delegated authority
may exist by policy or special assignment (e.g., K-9, SWAT), any supervisor may
temporarily direct any subordinate if an operational necessity exists.

Violation of Policy 340 of the Banning Police Department Policy Manual, which
provides in pertinent part:

**338.3   CONDUCT WHICH MAY RESULT IN DISCIPLINE**

"The following list of·causes for disciplinary action constitutes a portion of the
disciplinary standards of this department. This list is not intended to cover every possible
type of misconduct and does not preclude the recommendation of disciplinary action for
specific action or inaction that is detrimental to efficient department service:

. . .

**338.3.2   CONDUCT**

. . .

(k)     Discourteous, disrespectful or discriminatory treatment of any member of
        the public or any member of this department.

. .

**338.3.5   PERFORMANCE**

. . .

(c)     Unsatisfactory work performance including, but not limited to, failure,
        incompetence, inefficiency or delay in performing and/or carrying out
        proper orders, work assignments or instructions of supervisors without a
        reasonable and bona fide excuse.

476

Steven Hobb, Police Corporal
Notice of Proposed Disciplinary Action – Termination
February 3, 2016
Page 6

> (m)   Any knowing or negligent violation of the provisions of the department manual, operating procedures or other written directive of an authorized supervisor. The Department shall make this manual available to all employees. Employees shall familiarize themselves with this manual and be responsible for compliance with each of the policies contained herein.
>
> . . .
>
> (aa)   Any other on-duty or off-duty conduct which any employee knows or reasonably should know is unbecoming a member of the Department or which is contrary to good order, efficiency or morale, or which tends to reflect unfavorably upon the Department or its members.

**CHARGE THREE**

The preponderance of evidence supports a finding that in September, 2015, you engaged in conduct unbecoming of an officer and Acting Watch Commander of this Department when you accessed Departmental audio recordings related to a personnel complaint received against Sergeant Avila with the intent to disclose confidential personnel information related to him. Your actions constitute a violation of the following rules, regulations, orders and polices of the City:

Violation of Policy 340 of the Banning Police Department Policy Manual, which provides in pertinent part:

**338.3   CONDUCT WHICH MAY RESULT IN DISCIPLINE**

"The following list of causes for disciplinary action constitutes a portion of the disciplinary standards of this department. This list is not intended to cover every possible type of misconduct and does not preclude the recommendation of disciplinary action for specific action or inaction that is detrimental to efficient department service:

> . . .
>
> **338.3.2   CONDUCT**
>
> . . .
>
> (k)   Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department.
>
> . .
>
> **338.3.5   PERFORMANCE**
>
> . . .

477

*Steven Hobb, Police Corporal*
Notice of Proposed Disciplinary Action - Termination
February 3, 2016
Page 7

(h)    Knowingly making false, misleading or malicious statements that are reasonably calculated to harm or destroy the reputation, authority or official standing of the Department or members thereof.

(i)    The use of any information, photograph, video or other recording obtained or accessed as a result of employment with the Department for personal or financial gain or without the express authorization of the Chief of Police or a designee may result in discipline under this policy.

. . .

(m)    Any knowing or negligent violation of the provisions of the department manual, operating procedures or other written directive of an authorized supervisor. The Department shall make this manual available to all employees. Employees shall familiarize themselves with this manual and be responsible for compliance with each of the policies contained herein.

. . .

(aa)    Any other on-duty or off-duty conduct which any employee knows or reasonably should know is unbecoming a member of the Department or which is contrary to good order, efficiency or morale, or which tends to reflect unfavorably upon the Department or its members.

## 338.3.7 SECURITY

(a)    Unauthorized, intentional release of designated confidential information, materials, data, forms or reports.

(b)    Unauthorized access to any database, record, file, or report for any reason other than a specific law enforcement purpose.

Violation of Policy 450 of the Banning Police Department Policy Manual, which provides in pertinent part:

### 450.8  RELEASE OF RECORDINGS

Recordings made using portable recording devices pursuant to this policy are department records and may only be released as provided in the Release of Records and Information Policy or for other authorized legitimate department business purposes.

