Samantha M. Swanson, SBN 286954
sswanson@adamsferrone.com
**ADAMS FERRONE & FERRRONE APC**
4333 Park Terrace Drive, Suite 200
Westlake Village, California 91361
Telephone: (805) 373-5900
Facsimile:  (818) 874-1382

Attorneys for Plaintiff,
STEVE HOBB

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE HOBB,<br><br>              Plaintiff,<br><br>       vs.<br><br>CITY OF BANNING, a public agency and/or municipal corporation; BANNING POLICE DEPARTMENT, a public agency and/or municipal corporation; ALEX DIAZ, individually and as Police Chief; DON PETERSON, individually; and DOES 1 THROUGH 10,<br><br>              Defendants. | Case No.: 5:16-cv-01352 AB (JCx)<br><br>*Hon. André Birotte Jr.*<br><br>**PLAINTIFF'S INDEX OF EXHIBITS IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DECLARATION OF SAMANTHA M. SWANSON (VOLUME 1 OF 3 – EXHIBITS 1 THROUGH 2)**<br><br>*Filed Concurrently with:*<br>        *Plaintiff's Opposition to Defendants' Motion for Summary Judgment; Memorandum of Points and Authorities; Statement of Genuine Disputes of Material Fact by Opposing Party* |

1  TO THE HONORABLE COURT AND TO DEFENDANTS AND THEIR

2  COUNSEL OF RECORD:

3      Plaintiff Steve Hobb hereby submits the following Index of Evidence in

4  support of his Opposition to Defendants' Motion for Summary Judgment.

5  **<u>INDEX OF EVIDENCE</u>**

6  Excerpts from Deposition of Rita Chapparosa ................................................... Ex. 1

7  Excerpts from Deposition of Alejandro Diaz ..................................................... Ex. 2

8  Excerpts from Deposition of Steve Hobb Vol. I................................................ Ex. 3

9  Excerpts from Deposition of Steve Hobb Vol. II ............................................... Ex. 4

10  Exhibit 1 to Deposition of Alejandro Diaz ....................................................... Ex. 5

11  Exhibit 2 to Deposition of Alejandro Diaz ....................................................... Ex. 6

12  Exhibit 5 to Deposition of Alejandro Diaz ....................................................... Ex. 7

13  Exhibit 8 to Deposition of Alejandro Diaz ....................................................... Ex. 8

14  Exhibit 6 to Deposition of Steve Hobb Vol. I ................................................... Ex. 9

15  Exhibit 8 to Deposition of Steve Hobb Vol. I ................................................. Ex. 10

16  Exhibit 9 to Deposition of Steve Hobb Vol. I ................................................. Ex. 11

17  Exhibit 11 to Deposition of Steve Hobb Vol. II .............................................. Ex. 12

18  Exhibit 12 to Deposition of Steve Hobb Vol. II .............................................. Ex. 13

19  Exhibit 15 to Deposition of Steve Hobb Vol. II .............................................. Ex. 14

20  Exhibit 16 to Deposition of Steve Hobb Vol. II .............................................. Ex. 15

21  Exhibit 17 to Deposition of Steve Hobb Vol. II .............................................. Ex. 16

22  Declaration of Brandon Smith ........................................................................ Ex. 17

23

24

25

26

27

28

PLAINTIFF'S INDEX OF EXHIBITS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>DECLARATION OF MICHAEL A. MCGILL</u>

I, Samantha M. Swanson, declare as follows:

1.     I am an attorney at law with the law firm of Adams, Ferrone & Ferrone.  I am duly authorized to practice before this Court.  Our law firm represents the Plaintiff in this matter, and I have personally handled nearly all aspects of this case and am completely familiar with it.  If called to testify to the matters set forth below, I could and would do so competently.

2.     Attached hereto as Exhibit "1" are true and correct excerpts from the deposition of Rita Chapparosa.

3.     Attached hereto as Exhibit "2" are true and correct excerpts from the deposition of Alejandro Diaz.

4.     Attached hereto as Exhibit "3" are true and correct excerpts from the deposition of Steve Hobb Vol. I.

5.     Attached hereto as Exhibit "4" are true and correct excerpts from the deposition of Steve Hobb Vol. II.

6.     Attached hereto as Exhibit "5" is a true and correct copy of the Memorandum from Alex Diaz, Chief of Police, to Steven Hobb, Police Corporal, dated 2-4-16 produced by the Defendants in response to Plaintiff's request for production of documents in this matter.

7.     Attached hereto as Exhibit "6" is a true and correct copy of the Memorandum from Alex Diaz, Chief of Police, to Steven Hobb, Police Corporal, dated 3-4-16·produced by the Defendants in response to Plaintiff's request for production of documents in this matter.

8.     Attached hereto as Exhibit "7" is a true and correct copy of the Memorandum from Alex Diaz, Interim Chief of Police, to Steven Hobb, Police Corporal, dated 9-9-14 produced by the Defendants in response to Plaintiff's request for production of documents in this matter.

9.     Attached hereto as Exhibit "8" is a true and correct copy of the

Banning Police Department Officer Report of Performance Evaluation, 5-22-15·produced by the Defendants in response to Plaintiff's request for production of documents in this matter.

10. Attached hereto as Exhibit "9" is a true and correct copy of the two-page computer-generated letter addressed to Rita Chapparosa, signed by Steve Hobb and dated November 9, 2014 produced by the Defendants in response to Plaintiff's request for production of documents in this matter.

11. Attached hereto as Exhibit "10" is a true and correct copy of the Two-page computer-generated letter addressed to Alex, signed by Steve Hobb and dated July 17, 2015 produced by the Defendants in response to Plaintiff's request for production of documents in this matter.

12. Attached hereto as Exhibit "11" is a true and correct copy of the One-page letter generated on the letterhead of the City of Banning Police Department addressed to Corporal Steve Hobb, signed by Alex Diaz, and dated September 15, 2015 produced by the Defendants in response to Plaintiff's request for production of documents in this matter.