478

Steven Hobb, Police Corporal
Notice of Proposed Disciplinary Action - Termination
February 3, 2016
Page 8

### 450.9 REVIEW OF RECORDED MEDIA FILES

...

Supervisors are authorized to review relevant recordings any time they are investigating alleged misconduct, reports of meritorious conduct or whenever such recordings would be beneficial in reviewing the member's performance.

Recorded files may also be reviewed:

(a)   Upon approval by a supervisor, by any member of the Department who is participating in an official investigation, such as a personnel complaint, administrative investigation or criminal investigation.

(b)   Pursuant to lawful process or by court personnel who are otherwise authorized to review evidence in a related case.

(c)   By media personnel with permission of the Chief of Police or the authorized designee.

(d)   In compliance with a public records request, if permitted, and in accordance with the Release of Records and Information Policy.

### CHARGE FOUR

The preponderance of evidence supports a finding that in September, 2015, you engaged in conduct unbecoming of an officer and Acting Watch Commander of this Department when you communicated confidential personnel information related to Sergeant Avila to others. Your actions constitute a violation of the following rules, regulations, orders and polices of the City:

Violation of Policy 340 of the Banning Police Department Policy Manual, which provides in pertinent part:

### 338.3   CONDUCT WHICH MAY RESULT IN DISCIPLINE

"The following list of causes for disciplinary action constitutes a portion of the disciplinary standards of this department. This list is not intended to cover every possible type of misconduct and does not preclude the recommendation of disciplinary action for specific action or inaction that is detrimental to efficient department service:

. . .

#### 338.3.2   CONDUCT

. . .

479

Steven Hobb, Police Corporal
Notice of Proposed Disciplinary Action - Termination
February 3, 2016
Page 9

(k)  Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department.

### 338.3.5  PERFORMANCE

(h)  Knowingly making false, misleading or malicious statements that are reasonably calculated to harm or destroy the reputation, authority or official standing of the Department or members thereof.

(i)  The use of any information, photograph, video or other recording obtained or accessed as a result of employment with the Department for personal or financial gain or without the express authorization of the Chief of Police or a designee may result in discipline under this policy.

(aa)  Any other on-duty or off-duty conduct which any employee knows or reasonably should know is unbecoming a member of the Department or which is contrary to good order, efficiency or morale, or which tends to reflect unfavorably upon the Department or its members.

## IV.  PERSONNEL FILE CONSIDERATION

In determining this proposed disciplinary action, I have reviewed your entire personnel file and work history. In doing so, I have specifically taken into consideration your past relevant discipline, including the following:

1.  Stipulated Imposition of Disciplinary Action - Demotion dated 03-23-11.

2.  Stipulated Imposition of Disciplinary Action - Reduction in Pay & Counseling dated 09-09-14.

I have also considered the attached letter you wrote to me dated July 17, 2015, in which you express your unhappiness with your job, your anger issues, and your growing apathy to police work and our subsequent conversations regarding your work issues.

## V.  MATERIALS UPON WHICH THE PROPOSED ACTION IS BASED

This Notice includes as attachments all materials upon which this proposed disciplinary action is based. Your personnel file is not attached, but may be examined upon your making an appointment to do so during regular business hours upon your request. Several of the cited rules, regulations and orders which are set forth in this document are already attached to the underlying Administrative Investigation Reports which are provided herewith; those that are not are attached separately hereto or are California statutes equally available to you.

480

Steven Hobb, Police Corporal
Notice of Proposed Disciplinary Action - Termination
February 3, 2016
Page 10

VI.   **CONCLUSION**

The Law Enforcement Code of Ethics set forth in the Banning Police Department Policy Manual states that you will behave in a manner that does not bring discredit to you or your agency.   The Departmental Values portion thereof states that your professionalism will be demonstrated through your courteous and respectful treatment of others.   Police Officers are entrusted with providing a safe environment to all citizens, visitors, co-workers and to themselves while conducting the City's business and engaging in law enforcement activities.   A police officer holds a unique and special position of trust and the public and your co-workers have a right to receive the highest standard of behavior from those that are invested with the power and authority of a law enforcement officer.   Ultimately, failure to demonstrate these qualities results in harm to the public service and calls into question an officer's fitness to continue as a member of this Police Department.