13. Attached hereto as Exhibit "12" is a true and correct copy of the 13-page document generated on Banning Police Department memorandum letterhead, from Chief Alex Diaz to Steven Hobb, dated February 4, 2016 the subject line is, "Notice of Proposed Disciplinary Action, Termination" produced by the Defendants in response to Plaintiff's request for production of documents in this matter.

14. Attached hereto as Exhibit "13" is a true and correct copy of the Six-page document written on Banning Police Department memorandum letterhead from Alex Diaz, Chief of Police, to Steven Hobb, police corporal, re, "Notice of Imposition of Disciplinary Action, termination"

15. Attached hereto as Exhibit "14" is a true and correct copy of Three-page document captioned, "Special Prosecutions Section Complaint Form"

DECLARATION OF MICHAEL A. MCGILL

produced by the Defendants in response to Plaintiff's request for production of documents in this matter.

16.     Attached hereto as Exhibit "15" is a true and correct copy of Two-page e-mail dated September 14, 2015,  re "Emergency POA Meeting" produced by the Defendants in response to Plaintiff's request for production of documents in this matter.

17.     Attached hereto as Exhibit "16" is a true and correct copy of One-page e-mail dated September 16, 2015,  re "Emergency POA Meeting" produced by the Defendants in response to Plaintiff's request for production of documents in this matter.

18.     Attached hereto as Exhibit "17" is a true and correct copy of the declaration of Brandon Smith.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 12, 2017              /s/ Samantha M. Swanson
                                      Samantha M. Swanson

DECLARATION OF MICHAEL A. MCGILL

# EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

STEVE HOBB,                          )   CASE NO.
                                     )   5:16-cv-01352 AB (JCx)
          Plaintiff,                 )
                                     )
vs.                                  )
                                     )
CITY OF BANNING, a public            )
agency and/or municipal              )
corporation; BANNING POLICE          )
DEPARTMENT, a public agency          )
and/or municipal corporation; )
ALEX DIAZ, individually and          )
as Police Chief; DON PETERSON,)
individually; and DOES 1             )
THROUGH 10,                          )
                                     )
                                     )
          Defendants.                )
_____)

DEPOSITION OF RITA CHAPPAROSA

Taken Thursday, July 20, 2017

At 9:57 A.M.

At 4333 Park Terrace Drive, Suite 200

Westlake Village, California

Reported by:  DONNA J. RUDOLPH, RPR, CA. CSR NO. 9652
NV. CCR NO. 420

```
1         Q     Do you know what position he held?

2         A     No.

3         Q     You also said one of your responsibilities is

4    to create personnel action forms.

5         A     Yes.

6         Q     What's a personnel action form?

7         A     Well, it could be a personnel action from

8    hiring -- from hiring an employee to change of status as

9    promotion, salary increases, you know, step increases,

10   working out of class increases, title changes, other

11   incentive pays.  Those are examples.

12        Q     Okay.  And you also said one of your

13   responsibilities is that you are included in

14   disciplinary action or create disciplinary actions that

15   come from the directors or their supervisors.  Can I

16   have you expand.

17        A     Yes.  I don't do those for -- I do it for

18   other employees or I create those for other departments

19   but not -- not police.

20        Q     Are you included in any part of the

21   disciplinary process for the police department?

22        A     No.  Just at the process of receiving

23   documents, reading documents, signing documents of

24   disciplinary actions after -- after the -- it's been

25   investigated and after it's been -- the -- the decision
```

```
 1   has come down the department -- the department head to

 2   discipline.

 3           That was a short period of time when we had no

 4   director or -- we had no directors for over HR because

 5   usually -- we have an administrative services director

 6   that oversaw human resources, but I was the designee

 7   because we lacked the position.  We lacked hiring in

 8   that position sometimes or there was an interim, you

 9   know, that stepped up from that position to a City

10   Manager interim.

11       Q    And when was it that there was no director

12   over HR?

13       A    Let's see here.  When we had the -- when we

14   had the interim Jim Smith and Dean Martin.

15       Q    And based off of your earlier answers, would

16   that be approximately in 2015?

17       A    Approximately '15.  And -- yes.  Because 2016,

18   Michael Rock, the City Manager, when he came at the end,

19   I think, of 2015, like December -- November, December

20   2015, he became City Manager and he hired an admin

21   services director right -- right after he was hired.  He

22   decided to take over human resources at that time.  And

23   that's when he negotiated with police and -- and then

24   designated himself or the admin director to make -- make

25   decisions or so forth.
```

1              What did you mean by "outside your chain of

2    command"?

3         A    Well, the policy on the police manual says

4    that there's a protocol, as I recall.  There's a

5    protocol who you should file your complaint with.  And

6    he did go to the chief of police to file his complaint.

7         Q    So police department employees do not file

8    complaints with you?  Is that what you're saying?

9         A    Well, his complaint initially went to -- in

10   this particular case, in regards to this harassment,

11   there is a policy -- in the police manual, there's a

12   protocol, as I recall.  And I can't recall exactly the

13   wording on it, but I do know that their protocol goes to

14   the -- I think it goes to the chief, as I recall.

15             And with that -- let's see.  This is 2015.

16   Yes.  And with that, he filed this complaint -- let me

17   read it.  So I said:

18             "You were apparently not satisfied with that

19   result, and you filed your complaint with me outside

20   your chain of command."

21             Yes, I had written the document and with

22   assistance of counsel.  I can't go into detail because

23   he assisted me with the -- the final draft.

24        Q    Now, I just want to clarify.  So it is your

25   understanding that for the police department that they

1    do not file complaints with you and that if they do,

2    that is -- hold on.  Let me make it not compound.

3              So it's your understanding that the police

4    department does not file complaints with the human

5    resources.  Is that true?