Your past misconduct with both your fellow officers and with citizens reflects a degree of unprofessionalism derived from your frustrations with your service and resulting in anger that cannot be condoned in a police officer.   The discipline issued for this past misconduct apparently has failed to act as a deterrent to continued unprofessionalism and bad behavior.   The attached letter that you wrote me in July 2015 reflects your recent and significant unhappiness in your job.   It also demonstrates your continued frustration, anger and apathy that lead you to make poor decisions and act out in a manner that harmful to the operations of this Police Department.   We had several discussions of your issues in which you were emotional, frustrated and angry over work related matters and your recent failure to promote and issues with those who did promote.

It can longer be considered mere venting of your frustration when you subsequently engage in a series of unbecoming actions that involve discourteous and disrespectful treatment of guests of the Police Department and of superior officers.   You neglect the chain of command, call my authority into question, undermine my authority and that of your superiors, and finally have so little regard for Departmental procedure and that you improperly access Departmental files solely for personal use in a misguided effort to embarrassment a superior officer, this Department, and your Chief.   These actions are simply unacceptable and speak to the lengths you'll go to in your present unhappiness to discredit fellow employees and undermine the Police Department.

As a representative of this Department, you accepted responsibility to set an example to not only the public, but also to your co-workers and subordinates.   You cannot command respect and hope to lead in this organization if you cannot make prudent decisions in addressing issues with guests of the Department, issues with co-workers, issues with authority, issues with controlling your anger and hostility, and issues recognizing when your behavior has crossed bounds of normal decency.   Honesty, credibility and temperament are crucial to the proper performance of an officer's duties.   As a result of your actions, you have significantly damaged your reputation and standing in our organization.   Accordingly, your actions and past discipline call into question your ability to serve in any capacity within the Police Department and lead me to propose your termination.

481

Steven Hobb, Police Corporal
Notice of Proposed Disciplinary Action - Termination
February 3, 2016
Page 11

Moving forward, please be advised that it is unacceptable for you to take any adverse actions against any persons for their involvement in this incident, the department's investigation of it or the resulting proposed discipline.

## VII.   PRE-DISCIPLINARY RESPONSE RIGHTS

Pursuant to Banning Police Department Manual Policy 340.5.2(d) and Banning Administrative Policy AP-09, you are provided an opportunity within five (5) working days after receipt of this Notice to respond to me, orally or in writing, concerning the proposed disciplinary action. You may orally respond to this notice by meeting with me on February 11, 2016, at 10:00 a.m. in my office at 125 E. Ramsey Street, Banning. If you chose to respond in writing, rather than in person, please promptly advise my office of that intent so I may cancel the planned meeting and provide said written response no later than February 11, 2016, at 10:00 a.m. I can be reached at 951-849-1194.

If you do not participate in the pre-disciplinary meeting or provide a written response within the timeframe requested, then your right to respond shall be deemed waived and I will render my final determination based upon assessment of the materials upon which this notice of proposed discipline is based. On the other hand, if you participate in the pre-disciplinary meeting or provide a timely written response, your response shall be given appropriate consideration prior to my reaching a final decision.

You may be represented at the pre-disciplinary meeting or assisted in your written response by a representative of your choice, so long as the person is not a witness to, or a subject of, this investigation. Selection of a representative, if any, is your sole responsibility.

You are directed to sign and return the original of this document and maintain a copy for your records. This Memorandum does not alter any rights provided under section 3300 et seq. of the California Government Code.