6         A    Well, they're open -- you know, I -- well,

7    wait a minute.  Let me go -- there's a -- as I

8    mentioned, there's a protocol, process for them to file

9    complaints of this type of form if there's harassment --

10   sexual harassment.  And I do know, as I recall, it being

11   that it does go to the chief, which he did go to the

12   chief of police, filed it, apparently was not satisfied,

13   and ended up coming to HR, which he went through the

14   process already for him to go further than that and be

15   dissatisfied.

16             I went ahead and took the complaint and

17   followed through.  So --

18        Q    So to follow the chain of command with the

19   harassment complaint, according to your understanding

20   with the police department is they file it with the

21   chief of police?

22        A    Yes.  Or the -- I think the City Manager if

23   someone above that.

24        Q    And --

25             THE WITNESS:  Excuse me.  Can I stop?  Because

```
1        A     Okay.

2        Q     You're saying the -- according to your

3   understanding, the policy for the police department is

4   if they have a claim of harassment, they go to the chief

5   or the City Manager, not you, but if they come to you,

6   you'll take the complaint; is that correct?

7        A     Yes.

8        Q     And if they come to you, that is outside of

9   the chain of command; is that correct?

10       A     I'm -- as I recall in the police manual.  But

11  I have to --

12             MR. YIM:  Let me just interpose an

13  objection --

14             THE WITNESS:  Go ahead.

15             MR. YIM:  -- that to the extent it calls for a

16  legal conclusion or interpretation of what the City

17  personnel or the police manual provides, I think it

18  calls for a legal conclusion.

19             But with that noted, you can respond to the

20  best of your knowledge.

21             THE WITNESS:  Yeah.  To the best of my

22  knowledge.

23             MS. SWANSON:  Would you like me to have the

24  court reporter read the question back?

25             THE WITNESS:  Yes.
```

```
 1    Avila) would like to file a complaint against Steve

 2    Hobb."  It continues at the bottom where it says

 3    "e-mail" in bold.  Then on the next page, it ends in --

 4    the last sentence is "Can someone send this to Fisher?

 5    His e-mail was not in the POA contact list"; correct?

 6         A    Yes.

 7         Q    What is this document?

 8              MR. YIM:  Let me just object again for the

 9    record and clarification.  I want to state for the

10    record that Vincent Avila, he is a police officer and

11    his confidentiality's protected under 832.7 of the Penal

12    Code.  Other than what's expressly provided in this

13    document, which I know is essentially a public record at

14    this point, anything going beyond what is referenced in

15    this document concerning Avila that refers to his

16    personnel record or information contained therein would

17    be not relevant or subject to disclosure as for purposes

18    of this deposition.  I just want to make that clear.

19              MS. SWANSON:  What he's saying is he's

20    limiting you to this; correct?

21              MR. YIM:  Correct.

22    BY MS. SWANSON:

23         Q    So you recognize this document?

24         A    Yes.

25         Q    What is this document?
```

1        A    A complaint from Sergeant Vincent Avila

2    regarding Steve Hobb.

3        Q    Do you know when you received this complaint?

4        A    Yes.

5        Q    When did you receive it?

6        A    I don't recall.

7        Q    If I could direct your attention, see if this

8    refreshes your recollection --

9        A    Uh-huh.

10       Q    You know what?  That actually doesn't really

11   help you with the date.  It helps you with an

12   approximation.  If I said you received it on

13   September 15, 2015, would that help refresh your

14   recollection?

15       A    I -- I don't know.  I don't know exactly when

16   I received it.  I recall receiving both documents,

17   though.

18       Q    Did you -- what did you do with this complaint

19   that Sergeant --

20       A    Avila.

21       Q    Avila?

22       A    Vincent Avila, uh-huh.

23       Q    -- gave to you?

24       A    This was handled -- as I recall, he gave a

25   copy to me, but it was handled through the police

```
 1    department.  It was handled through the police
 2    department.
 3         Q    Okay.
 4         A    That's it.
 5         Q    After you received this complaint, did you
 6    give this complaint to Chief Diaz?
 7         A    Chief Diaz had the complaint already.  As I
 8    recall, he had the complaint already.
 9         Q    Okay.  And so -- so it's your understanding
10    Chief Diaz had this complaint prior to your receipt of
11    this complaint?
12         A    As I recall.  I -- the police department
13    handled the complaint.  I think it was part of an IA.
14         Q    If I represent to you that it was, would that
15    help?  Or would you like me to print out a document?
16         A    That it was part of an IA?
17         Q    (Counsel nods head.)
18         A    Are you going to ask me questions more related
19    to that?
20         Q    (Counsel shakes head.)
21              No.
22         A    No.  No.
23         Q    Okay.  Did you ever speak with Chief Diaz
24    regarding this complaint?
25         A    Yes.  I had to because I wanted to find out if
```

```
 1      UNITED STATES DISTRICT COURT            )
 2                                              ) ss
        FOR THE CENTRAL DISTRICT OF CALIFORNIA  )
 3              I, DONNA J. RUDOLPH, RPR, CSR No. 9652, Certified
 4      Shorthand Reporter, certify:
 5              That the foregoing proceedings were taken before
 6      me at the time and place therein set forth, at which time
 7      the witness was put under oath by me;
 8              That the testimony of the witness, the questions
 9      propounded, and all objections and statement made at the
10      time of the examination were recorded stenographically by me
11      and were thereafter transcribed;
12              That a review of the transcript by the deponent
13      was requested;
14              That the foregoing is a true and correct
15      transcript of my shorthand notes so taken.
16              I further certify that I am not a relative or
17      employee of any attorney of the parties, nor financially
18      interested in the action.
19              I declare under penalty of perjury under the laws
20      of California that the foregoing is true and correct.
21              Dated this 2nd day of August, 2017.
22      _____
        DONNA J. RUDOLPH, RPR
23      CA CSR NO. 9652, NV CCR NO. 420
24
25
```

# EXHIBIT 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


STEVE HOBB,                      )   CASE NO.
                                 )   5:16-cv-01352 AB (JCx)
        Plaintiff,               )
                                 )
vs.                              )
                                 )
CITY OF BANNING, a public        )
agency and/or municipal          )
corporation; BANNING POLICE      )
DEPARTMENT, a public agency      )
and/or municipal corporation; )
ALEX DIAZ, individually and      )
as Police Chief; DON PETERSON,)
individually; and DOES 1         )
THROUGH 10,                      )
                                 )
                                 )
        Defendants.              )
_____)

DEPOSITION OF ALEJANDRO DIAZ

Taken Thursday, July 20, 2017

At 1:03 P.M.