Steven Hobb
Police Corporal

2/5/16
Date

Alex Diaz
Chief of Police

02/04/16
Date

Rochelle Clayton
Administrative Services Director

02-04-2016
Date

482

Steven Hobb, Police Corporal
Notice of Proposed Disciplinary Action - Termination
February 3, 2016
Page 12

Enclosures:

1. Employees Handbook;
2. Banning Administrative Policy No. AP-09;
3. Memorandum of Understanding Between the City of Banning and the City of Banning Police Officers Association July 1, 2013 – June 30, 2014;
4. CD containing Banning Police Department Policy Manual (Update 9/2014)
5. Proof of receipt of Banning Police Department Policy Manual (Update 9/2014);
6. Most recent performance evaluation dated 05-12-2015 (Per AP-09);
7. Blank copy of "Report of Disciplinary Action Taken" form (Per AP-09);
8. Administrative Investigation Report IA#15-04;
9. Administrative Investigation Report IA#15-08;
10. Administrative Investigation Report IA#15-09;
11. Stipulated Imposition of Disciplinary Action - Demotion dated 03-23-11;
12. Stipulated Imposition of Disciplinary Action - Reduction in Pay & Counseling dated 09-09-14;
13. Ltr. from S.Hobb to A.Diaz dated July 17, 2015.

cc:     Colin Tanner, Deputy City Attorney
        Personnel File

483

Steven Hobb, Police Corporal
Notice of Proposed Disciplinary Action – Termination
February 3, 2016
Page 13

DECLARATION OF SERVICE

I hereby declare under penalty of perjury, under the laws of the State of California, that this Notice and all attachments were personally served on the individual to whom it is addressed as of the day executed below (or attach Declaration of Service by Mail).

Executed this __5__ day of February, 2016, at Banning, California.


_Phil Holder_
Print Name


_[signature]_
Declarant

484

# EXHIBIT 15



**Banning Police Department**
125 E. Ramsey Street, Banning, CA 92220 (951) 922-3170

*Memorandum*

To:        Steven Hobb, Police Corporal                Date:    March 4, 2016

From:      Alex Diaz, Chief of Police

Reference: Notice of Imposition of Disciplinary Action - Termination

---

## I.    INTRODUCTION

The purpose of this Memorandum is to provide you with notice of my final determination that you be **terminated effective close of business today, March 4, 2016** from your employment as a City of Banning ("City") Police Corporal. My determination is based upon the materials previously served on you which are incorporated herein by this reference, including but not limited to the Notice of Proposed Disciplinary Action – Termination dated February 4, 2016, Internal Affairs Investigation #15-04, Internal Affairs Investigation #15-08, Internal Affairs Investigation #15-09, the Administrative Investigation Reports prepared by outside investigator David Flutts of RSC Investigations And Consulting LLC, and pertinent City and departmental documents, rules and regulations cited therein or provided therewith. Summaries of your administrative interviews and copies of the interview recordings were also previously provided to you as part of the investigatory materials.

You were provided an opportunity to respond to the proposed discipline in person or in writing at a Skelly meeting scheduled to occur on February 11, 2016. Your attorney's office subsequently requested an extension of time to respond because of unavailability of your requested/assigned attorney. I approved an extension on your time to respond and mutually agreed with your attorney's office to conduct the pre-disciplinary "Skelly" meeting on February 29, 2016, at 9:30 a.m. (Exhibit 1.)

We held the meeting as scheduled on February 29, 2016, which was attended by you, your attorney Samantha M. Swanson, Esq. of Adams Ferrone & Ferrone, Deputy City Attorney Colin J. Tanner, Esq. of Aleshire & Wynder LLP, and me. The meeting was recorded by both your attorney and by me. A copy of my recording is attached hereto. (Exhibit 2.)

2485

Steven Hobb, Police Corporal
Notice of Imposition of Disciplinary Action - Termination
March 4, 2016
Page 2

At the pre-disciplinary meeting, you did not dispute the substantive factual findings of the underlying investigation reports that:

1.  On July 30, 2015, you engaged in conduct unbecoming of an officer and Acting Watch Commander of this Department by being rude, discourteous and unprofessional to the SART Team members making them uncomfortable visiting and working with the Department, which constituted a violation of rules, regulations, orders and polices of the City.

2.  On or about August 20, 2015, you engaged in conduct unbecoming of an officer and Acting Watch Commander of this Department when you misrepresented to Sergeant Fisher who you were calling and violated the chain of command by calling your Police Chief, instead of your immediate supervisor Lt. Holder, to resolve the dispute you were having with Sergeant Fisher on that day, which constituted a violation of rules, regulations, orders and polices of the City.