At 4333 Park Terrace Drive, Suite 200

Westlake Village, California


Reported by:  DONNA J. RUDOLPH, RPR, CA. CSR NO. 9652
NV. CCR NO. 420

```
 1   supervisor?

 2        A     I believe when he was a sergeant and a

 3   corporal.

 4        Q     Can you explain the duties of a sergeant.

 5        A     Can you be a little bit more specific?

 6   Because it's kind of global and it's --

 7        Q     Yeah, of course.  When you said that you were

 8   aware that Mr. Hobb was a sergeant at one point in time,

 9   do you know what duties and responsibilities he

10   undertook in whatever assignment he was in?

11        A     Patrol.  So the basic duties of a patrol

12   sergeant, they are the watch commander.  And that's

13   the -- the name given to the sergeant.  They supervise a

14   patrol team consisting of anywhere from three to four

15   officers.  And their job is protection of city

16   boundaries, to provide mutual aid to other agencies if

17   necessary, to write evaluations for -- for officers'

18   yearly evaluations, discipline if need be, and then to

19   be the point of contact for citizens on behest -- at the

20   behest of administration.

21        Q     Okay.  And when Mr. Hobb was a corporal, do

22   you know what assignment he was working?

23        A     He was working the watch commander position.

24        Q     And what are the responsibilities for a

25   corporal watch commander?
```

1      A    The same.  The only difference was that the

2   corporal was not allowed to -- I believe it was not

3   allowed to allow people to go on extended vacations.

4   That had to be bumped up to an actual sergeant.

5      Q    But it was the same duties and

6   responsibilities as a sergeant watch commander?

7      A    Correct.  They -- they still manage a team,

8   they still, you know, write evaluations, they still

9   discipline personnel if need be, and they're still a

10  point of contact for citizens on a daily basis.

11     Q    Okay.  Do you know if Mr. Hobb was working as

12  a watch commander when he was terminated?

13     A    I believe so.  I believe he was the cap- --

14  corporal for team one.