3.  In September 2015, you engaged in conduct unbecoming of an officer and Acting Watch Commander of this Department when you accessed Departmental audio recordings related to a personnel complaint received against Sergeant Avila with the intent to disclose confidential personnel information related to him, which constituted a violation of rules, regulations, orders and polices of the City.

4.  In September 2015, you engaged in conduct unbecoming of an officer and Acting Watch Commander of this Department when you communicated confidential personnel information related to Sergeant Avila to others, which constituted a violation of rules, regulations, orders and polices of the City.

Your primary argument was that the discipline of termination being imposed was unwarranted and unjustified. Your attorney argued that you should receive a written reprimand because you had no prior discipline. It was pointed out to your attorney that you in fact had significant and material prior discipline and that progressive discipline required a more serious response to your recent actions.

Relative to Charge 1 listed above, you essentially argued that you were professional at all times, that the SART Team members' claims were factually inaccurate and that they were embellishing, and that even if you committed the alleged misconduct that verbal counseling or written reprimand was more appropriate. You made no admissions of any misconduct despite the findings of the investigator, accepted no responsibility, and made no proffered apology to the SART Team members for your actions or to me for failing to properly represent the Police Department.

Relative to Charge 2 listed above, your attorney first contended that your administrative interview failed to advise you that Sgt. Fisher had filed his own complaint against you making you a subject of the investigation as well. Your initial email to Lt. Holder dated August 21, 2015 stated that you were "filing a formal complaint against Sergeant Robert Fisher due to his actions

486

Steven Hobb, Police Corporal
Notice of Imposition of Disciplinary Action - Termination
March 4, 2016
Page 3

on 8/20/15" and proceeded to provide a statement of facts relative to your complaint. Your statement admits that Sgt. Fisher "directed Dispatch to have the next available officer respond to take custody of the dog." In response to that directive, you stated that you "responded to the concert venue to speak with Sergeant Fisher" but do not mention whether you are attempting to comply with his initial directive. You further admit in your initial complaint that Sgt. Fisher gave "you a direct order to take the dog to Beaumont" and that you advised him that you were "going to first call Lt. Holder, but then told him that I would call Chief Diaz instead." You are clearly aware of the seriousness of your potential failure to follow these directives and even mention in your initial complaint that you believed the order you received was "counterproductive to the mission of patrol" and "unethical." Accordingly, the administrative interview that followed based upon your initial complaint clearly addressed the exchange between you and Sgt. Fisher as you made that the essential part of your complaint and you were on notice of the nature of that investigation and also aware that you had disobeyed a direct order as well as also potentially violated chain of command by skipping over Lt. Holder and calling me directly to intervene.

For you to now claim that in your administrative interview you did not understand the "nature" of the investigation, that you could be a "subject" of it, or that it could lead to findings that you had acted inappropriately is illogical given the circumstances of the situation and the subject matter and nature of your initial complaint. Accordingly, I do not see how any rights have been violated as afforded under the Public Safety Officers Procedural Bill of Rights Act (Gov't Code Sections 3300-3313). Furthermore, you did not state how that disadvantaged you or what statements that you made that you wanted stricken from consideration. In fact, you did not deny the actions being alleged, but rather stated that you did not believe you were violating chain of command by calling me because I had allegedly told you or even gave you a directive that if you had a problem with Sgt. Fisher you should bring it directly to me. Unfortunately, no such directive was ever issued to you and you were never excused from following the chain of command in fulfilling your watch commander or corporal duties.

Relative to Charges 3 and 4 listed above, you essentially admitted that you accessed confidential police audio records the day a citizen complaint came in against Sgt. Avila. However, you now contend that you allegedly did so for both general training purposes as a watch commander and former sergeant and for purposes of offering assistance to Sgt. Avila. Yet, you then used that information you learned from that improper access to apparently embarrass Sgt. Avila and share the protected information with others for your own personal reasons, which persons were also not authorized to have access to the audio information. I do not find your explanation believable, nor does it excuse your unauthorized access to the audio tapes simply because you learned that a citizen complaint had been filed against Sgt. Avila, a supervising officer. Your actions, lack of acceptance of responsibility for them, and excuses fail to change my initial proposed discipline and lead me to conclude that termination is the appropriate remedy under the circumstances for the reasons stated herein and in the underlying Notice of Proposed Disciplinary Action – Termination dated March 4, 2016.