15     Q    Is Mr. Hobb still a police officer with the

16  City of Banning?

17     A    No.

18     Q    Was he terminated from his employment?

19     A    Yes, he was.

20     Q    And when was he terminated?

21     A    Late 2015.

22     Q    Who made -- who proposed the termination?

23     A    I did.

24     Q    What were the reasons that you decided to

25  propose the termination?

```
 1        A     The same.  The only difference was that the

 2   corporal was not allowed to -- I believe it was not

 3   allowed to allow people to go on extended vacations.

 4   That had to be bumped up to an actual sergeant.

 5        Q     But it was the same duties and

 6   responsibilities as a sergeant watch commander?

 7        A     Correct.  They -- they still manage a team,

 8   they still, you know, write evaluations, they still

 9   discipline personnel if need be, and they're still a

10   point of contact for citizens on a daily basis.

11        Q     Okay.  Do you know if Mr. Hobb was working as

12   a watch commander when he was terminated?

13        A     I believe so.  I believe he was the cap- --

14   corporal for team one.

15        Q     Is Mr. Hobb still a police officer with the

16   City of Banning?

17        A     No.

18        Q     Was he terminated from his employment?

19        A     Yes, he was.

20        Q     And when was he terminated?

21        A     Late 2015.

22        Q     Who made -- who proposed the termination?

23        A     I did.

24        Q     What were the reasons that you decided to

25   propose the termination?
```

```
 1    disciplinary action that you considered when coming up

 2    with your proposal of termination?

 3         A    It was just based on this and previous

 4    knowledge of other discipline -- discipline that's

 5    contained within.

 6         Q    Just to make sure, we are talking about --

 7    actually, first of all, it says on the first page IA

 8    1504, 1506, 1508, 1509; correct?

 9         A    Correct.

10         Q    And do you recall what IA 1506 is?

11         A    I couldn't tell you off the top of my head.

12         Q    If you would like to look -- or is the

13    inclusion of 1506 a mistake?  And you can look on

14    pages 2 and 3.

15         A    (Examining.)

16         Q    Or throughout the rest of the document, if you

17    would like to.

18         A    (Examining.)

19              I don't see 1506.

20         Q    Could its inclusion have been a mistake, that

21    one typo?

22         A    I'm not sure.  I'd have to see what 1506 is.

23              MS. SWANSON:  Could I -- let me hand you the

24    notice of imposition of discipline.  I'm going to mark

25    this as Exhibit 2.
```

```
 1              MR. YIM:  I just want to also just note that

 2    the document speaks for itself.

 3    BY MS. SWANSON:

 4         Q    So you were stating that he was making rude

 5    comments and mannerisms; correct?

 6         A    Correct.

 7         Q    Is he alleged to have done anything else?

 8         A    Yeah.  According to the document, the

 9    investigation, discourteous, unprofessional towards the

10    SART team.  Made them feel uncomfortable during the

11    visit and made them feel uncomfortable working with the

12    department.

13         Q    Would that have been due to the rude comments

14    and mannerisms, if you're aware?

15         A    It had to be related to that.

16         Q    Are you aware if Mr. Hobb took any other

17    action that led to an allegation for this charge one?

18         A    No.

19         Q    Discourteous to a citizen taken by itself, is

20    that sufficient to warrant termination of an officer?

21         A    Not by itself.

22         Q    And this document identifies on the next page,

23    page 4, charge two.  Do you recall what charge two is

24    regarding?

25         A    That is regarding an issue with a sergeant
```

```
1    that was assigned to work the concerts at the park ended

2    up having to take the dog to the holding facility at

3    Beaumont.

4         Q    Do you know why the original officer did not

5    take the dog to the city of Beaumont?

6         A    Eventually, I received a call from Corporal

7    Hobb.  And at that point, just to not to have to deal

8    with the issue, I told the sergeant have someone else

9    take the dog.

10        Q    What is Corporal -- Mr. Hobb alleged to

11   have -- which policies is he alleged to have violated?

12        A    Chain of command.

13        Q    And how did he allegedly violate chain of

14   command?

15        A    Well, he contacted me directly instead of

16   following the chain of command, which would have been

17   the lieutenant/now captain at that point.

18        Q    And who was the lieutenant/now captain?

19        A    Phil Holder.

20        Q    So your understanding is the officer was not

21   taking the dog to the city of Beaumont, so they summoned

22   the watch commander, which would have been Corporal

23   Hobb --

24        A    Uh-huh.  Yes.

25        Q    -- and when Corporal Hobb arrived, he called
```

```
 1   person to go to their immediate supervisor and tell them

 2   I'm being harassed by you.  We've had personnel, not

 3   only patrol personnel but also City personnel, that

 4   choose to go to HR to report that type of -- of

 5   violation.  So it's not uncommon for it to happen.

 6       Q    And that would not be breaking chain of

 7   command to go to HR; correct?

 8       A    No.

 9       Q    Okay.  That was a nice tangent.  I'll bring us

10   back here, and I do apologize for -- I'm trying to make

11   it very efficient for you.

12           You said that Corporal Hobb, by contacting

13   you, was breaking the chain of command because he did

14   not contact Lieutenant Holder?

15       A    Correct.

16       Q    Do you know if Lieutenant Holder was on duty

17   that day?

18       A    No, he was -- well, hold on.  The concerts at

19   the park was after hours.  So I'm making the assumption

20   the captain -- I'm sorry, the lieutenant then was not in

21   the City.

22       Q    During that night at the concert in the park,

23   were you present for the concert in the park?

24       A    I was there for about an hour.

25       Q    And was the concert in the park, did it occur
```

```
 1    within the city of Banning?

 2         A    Yes.

 3         Q    Are you aware if Sergeant Fisher was assigned

 4    to work the concert in the park or if he was voluntarily

 5    doing overtime?

 6         A    That he was voluntarily doing overtime.

 7         Q    When Sergeant Fisher was working overtime at

 8    concert in the park, was he the supervisor of that

 9    shift?

10         A    He was the supervisor for himself and the

11    officers that were assigned to work the park.

12         Q    When Sergeant Fisher was working at concert in

13    the park doing overtime, was he still the acting

14    supervisor for that on-duty shift?

15         A    For the regular patrol team?

16         Q    Uh-huh.

17         A    No.  That would have been Corporal Hobb.

18         Q    And I just violated my own rule.  I said the

19    word "uh-huh."  By that I meant "yes," just to clarify

20    for the record.

21              I'm sorry.  Can I have you repeat your answer.

22         A    You -- I believe you asked if Sergeant Fisher

23    was the supervisor for the patrol team?

24         Q    Yes.

25         A    No.  That was Corporal Hobb.
```

```
 1        Q    Do you know if any other lieutenant was on
 2   duty the day of the concert in the park?
 3        A    No.
 4        Q    Do you know -- are you aware if any other
 5   lieutenants were within the city limits of Banning on
 6   the day of the concert in the park?
 7        A    No.  Let me answer that with a little bit
 8   more.
 9        Q    Okay.
10        A    There's a chief of police and lieutenant at
11   that time.  We were both out of the city.
12        Q    During the night at the concert in the park,
13   did you run into Corporal Hobb?
14        A    Yes, I did.
15        Q    And when I say "run into," let me clarify for
16   you.  Did you have a physical interaction with him that
17   night?
18        A    Yes.  He sat --
19        Q    Where you saw him in person?
20        A    Yeah.  He sat next to me.
21        Q    When was that?  Like, when in the night did
22   that occur?
23        A    Right before the actual concert began as
24   people were arriving.
25        Q    Do you know around what time the incident with
```

```
 1    the dog occurred?

 2         A    Without checking documents in my phone, I -- I

 3    was heading home.

 4         Q    So that night Corporal Hobb was the watch

 5    commander, which meant that he was the supervisor for

 6    the patrol --

 7         A    Patrol.

 8         Q    -- team; correct?

 9              Are you aware if any other sergeants were on

10    duty?

11         A    Other than himself and Sergeant Fisher?  That

12    was pretty much it.

13         Q    Okay.  And the allegation is when Mr. Hobb got

14    into a dispute with Sergeant Fisher, he broke the chain

15    of command by contacting you; correct?

16         A    Yes.

17         Q    When Corporal Hobb called you, did you inform

18    him he was breaking the chain of command?

19         A    No, I didn't.

20         Q    Do you recall how you responded to Corporal

21    Hobb?

22         A    I asked him if he had contacted the

23    lieutenant.

24         Q    And what did Corporal Hobb inform you?

25         A    He -- I believe he said, no, that because I
```

```
 1    was there, he contacted me directly.

 2        Q     When a corporal is having a disagreement

 3    with -- strike that.

 4              Could -- is it policy for Corporal Hobb to --

 5    strike all of that.

 6              Is it practice when there's a disagreement as

 7    to how to handle an incident for a corporal to contact

 8    an off-duty lieutenant?

 9              MS. SWANSON:  Objection.  Incomplete

10    hypothetical.

11              Do you understand the question?

12              THE WITNESS:  I understand the question.

13              It's not -- it's not very common.  As a matter

14    of fact, I could even say that it doesn't happen.

15    Because although Sergeant Fisher was not in charge of

16    patrol and was assigned to the concert series, he still

17    held the rank of supervisor.

18    BY MS. SWANSON:

19        Q     And Sergeant Fisher, to your knowledge, was he

20    the highest-ranking official that was on duty that

21    night?

22        A     Yes, he was.

23        Q     And part of charge two is that Corporal Hobb

24    should have contacted off-duty lieutenant -- or then

25    Lieutenant/now Captain Holder regarding the
```

```
 1    dispute; correct?

 2         A    Correct.

 3         Q    Following the concert in the park, did

 4    Mr. Hobb speak to you about any issues he had with his

 5    sergeant?

 6         A    No, he didn't speak to me.

 7         Q    Are you aware if Mr. Hobb spoke to the

 8    lieutenant the next day regarding the incident at the

 9    park?

10         A    No, he did not speak to him.

11         Q    Do you know if Mr. Hobb filed a complaint

12    regarding the incident in the park?

13         A    Yes.

14         Q    And how did he file the complaint?

15         A    He sent me, I believe, an e-mail or a text.  I

16    can't recall which.

17         Q    And the e-mail or the text that he sent you,

18    is that different than him contacting you the night

19    before about the incident?

20         A    I believe the e-mail or text, whatever I

21    received from him, came to me a few hours after the

22    phone call.

23         Q    And was he making a complaint against the

24    sergeant.

25         A    Yes, he was.
```

```
 1    nothing but internal affairs investigations.

 2         Q    And what company is that?

 3         A    RSC [sic] Investigations.

 4         Q    And how long does it take -- once it's been

 5    determined that a case is going to be an internal

 6    affairs investigation, how long does it take to pull a

 7    case number?

 8         A    We do that immediately.

 9         Q    So if a complaint came in regarding another

10    officer, it would immediately be assigned an internal

11    affairs investigation number and then would go to the

12    outside investigator?

13         A    Yes.

14         Q    Okay.

15         A    So the information would go to the lieutenant,

16    then the lieutenant -- you know, it was going to depend

17    on the lieutenant.  If the lieutenant's available, then

18    he's the one that pulls the number, enters the

19    information into the file.

20         Q    Is this a process that can take a few weeks at

21    a time to pull a number?

22         A    No.  No.  It just depends on -- on the

23    availability of -- of the lieutenant.

24         Q    So what would you estimate the time frame

25    would be between figuring out that it's going to be an
```