487

Steven Hobb, Police Corporal
Notice of Imposition of Disciplinary Action - Termination
March 4, 2016
Page 4

This disciplinary action is imposed pursuant to the applicable provisions of Title 2 of the Code of the City of Banning, the City of Banning Personnel Rules (Resolution No. 1974-22), the Memorandum of Understanding Between the City of Banning and the City of Banning Police Officers Association ("BPOA MOU"), and the Banning Police Department Policy Manual. This disciplinary action has been made in consultation with the Human Resources Department. As required by due process and law, you are afforded administrative appeal rights pursuant to the BPOA MOU previously served on you as an attachment to the Notice of Proposed Disciplinary Action – Termination dated MARCH 4, 2016. Accordingly, you have the right to appeal any disciplinary action by submitting written notice to the City Manager of your intent to submit the matter to advisory arbitration within fourteen (14) calendar days of the date of my written decision. The appeal notice must set forth in detail your view of the basis of the disciplinary dispute and must separately set forth the issue or issues to be submitted to the advisory arbitrator.

Thereafter, the parties shall follow the procedures detailed in Article 25.7 and 25.8 of the BPOA MOU regarding the selection of the arbitrator, scheduling the arbitration date, written advisory recommendation of the arbitration and final and binding decision by the City Manager accepting, rejecting or modifying the arbitrator's recommendation. All costs will be paid by the City.

You are directed to sign and return the original of this document and maintain a copy for your records. This Memorandum does not alter any rights provided under section 3300 et seq. of the California Government Code.

_____          ___3/8/16___
Steven Hobb                          Date
Police Corporal

_____          ___03/03/16___
Alex Diaz                            Date
Chief of Police

_____          ___03 · 03 · 2016___
Rochelle Clayton                     Date
Administrative Services Director

Enclosures:
1.    Email exchanges confirming extension of pre-disciplinary response date/time;
2.    CD containing audio recording of 2/29/16 pre-disciplinary meeting; and
3.    Report of Disciplinary Action Taken form (Per AP-09).

cc:   Michael Rock, City Manager
      Colin Tanner, Deputy City Attorney
      Personnel File

**488**

# EXHIBIT 16



**ADAMS & FERRONE & FERRONE**
A Professional Law Corporation

Stuart D. Adams, Esq          Michael T. Bannon, Esq
John A. Ferrone, Esq          Michael A. McGill, Esq
Paul F. Ferrone, Esq          Robert L. Baumann, Esq
E. Earl Dove, Esq             Andrew B. Scott, Esq
                              Samantha M. Swanson, Esq

Of Counsel - Mark J. Peacock, Esq
Personal Injury Litigation

www.adamsferrone.com
🐦 @AdamsFerrone

Office - 866-873-5900
Fax - 818-874-1382
4333 Park Terrace Dr., Ste. 200, Westlake Village, CA 91361
Additional Offices In - San Diego - Newport Beach - Bakersfield

Please reply to the Westlake Village Location

March 7, 2016

Michael Rock, City Manager
City of Banning
99 East Ramsey Street
Banning, CA 92220
Sent via Email and Certified Mail: citymanager@ci.banning.ca.us

**RE: Appeal of Steven Hobb of Termination Notice dated March 4, 2016**

Pursuant to Articles 25.7 and 25.8 of the Memorandum of Understanding ("MOU") between the City of Banning and the Police Officers Association, this letter shall constitute the appeal of the above referenced discipline and request for advisory arbitration on behalf of Corporal Steven Hobb. Pursuant to the MOU, Corporal Hobb is hereby notifying the City Manager of his intent to submit the matter to advisory arbitration. The reasons for the appeal are that there are no merits to the allegations brought against Corporal Hobb, the evidence does not support the allegations, and the penalty is excessive. Corporal Hobb reserves all rights, as he continues to review the file, to assert any other basis justifying this appeal. Corporal Hobb requests the City to submit a request to the Federal Mediation and Conciliation Service for a list of arbitrators for striking purposes.