1   IA and pulling the number?

2       A    It's just going to depend on what day of the

3   week the complaint was filed.  If it was on the weekend,

4   then obviously it's going to take a few days.  My

5   lieutenant/now captain works Tuesday through Friday.

6   So, you know, if a case comes in on Friday, then

7   obviously it's going to take a few more days for him to

8   come in.  I give him the information.  He pulls the

9   number, and then the information gets forwarded to the

10  investigator for follow-up.

11      Q    Now, you used the word "a few days."  Is that

12  -- are you saying roughly within a week the number will

13  be pulled?

14      A    Like I said, it depends on just what day of

15  the week the -- the incident occurred.  If it happens on

16  a Tuesday when the lieutenant's there and I provide him

17  the information or -- or, you know, he receives the blue

18  card, then obviously that -- that can take anywhere from

19  a couple hours to maybe a couple of days depending on --

20  on his schedule.

21      Q    If you're going to pull a number -- and I'm

22  going to get off of this really quickly -- would it

23  take -- would it be normal practice for it to take about

24  a month to pull an internal affairs investigation

25  number?

 1        A      It could be.  It could very well be.

 2        Q      According to Exhibit 1, what is the -- what is

 3   charge three that led to the proposal of termination

 4   against Mr. Hobb?

 5        A      Charge three is engaging in conduct unbecoming

 6   of -- of an officer.

 7        Q      And what are the facts and circumstances

 8   surrounding that?

 9        A      I believe that Steve Hobb was trying to

10   disseminate some information on another officer,

11   specifically Sergeant Vince Avila, on discipline

12   matters.  And I believe that he wanted to disseminate or

13   disseminated that information during a POA meeting.

14        Q      Who informed you that Mr. Hobb was trying to

15   disseminate this information?

16        A      I found out when the complaint was filed.

17        Q      Who filed the complaint?

18        A      I believe it was Sergeant Avila himself.

19        Q      Did Sergeant Avila -- Avila -- Avila

20   (pronouncing), did he file it -- did he file the

21   complaint with you?

22        A      No.

23        Q      Who'd he file the complaint with?

24        A      I believe he went to human resources.

25        Q      And do you know who -- do you know who in

```
 1    incident in the park; correct?

 2         A    Yes.

 3         Q    Do you know when Sergeant Fisher filed a

 4    complaint -- did Sergeant Fisher file a complaint

 5    against Mr. Hobb regarding the August 20th, 2015,

 6    incident?

 7         A    Yes, he did.

 8         Q    Do you know when Sergeant Fisher filed a

 9    complaint?

10         A    May have been a couple of days after

11    Sergeant Hobb -- Corporal Hobb filed this.

12         Q    Do you know if Sergeant Fisher filed his

13    complaint before September 15th, 2015?

14         A    I -- I wouldn't know off the top of my head.

15         MR. YIM:   Sorry to break you up right now.  I

16    know we've been going about an hour and 15 minutes.  Can

17    we take a short break?

18         MS. SWANSON:   Of course.

19         (Brief recess.)

20    BY MS. SWANSON:

21         Q    And just to follow up with charge three, is

22    charge three by itself enough to warrant termination?

23         A    Not by itself.

24         Q    When did you -- did you place Corporal Hobb on

25    administrative leave?
```

1        Q    Of course.

2        A    Yes, it is.

3        Q    When you placed Mr. Hobb on administrative

4    leave, can you explain what administrative leave is?

5        A    That is when an officer is -- is pretty much

6    sent home on paid leave pending an investigation or a

7    series of investigations.