Please contact me to schedule the hearing. If this notice is insufficient in any way, immediately notify me as to the reason.

Sincerely,

//s//

**Robert L. Baumann, Esq.**
Adams, Ferrone and Ferrone

489

# EXHIBIT 17

**Joung H. Yim**

Subject:             RE: Steven Hobb Disciplinary Appeal - FMCS R43 Request, Case #1653654 ARBOK:A

-----Original Message-----
From: Robert Baumann [mailto:rbaumann@adamsferrone.com]
Sent: Friday, March 18, 2016 7:58 AM
To: Colin Tanner
Subject: RE: Steven Hobb Disciplinary Appeal - FMCS R43 Request, Case #1653654
ARBOK:A
Sensitivity: Confidential

Mr. Tanner,

At this point in time Mr. Hobb has decided to withdraw his appeal request.
I will follow up with a letter. Thank you for your time and effort.

Robert

-----Original Message-----
From: Colin Tanner [mailto:ctanner@awattorneys.com]
Sent: Tuesday, March 15, 2016 2:06 PM
To: rbaumann@adamsferrone.com
Cc: rclayton@ci.banning.ca.us; mrock@ci.banning.ca.us; vwood@adamsferrone.com;
'rchapparosa@ci.banning.ca.us'
<rchapparosa@ci.banning.ca.us>; Alex Diaz (adiaz@ci.banning.ca.us) <adiaz@ci.banning.ca.us
Subject: RE: Steven Hobb Disciplinary Appeal - FMCS R43 Request, Case
#1653654 ARBOK:A
Sensitivity: Confidential

Dear Mr. Baumann,

Our office has received your attached Notice of Appeal letter dated March 7,
2016 on behalf of Steven Hobb, which was timely submitted under the attached BPOA MOU
Discipline Appeals Procedure. The City has equally timely requested and received the attached
FMCS Arbitrator Panel. I have been assigned to represent the City in the administrative appeal
and respond to the FMCS Panel.

Pursuant to the terms of the BPOA MOU Discipline Appeals Procedure, the parties have within
fourteen (14) calendar days to attempt to agree on an arbitrator, presumably on the panel or
elsewhere. If the parties do not agree on an arbitrator, then the parties shall take turns striking the
names of arbitrators until only one remains, with your client striking the first name to commence
the strike process. Please advise whether you have any
arbitrator(s) to propose as being potentially mutually acceptable.
Otherwise, we will await notification of your first strike from the existing FMCS panel.

Feel free to contact me if you have any issues or related questions concerning this administrative
appeal process.

490

Sincerely,

Colin J. Tanner | Partner
Aleshire & Wynder, LLP | 18881 Von Karman Ave., Suite 1700, Irvine, CA 92612
Tel: (949) 223-1170 | Dir: (949) 250-5402 | Fax: (949) 223-1180 | ctanner@awattorneys.com | awattorneys.com This email and any files transmitted with it may contain privileged or otherwise confidential information.  If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via email and delete the email you received.

------Original Message------
From: rchapparosa@ci.banning.ca.us [mailto:rchapparosa@ci.banning.ca.us]
Sent: Tuesday, March 15, 2016 10:17 AM
To: Colin Tanner; rbaumann@adamsferrone.com
Cc: rclayton@ci.banning.ca.us; mrook@ci.banning.ca.us; vwood@adamsferrone.com
Subject: FW: FMCS R43 Request, Case #1653654 ARBOK:A

The FMCS sent the attached list of arbitrators as requested by Steve Hobb's represented attorney, Robert Baumann.

Please contact if you have any questions.

Thank you,

Rita Chapparosa
Deputy Human Resources Director
City of Banning
Email: rchapparosa@ci.banning.ca.us
Phone: 951-922-3147 Fax: 951-922-3157

**491**