8        Q    Are you -- are you aware if being placed on

9    administrative leave removes an officer from being part

10   of the Police Officers Association?

11       A    I -- I did some research and I found out that,

12   you know, the officer can attend POA meetings as long as

13   it's after -- after their -- their hours.

14       Q    So being placed on administrative leave does

15   not remove an officer from the Police Officers

16   Association; correct?

17       A    No, it doesn't.

18       Q    And you said you did research and a police

19   officer is allowed to still attend meetings even though

20   they're on administrative leave; correct?

21       A    Oh, absolutely, yes.

22       Q    Following placing Mr. Hobb on administrative

23   leave, did you inform POA members that Mr. Hobb could

24   not attend the POA meeting held at the station?

25       A    Yes, I did.

July 20, 2017

```
 1              MS. SWANSON:  I'm going to pass you some more
 2    documents.  I'm going to mark this as Exhibit 5.
 3              (Exhibit 5 marked.)
 4    BY MS. SWANSON:
 5         Q    It is three pages of text messages.
 6         A    Yes.
 7         Q    Do you recognize the text message on page 1 of
 8    Exhibit 5?
 9         A    I'd have to look at it, if you don't mind.
10              (Examining.)
11              Yes, I do.
12         Q    Did you send the top text message to a POA
13    member?
14         A    It was a response from an inquiry from them.
15    So, yes, I did send this.
16         Q    Are you the phone number that's listed at the
17    top of the page?
18         A    Correct.  That's my work phone number.
19         Q    And you sent this to a POA member.  Was this
20    regarding Mr. Hobb?
21         A    Yes.
22         Q    And you were stating that he could not come to
23    the station for the POA meeting; correct?
24         A    Yes.
25         Q    Okay.  Do you know if Mr. Hobb ended up
```

1        A    Yes.

2        Q    Where it says "Assignment, patrol watch

3    commander," is that referring to the supervisor or

4    Mr. Hobb?

5        A    No, that -- that would be referring to Hobb.

6        Q    And if you go up to "Position job title" on

7    the first box --

8        A    Yes.

9        Q    -- it states that Mr. Hobb's position at the

10    time was the watch commander/corporal; correct?

11        A    Yes.

12        Q    And that the date that he achieved that rank

13    was May 12th, 2014; correct?  If you look to the box to

14    the right.

15        A    The -- the corporal rank?

16        Q    Yes, the watch commander corporal.

17        A    Well, no.  The - just the corporal.  Watch

18    commander is not an actual rank.  It is just a -- a

19    specific name that is used only during supervision of

20    patrol officers.  So it's actually not a rank that will

21    gain you extra pay or anything like.

22        Q    And for it to say position job title for

23    Mr. Hobb being watch commander corporal, does that mean

24    during the period of time of this evaluation, he was the

25    watch commander?

```
 1        A    Yes.

 2        Q    Okay.  And the rating period for this is

 3   May 13th of 2014 to May 12th, 2015; correct?

 4        A    Yes.

 5        Q    And this, like you said, it just evaluates how

 6   the employee is performing within the

 7   department; correct?

 8        A    Yes.

 9        Q    What are the two options for the performance

10   evaluations for an officer to meet?

11        A    Meets standards or does not meet standards.

12        Q    So there -- it's not like a grade?  Because

13   some of them have average, below average, exceeds.

14        A    Unfortunately, the way this was implemented,

15   it was not good because when the officer needs room for

16   improvement, it doesn't give you the capability of being

17   able to, you know, document it further.

18        Q    If we can look at page 2 of document

19   eight -- or of Exhibit 8, underneath -- in the first

20   box, let's say just for example, "Self-initiated

21   activity"; correct?

22        A    Correct.

23        Q    There's a box labeled "Comments"; correct?

24        A    Yes.

25        Q    And in there, one of his supervisors added in
```

```
 1        Q     Did you meet -- do you recall meeting with

 2    Mr. Hobb on April 16th, 2015?

 3        A     Not the specific date, but if there's a record

 4    of it, I guess I did.

 5        Q     Do you recall if Mr. Hobb ever had a meeting

 6    with you where he discussed Sergeant Fisher's promotion?

 7        A     Yes.

 8              MR. YIM:  Just to clarify, are you talking

 9    about the same meeting that you're representing?

10              MS. SWANSON:  A different meeting.

11              MR. YIM:  Okay.

12              MS. SWANSON:  One prior to the one with

13    Brandon Smith.

14              THE WITNESS:  I recall a meeting after the

15    meeting with Brandon Smith.

16    BY MS. SWANSON:

17        Q     And in the meeting without Officer Smith, did

18    you speak with Mr. Hobb regarding Interim City Manager

19    Smith?

20        A     No, I didn't.

21        Q     Did you tell -- did you tell Mr. Hobb that

22    interim City Manager Smith was telling you to promote

23    Sergeant Fisher?

24        A     No, I did not tell him that.

25        Q     Did you tell Mr. Hobb that -- excuse me.  Did
```

```
 1   you ever tell Mr. Hobb that Sergeant Smith was friends

 2   with city council member Don Peterson?

 3       A     Sergeant Smith?

 4       Q     If -- that Sergeant Fisher was friends with

 5   city council member Peterson.

 6       A     Oh, no, I didn't tell him.  Everyone knew

 7   that.

 8       Q     Did you ever speak with city council member

 9   Peterson regarding which officer should be promoted?

10       A     Absolutely not.  That's not his prerogative.

11   It's mine as chief of police.

12       Q     Did you ever enter into a deal with interim

13   City Manager Smith that you would promote

14   Sergeant Fisher in exchange for money for new personnel,

15   new cars, and money for a radio?

16       A     No, I did not.

17       Q     During the meeting with Brandon Smith, did

18   they -- did a discussion about a deal with interim City

19   Manager Smith come up again?

20       A     Oh, I'm sorry.  The Smith -- the last name is

21   confusing me.  It was brought up by them.

22       Q     And do you recall what the conversation was?

23       A     Not -- not really.  I don't -- I know that

24   they brought up this quid pro quo that supposedly

25   happened, but there really wasn't any information to
```

1         A      His not being promoted and the promotion of

2    people that he felt were not adequate for the positions.

3    That was pretty much it.

4         Q      Did Steve ever mention any other issues he had

5    with the department while you were chief, or was it just

6    the promotions and him not being promoted and others

7    being promoted?

8         A      I believe one of the topics that we also

9    discussed was the SWAT team, trying to bring the SWAT

10   team back.

11        Q      And was Mr. Hobb for bringing the SWAT team

12   back?

13        A      Yes, he was.

14        Q      What else did -- what other issues would

15   Mr. Hobb bring up to you after you became chief to help

16   make the department run better?

17        A      Scheduling.  I know that he was looking at

18   trying to change our schedule, our work hours.  We

19   currently work from 4:00 A.M. to 4:00 P.M., 4:00 P.M. to

20   4:00 A.M.  And he wanted to see if there could be a

21   change and we could do a trial period of maybe coming in

22   a little bit later, which entails a little bit of -- of

23   a dilemma, but, you know, it can be done.  And we

24   actually tried it for a while, and it didn't work.

25        Q      Did Mr. Hobb bring up any other issues?

```
 1   some really decent deep discussions.  And he did it on

 2   paper.  But when we sat down to speak, you know, he

 3   brought up what he thought were issues and -- and we

 4   discussed them.  And, you know, we -- we never ended our

 5   meetings on a negative note.

 6        Q    So from 2014 to 2016, you don't -- is it your

 7   belief that Steve was undermining your authority as --

 8   as chief of police of Banning?

 9        A    I don't know.  I mean, I can honestly tell you

10   I don't know.  I wasn't privy to the conversations that

11   were happening amongst the ranks at the bottom.  I was

12   busy trying to ride a ship that was out of control.  And

13   my focus was that, how do we get this ship back on

14   course and try to get everyone on board.

15             And I hate the stupid analogy of the ship, but

16   that was the reality.  You know, we had plenty of

17   anchors.  And my goal was to reel those anchors in so we

18   could keep moving forward.  I wasn't focused on -- on

19   whether he was trying to undermine me or not.  I was

20   focused on -- not back here.  I was focused on -- on the

21   future and giving those people opportunities, continue

22   giving opportunities and -- and save careers if at all

23   possible.

24        Q    Could I have you go back to Exhibit 1,

25   page 10, the second-to-last paragraph.  There is a
```

 1   sentence that states "You neglect the chain of command,

 2   call my authority into question, undermine my authority

 3   and that of your superiors, and finally, have so little

 4   regard for departmental procedure and that you

 5   improperly access departmental files solely for personal

 6   use and misguided effort to embarrassment a super" --

 7   "superior officer, this department, and your chief."

 8          You stated that he undermined your authority.

 9   How did he undermine your authority?

10      A    Well, he did specifically with the issue of

11   dealing with -- with the officer with the recording.

12   Towards the end, there were -- there were a lot of

13   issues that were occurring specific to -- to the -- the

14   issue with -- with Mr. Avila.

15          Instruction was given to him that, you know,

16   you can't do that.  Be careful with dealing -- when

17   dealing with personnel matters, not by me but by -- by

18   attorneys for the POA.

19          And still, you know, he disregarded the

20   direction that was given to him.  And -- and he -- yet

21   he continued and went out and disseminated information

22   that was privy and that was private and, you know, that

23   pretty much embarrassed the supervisor.

24      Q    So him -- when you say he undermined your

25   authority, that is in reference to him disseminating the

```
 1    information regarding Sergeant Avila and the written

 2    reprimand, the September 14th e-mail?

 3         A    Yes.

 4         Q    And when you say that he called your

 5    authority -- or "my authority," which I'm going to -- so

 6    your authority into question, that's when he

 7    disseminated the information regarding Sergeant Avila,

 8    the written reprimand in the September 14th e-mail?

 9         A    Yes.  But you asked a specific question.  Let

10    me -- we were talking specifically about the meetings

11    that he and I had.  So my answer to you was that when we

12    were having those meetings, there was no undermining of

13    authority.  There's none.  They were productive

14    meetings.  However, what was happening above and beyond

15    those meetings is -- is where this comes into play.

16         Q    And aside from the meetings, it's him writing

17    that e-mail containing the information regarding

18    Sergeant Avila and the written reprimand, that is what

19    was calling your authority into question?

20         A    Absolutely.  And some of the other stuff that

21    is documented that was occurring at that time also.  But

22    I just wanted to clarify that the positive things were

23    happening in the meeting and there was a good exchange

24    of information.

25         Q    And you state that sentence that I read to you
```

```
 1
      UNITED STATES DISTRICT COURT            )
 2                                            ) ss
      FOR THE CENTRAL DISTRICT OF CALIFORNIA  )
 3            I, DONNA J. RUDOLPH, RPR, CSR No. 9652, Certified

 4    Shorthand Reporter, certify:

 5            That the foregoing proceedings were taken before

 6    me at the time and place therein set forth, at which time

 7    the witness was put under oath by me;

 8            That the testimony of the witness, the questions

 9    propounded, and all objections and statement made at the

10    time of the examination were recorded stenographically by me

11    and were thereafter transcribed;

12            That a review of the transcript by the deponent

13    was requested;

14            That the foregoing is a true and correct

15    transcript of my shorthand notes so taken.

16            I further certify that I am not a relative or

17    employee of any attorney of the parties, nor financially

18    interested in the action.

19            I declare under penalty of perjury under the laws

20    of California that the foregoing is true and correct.

21            Dated this 2nd day of August, 2017.

22    _____
      DONNA J. RUDOLPH, RPR
23    CA CSR NO. 9652, NV CCR NO. 420

24

25
```